## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF NEW JERSEY; STATE OF RHODE ISLAND; STATE OF CALIFORNIA; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF COLORADO; STATE OF CONNECTICUT; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in her official capacity as Attorney General of the United States; OFFICE OF JUSTICE PROGRAMS; MAUREEN HENNEBERG, in her official capacity as Acting Assistant Attorney General for the Office of Justice Programs; OFFICE FOR VICTIMS OF CRIME; KATHERINE DARKE SCHMITT, in her official capacity as Acting Director of the Office for Victims of Crime, <br><br> *Defendants*. | No. 1:25-cv-_____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    More than 40 years ago, Congress enacted the Victims of Crime Act (VOCA) to address the criminal justice system's neglect of crime victims—which had become, in the words of a Presidential Task Force, a "national disgrace." VOCA created a series of grant programs to

1

enable States to provide critical resources and services to victims and survivors of crime as they sought to recover and restore normalcy: victim and witness advocacy services; emergency shelter; sexual assault forensic exams; medical, funeral, and burial expenses; compensation for lost wages; and much more. These funding streams—totaling more than a billion dollars for this year alone—have long aided States in fulfilling their fundamental duty to protect public safety and assist victims of crime. Between 2021 and 2024, States have used federal VOCA funds to assist, on average, more than 8.5 million crime victims per year and to pay more than 200,000 claims per year for losses suffered by crime victims.

2.      In enacting these grant programs, Congress's focus was crystal clear: the funds must be used to help victims. Indeed, Congress mandated the distribution of nearly all VOCA funds to States based on fixed statutory formulas. Yet the Office for Victims of Crime (OVC), an agency housed within the U.S. Department of Justice (USDOJ) that is charged with administering VOCA grants, has now declared that States will be unable to access VOCA funds unless they accede to the Executive Branch's immigration enforcement priorities. This new policy would impose unprecedented conditions on the use of VOCA funds, requiring States to assist the U.S. Department of Homeland Security (DHS) in unrelated immigration enforcement efforts.

3.      Defendants' brazen attempt to manipulate critical funding for crime victims to strong-arm States into supporting the Administration's immigration policies runs headlong into two basic principles of American governance: separation of powers and federalism. A federal agency has "no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). That is particularly so when it comes to federal funding, where Congress retains the power of the purse, and thus establishes the criteria USDOJ must use when awarding its grants. And because the imposition of these immigration-related

2

conditions would dramatically upset the federal-state balance—forcing the States to change their policies to gain access to vast sums of federal victims' services dollars—there must be a "clear statement" in the statute showing that Congress intended to impose them. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). But nothing in VOCA or any other statute authorizes USDOJ to impose immigration-related funding conditions on grant programs intended to support the victims of crime. Because USDOJ lacks the statutory authority to impose these conditions, they are unlawful.

4.      Nor is that the sole legal defect. For one, even if USDOJ somehow enjoyed the authority to condition funds for victims of crime on unrelated immigration objectives, the imposition of these conditions would be arbitrary and capricious, as USDOJ (1) failed to grapple with the States' reliance on these congressionally approved grants and the harms the States will suffer if they are required to abandon their law enforcement policies or are forced to scale back services for crime victims, (2) imposed conditions based on immigration policy concerns that Congress plainly did not intend the agency to consider in deciding how to administer the program, and (3) failed to consider how these conditions would undermine rather than support VOCA's goal of assisting crime victims. Further, given the coercive nature of the challenged conditions, their ambiguity, and lack of relatedness to the underlying grant programs at issue, they run afoul of the Spending Clause as well.

5.      Action by this Court is urgently needed. Defendants' imposition of new conditions forces Plaintiff States either to abandon critical funds to support crime victims or relinquish their sovereign rights to decide how to use state and local resources. Many Plaintiff States have long concluded that public safety is best protected by focusing their limited law enforcement resources on core public safety missions and ensuring that victims and witnesses to a crime will not hesitate to come forward due to their immigration status. Other Plaintiff States have chosen to permit their

political subdivisions or law enforcement agencies to exercise their own discretion in determining whether law enforcement resources are best spent assisting the federal government in immigration matters. Still other Plaintiff States must comply with state court rulings that restrict their cooperation with federal immigration enforcement. *See, e.g.*, *Lunn v. Commonwealth*, 78 N.E. 3d 1143 (Mass. 2017). The challenged conditions would force these States into an untenable position: either forfeit access to critical resources for vulnerable crime victims and their families, or accept unlawful conditions, allowing the federal government to conscript state and local officials to enforce federal immigration law and destroying trust between law enforcement and immigrant communities that is critical to preventing and responding to crime. To prevent the extraordinary and irreparable harms that will arise from OVC's new policy of imposing these unlawful conditions, this Court should swiftly enjoin their implementation and enforcement and set aside the challenged conditions.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. The Court has authority to grant declaratory, injunctive, and other relief pursuant 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in her official capacity. The State of Rhode Island is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Rhode Island.

## PARTIES

I.    **Plaintiffs**

8.      Plaintiff the State of New Jersey, represented by and through its Attorney General, Matthew J. Platkin, is a sovereign State in the United States of America. As the State's chief legal

officer, the Attorney General is authorized to act on behalf of the State in this matter. The Attorney General is also head of the New Jersey Department of Law and Public Safety, which is the agency responsible for applying for, obtaining, and disbursing funds pursuant to the federal grant programs that are the subject of this litigation. *See* N.J. Stat. Ann. § 52:17B-2.

9.      Plaintiff the State of Rhode Island, represented by and through its Attorney General, Peter F. Neronha, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

10.      Plaintiff the State of California, represented by and through its Attorney General, Rob Bonta, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

11.      Plaintiff the State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign State in the United States of America. This action is brought on behalf of the State by Attorney General Jennings as the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State pursuant to statutory authority. Del. Code Ann. tit. 29, § 2504.

12.      Plaintiff the State of Illinois, represented by and through its Attorney General, Kwame Raoul, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

13.      Plaintiff the State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

14.     Plaintiff the State of Connecticut is a sovereign State in the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Connecticut General Statutes § 3-125 to act on behalf of the State.

15.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

16.     Plaintiff State of Hawaiʻi is a sovereign State in the United States of America. Hawaiʻi is represented by Attorney General Anne E. Lopez, Hawaiʻi's chief legal officer and chief law enforcement officer, who is authorized by Hawaiʻi Revised Statutes § 28-1 to pursue this action.

17.     Plaintiff the State of Maine is a sovereign State in the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

18.     Plaintiff the State of Maryland is a sovereign State in the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief law officer of Maryland.

19.     Plaintiff the Commonwealth of Massachusetts is a sovereign State in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

20.     Plaintiff the State of Michigan is a sovereign State in the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

21.     Plaintiff the State of Minnesota is a sovereign State in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

22.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State in the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

23.     Plaintiff the State of New Mexico is a sovereign State in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico.

24.     Plaintiff the State of New York, represented by and through its Attorney General, Letitia James, is a sovereign State in the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

25.    Plaintiff the State of Oregon, represented by and through its Attorney General Dan Rayfield, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

26.    Plaintiff the State of Vermont is a sovereign State in the United States of America. Vermont is represented by Attorney General Charity Clark, who is the chief law enforcement officer and is authorized by law to initiate litigation on behalf of the State.

27.    Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign State in the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern under Wash. Rev. Code ch. 43.10.

28.    Plaintiff the State of Wisconsin is a sovereign State in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

## II.    Defendants

29.    Defendant United States Department of Justice is an agency and the executive department of the United States government that has responsibility for administering grant programs authorized by VOCA.

30.    Defendant Pamela J. Bondi is the United States Attorney General and the federal official in charge of USDOJ. The Attorney General is sued in her official capacity.

31.    Defendant Office of Justice Programs (OJP) is the largest grantmaking component of USDOJ. OJP oversees the work of the Office for Victims of Crime.

32.    Defendant Maureen Henneberg (Acting AAG) is the Deputy Assistant Attorney General for Operations and Management within USDOJ currently in charge of OJP in an acting capacity. The Acting AAG is sued in her official capacity.

33.    Defendant Office for Victims of Crime (OVC) is a Program Office within USDOJ with responsibility for administering the grant programs authorized by VOCA.

34.    Defendant Katherine Darke Schmitt (Acting OVC Director) is the Acting Director within USDOJ in charge of OVC. The Acting OVC Director is sued in her official capacity.

## ALLEGATIONS

**I.    Congress Has Long Authorized Grants To States Under The Victims Of Crime Act To Support Crime Victims, Survivors, And Their Families.**

35.    Federal grants administered by USDOJ have long been instrumental in supporting state programs that provide compensation and assistance to victims of crime.

36.    In December 1982, President Ronald Reagan's Task Force on Victims of Crime issued a report concluding that "[t]he neglect of crime victims is a national disgrace." Among the report's key recommendations was to "enact legislation to provide federal funding to assist state crime victim compensation programs" and "provide federal funding, reasonably matched by local revenues, to assist in the operation of federal, state, local, and private nonprofit victim/witness assistance agencies that make comprehensive assistance available to all victims of crime."

37.    Congress answered the call two years later, passing VOCA, which created the Crime Victims Fund within the U.S. Treasury and established OVC as an office within USDOJ. Congress structured VOCA "with minimal bureaucratic 'strings attached,' for direct compensation and service programs to assist victims of crime" in order to support inadequately funded state and local victim assistance programs. S. Rep. No. 497, 98th Cong., 2d Sess. at 1, 3 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3607, 3607, 1984 WL 37447. "Unlike some past compensation bills,"

9

VOCA is "intended to keep conditions on Federal Aid to a bare minimum." *Id.* at 9. The U.S. Attorney General at the time emphasized that the new grants would not "creat[e] an unnecessary bureaucracy to impose the Federal government's priorities on the States .... [T]he Federal government will provide money to the States to enable the States to effectively run their own programs." 130 Cong. Rec. S5252, 5352 (Mar. 13, 1984) (statement of Attorney General William French Smith).

38.     Over the years, Congress has amended VOCA to "allow a greater measure of flexibility to ... State and local victims' assistance programs" and provide "greater certainty" that VOCA funding "will not wax and wane with events .... [Grant recipients] need to be able to plan and hire and have a sense of stability if these measures are to achieve their fullest potential." S. Rep. No. 179, 104th Cong., 1st Sess. at 29 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 941, 1995 WL 731704.

39.     VOCA directs that the U.S. government shall deposit into the Crime Victims Fund various penalties and fees recovered from individuals convicted of federal offenses.

40.     VOCA further directs that the federal government shall draw on the Crime Victims Fund to issue annual grants to States for victim compensation and assistance. 34 U.S.C. §§ 20101-20111.

41.     Since VOCA's enactment, VOCA funds have been instrumental in providing critical support to millions of victims and survivors (and their families) of serious crime in all States and territories. *See, e.g.*, Office for Victims of Crime, *VOCA Victim Compensation Data Dashboard: Data Analyses for Fiscal Years 2021-2024*, https://tinyurl.com/3xt53tpd; Office for Victims of Crime, *VOCA Victim Assistance Data Dashboard: Data Analyses for Fiscal Years 2021-2024*, https://tinyurl.com/mr28xvfp. For example, in Federal Fiscal Year (FY) 2024 alone, VOCA

grants enabled assistance to more than 2.8 million crime victims in Plaintiff States and payment for more than 88,000 claims for losses suffered by crime victims in Plaintiff States. *Id.*

42.     As available amounts in the Crime Victims Fund have fluctuated over the years, Congress has taken action to make additional funds available, including by amendments to VOCA through the 2001 USA PATRIOT ACT, Pub. L. 107-56, and the VOCA Fix to Sustain the Crime Victims Fund Act of 2021, Pub. L. 117-27. In January 2002, Congress also appropriated $68.1 million for the Crime Victims Fund to assist in providing relief to 9/11 victims. Emergency Supplemental Appropriations for Recovery from and Response to Terrorist Attacks on the United States Act, Pub. L. 107-117.

### A.     VOCA Formula Grants

43.     Congress has directed OVC to administer two formula grant programs pursuant to VOCA that support crime victim compensation and assistance: Victim Compensation Formula Grants and Victim Assistance Formula Grants.

44.     The Victim Compensation and Victim Assistance grants are formula grants, not competitive grants, which means each State is entitled to a specific amount of funding based on the applicable statutory formula. The relevant statutory formulas are detailed below.

45.     For FY 2025, over $178 million from the Crime Victims Fund is to be awarded to States under the Victim Compensation Formula Grant, and over $1.2 billion is to be awarded to States under the Victim Assistance Formula Grant. Based on the applicable statutory formulas, OVC has calculated that Plaintiff States are collectively entitled to approximately $81 million of the Victim Compensation Formula Grant funds and approximately $594 million of the Victim Assistance Formula Grant funds.

46.    Because each VOCA formula grant typically remains open for four years, and is subject to further extension, an award in one fiscal year can allow States to continue to support program activities in at least the three years thereafter.

### 1.    Victim Compensation Formula Grants

47.    Victim Compensation Formula Grants provide funding from the U.S. Treasury's Crime Victims Fund to all qualifying state-run crime victim compensation programs. 34 U.S.C. § 20102.

48.    The purpose of these grants is to provide compensation to eligible crime victims for costs resulting from crime, including for medical care, lost wages, mental health counseling, funeral expenses, and crime scene clean-up. The grants are designed to supplement state and territory efforts to provide financial compensation to crime victims. Ex. 1 at 8.

49.    VOCA provides that the OVC Director "shall make an annual grant" to eligible victim compensation programs based on a fixed statutory formula. 34 U.S.C. § 20102(a).

50.    VOCA delineates a precise set of requirements that a state victim compensation program must satisfy to be eligible for a grant, requiring, for example, that States pay for certain victim expenses, treat federal and state crimes and residents and non-residents the same, and do not deny compensation based on a victim's familial relationship with an offender. *Id.* § 20102(b)(1)-(9). The recipient State must also certify that grant funds will "not be used to supplant State funds otherwise available to provide crime victim compensation." *See id.* § 20102(b)(3). None of the statutory eligibility or certification requirements relates to immigration enforcement.

51.    Victim Compensation Formula Grants are distributed among eligible state programs based on a statutory formula that accounts for the amount of money each state crime victim compensation program distributed to victims in the preceding fiscal year. Specifically, the

OVC "Director shall make an annual grant from the Fund to an eligible crime victim compensation program of 75 percent of the amounts awarded" by the state compensation program "during the preceding fiscal year, other than amounts awarded for property damage." *Id.* § 20102(a)(1).

52.     The statute recognizes only one exception to this statutory formula. If the Crime Victims Fund is "insufficient" to provide 75 percent of the amount distributed by each State in the preceding fiscal year, "the [OVC] Director shall make, from the sums available, a grant to each eligible crime victim compensation program so that all such programs receive the same percentage of the amounts awarded by such program during the preceding fiscal year, other than amounts awarded for property damage." *Id.* § 20102(a)(2).

53.     The statutory formula makes no reference to federal immigration policy. And Plaintiffs are unaware of OVC ever having previously conditioned Victim Compensation funding on States assisting with federal immigration enforcement efforts.

54.     States have used Victim Compensation Formula Grant funds to compensate victims and survivors of crime for various injuries and losses that they have suffered as a result of the crime.

55.     For example, in FY 2024, New Jersey used Victim Compensation grant funds, along with associated state funds, to provide over $21.8 million in compensation to over 5,500 claimants, including victims and survivors of domestic violence, sexual assault, homicide, child abuse, and human trafficking. These payments covered funeral and burial costs, relocation expenses, crime scene cleanup, loss of support, attorney fees, and other necessary expenses.

56.     In FY 2024, California's Victim Compensation Board (CalVCB) received $23.2 million in VOCA Compensation Program awards, and CalVCB reimbursed 24,639 applications from victims and survivors of assault, homicide, child abuse, and other crimes for funeral, medical,

mental health, relocation, and other costs incurred because of crime. The vast majority of CalVCB's budget is spent providing direct compensation to victims whose financial losses are not covered by insurance or other sources. CalVCB plans to use VOCA Compensation Program funds in FY 2025 for these same purposes.

57.    Rhode Island received a VOCA Compensation Program award of $290,000 in FY 2024, and the State has likewise used this funding to, for example, help victims and survivors pay for out-of-pocket medical expenses, funeral and burial costs, relocation expenses, mental health counseling fees, and crime scene clean-up costs.

58.    Between FY 2022 and 2024, Delaware received a total of $2,050,000 in VOCA Victim Compensation funding. These funds supported state compensation programs that provided financial assistance to victims of crime for crime-related expenses such as medical care, lost wages, mental health counseling, and other costs.

59.    Other Plaintiff States have likewise used Victim Compensation grants, along with associated state funds, to provide compensation to victims and their families for crime-related expenses. These federal funds have enabled Plaintiff States to pay for a wide range of victim and survivor services in the immediate aftermath of a crime (for example, the timely use of rape kits), and to help them heal from the lasting impacts of crime (for example, counseling for child witnesses to violent crime). These funds are also used to foster trust-based participation in the criminal justice system for victims, witnesses, and their families, by facilitating, for example, safe and secure transportation to and from court hearings.

60.    OVC allocated Victim Compensation Formula Grant funds to Plaintiff States from FY 2021 to FY 2024 in the following amounts as shown in Table 1 below:

| **Plaintiff** | **FY 2021** | **FY 2022** | **FY2023** | **FY2024** |
|---|---|---|---|---|
| California | $36,000,000 | $32,389,000 | $25,746,000 | $23,206,000 |
| Colorado | $7,546,000 | $6,770,000 | $5,841,000 | $7,510,000 |
| Connecticut | $1,269,000 | $755,000 | $844,000 | $1,076,000 |
| Delaware | $1,219,000 | $495,000 | $721,000 | $834,000 |
| D.C. | $1,131,000 | $1,045,000 | $2,668,000 | $3,122,000 |
| Hawaiʻi | $257,000 | $192,000 | $262,000 | $318,000 |
| Illinois | $1,615,000 | $860,000 | $3,405,000 | $7,549,000 |
| Maine | $443,000 | $416,000 | $363,000 | $404,000 |
| Maryland | $1,617,000 | $1,257,000 | $1,081,000 | $1,369,000 |
| Massachusetts | $1,558,000 | $1,669,000 | $2,019,000 | $1,452,000 |
| Michigan | $1,815,000 | $1,201,000 | $1,316,000 | $2,680,000 |
| Minnesota | $1,363,000 | $1,759,000 | $2,545,000 | $2,106,000 |
| Nevada | $1,119,000 | $2,349,000 | $1,030,000 | $2,362,000 |
| New Jersey | $3,252,000 | $6,103,000 | $9,522,000 | $9,996,000 |
| New Mexico | $937,000 | $1,003,000 | $1,176,000 | $1,221,000 |
| New York | $11,842,000 | $9,588,000 | $10,880,000 | $6,789,000 |
| Oregon | $2,457,000 | $2,253,000 | $1,981,000 | $3,062,000 |
| Rhode Island | $502,000 | $231,000 | $642,000 | $290,000 |
| Vermont | $369,000 | $257,000 | $168,000 | $268,000 |
| Washington | $9,769,000 | $10,877,000 | $7,951,000 | $4,354,000 |
| Wisconsin | $2,481,000 | $2,424,000 | $2,524,000 | $3,008,000 |
| **Totals** | $88,561,000 | $83,893,000 | $82,685,000 | $82,976,000 |

61.    Plaintiff States have applied for and obtained Victim Compensation Formula Grant funds for decades.

62.    Final applications for Victim Compensation Formula Grants for FY 2025 are due on August 20, 2025. Plaintiff States intend to apply, and some have already submitted applications,

for these grant funds. Plaintiff States do not agree to comply with the Immigration Enforcement Conditions set forth in the NOFO for these funds.

### 2.    Victim Assistance Formula Grants

63.    Victim Assistance Formula Grants provide funding to each State to provide financial support for eligible crime victim assistance programs. 34 U.S.C. § 20103(a)(1).

64.    The purpose of Victim Assistance Formula Grants is to improve the treatment of victims of crime by providing them with the assistance, support, and services necessary to aid their restoration and healing after a criminal act. Ex. 2 at 8. These grants are intended to enable States to provide subgrants to local community-based organizations and public agencies that provide services directly to crime victims, including but not limited to victim and witness advocacy services; crisis counseling; telephone and onsite information and referrals; criminal justice support and advocacy; emergency shelter; therapy; and consistent communication about significant events in their case. *Id.* These services are to be administered without regard to a victim's immigration status. *See, e.g.*, 28 C.F.R. § 94.103(a).

65.    VOCA provides that the OVC Director "shall make an annual grant" to the chief executive of each State to provide financial support to eligible victim assistance programs. 34 U.S.C. § 20103(a). Each State subgrants such funds out to community-based organizations and public agencies that provide services directly to crime victims. *Id.* § 20103(b)-(c).

66.    Congress has specified the criteria for determining the eligibility of a victim assistance program to receive Victim Assistance grant funds. *Id.* § 20103(b). A program is eligible under these statutory criteria if, among other things, it is run by a public agency or nonprofit organization, has a demonstrated record of providing effective services to crime victims, assists victims in seeking compensation benefits, and does not discriminate against victims because they

16

disagree with how a case is prosecuted. *Id*. Congress has also specified which certifications are required of a State's chief executive, including that "funds awarded to eligible crime victim assistance programs will not be used to supplant State and local funds otherwise available for crime victim assistance." *Id.* § 20103(a)(2). None of the eligibility criteria or required certifications specified in the statute relate to immigration enforcement.

67.    Victim Assistance Formula Grants are distributed among the States based on a fixed statutory formula. Under that formula, each State is entitled to a base amount of $500,000 and an additional share of the remaining available money in the Crime Victims Fund based on "each State's population in relation to the population of all States." *Id.* § 20103(a)(3).

68.    The statutory formula makes no reference to civil immigration policy. And Plaintiffs are unaware of OVC ever having previously conditioned Victim Assistance funding on States assisting with federal immigration enforcement efforts.

69.    States use Victim Assistance Formula Grants to fund a wide range of activities that provide support to victims who are navigating the criminal justice system and addressing the trauma and disruption suffered as a result of their victimization.

70.    For example, in FY 2024, New Jersey subgranted VOCA victim assistance funds and associated state funds to dozens of subrecipients that provide victim services across the State. Over $33 million in funds were subgranted to public agencies, including: county prosecutors' offices, to help guide victims and witnesses through criminal and civil processes, and for Sexual Assault Response Teams and Forensic Nurse Examiner programs to assist victims of sexual assault; the Division of Criminal Justice, to support a statewide automatic notification service for victims when individuals convicted of sex crimes are released from custody; and the Department of Corrections, to support domestic violence survivors. Another $61 million in funds were

subgranted to victim support organizations to support a wide array of services for victims and survivors, including trauma recovery centers, clinical counseling, medical and behavioral health assessments, and legal representation. With those funds, over 34,000 calls were fielded by crisis hotlines, and over 9,400 individuals were assisted with shelter and supportive housing. Collectively, Victim Assistance funds and associated state funds were used to support approximately 433,000 victims in New Jersey in FY 2024.

71.     In Illinois, the Illinois Criminal Justice Information Authority (ICJIA) applied in FY 2024 for a VOCA Assistance Program award and received $28,385,202. ICJIA subgrants VOCA funds to over 60 subgrantees, three of which are lead entity programs that pass-through funds to 124 recipients. VOCA Assistance Program funds support a range of programming, including: services to domestic violence victims, including crisis response, legal advocacy, shelter, counseling, and case management through a statewide network of service providers; services to victims of sexual assault, including support for over 30 rape crisis centers in Illinois that provide 24/7 advocacy, medical accompaniment, counseling, support groups, and prevention education; and services to victims of child abuse, including forensic interviews, medical exams, counseling, and family advocacy to child victims of abuse, working closely with law enforcement and DCFS. These services include programs in schools and communities that work to prevent sexual violence before it happens; transitional housing services that provide safe, supportive housing for victims of domestic violence, trafficking, or other violent crimes; and trauma recovery centers that provide crime victims with mental health care, substance abuse support, and intensive case management, particularly for those who do not traditionally seek help.

72.     Rhode Island received $2,935,210 in VOCA Assistance Program funds in FY 2024. These funds, which have been distributed to over two-dozen subgrantees throughout the State,

support wrap-around services such as counseling, housing, job training, life skills training, financial education, advocacy, resource referrals, case management, language services, and other support for victims of violent crimes and their families. Those services include support for human trafficking and domestic violence victims, advocacy and support for child sexual assault investigations, a domestic violence and sexual assault victim hotline, court advocates to accompany victims through the criminal justice process, clinics for uninsured victims as well as those seeking to preserve their anonymity, shelters for domestic violence victims and their families, advocacy services for the deaf and the elderly,  and other support for community-based advocacy groups. The State also used VOCA Assistance Program funds to establish a multiagency platform to provide victims and their advocates information on offender compliance and release, as well as to allow victims to submit impact statements for parole hearings. In FY 2024 alone, over 40,000 individuals received services paid for by VOCA Assistance Program funds.

73.     California uses VOCA Victim Assistance funds to support various victim assistance efforts through 35 programs, including subgrants to Victim Witness Assistance Centers at district attorney's offices in each of California's 58 counties, to provide comprehensive services to victims and witnesses of all types of violent crime; subgrants through the Domestic Violence Assistance Program to 98 non-government organizations throughout the state to provide comprehensive support, including emergency shelter, food, and clothing to victims of domestic violence and their children, a 24-hour crisis hotline, and local assistance to domestic violence service providers.

74.     Other Plaintiff States have also used Victim Assistance funds for services such as information and referral, advocacy and accompaniment, support and safety, shelter and housing, and assistance with navigating the justice system. And they have used the funds for organizations that include child advocacy centers, rape crisis centers, sexual assault nurse examiner programs,

domestic violence shelters and services providers, human trafficking service providers, legal services for victims, elder abuse resources, trauma recovery centers, and more.

75.    OVC allocated Victim Assistance Formula Grant funds to Plaintiff States from FY 2021 to FY 2024 in the following amounts as shown in Table 2 below:

| **Plaintiff** | **FY 2021** | **FY 2022** | **FY2023** | **FY2024** |
|---|---|---|---|---|
| California | $120,361,953 | $165,115,554 | $153,789,867 | $87,080,017 |
| Colorado | $18,182,462 | $24,883,530 | $23,436,628 | $13,559,953 |
| Connecticut | $11,329,832 | $15,626,659 | $14,742,118 | $8,537,306 |
| Delaware | $3,504,486 | $4,709,524 | $4,499,806 | $2,792,843 |
| D.C. | $2,670,274 | $3,311,079 | $3,138,542 | $2,008,665 |
| Hawaiʻi | $4,783,838 | $6,547,786 | $6,156,448 | $3,688,853 |
| Illinois | $38,824,602 | $53,660,957 | $49,916,616 | $28,385,202 |
| Maine | $4,610,705 | $6,257,025 | $5,940,998 | $3,601,271 |
| Maryland | $18,937,787 | $26,364,732 | $24,712,038 | $14,232,420 |
| Massachusetts | $21,488,509 | $29,803,197 | $27,992,083 | $16,056,993 |
| Michigan | $30,844,655 | $42,666,439 | $39,909,525 | $22,802,629 |
| Minnesota | $17,724,617 | $24,444,368 | $22,954,552 | $13,249,553 |
| Nevada | $10,054,895 | $13,690,070 | $12,980,873 | $7,597,406 |
| New Jersey | $27,543,696 | $39,378,641 | $36,875,827 | $21,144,096 |
| New Mexico | $6,913,001 | $9,376,796 | $8,800,274 | $5,198,098 |
| New York | $59,373,683 | $83,718,142 | $77,783,082 | $43,986,920 |
| Oregon | $13,413,897 | $18,314,009 | $17,153,369 | $9,906,452 |
| Rhode Island | $3,718,574 | $5,096,442 | $4,795,700 | $2,935,210 |
| Vermont | $2,397,872 | $3,208,377 | $3,041,379 | $1,938,654 |
| Washington | $23,924,343 | $32,996,334 | $31,079,099 | $17,860,091 |
| Wisconsin | $18,258,383 | $25,235,262 | $23,643,268 | $13,634,045 |
| **Totals** | $458,862,064 | $634,404,923 | $593,342,092 | $340,196,677 |

76.    Plaintiff States have applied for and obtained Victim Assistance Formula Grant Funds for decades.

77.    Final applications for Victim Assistance Formula Grants for FY 2025 are due on August 20, 2025. Plaintiff States intend to apply, and some have already submitted applications, for these grant funds. Plaintiff States do not agree to comply with the Immigration Enforcement Conditions set forth in the NOFO for these funds.

### B.    VOCA Competitive Grants

78.    OVC also administers certain competitive grant programs authorized by VOCA, including: Services for Victims of Crime; Emergency and Transitional Pet Shelter and Housing Assistance for Victims of Domestic Violence Program; Technology to Support Services for Victims of Crime; Services for Victims of Technology-Facilitated Abuse; Sexual Assault Nurse Examiner Program Development and Operation Guide; National Crime Victim Crisis Hotlines; and Increasing Availability of Medical Forensic Examinations for Victims of Sexual Assault.

79.    Awards under these programs support a range of initiatives designed to expand and strengthen services for crime victims, including funding specialized assistance for children, elders, and victims of technology-facilitated abuse; providing housing assistance for victims; expanding victims' access to specialized medical forensic professionals and examinations; and development of statewide technology programs to improve the quality and reach of victim services. Collectively, they enhance the quality and accessibility of services for victims of crime nationwide.

80.    VOCA's competitive grants are generally governed by 34 U.S.C. § 20103(c), which specifies the purpose of competitive grants. VOCA provides that the OVC Director "shall make grants" for "victim services, demonstration projects, program evaluation, compliance efforts, and training and technical assistance services to eligible crime victim assistance programs" and "for

the financial support of services to victims of Federal crime by eligible crime victim assistance programs." *Id.* § 20103(c)(1)(A)-(B). The OVC Director "shall … use funds made available" for these grants "pursuant to rules or guidelines that generally establish a publicly-announced, competitive process." *Id.* § 20103(c)(3)(E). The statutory purposes of VOCA competitive grant funds do not relate in any way to immigration enforcement.

81.    Congress has also specified certain criteria for creating and awarding these competitive grant funds under VOCA. The only relevant restriction that Congress has placed on the use of these funds is that not more than 50 percent of available funds shall be used for support of victims of Federal crime. *See id.* § 20103(c)(2)(A)-(B). Plaintiffs are unaware of OVC ever having previously conditioned VOCA competitive grants on States assisting with federal immigration enforcement efforts.

82.    Several Plaintiff States (including Colorado, Massachusetts, Michigan, New Jersey, Rhode Island, and Wisconsin) intend to apply for various VOCA competitive grants in FY 2025.

83.    For example, Rhode Island intends to apply for a VOCA Technology Grant award for continued improvements to the state's VOICE (Victims Outreach Integrated Community Environment) System, a secure portal that provides real-time access to cases, offender status, and other information to crime victims, advocates, and state agencies. And Wisconsin's Department of Justice intends to apply for a Services for Victims of Crime Grant award to work with the University of Wisconsin – Green Bay to fund a project to enhance victim-centered services to older adults who have experienced elder abuse, fraud, or exploitation. The project's goal and expected outcome is to unify and coordinate state and local resources, both private and public, to increase capacity and coordination for victim identification and victim services, provide increased

education, and support system reforms to reduce elder financial abuse and exploitation, a large and rapidly growing problem in Wisconsin.

## II.    Plaintiffs' Law Enforcement Policies

84.    Plaintiff States are responsible for maintaining the day-to-day safety of all residents of their communities. Plaintiff States enact statutes and establish policies to effectively enforce state and local laws, keep public order, and provide public safety services. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

85.    Many Plaintiff States and their political subdivisions have long enacted laws or policies designed to ensure that state and local law enforcement can focus on fulfilling their core mission of public safety and criminal enforcement, including when working with witnesses and victims from local immigrant communities.

86.    Evidence and experience teach that undocumented immigrants and their families are less willing to engage with law enforcement, even if they have been victims or witnesses to a crime, if their engagement with law enforcement could risk deportation. *See, e.g.,* N.J. Att'y Gen. Directive 2018-6 (N.J. Directive) at 1 (recognizing that the fear of engaging with state and local law enforcement "makes it more difficult for officers to solve crimes and bring suspects to justice"); Cal. Gov't Code § 7284.2 (finding that "immigrant community members fear approaching police" and "[e]ntangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of accountability between local, state, and federal governments"); N.Y. Exec. Order No. 170, Sep. 15, 2017 (recognizing that "the reporting of unlawful activity by immigrant witnesses and victims is critical

to strengthening ties between immigrants and law enforcement, reducing crime, and enhancing the State's ability to protect all residents."); Wash. Rev. Code § 43.10.315 (recognizing that restricting participation in federal immigration enforcement "ensure[s] state and law enforcement agencies are able to foster the community trust necessary to maintain public safety").

87.    Those concerns have been substantiated, time and again, by law enforcement agencies and independent studies. *See Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 363 n.5 (D.N.J. 2020) (noting "a number of studies that confirm that immigration-related fears prevent individuals from reporting crimes"), *aff'd sub nom.*, *Ocean Cnty. Bd. of Commissioners v. Att'y Gen. of State of New Jersey*, 8 F.4th 176 (3d Cir. 2021); Rafaela Rodrigues et al., *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* at 72-73, National Immigrant Women's Advocacy Project (May 3, 2018), *available at* http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf. The current Administration's policies and practices make these concerns even more acute, by making individuals in periods of authorized stay amenable to removal and criminalizing conduct related to immigration status.

88.    In light of these concerns, several Plaintiff States and local governments have adopted policies to ensure that an immigrant can come forward to state and local law enforcement agencies when, *inter alia*, they have been victims or witnesses to a crime, without fear that this will lead to their deportation. *See, e.g.*, N.J. Att'y Gen. Directive 2018-6; 5 Ill. Comp. Stat. § 805/1 to /20; Cal. Gov. Code §§ 7282.5, 7284.6; Wash. Rev. Code Ann. § 10.93.160; Colo. Rev. Stat. § 24-76.6-102 to -103; Conn. Gen. Stat. Ann. § 54-192h; D.C. Code § 24-211.07; Or. Rev. Stat. § 181A.820; Vt. Stat. Ann. tit. 20, § 4651; N.Y. Exec. Orders 170 and 170.1. Although these various policies are by no means identical, they seek to promote effective state and local law enforcement

by ensuring a clear distinction between the roles of state and local officers who enforce state criminal law and federal immigration officers who enforce federal civil immigration law.

89.    As relevant, New Jersey's Immigrant Trust Directive restricts state and local law enforcement officers from voluntarily assisting in the civil enforcement of federal immigration law. For example, it restricts state and local law enforcement officers from participating in civil immigration raids, from providing federal civil immigration officials with access to state or local law enforcement facilities, and from giving notice to officials of certain low-level detainees' upcoming release dates from state custody. Issued by the New Jersey Attorney General, the State's chief law enforcement officer, the Directive carries the force of law and is binding on all New Jersey law enforcement agencies. It is designed to help communities draw a clear distinction between state and local officers who enforce state criminal law, and federal immigration officers who enforce federal civil immigration law. *See* N.J. Directive at 3-4.

90.    Similarly, Illinois has codified its commitment to building trust between immigrant communities and state and local law enforcement officers in the TRUST Act, which was enacted in 2017 by the Illinois General Assembly and signed into law by Bruce Rauner, then the Republican Governor of Illinois. The TRUST Act provides that law enforcement agencies and officers in Illinois may not detain a person solely on the basis of an "immigration detainer" or a civil immigration warrant, 5 Ill. Comp. Stat. § 805/15(a), and generally prohibits detaining people solely on the basis of citizenship or immigration status, *id.* § 805/15(b). The statute also prohibits state and local law enforcement officials from assisting federal immigration agents in any enforcement operations, *id.* § 805/15(h)(1); providing access to detained individuals to immigration agents, *id.* § 805/15(h)(2); and giving immigration agents non-public information about the release dates of detained individuals, *id.* § 805/15(h)(7).

91.     Likewise, in 2017, California enacted Senate Bill 54, known as the California Values Act, Cal. Gov't Code §§ 7284-7284.12, to "foster trust between California's immigrant community and state and local agencies;" to "ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California"; and "to direct the state's limited resources to matters of greatest concern to state and local governments." *Id.* § 7284.2. In furtherance of those objectives, the Values Act sets the parameters under which California law enforcement agencies may assist in immigration enforcement. For example, the Values Act: (a) prohibits compliance with detainer hold requests, *id.* § 7284.6(a)(1)(B); (b) defines when California law enforcement agencies may comply with requests by immigration authorities seeking the release date and time of a person in advance of the person's release, *i.e.*, notification requests, *id.* §§ 7282.5(a), 7284.6(a)(1)(C); (c) defines when California law enforcement agencies may transfer an individual to immigration authorities—including when authorized by a judicial warrant or judicial probable cause determination, *id.* §§ 7282.5(a), 7284.6(a)(4); and (d) restricts California law enforcement agencies from "[p]roviding personal information ... about an individual" for "immigration enforcement purposes," unless that information is publicly available, *id.* § 7284.6(a)(1)(D).

92.     Some States have likewise determined that diverting their resources to engaging in unnecessary inquiries into individuals' immigration status, fulfilling information requests by federal immigration officials not required by law, or facilitating civil immigration arrests in state buildings will interfere with important public functions and should be limited. *See, e.g.*, 11 Del. § 8402B; New York Exec. Order 170 (Sept. 15, 2017); New York Exec. Order 170.1 (Apr. 25, 2018); Wash. Rev. Code § 10.93.160(2) ("The legislature finds that it is not the primary purpose of state

and local law enforcement agencies or school resources officers to enforce civil federal immigration law.").

93.    Of course, there are important exceptions. Most obviously, although not every state statute or policy is the same, a range of Plaintiff States authorize state and local law enforcement to collaborate with federal civil immigration officials in order to facilitate the removal of violent criminals. *See, e.g.*, N.J. Directive at §§ II.B.5-6 (authorizing law enforcement agencies to provide civil immigration authorities with notice of the release date, and to continue the detention of, any inmate or detainee convicted of any crime in the last five years or who is charged with or has ever been convicted of serious or violent offenses); Cal. Gov't Code §§ 7284.6(a)(1)(C), 7282.5(a)(1) (permitting law enforcement agencies to respond to requests from immigration authorities for notice of the release date of an individual who has been convicted of a serious or violent felony); 5 Ill. Comp. Stat. § 805/15(i) (allowing law enforcement officials to cooperate in criminal investigations conducted by federal immigration authorities).

94.    Many of these state policies also include express exceptions confirming that state and local officials must comply with the law, including clarifications that, *inter alia*: (i) state and local law enforcement will support federal civil immigration authorities "when required to do so by law," including to comply with federal court orders (such as a removal order signed by a federal judge) and judicially issued arrest warrants, N.J. Directive at 1-2; 5 Ill. Comp. Stat. § 805/15(h); Cal Gov't Code §§ 7282.5(a), 7284.6(a)(4); 11 Del. C. § 8402B(c); New York Exec. Order 170 (Sept. 15, 2017); Wash. Rev. Code § 10.93.160(16); and (ii) state and local law enforcement are in no way restricted from sharing with federal civil immigration authorities the citizenship or immigration status of any individual, N.J. Directive at § II.C.10 (citing 8 U.S.C. §§ 1373 and

1664); 5 Ill. Comp. Stat. § 805/5; Cal Gov't Code § 7284.6(e); Wash. Rev. Code § 43.17.425; Wash. Sess. Laws of 2019, ch. 440, § 8.

95.    Many of these measures have been in place for several years. For example, New Jersey adopted its policy in November 2018. *See* N.J. Directive at 1. Illinois and California enacted their laws in 2017. New York's EO 170 has been in place since 2017. Washington's law was enacted in 2019. Oregon's law was enacted in 2021.

96.    Plaintiffs' policies have sometimes been challenged in court, and to date, they have been consistently upheld. *See, e.g.*, *Ocean Cnty.*, 8 F.4th at 182; *United States v. New Jersey*, Civ. No. 2013-64, 2021 WL 252270, at *1 (D.N.J. Jan. 26, 2021); *United States v. California*, 921 F.3d 865, 873 (9th Cir. 2019); *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022); *United States v. Illinois*, Civ. No. 25-1285, slip op. at 1 (N.D. Ill. July 25, 2025).

97.    Although other Plaintiff States do not have statewide directives regarding the use of law-enforcement resources to assist in federal immigration law (meaning that they do not have any statewide limitations on the use of law-enforcement resources to assist in the enforcement of federal immigration law), they nonetheless do not impose categorical *requirements* that state and local law-enforcement officers provide on-demand assistance to federal immigration authorities either. Many of these States have concluded that they can best protect their residents by maintaining control over state and local law-enforcement resources and/or by empowering law-enforcement officials to exercise discretion in determining when it would best promote public safety to assist federal immigration-enforcement efforts, rather than affirmatively requiring law enforcement officers to devote state and local resources to federal immigration enforcement on the federal government's command.

98.    Other States are subject to different rules. For instance, some Plaintiff States must comply with state court rulings that restrict their cooperation with civil immigration detainer requests. *See, e.g.*, *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1146 (Mass. 2017). Still other Plaintiff States have concluded that participating in federal immigration-enforcement efforts imposes substantial costs on local jurisdictions, not only in the form of personnel and resources but also in the form of potential civil liability.

99.    While Plaintiff States' decisions in this area have differed, all are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521 U.S. 898, 928 (1997)—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

## III.    The Challenged Grant Conditions

100.    On Inauguration Day, January 20, 2025, President Donald J. Trump issued an executive order directing the Attorney General and Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions … do not receive access to Federal funds" and to take "any other lawful actions, criminal or civil, that they deem warranted." Exec. Order No. 14159, 90 C.F.R. 8443 (2025).

101.    The following day, then-Acting Deputy Attorney General Emil Bove issued a memorandum to USDOJ employees asserting that "[f]ederal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests," and immediately requiring all USDOJ employees to "work with the newly established Sanctuary Cities Enforcement Working Group … to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws." That directive further required that U.S. Attorney's Offices and USDOJ litigating components "shall investigate … for potential

prosecution" any and all "resistance, obstruction, or other non-compliance with lawful immigration-related commands."

102.    On February 5, 2025, the day after she was confirmed as U.S. Attorney General, Pamela Bondi issued a memorandum to USDOJ, titled "Sanctuary Jurisdiction Directives" (the "Bondi Directive"), that directed USDOJ to undertake wide-ranging efforts to punish "so-called 'sanctuary jurisdictions'" for failing to assist in federal immigration enforcement. The Bondi Directive required USDOJ attorneys to evaluate "all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens" for their potential termination. The Bondi Directive instructed USDOJ attorneys to investigate and prosecute "violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373," to promptly report declination decisions to USDOJ leadership, and to investigate and challenge state and local laws and policies "that facilitate violations of federal immigration laws or impede lawful federal immigration operations."

103.    "In furtherance of that objective," the Bondi Directive declares:

> [T]he Department of Justice will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate.

104.    The Bondi Directive further reiterated that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice."

105.    USDOJ's grant-funding offices proceeded to give effect to the Administration's directives requiring States to cooperate with federal civil immigration-enforcement efforts.

30

106.    OVC has adopted a policy, which it has implemented across all OVC-administered grants, of refusing to allow grant recipients to use any awarded funds for victim compensation and assistance unless the grant recipients agree to broadly support and assist federal immigration enforcement by DHS.

107.    On July 21, 2025, OVC issued Notices of Funding Opportunity (NOFOs) for its Victim Compensation Formula Grant, Ex. 1, Victim Assistance Formula Grant, Ex. 2, and various competitive grants, *e.g.*, Ex. 3, specifying new immigration-related conditions on issuance of funding for FY 2025.

108.    In accordance with OVC's policy, every one of the OVC NOFOs provides, in relevant part, that "[a]ny program or activity that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" is "out of the program scope and will not be funded" (collectively, the "Immigration Enforcement Conditions" or "Conditions"). Ex. 1 at 8; Ex. 2 at 9; Ex. 3 at 9-10.

109.    Although styled as a restriction on the "unallowable use of funds," this language functions as an eligibility requirement: OVC "will not … fund" "[a]ny program or activity" unless it agrees to (1) provide notice to DHS agents on demand, (2) give unfettered access to DHS agents, (3) comply with 8 U.S.C. § 1373, and (4) honor any and all DHS requests. Further, funds will not be provided to any program if DHS concludes that the program is directly or indirectly "imped[ing] or hinder[ing] enforcement of federal immigration law" in any other way. The NOFOs impose all of these requirements on any and all FY 2025 grant awards under VOCA.

110.    The NOFOs do not explain what, if any, limits exist on the "notice" and "access" that must be provided and the "requests" that must be honored. The NOFOs also do not define "program or activity" or "promoting or facilitating." And it is unclear what an "indirect" violation of the immigration laws (or "indirectly" promoting or facilitating a violation of the immigration laws) constitutes. On their face, however, the Conditions would require States to provide information about, and access to, victims with whom States may interact in operating their victim services programs, that DHS is targeting for potential immigration enforcement.

111.    States are responsible for operating the victim compensation programs that are funded by the Victim Compensation Formula Grant. They or their subdivisions are likewise responsible for operating many of the victim assistance programs that are funded by the Victim Assistance Formula Grant. The Immigration Enforcement Conditions thus burden States directly, denying them access to funding on which they have long relied, unless they either abandon policies that affirmatively limit their role in civil immigration enforcement or cease providing discretion to state officials on when and whether to participate in federal immigration enforcement.

112.    The Immigration Enforcement Conditions also burden and constrain Plaintiff States' ability to select the subgrantees of their choice, as States will be barred from choosing subgrantees that will not comply with the Conditions. In addition, States are required to monitor their subrecipients' compliance with subaward conditions. *See* 2 C.F.R. § 200.332(e). Each Plaintiff subawards Victim Assistance funds to dozens of subrecipients—with some States issuing subawards to well over one hundred different public agencies and organizations. Monitoring subgrantees' compliance with the Conditions would impose a substantial new burden on States.

113.    Consistent with the Bondi Directive, other components within USDOJ have begun to incorporate immigration-related conditions into their grants. For example, the Office on

32

Violence Against Women administers formula grant funds provided under the Violence Against Women Act (VAWA). In May 2025, the Office on Violence Against Women issued NOFOs that included a list of activities that the Office now believes cannot be funded because they are out of the VAWA grant-funding program's scope, including activities related to the immigrant populations that those grants are intended to serve. Those new out-of-scope activities included, among other things, "[p]rograms that discourage collaboration with law enforcement or oppose or limit the role of police, prosecutors, or immigration enforcement in addressing violence against women." A coalition of non-profit organizations that had previously received federal funds through VAWA-authorized grants challenged these out-of-scope activities conditions and recently obtained a preliminary stay of those conditions. *See Rhode Island Coalition Against Domestic Violence v. Bondi*, Civ. No. 25-279, Dkt. No. 34 (D.R.I. Aug. 8, 2025).

**IV.    The Immigration Enforcement Conditions Are Unlawful.**

114.    The Immigration Enforcement Conditions are unlawful for multiple, independent reasons: USDOJ lacks requisite statutory authority to impose them; their imposition was arbitrary and capricious; and even if authorized by statute, they violate the Spending Clause.

115.    *First*, USDOJ has no statutory authority to impose the Immigration Enforcement Conditions. USDOJ's "power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). USDOJ "literally has no power to act … unless and until Congress confers power upon it." *Id.* (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 374). Not only do Executive Branch agencies violate the law when they act without a congressional grant of authority, but that statutory authority must be clearly stated where the executive branch would upset any federal-state balance of power. *See Gregory*, 501 U.S. at 461. Here, these principles are fatal to the Immigration

33

Enforcement Conditions: no statutes, including the statutes that authorize the VOCA grant programs, furnish USDOJ the authority to impose the Conditions.

116.    Initially, the statutes defining the duties of the leader of USDOJ's Office of Justice Programs, its largest grantmaking entity, and of the Director of OVC do not grant these officials freestanding authority to impose the Immigration Enforcement Conditions. *See, e.g.*, 34 U.S.C. § 20111(c).

117.    The statutes directing OVC to provide formula grants to the States likewise do not authorize the Immigration Enforcement Conditions. Rather, those laws expressly set forth the criteria for eligibility for the VOCA formula grants and fixed a formula for determining the allocation of awards to the States. *See Providence*, 954 F.3d at 34-35. And those criteria do not include any demands relating to federal immigration enforcement. In addition, the federal statutes authorizing VOCA competitive grants do not give USDOJ unfettered discretion to impose conditions that have no nexus to the purpose and nature of the grant programs, as defined by statute. Here, nothing in the authorizing statute suggests that VOCA grant funds are intended to support federal civil immigration enforcement.

118.    8 U.S.C. § 1373 also does not authorize OVC to impose the Immigration Enforcement Conditions on these grants. Section 1373(a) prohibits States and local governments from restricting the sharing of citizenship or immigration status information with federal immigration authorities, but it does not require States or local governments to provide the type of assistance mandated by the Conditions, nor does it in any way concern the receipt of federal funds.

119.    In addition to being contrary to VOCA, the Immigration Enforcement Conditions are contrary to 34 U.S.C. § 10228(a), which states that "[n]othing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States

to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a). The Conditions are vague but appear to require, at least, that state recipients give DHS agents access to detainees, provide DHS agents with notice of when such detainees are released from custody, and otherwise honor DHS requests—and warn that if any of these requirements are not met the recipient's victim-services programs and activities "will not be funded." But that is the type of federal "direction, supervision, or control" over state police and criminal justice agencies that section 10228(a) forbids.

120.    The Immigration Enforcement Conditions therefore violate Congress's carefully designed statutory schemes for these VOCA grant programs. USDOJ cannot cite a clear statement of statutory authority to justify imposition of the Immigration Enforcement Conditions.

121.    *Second*, the Immigration Enforcement Conditions are arbitrary and capricious agency action in violation of the APA, which requires that agencies' decisions be supported by a rational connection between the choice made and the facts underlying that choice, and that any deviation from agency policy be supported by a reasoned explanation or justification. In imposing the Immigration Enforcement Conditions, USDOJ arbitrarily relied on immigration-related factors that Congress did not authorize it to rely on in allocating federal grant monies to support victims. Indeed, by conscripting victim services' programs into federal immigration enforcement, the Conditions would undermine the federal policy under VOCA as expressed in USDOJ's own regulations stating that victim eligibility for assistance "is not dependent on the victim's immigration status," 28 C.F.R. § 94.103(a), and would undermine rather than support state and local efforts to assist victims without regard to their immigration status. Further, USDOJ failed to consider the States' reliance interests in their continued receipt of congressionally authorized

funding on an annual basis to support ongoing state-run victim services programs and in maintaining policies that promote public safety by ensuring trust with immigrant communities.

122.    *Third*, even if the Immigration Enforcement Conditions had been authorized by Congress, they would exceed Congress's authority under the Spending Clause. Where, as here, a new funding condition is unrelated to existing uses of federal funds, is so ambiguous as to prevent States from exercising their choice knowingly as to whether to comply, and instead serves only to coerce unwilling States to implement some other federal policy objective, it cannot be justified under the Spending Clause.

## V.    The Immigration Enforcement Conditions Harm The States.

123.    USDOJ's imposition of the Immigration Enforcement Conditions causes significant harm to Plaintiff States by subjecting them to an impossible dilemma: either forego control over use of their own law enforcement resources and allow the federal government to invade their sovereign right to determine how best to exercise state police power, or forego hundreds of millions in critical federal funds that are necessary to sustain ongoing state victim-services programs.

124.    Plaintiffs have long relied on federal VOCA funding to support critical victim services—from medical expenses, funeral expenses, crime-scene cleanup, sexual assault forensic exams, victim and witness advocacy services, counseling, and emergency shelter, among other forms of compensation and assistance provided to crime victims and their families. Plaintiff States have had access to this funding for decades and reasonably expected that they would continue to be able to do so. That is especially true for the Victim Compensation and Assistance Formula Grants, which promise allocations each year based on settled criteria defined by statute—

allocations that Plaintiffs States reasonably anticipate unless Congress itself amends those statutory provisions.

125.    With VOCA formula grant awards open for four years, Plaintiff States have sustained multi-year compensation and assistance efforts that would be interrupted by any disruption in funding. State compensation programs issue awards that crime victims can spend down over a multi-year period for a variety of expenses, and States closely coordinate their assistance programs and support multi-year projects with victim-services providers based on the reasonable expectation that they can rely on consistent federal formula funding for these activities.

126.    In short, lapses in grant funding, even if temporary, would result in the sudden and massive disruption of state victim services programs that have historically been supported by USDOJ grant funds.

127.    The consequences of such a disruption would be disastrous for Plaintiff States. In FY 2024 alone, VOCA compensation funding supported Plaintiff States in making over $191 million in payments to over 88,000 victims of crime, and VOCA assistance funding supported Plaintiff States in subawarding over $1.2 billion in funding to public agencies and local community-based organizations, which, in turn, provided services to over 2.8 million individual victims of crime.

128.    For example, New Jersey has received between $30 million and $94 million in VOCA funding for each of the past 10 years. Loss of grant funding, even for just a single fiscal year, would require New Jersey to significantly scale back its victim compensation and assistance initiatives, undermining the State's ability to provide victim services to some of its most vulnerable residents and harming crime victims and their families. Likewise, California has received over $487 million in VOCA Assistance and Compensation Grant funds from FY 2022 to 2024, and its

anticipated allocation for FY 2025 is $165,356,925. If California does not receive USDOJ grant funds in FY 2025, it will soon have to reduce the funding it provides to existing victim-assistance programs and will have to eliminate some programs altogether.

129.    Other Plaintiff States receive similarly substantial sums annually, and the loss of even one fiscal year of funding would have an immediate impact on their victim compensation and victim assistance work: requiring them to reduce or to delay the availability of critical services to victims. Among other things, this could result in unsafe conditions for victims and their families. Furthermore, this loss in VOCA funding and curtailment of victim support services would likely impact victims' willingness to cooperate with law enforcement and adversely impact law enforcement efforts throughout the State.

130.    Nor can Plaintiffs simply avoid these harms by acceding to the Immigration Enforcement Conditions, because doing so would subject the States to equally grave and irreparable harms.

131.    If Plaintiff States were to accept the Conditions, they would lose their abilities as sovereigns to maintain what evidence and experience have taught them are optimal law enforcement policies—including the ability to determine on a case-by-case basis if an inquiry into whether a witness or victim lacks lawful immigration status will promote or harm public safety.

132.    USDOJ's imposition of the Immigration Enforcement Conditions thus puts Plaintiff States in the untenable position of having to choose between refusing to comply with the unauthorized Conditions and facing substantial program disruption and loss of crucial federal funding, or forfeiting their law enforcement discretion and control of their law enforcement agencies by complying with the Conditions.

133. Moreover, the harms threatened by the Immigration Enforcement Conditions are imminent and require urgent relief. Plaintiffs' applications for both VOCA formula grants and all but one of the VOCA competitive grants are due on August 20, and OVC plans to issue funding awards by the end of the Federal Fiscal Year on September 30. If USDOJ refuses to award funds to Plaintiff States that do not comply with the Immigration Enforcement Conditions, the window for Plaintiffs to have secured FY 2025 VOCA funding will have passed. As a result, even if Plaintiffs ultimately prevail in having the Conditions vacated and declared unlawful, critical programs for victims and survivors that have long been supported by USDOJ grants will be irreparably disrupted.

134. The imminent harms that would flow from Plaintiff States' loss of VOCA funding cannot be remedied by payment of damages at the conclusion of this litigation. Initially, sovereign immunity would prevent Plaintiffs from recovering damages against the federal government. And even if such damages were ultimately recoverable, even a short-term disruption to Plaintiff States' access to federal VOCA funding would require Plaintiffs to cut back significantly their vital victim-services programs and activities.

135. Curtailing victim assistance programs would likely make States unable to support many critical and time-sensitive services, including maintaining emergency hotlines, deploying sexual assault response teams, and providing notification to victims when perpetrators are released from incarceration. And it could interrupt the long-running efforts of victim and witness advocates to maintain relationships that ensure the continued engagement required for successful criminal prosecutions and civil restraining order proceedings. It would also result in harms to victims of crime and their families—the persons the state programs are meant to assist—especially because state victim compensation programs act as payors of last resort, paying for expenses only when

crime victims have no other option. Interrupting such payments would likely result in the interruption of ongoing courses of medical treatment or mental-health counseling, and lead crime victims to be unable to afford time-sensitive services, such as funerals, burials, and crime-scene clean-up.

136.    Urgent relief from this Court is therefore required to avert the immediate and irreparable harm that would result from States being forced to choose either of the two equally untenable options presented by USDOJ's imposition of the Conditions.

## FIRST CAUSE OF ACTION

### Violation of Administrative Procedure Act
### Agency Action In Excess of Statutory Authority and Contrary to Law

137.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

138.    The APA requires that a court "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or that is "not in accordance with law," *id.* § 706(2)(A).

139.    Defendants have no statutory authority to impose the Immigration Enforcement Conditions. The statutes authorizing Defendants to administer the VOCA grant programs lay out a specific set of eligibility criteria, none of which authorize the imposition of these conditions. *See* 34 U.S.C. §§ 20102(b), 20103(b). Nor does any other statute authorize USDOJ to impose these Conditions on VOCA grants.

140.    Further, Defendants' adoption of the Immigration Enforcement Conditions is contrary to specific statutory provisions. *See* 34 U.S.C. § 20102(a) (requiring that the OVC Director "shall make an annual grant from the Fund to an eligible crime victim compensation program"); 34 U.S.C. § 20103(a) (requiring that the OVC Director "shall make an annual grant

from any portion of the Fund … to the chief executive of each State for the financial support of eligible crime victim assistance programs"); *see also* 34 U.S.C. § 10228(a) ("Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.").

141.    Defendants have therefore exceeded their statutory authority and acted contrary to law in adopting the Immigration Enforcement Conditions.

142.    The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

## SECOND CAUSE OF ACTION

### *Ultra Vires* Agency Action

143.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

144.    Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013). When an Executive agency acts in a manner that violates a specific statutory provision, such agency action is *ultra vires*. *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).

145.    The Immigration Enforcement Conditions violate specific statutory provisions. *See* 34 U.S.C. § 20102(a) (requiring that the OVC Director "shall make an annual grant from the Fund to an eligible crime victim compensation program"); 34 U.S.C. § 20103(a) (requiring that the OVC Director "shall make an annual grant from any portion of the Fund … to the chief executive of each State for the financial support of eligible crime victim assistance programs"); *see also* 34 U.S.C. § 10228(a) ("Nothing in this chapter or any other Act shall be construed to authorize any

department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.").

146.    The Immigration Enforcement Conditions impose new eligibility criteria on VOCA grant funding that are contrary to the criteria set forth in VOCA. In doing so, they violate specific federal statutory provisions and constitute *ultra vires* agency action.

147.    The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

**THIRD CAUSE OF ACTION**

**Violation of U.S. Constitution
Separation of Powers**

148.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

149.    The Constitution vests the spending power in Congress, not in the President or in any executive agency. U.S. Const. art. I, § 8, cl. 1. An executive agency therefore does not have unilateral authority to refuse to spend funds that Congress has directed it to disburse. And an executive agency likewise lacks authority to condition funds on satisfaction of eligibility criteria other than the ones that Congress authorized it to impose.

150.    Defendants acted without statutory or constitutional authority to impose the Immigration Enforcement Conditions. Imposing these Conditions on the VOCA grant programs amounts to refusing to spend money that Congress intends to be used for crime victims until the Conditions are satisfied. Therefore, Defendants' imposition of the Immigration Enforcement Conditions amounts to improper usurpation of Congress's spending power by the Executive Branch.

151.    The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

## FOURTH CAUSE OF ACTION

### Violation of Administrative Procedure Act
### Arbitrary and Capricious Agency Action

152.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

153.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made" (citation omitted)); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account").

154.    In imposing the Immigration Enforcement Conditions, Defendants failed to account for the States' reliance on these congressionally approved grants and the harms the States and their residents will suffer if they are forced to scale back services for crime victims or abandon their law enforcement policies. Defendants also imposed conditions based on immigration policy concerns that Congress plainly did not intend the agency to consider in deciding how to administer the program. Further, Defendants failed to consider how the Conditions would undermine rather than support VOCA's goal of assisting crime victims. Individually and taken together, these errors all render the agency's imposition of the Conditions arbitrary and capricious.

155.    The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

## FIFTH CAUSE OF ACTION

### Violation of U.S. Constitution
### Spending Clause

156.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

157.    The Constitution vests the spending power in Congress, not the President or any executive agency. U.S. Const. art. I, § 8, cl. 1.

158.    Even if Congress had (contrary to Counts 1 and 2) delegated to Defendants power to impose the Immigration Enforcement Conditions, the Constitution prohibits grant conditions that are not reasonably related to the purposes of the grants; that are so ambiguous as to prevent recipients from exercising their choice knowingly; or that are "so coercive as to pass the point at which pressure turns into compulsion." *S. Dakota v. Dole*, 483 U.S. 203, 211 (citation omitted) (1987). USDOJ violates all three limits here: These Conditions are not related to the purposes of VOCA, supporting victims of crime through compensation and assistance; are improperly ambiguous as to what it means to "promote[]" or "facilitate[]" a violation of the federal immigration laws, what it means to "indirectly" violate the federal immigration laws (or "indirectly" promote or facilitate a violation of the immigration laws), what it means to "hinder[]" or "impede[]" immigration enforcement, which DHS "requests" Plaintiff States must "honor," and what kind of "notice" they must give and what kind of "access" Plaintiff States must provide; and coercively condition substantial and crucial victims' grants on federal civil immigration demands.

159.    The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

## SIXTH CAUSE OF ACTION

### Violation of Administrative Procedure Act
### Agency Action Contrary to Constitutional Right

160.    Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

161.    For the reasons discussed above, the Immigration Enforcement Conditions violate the U.S. Constitution's separation of powers and Spending Clause. U.S. Const. art. I, § 8, cl. 1.

162.    The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court:

a.  Declare that Defendants' adoption of the Immigration Enforcement Conditions is contrary to the Constitution and federal laws;

b.  Declare that Defendants' adoption of the Immigration Enforcement Conditions and any actions Defendants, or any agencies or individuals working in concert with Defendants, take to implement or enforce the Conditions violate the Administrative Procedure Act, and to the extent that they rely on statutory authority, exceed Congress's powers under the Spending Clause;

c.  Preliminarily and permanently enjoin Defendants from implementing or enforcing the Immigration Enforcement Conditions against Plaintiff States, including their subdivisions and instrumentalities;

d.  Vacate and set aside OVC's adoption of the Immigration Enforcement Conditions and any actions taken by Defendants to implement or enforce them;

e.  Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

f.  Award Plaintiff States their reasonable fees, costs, and expenses, including attorney's

fees; and

g.  Award such additional relief as this Court may deem just and proper.

Respectfully submitted,

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL OF NEW JERSEY

By: <u>/s/ *Mayur P. Saxena*</u>
Jeremy M. Feigenbaum*
  *Solicitor General*
Shankar Duraiswamy*
  *Deputy Solicitor General*
Mayur P. Saxena*
  *Assistant Attorney General*
Surinder K. Aggarwal*
Bassam F. Gergi*
Anaiis Gonzalez*
Olivia C. Mendes*
Phoenix N. Meyers*
Sarah Nealon*
Daniel Resler*
Nathaniel F. Rubin*
  *Deputy Attorneys General*

New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5365
Mayur.Saxena@law.njoag.gov
*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
 ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Patrick J. Dolan*
Patrick J. Dolan (RI No. 10462)
 *Senior Counsel to the Attorney General*
Leonard Giarrano IV (RI No. 10731)
 *Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
PDolan@riag.ri.gov
LGiarrano@riag.ri.gov
*Attorneys for the State of Rhode Island*

**ROB BONTA**
 ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman*
 *Senior Assistant Attorney General*
Joel Marrero*
James E. Stanley*
 *Supervising Deputy Attorneys General*
Brandy Doyle*
Luke Freedman*
Heidi Joya*
Newton Knowles*
Deylin Thrift-Viveros*
Delbert Tran*
 *Deputy Attorneys General*

By: */s/ Lee I. Sherman*
Lee I. Sherman*
 *Deputy Attorney General*
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6000
lee.sherman@doj.ca.gov
*Attorneys for the State of California*

**KATHLEEN JENNINGS**
 ATTORNEY GENERAL OF DELAWARE

By: */s/ Vanessa L. Kassab*
Ian R. Liston*
 *Director of Impact Litigation*
Vanessa L. Kassab*
 *Deputy Attorney General*
Rose Gibson*
 *Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

**KWAME RAOUL**
 ATTORNEY GENERAL OF ILLINOIS

By: */s/ Alex Hemmer*
Alex Hemmer*
 *Deputy Solicitor General*
Christopher G. Wells*
 *Chief of the Public Interest Division*
Michael M. Tresnowski*
R. Henry Weaver*
 *Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov
*Attorneys for the State of Illinois*

**PHILIP J. WEISER**
 ATTORNEY GENERAL OF COLORADO

By: */s/ David Moskowitz*
David Moskowitz*
 *Deputy Solicitor General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
*Attorneys for the State of Colorado*

**BRIAN L. SCHWALB**
 ATTORNEY GENERAL OF THE DISTRICT OF
COLUMBIA

By: */s/ Mitchell P. Reich*
Mitchell P. Reich*
 *Senior Counsel to the Attorney General*
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov
*Attorneys for the District of Columbia*

**AARON M. FREY**
 ATTORNEY GENERAL OF MAINE

By: */s/ Stanley Abraham*
Stanley Abraham*
 *Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Stanley.Abraham@maine.gov
*Attorneys for the State of Maine*

**WILLIAM TONG**
 ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Ashley Meskill*
Ashley Meskill*
 *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
ashley.meskill@ct.gov
*Attorneys for the State of Connecticut*

**ANNE E. LOPEZ**
 ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
 *Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
 *Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawaiʻi*

**ANTHONY G. BROWN**
 ATTORNEY GENERAL OF MARYLAND

By: */s/ Virginia A. Williamson*
Virginia A. Williamson*
 *Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6584
VWilliamson@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Hannah C. Vail*
Katherine Dirks*
  *Chief State Trial Counsel*
Hannah C. Vail*
  *Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2512
katherine.dirks@mass.gov
hannah.vail@mass.gov
*Attorneys for the*
*Commonwealth of Massachusetts*

**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

By: */s/ Brian S. Carter*
Brian S. Carter*
  *Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-7403
Brian.carter@ag.state.mn.us
*Attorneys for the State of Minnesota*

**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Mark Noferi*
Mark Noferi*
  *Senior Litigation Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
MNoferi@nmdoj.gov
*Attorneys for the State of New Mexico*

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti*
John Pallas*
  *Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PallasJ@michigan.gov
*Attorneys for the State of Michigan*

**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
  *Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for the State of Nevada*

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

By: */s/ Natasha M. Korgaonkar*
Natasha M. Korgaonkar*
  *Special Counsel for Federal Initiatives*
Rabia Muqaddam*
  *Chief Counsel for Federal Initiatives*
Zoe Levine*
  *Special Counsel for Immigrant Justice*
Benjamin Liebowitz*
  *Assistant Attorney General*
28 Liberty Street
New York, NY 10005
(212) 416-6557
Natasha.Korgaonkar@ag.ny.gov
*Attorneys for the State of New York*

**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

By: */s/ Thomas H. Castelli*
Thomas H. Castelli*
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov
*Attorneys for the State of Oregon*

**CHARITY T. CLARK**
  ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
  *Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.Rose@vermont.gov
*Attorneys for the State of Vermont*

**NICHOLAS W. BROWN**
  ATTORNEY GENERAL OF WASHINGTON

By: */s/ Benjamin Seel*
Benjamin Seel*
Tyler Roberts*
  *Assistant Attorneys General*
Marsha Chien*
Cristina Sepe*
  *Deputy Solicitors General*
Washington State Office
of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov
*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
  ATTORNEY GENERAL OF WISCONSIN

By: */s/ Colin T. Roth*
Colin T. Roth*
  *Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us
*Attorneys for the State of Wisconsin*

*\*Pro hac vice application forthcoming*