**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF NEW JERSEY; STATE OF RHODE ISLAND; STATE OF CALIFORNIA; STATE OF DELAWARE; STATE OF ILLINOIS; STATE OF COLORADO; STATE OF CONNECTICUT; DISTRICT OF COLUMBIA; STATE OF HAWAI‘I; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Attorney General of the United States; OFFICE OF JUSTICE PROGRAMS; MAUREEN HENNEBERG, in her official capacity as Acting Assistant Attorney General for the Office of Justice Programs; OFFICE FOR VICTIMS OF CRIME; KATHERINE DARKE SCHMITT, in her official capacity as Acting Director of the Office for Victims of Crime; BUREAU OF JUSTICE ASSISTANCE; TAMMIE GREGG, in her official capacity as Acting Director of the Bureau of Justice Assistance; OFFICE OF JUVENILE JUSTICE AND DELIQUENCY PREVENTION; EILEEN M. GARRY, in her official capacity as Acting Administrator of the Office of Juvenile Justice and Delinquency Prevention; BUREAU OF JUSTICE STATISTICS; KEVIN M. SCOTT, in his official capacity as Acting Director of the Bureau of Justice Statistics; NATIONAL INSTITUTE OF JUSTICE; JENNIFER SCHERER, in her official capacity as Acting Director of the National Institute of Justice,

*Defendants*.

No. 1:25-cv-00404-JJM-AEM

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. For decades, state and local law enforcement agencies have relied on a wide range of federal grants to support and sustain critical law enforcement operations and victim services. These grant programs provide more than a billion dollars to States annually to address some of the most serious threats to the safety of their residents: from gang violence to drug trafficking to sexual assault to all kinds of violent crimes. These statutory funding streams, provided through federal grant funds administered by the U.S. Department of Justice (USDOJ), have long aided States in fulfilling their fundamental duty to protect the public. Each year, States rely on USDOJ grant funds to assist more than 8.5 million crime victims; pay more than 200,000 claims for losses suffered by crime victims; and fund ongoing criminal justice and public safety operations, such as drug task forces, crisis intervention programs, and youth recidivism reduction efforts, in all 50 states and over 1,000 local government units nationwide.

2. In enacting these grant programs, Congress's focus was crystal clear: the funds must be used to support criminal law enforcement, juvenile justice, and victim services programs. Indeed, Congress mandated the distribution of the vast majority of these funds to States based on fixed statutory formulas. Yet the Office of Justice Programs (OJP), an agency within USDOJ that is charged with administering these federal grants, has now declared that States will be unable to access grant funds unless they accede to the Executive Branch's immigration enforcement priorities. OJP's new policy would condition the use of grant funds on States' assistance to the U.S. Department of Homeland Security (DHS) with unrelated civil immigration enforcement efforts. Specifically, OJP and its program offices have included in every FY 2025 and FY 2026 Notice of Funding Opportunity and in several Notices of Award conditions that would require grant recipients to cooperate with federal civil immigration enforcement. OJP has required that recipients provide access to individuals believed to be aliens who are held in state custody, required that

recipients notify DHS of the release of such individuals from custody, and imposed restrictions and requirements relating to the disclosure of immigration-related information by recipients (collectively, the "Immigration Enforcement Conditions").

3. Defendants' brazen attempt to manipulate critical funding for law enforcement and crime victims to strong-arm States into supporting the Administration's civil immigration policies runs headlong into two basic principles of American governance: separation of powers and federalism. A federal agency has "no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). That is particularly so when it comes to federal funding, where Congress retains the power of the purse, and thus establishes the criteria that executive branch agencies like USDOJ must use when awarding grants. Nothing in any federal grant-funding statute authorizes USDOJ to impose immigration-related funding conditions on grant programs intended to support criminal law enforcement, juvenile justice, and victim services.

4. Nor is that the sole legal defect. Imposition of these conditions is also arbitrary and capricious in multiple respects. USDOJ failed to grapple with the States' reliance on these congressionally approved grants and the harms the States and their law enforcement agencies will suffer if they are required to abandon their law enforcement policies or are forced to scale back grant-funded criminal law enforcement, juvenile justice, and services for crime victims. USDOJ imposed conditions based on immigration policy concerns that Congress plainly did not intend the agency to consider in deciding how to administer the program. And USDOJ also failed to consider how these conditions would undermine rather than support Congress's goal of assisting state and local criminal law enforcement, juvenile justice, and victim services programs. Further, beyond these multiple defects under the APA, these conditions run afoul of the Spending Clause—because

they are impermissibly coercive, improperly ambiguous, and unrelated to the underlying grant programs at issue.

5. Action by this Court is urgently needed. Defendants' imposition of new conditions forces Plaintiff States either to abandon critical funds to support crime victims or relinquish their sovereign rights to decide how to use their own state and local resources, including their own law enforcement resources. Many Plaintiff States have long concluded by statute, executive policy, or court order that public safety is improved by focusing their limited law enforcement resources on core public safety missions and ensuring that victims and witnesses to a crime will not hesitate to come forward due to their immigration status. Other Plaintiff States have chosen to permit their political subdivisions or law enforcement agencies to exercise their own discretion in determining whether law enforcement resources are best spent assisting the federal government in immigration matters. But either way, USDOJ's new challenged conditions on statutory grants would force these States into an untenable position: either forfeit access to critical resources, or accept unlawful conditions, allowing the Federal Government to conscript state and local officials to enforce federal civil immigration law and undermining trust between law enforcement and immigrant communities that is critical to preventing and responding to crime. To prevent the extraordinary harms that will arise from OJP's policy of imposing these unlawful conditions, this Court should enjoin their implementation and enforcement and set aside the challenged conditions.

**JURISDICTION AND VENUE**

6. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346. The Court has authority to grant declaratory, injunctive, and other relief pursuant 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

7. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in his official capacity. The State of Rhode Island is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Rhode Island.

## PARTIES

### I. Plaintiffs

8. Plaintiff the State of New Jersey, represented by and through its Attorney General, Jennifer Davenport, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. The Attorney General is also head of the New Jersey Department of Law and Public Safety, which is the agency responsible for applying for, obtaining, and disbursing funds pursuant to the federal grant programs that are the subject of this litigation. *See* N.J. Stat. Ann. § 52:17B-2. The Attorney General of New Jersey also serves, by statute, as the chief law enforcement officer for the State. *Id.* § 52:17B-98.

9. Plaintiff the State of Rhode Island, represented by and through its Attorney General, Peter F. Neronha, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

10. Plaintiff the State of California, represented by and through its Attorney General, Rob Bonta, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

11. Plaintiff the State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign State in the United States of America. This action is brought on behalf of the State by Attorney General Jennings as the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State pursuant to statutory authority. Del. Code Ann. tit. 29, § 2504.

12. Plaintiff the State of Illinois, represented by and through its Attorney General, Kwame Raoul, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

13. Plaintiff the State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

14. Plaintiff the State of Connecticut is a sovereign State in the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Connecticut General Statutes § 3-125 to act on behalf of the State.

15. Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

16. Plaintiff State of Hawai‘i is a sovereign State in the United States of America. Hawai‘i is represented by Attorney General Anne E. Lopez, Hawai‘i's chief legal officer and chief law enforcement officer, who is authorized by Hawai‘i Revised Statutes § 28-1 to pursue this action.

17. Plaintiff the State of Maine is a sovereign State in the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

18. Plaintiff the State of Maryland is a sovereign State in the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief law officer of Maryland.

19. Plaintiff the Commonwealth of Massachusetts is a sovereign State in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

20. Plaintiff the State of Michigan is a sovereign State in the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

21. Plaintiff the State of Minnesota is a sovereign State in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

22. Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State in the United States of America. The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

23. Plaintiff the State of New Mexico is a sovereign State in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico.

24. Plaintiff the State of New York, represented by and through its Attorney General, Letitia James, is a sovereign State in the United States of America. The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

25. Plaintiff the State of Oregon, represented by and through its Attorney General Dan Rayfield, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

26. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6).

27. Plaintiff the State of Vermont is a sovereign State in the United States of America. Vermont is represented by Attorney General Charity Clark, who is the chief law enforcement officer and is authorized by law to initiate litigation on behalf of the State.

28. Plaintiff the Commonwealth of Virginia is a sovereign State of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2 513.

29. Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign State in the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern under Wash. Rev. Code ch. 43.10.

30. Plaintiff the State of Wisconsin is a sovereign State in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

## II. Defendants

31. Defendant United States Department of Justice is an agency and the executive department of the United States government that has responsibility for administering grant programs authorized by VOCA.

32. Defendant Todd Blanche is the United States Attorney General and the federal official in charge of USDOJ. The Attorney General is sued in his official capacity.

33. Defendant Office of Justice Programs (OJP) is the largest grantmaking component of USDOJ. OJP oversees the work of the Office for Victims of Crime, Bureau of Justice Assistance, Office of Juvenile Justice and Delinquency Prevention, Bureau of Justice Statistics, and National Institute of Justice.

34. Defendant Maureen Henneberg (Acting AAG) is the Deputy Assistant Attorney General for Operations and Management within USDOJ currently in charge of OJP in an acting capacity. The Acting AAG is sued in her official capacity.

35. Defendant Office for Victims of Crime (OVC) is a Program Office within USDOJ with responsibility for administering the grant programs authorized by VOCA.

36. Defendant Katherine Darke Schmitt (Acting OVC Director) is the Acting Director within USDOJ in charge of OVC. The Acting OVC Director is sued in her official capacity.

37. Defendant Bureau of Justice Assistance (BJA) is a Program Office within USDOJ and its primary criminal justice grantmaking component.

38. Defendant Tammie Gregg (Acting BJA Director) is the Acting Director within USDOJ in charge of BJA. The Acting BJA Director is sued in her official capacity.

39. Defendant Office of Juvenile Justice and Delinquency Prevention (OJJDP) is a Program Office within USDOJ with responsibility for administering grant programs designed to support States' juvenile justice and juvenile delinquency prevention programs.

40. Defendant Eileen M. Garry (Acting OJJDP Administrator) is the Acting Administrator in charge of OJJDP. The Acting OJJDP Administrator is sued in her official capacity.

41. Defendant Bureau of Justice Statistics (BJS) is a Program Office within USDOJ with responsibility for administering grant programs designed to support States' statistical capabilities and the quality and the utility of their criminal history records.

42. Defendant Kevin M. Scott (Acting BJS Director) is the Acting Director in charge of BJS. The Acting BJS Director is sued in his official capacity.

43. Defendant National Institute of Justice (NIJ) is a Program Office within USDOJ with responsibility for administering grant programs to support States' research, development, and technological capabilities as they relate to crime control and justice issues.

44. Defendant Jennifer Scherer (Acting NIJ Director) is the Acting Director in charge of NIJ. The Acting NIJ Director is sued in her official capacity.

## ALLEGATIONS

### I. Congress Has Long Authorized Grants To States Under Programs Administered By The Bureau Of Justice Assistance Designed To Support State Law Enforcement.

45. Federal grants administered by USDOJ have long been instrumental in supporting state criminal justice and law enforcement efforts.

46. USDOJ's criminal justice and law enforcement grants are administered by BJA, which was established by Congress in 1984, pursuant to the Justice Assistance Act, in order to

"assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system, with special emphasis on violent crime and serious offenders." Pub. L. No. 98-473, sec. 403(a) (Oct. 12, 1984).

47. BJA is currently a program office within OJP.

48. State and local law enforcement agencies rely on the funding issued under the dozens of formula and competitive grant programs that BJA administers every year.

**A. BJA Formula Grants**

**1. Edward Byrne Memorial Justice Assistance Formula Grants**

49. In 1988, President Reagan signed into law the Anti-Drug Abuse Act of 1988, which established Edward Byrne Memorial State and Local Law Enforcement Programs "to assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system," with an emphasis on combating drug crime and violent crime. Pub. L. No. 100-690, secs. 500-501 (Nov. 1, 1988).

50. Named after an officer in the New York City Police Department who was murdered while protecting a witness in a drug case, the Byrne Programs have for decades been the leading federal source of criminal justice funding to state and local jurisdictions.

51. In 2006, Congress merged the Byrne Programs with another formula grant program, the Local Law Enforcement Block Grant Program, creating the Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) Program, which authorized formula grants to States and to their local government subdivisions "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice." *See* Pub. L. No. 109-162, sec. 1111 (Jan. 5, 2006).

52. The Byrne JAG Program exists to give state and local governments "flexibility to spend money on programs that work for them rather than to impose a 'one size fits all' solution" to State and local criminal justice problems. H.R. Rep. No. 109-233, at 89 (2005).

53. Congress enumerated several types of programs for which this funding can be used, including: law enforcement; prosecution and court; prevention and education; corrections and community corrections; drug treatment and enforcement; planning, evaluation, and technology improvement; and crime victim and witness programs, other than compensation. Pub. L. No. 109-162, sec. 1111, *codified at* 34 U.S.C. § 10152(a)(1)(A)-(G).

54. Every State is eligible to receive Byrne JAG formula funds, as long as the State complies with the application requirements set forth in the statute, which include providing certain certifications and assurances to USDOJ, 34 U.S.C. § 10153(a)(1)-(5), as well as providing USDOJ with a comprehensive plan detailing how grants received will be used to improve the administration of the criminal justice system, including "a description of how the State will allocate funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title." *Id.* § 10153(a)(6).

55. The formula "grants to States and units of local government" issued pursuant to the Byrne JAG Program must be made "in accordance with the formula established under" the statute. *Id.* § 10152(a)(1).

56. That express statutory formula requires that USDOJ "shall … allocate … to each State" funding based on two factors: (1) the ratio of the State's population to the total U.S. population, and (2) the ratio of the three-year average of violent crimes reported by the State to the three-year average for all States. *Id.* § 10156(a)(1).

57. The statute recognizes only one exception to this statutory formula. If any State receives less than 0.25% of the total amount, then all allocations must be adjusted so that "each State" receives no less than 0.25% of the total amount. *Id.* § 10156(a)(2).

58. States must also pass through a portion of their Byrne JAG funding to their local governments. *Id.* § 10156(d). Local governments' allocations are determined based on their relative rates of violent crime compared to the State as a whole. *Id.* § 10156(b)(2), (d).

59. If USDOJ determines that any State will not qualify to receive funds, will be unable to use any portion of its allocation, or if a State chooses not to participate in the Byrne JAG Program, then USDOJ "shall" award that State's allocation "to units of local government, or combinations thereof, within such State," giving priority to those with the highest number of violent crimes reported in the past three years. *Id.* § 10156(f).

60. States have used Byrne JAG formula funds to support a wide variety of state and local criminal justice and law enforcement programs that further the public safety of their residents and help to prevent and remedy crime.

61. States use Byrne JAG formula funds for myriad law enforcement purposes, including crime prevention, education, corrections, drug-treatment, drug crime enforcement, technology improvement, victim and witness services, mental and behavioral health, and crisis intervention.

62. For example, from FY 2019 to FY 2024, New Jersey received over $21 million in Byrne JAG formula funds, which it used to support anti-gang and narcotics task forces operated by 21 county prosecutors' offices (which purchased protective equipment for officers and funded operations involving informants and narcotics purchases); an anti-corruption initiative run by its Office of Public Integrity and Accountability (including hiring additional staff); an anti-gang task force run by its Division of Criminal Justice; law enforcement training and community policing

initiatives (including suicide prevention and youth engagement efforts); maintenance of data relating to law enforcement by its Office of Justice Data; hiring a technician in its Division of State Police's ballistics laboratory; purchase of body cameras for use by municipal police departments; and local law enforcement assistance programs (including enforcement of Megan's Law and maintaining sex offender registries and community notification procedures).

63. Byrne JAG awards likewise provide critical law enforcement funds to Rhode Island, which uses Byrne JAG funding, among other things, to enhance policing, aid in community relations, combat corruption, and provide training and other services to ensure the well-being of law enforcement officers, victims, and others impacted by the criminal justice system. For example, in FY 2024, local police departments received $335,927 to fund their Neighborhood Response Teams, records management services, cold case investigations, community outreach efforts, and critical tools and supplies such as computers, cameras, dive equipment, evidence packing materials, patrol motorcycles, communications upgrades, interview recording devices, security upgrades, radar signs, desk computers, narcotics analyzers, tourniquets, training programs, and related efforts. Likewise, in FY 2024, State Agencies and nonprofits received $279,067 to fund behavioral health specialists at family court, recidivism reduction projects, family reunification projects, security forces for significant statewide events, and related efforts. And in FY 2024, the Law Enforcement Planning Committee received $89,052 to fund peer-to-peer mental wellness programs, the State Commission on Prejudice and Bias, the State's Municipal Police Training Academy, the Rhode Island State Crime Lab, and related efforts.

64. Byrne JAG funds are critical for Washington where they have been used to support a broad range of services, including, increasing the capacity of subgrantees to provide culturally-specific legal assistance to survivors of domestic and sexual violence in order to close the "justice

gap" these crime victims often experience when critical legal intervention is needed, as well as to increase the availability of survivor-centered pre-diversion and conviction relief programs. Byrne JAG funds helped Washington, through its sub-grantees, provide services to hundreds of survivors of domestic and sexual violence in King, Clark, and Pierce counties over the course of calendar year 2025. For instance, one organization Washington has been able to support with Byrne JAG funds is providing critical support to crime victims through a model that brings together legal aid and victim wraparound support services in Pierce County, Washington. Byrne JAG funds have also been used in Washington to address critical issues that its youth in underserved parts of the state are increasingly facing, such as rising youth violence, opioid use, and mental health struggles.

65. Over the past several years, Byrne JAG formula funds have supported several local police departments in Massachusetts. Among other purposes, these funds have been used for readiness training for active shooter situations; mobile repeaters to improve communications with officers on patrol in remote settings; Flock cameras to enhance detection and prevention of contraband at various holding facilities; and replacement of various vehicles and equipment (including cruisers, motorcycles, utility vehicles, tactical vests, firearms storage system, radios, and computers) that, without the Byrne JAG funds, would not be available to the departments.

66. Hawaiʻi uses Byrne JAG funds to support county police departments, county prosecutor's offices, the Department of Corrections, Hawaiʻi Paroling Authority, and the Judiciary. For example, funds will support the Maui County Department of the Prosecuting Attorney's mental health summit, a two-day summit aimed at developing a framework to improve screening, referral, and diversion efforts for individuals with mental illness involved in the criminal justice system in Maui County. Funds have also been used to support firearms and latent fingerprint examiner training and to enhance the capacity of police department's special response teams.

67. The majority of Maine's Byrne JAG funding is typically used by Maine Drug Enforcement Agency (MDEA) primarily to fund law enforcement personnel under contract to MDEA from local departments. Maine's remaining Byrne JAG funding is subawarded to local law enforcement agencies, which use it to purchase or upgrade equipment or supplies, provide training, and fund personnel, among other uses.

68. BJA allocated Byrne JAG formula funds to Plaintiff States from FY 2022 to FY 2025 in the following amounts as shown in Table 1 below:

**Table 1 – Byrne JAG Allocations to Plaintiff States**

| Plaintiff | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|
| California | $19,663,951.00 | $21,274,503.00 | $18,234,257.00 | $20,135,051.00 |
| Colorado | $3,422,661.00 | $3,730,808.00 | $3,197,184.00 | $3,534,243.00 |
| Connecticut | $1,680,710.00 | $1,835,074.00 | $1,560,395.00 | $1,734,311.00 |
| Delaware | $1,006,656.00 | $1,079,646.00 | $923,744.00 | $1,032,233.00 |
| D.C. | $1,521,591.00 | $1,663,208.00 | $1,412,686.00 | $1,584,318.00 |
| Hawaiʻi | $928,484.00 | $1,015,811.00 | $863,118.00 | $959,501.00 |
| Illinois | $6,931,195.00 | $7,501,278.00 | $6,394,906.00 | $7,142,447.00 |
| Maine | $1,032,966.00 | $1,082,365.00 | $950,015.00 | $1,045,598.00 |
| Maryland | $3,699,618.00 | $4,028,663.00 | $3,463,964.00 | $3,804,480.00 |
| Massachusetts | $3,503,316.00 | $3,810,542.00 | $3,412,343.00 | $3,784,589.00 |
| Michigan | $6,033,033.00 | $6,740,739.00 | $5,808,062.00 | $6,394,248.00 |
| Minnesota | $2,868,392.00 | $3,127,448.00 | $2,715,886.00 | $2,979,912.00 |
| Nevada | $2,176,692.00 | $2,396,984.00 | $2,043,556.00 | $2,262.080.00 |
| New Jersey | $3,969,017.00 | $4,421,969.00 | $3,817,094.00 | $4,206,071.00 |
| New Mexico | $1,953,303.00 | $2,107,023.00 | $1,873,193.00 | $2,056,707.00 |
| New York | $9,231,239.00 | $10,015,972.00 | $8,487,623.00 | $9,522,245.00 |
| Oregon | $2,264,047.00 | $2,429,084.00 | $2,099,135.00 | $2,279,545.00 |
| Rhode Island | $855,245.00 | $943,399.00 | $782,273.00 | $890,074.00 |

| | | | | |
|---|---|---|---|---|
| Vermont | $520,036.00 | $542,919.00 | $458,542.00 | $538,200.00 |
| Washington | $3,721,562.00 | $4,037,082.00 | $3,467,946.00 | $3,825,048.00 |
| Wisconsin | $3,128,982.00 | $3,397,150.00 | $2,912,954.00 | $3,241,699.00 |
| **Totals** | $80,112,696.00 | $87,181,667.00 | $74,878,876.00 | $80,690,520.00 |

69. Plaintiff States and their political subdivisions and instrumentalities have applied for and been awarded Byrne JAG formula funds for decades, up to and including FY 2025.

70. The statutory formula makes no reference to state or local cooperation with federal immigration enforcement.

71. USDOJ has once previously attempted to condition Byrne JAG formula funding on States assisting with federal immigration enforcement efforts, but multiple courts found the conditions unlawful and enjoined USDOJ from implementing them. *See City of Providence v. Barr*, 385 F. Supp. 3d 160, 164 (D.R.I. 2019); *see also, e.g.*, *Colorado v. U.S. Dep't of Justice*, No. 19-cv-00736-JLK at ECF 56 (D. Colo. May 4, 2021); *City of Albuquerque v. Barr*, 515 F. Supp. 3d 1163, 1181-82 (D.N.M. 2021); *Illinois v. Barr*, No. 19-cv-3461 at ECF 27 (N.D. Ill. Oct. 23, 2019); *City of Evanston v. Barr*, 412 F. Supp. 3d 873, 889 (N.D. Ill. 2019); *Oregon v. Trump*, No. 18-cv-01959 at ECF 38 (D. Or. Aug. 29, 2019); *California v. Sessions*, No. 18-cv-5169 at ECF 51 (N.D. Cal. Mar. 26, 2019); *California ex rel. Becerra v. Sessions*, No. 17-cv-4701 at ECF 154 (N.D. Cal. Nov. 20, 2018); *City & County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958-61 (N.D. Cal. 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 882 (N.D. Ill. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 271, 287 (E.D. Pa. 2018).

72. OJP and BJA issued awards for FY 2025 Byrne JAG formula funds on or around July 13, 2026 that contain conditions requiring recipients to cooperate with federal civil immigration enforcement efforts. *See, e.g.*, ECF 54 at 21-24 (award conditions 63-66 of the FY 2025 Byrne

JAG pre-acceptance award package issued to New Jersey). Plaintiff States do not agree to comply with these conditions.

**2. Byrne State Crisis Intervention Program Formula Grant Program**

73. In 2022, Congress passed the Bipartisan Safer Communities Act, which established the Byrne State Crisis Intervention Program (SCIP), authorizing use of Byrne JAG funds "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice or civil proceedings," and expanding the permissible uses of such funding. Pub L. No. 117-159, sec. 12003 (June 25, 2022).

74. Specifically, Congress permitted Byrne JAG funding to be used for (1) mental health programs and related law enforcement corrections programs, including behavioral programs and crisis intervention teams; and (2) implementation of state crisis intervention court proceedings and related programs or initiatives." 34 U.S.C. § 10152(a)(1)(H)-(I).

75. As with Byrne JAG grants, any grants made pursuant to Byrne SCIP must be made "in accordance with the formula established under" the Byrne JAG statute. *Id.* § 10152(a)(1); *see id.* § 10156 (setting forth formula).

76. States have used Byrne SCIP formula grant funds to support the creation and implementation of state crisis intervention court proceedings, including extreme risk protection order (ERPO) programs that work to keep guns out of the hands of those who pose a threat to themselves or others, as well as other related gun violence reduction initiatives. The funds have also supported the creation and continuation of state specialty courts like drug, mental health and veterans' treatment courts, as well as gun violence recovery courts. The program funds have also been used to establish technology and information-sharing solutions for ensuring public safety/public health stakeholders are informed when a prohibited person attempts to purchase a firearm, enhancing

behavioral health responses to individuals in crisis like civil commitment treatment orders and establishment of guardianship programs.

77. For example, Rhode Island received $1,213,223.00 in SCIP funds for FY 2022 and FY 2023. The funds were passed through to State and local courts, prosecutors, local law enforcement, victim advocacy organizations, and diverse other organizations, including gun violence prevention organizations and those representing gun owners, for the purpose of creating a standardized policy, implementation plan, and training for applying for ERPOs, reducing suicide through ERPOs, disseminating information among gun owners and others about gun violence prevention and mental health resources, and training law enforcement officers, prosecutors, and judges on gun violence prevention.

78. New Jersey has received over $8.3 million in Byrne SCIP funds from FY 2022 to 2024, which it plans to use to support two initiatives. First, the funds will be used for public outreach and education initiatives concerning the public safety benefits of ERPOs, including media campaigns and direct outreach to community members and leaders working with at-risk individuals, as well as associated training efforts for law enforcement officers, prosecutors, and court staff who are responsible for public education and handling ERPO petitions. Second, the funds will be used to assist with the expansion of the New Jersey State Police ARRIVE ("Alternate Responses to Reduce Instances of Violent Escalation") Together program, which seeks to improve interactions between law enforcement and individuals with mental health disorders by implementing co-responder programs that pair plainclothes law enforcement officers with mental health specialists to respond together to behavioral health crisis 9-1-1 calls in order to circumvent harm that may come to individuals with mental health disorders.

79. Washington has been awarded more than $10 million in SCIP funds between FY 2022 and FY 2025, which it has used to improve the implementation of its protection order laws, which are meant to keep firearms out of the hands of those who pose a threat to themselves or others. Washington is focused on further developing evidence-informed strategies aimed at preventing firearm-related harm across the state and, to date, has achieved notable progress in refining civil protection order processes and expanding crisis intervention capabilities.

80. Hawai‘i's FY 2024 Byrne SCIP formula funds have been used to reduce firearm-related and community violence. This includes funding a Hawai‘i Police de-escalation training project, a project deploying canines trained in firearm detection to deter gun-related violence and support officer safety, and a Hawai‘i violence prevention education project to increase and support training on threat assessment, threat management, violence prevention, and bystander intervention practices. Hawai‘i also uses Byrne SCIP funds to support projects that identify high risk youth, including gang-involved youth, and proactively connect them to appropriate services and counseling to divert them from further involvement with the justice system.

81. In Maryland, SCIP funds have been critical to strengthening behavioral health and crisis response systems while supporting effective, constitutionally sound implementation of ERPOs. For example, the Baltimore City Sheriff's Office Safe Pathways project supports a crisis intervention initiative through firearm safe-storage education, community outreach, behavioral health referrals, and violence prevention. The program has served more than 17,000 individuals, engaged over 10,400 participants, conducted 97 outreach events, delivered 890 firearm safety trainings, and made 173 referrals to supportive services.

82. Over the past several years, Byrne SCIP formula funds have supported several law enforcement initiatives in Massachusetts. These efforts include crisis intervention programs;

mental health and domestic violence training; suicide prevention and de-escalation tools; gun violence prevention initiatives; school-based education, mentorship and outreach; and virtual reality training to enhance decision-making, situational awareness and preparedness.

83. Maine's Byrne SCIP award has been used primarily to fund law enforcement efforts to store relinquished weapons effectively and efficiently, including through subawards to local law enforcement agencies to upgrade and modernize their weapons storage facilities and systems. Maine also uses Byrne SCIP funds to develop a statewide strategic plan intended to provide a road map for crisis intervention programs in preventing violence and suicide.

84. BJA allocated Byrne SCIP formula funds to Plaintiff States from FY 2022 to FY 2025 in the following amounts as shown in Table 2 below:

**Table 2 – Byrne SCIP Allocations to Plaintiff States**

| **Plaintiff** | **FY 2022-2023** | **FY 2024** | **FY 2025** |
|---|---|---|---|
| California | $29,231,074.00 | $16,611,430.00 | $14,672,295.00 |
| Colorado | $4,564,438.00 | $2,650,316.00 | $2,349,312.00 |
| Connecticut | $2,470,247.00 | $1,406,812.00 | $1,241,726.00 |
| Delaware | 1,343,782.00 | 773,651.00 | $686,751.00 |
| D.C. | $1,503,477.00 | $858,918.00 | $761,489.00 |
| Hawai‘i | $1,445,832.00 | $828,728.00 | $732,077.00 |
| Illinois | $9,527,496.00 | $5,427,421.00 | $4,792,068.00 |
| Maine | $1,234,695.00 | $710,927.00 | $630,374.00 |
| Maryland | $5,124,825.00 | $2,887,797.00 | $2,555,689.00 |
| Massachusetts | $4,983,728.00 | $2,831,825.00 | $2,506,105.00 |
| Michigan | $7,945,884.00 | $4,573,367.00 | $4,043,567.00 |
| Minnesota | $3,723,236.00 | $2,157,199.00 | $1,909,759.00 |
| Nevada | $3,088,478.00 | $1,755,528.00 | $1,555,255.00 |
| New Jersey | $5,317,826.00 | $3,048,279.00 | $2,697,661.00 |

| | | | |
|---|---|---|---|
| New Mexico | $2,853,074.00 | $1,633,050.00 | $1,445,022.00 |
| New York | $13,313,053.00 | $7,629,061.00 | $6,724,205.00 |
| Oregon | 3,127,544.00 | $1,798,179.00 | $1,588,284.00 |
| Rhode Island | $1,213,223.00 | $698,613.00 | $618,325.00 |
| Vermont | $644,469.00 | $370,436 | $328,125.00 |
| Washington | $5,245,397.00 | $3,019,496.00 | $2,672,994.00 |
| Wisconsin | $4,166,354.00 | $2,392,048.00 | $2,117,254.00 |
| **Totals** | $112,068,132.00 | $64,063,081.00 | $56,628,337.00 |

85. Plaintiff States have applied for and been awarded Byrne SCIP formula funds for multiple years, up to and including FY 2025.

86. The statutory formula makes no reference to state or local cooperation with federal immigration enforcement.

87. Plaintiff States are unaware of BJA ever having previously imposed conditions in Byrne SCIP funding awards requiring States to assist with federal immigration enforcement efforts.

88. OJP and BJA issued awards for FY 2025 Byrne SCIP formula funds on or around July 13, 2026. The awards contain conditions that require recipients to cooperate with federal civil immigration enforcement efforts. *See, e.g.*, ECF 52-2 at 18-22 (award conditions 55-58 of the FY 2025 Byrne SCIP award issued to New Jersey). Plaintiff States do not agree to comply with these conditions.

**B. Other BJA Grants and OJP Public Safety Grants**

89. BJA and other OJP Program Offices administer several other grant programs relating to criminal justice and public safety on which Plaintiff States rely.

90. For example, BJA administers multiple other grant programs that provide critical funding to States, including the FY 2025 Sex Offender Registration and Notification Act

(SORNA), FY 2025 Prison Rape Elimination Act (PREA), and FY 2025/2026 Project Safe Neighborhoods (PSN) grant programs.

91. The authorizing statutes for these grants require distributions to eligible States pursuant to statutory formulas and make no reference to state or local cooperation with federal civil immigration enforcement. *See, e.g.*, 34 U.S.C. § 20927 (providing that States that fail to implement SORNA requirements "shall not receive" 10 percent of their Byrne JAG funds allocated for the corresponding fiscal year and that such funds "shall be reallocated … to jurisdictions that have not failed to substantially implement [SORNA requirements]"); 34 U.S.C. § 30307(e) (providing, in the event that a State is unable to certify that at least 5 percent of their Byrne JAG funds will be used to comply with PREA standards, that USDOJ "shall redistribute the funds of [such] … to other States to be used in accordance with the conditions of the grant program for which the funds were provided"); 34 U.S.C. §§ 60703-60704 (setting forth purposes of PSN funding, none of which include federal civil immigration enforcement, and requiring that PSN grants "shall be, to the greatest extent practicable, locally controlled to address problems that are identified locally").

92. In addition, BJA also administers dozens of competitive grant programs under the Byrne JAG statute and other federal statutes, including but not limited to: Byrne Discretionary Grants Program; Missing and Unidentified Human Remains (MUHR) Program; Postconviction Testing of DNA Evidence; CEBR Competitive Grants Program; Body-Worn Camera Policy and Implementation Program to Support Law Enforcement Agencies; National Sexual Assault Kit Initiative (SAKI); OJP Community Based Violence Intervention and Prevention Initiative; Prosecuting Cold Cases Using DNA; Student, Teacher, Officers Preventing (STOP) School Violence; Upholding the Rule of Law and Preventing Wrongful Convictions; and Comprehensive Opioid, Stimulant, and Substance Use Program (COSSUP).

93. BJA competitive grants are governed by a variety of statutes. Certain BJA competitive grants are based on the same authority as their BJA formula grant counterparts, which do not authorize the Immigration Enforcement Conditions. *See, e.g.*, Pub. L. No. 118-42, para 10(A) (authorizing DNA CEBR and Protecting Cold Cases Using DNA competitive grants "for the purposes authorized under section 2 of [the Debbie Smith Act]"). Other BJA competitive grants specify the purpose of the competitive grants and require BJA to make funds available for grants serving those purposes pursuant to a competitive process. *See, e.g.*, 34 U.S.C. § 40501-40502 (Missing and Unidentified Human Remains Program); Pub. L. No. 118-42, para. 10(C) (appropriating monies for the Postconviction Testing of DNA Evidence Program for the purposes described in the Kirk Bloodsworth Post-Conviction DNA Testing Grant Program). The statutory purposes of these BJA competitive grant funds do not relate in any way to immigration enforcement.

94. Beyond BJA grants, Plaintiff States and their instrumentalities rely on additional grants administered by other OJP Program Offices, including BJS and NIJ. Examples of such grants include the BJS State Justice Statistics Program for Statistical Analysis Centers, and the NIJ Research and Evaluation on Innovations in Forensic Science for Criminal Justice Purposes grant program.

95. The authorizing statutes for these grants also do not relate in any way to federal civil immigration enforcement. *See, e.g.*, 34 U.S.C. §§ 10131–10132 (authorizing BJS to make grants "for purposes related to this subchapter," which are "to provide for and encourage the collection and analysis of statistical information concerning crime, juvenile delinquency, and the operation of the criminal justice system and related aspects of the civil justice system and to support the development of [related] information and statistical systems"); 34 U.S.C. 10121–22 (authorizing NIJ to make grants in order to "conduct research, demonstrations, or special projects pertaining

to the purposes described in this subchapter," which include, among other things, to provide for and encourage research into "improving Federal, State, and local criminal justice systems and related aspects of the civil justice system," with "primary emphasis to the problems of State and local justice systems").

96. Awards under these programs support a range of initiatives designed to assist state and local law enforcement and criminal justice efforts. For example, through the Body-Worn Camera Policy and Implementation Program to Support Law Enforcement Agencies, States have been able to purchase and integrate body-worn camera technology into their law enforcement operations, as well as develop policies and train officers on the use of this technology, to enhance public safety, enhance officer safety, and obtain reliable evidence for solving crimes. Collectively, they enhance the quality of law enforcement and promote public safety nationwide.

97. Several Plaintiff States and their political subdivisions and instrumentalities (including Rhode Island, New Jersey, California, Delaware, Colorado, Connecticut, Illinois, Massachusetts, Maine, Michigan, Minnesota, New York, Oregon, Virginia, Washington, and Wisconsin) have applied for and/or intend to apply for these OJP grants in FY 2025 and/or FY 2026.

98. For example, New Jersey applied for the FY 2025 Body-Worn Camera Policy and Implementation Program and would use the funding to upgrade its body-worn camera devices and associated hardware, including the purchase of 1,768 new body-worn cameras, as well as to secure a digital evidence storage platform for the State Police and establish a centralized repository for body-worn camera footage and other digital evidence, to improve evidence sharing.

99. As another example, Maine's applied for FY 2025-2026 Project Safe Neighborhoods funding, which it would use for enforcement against gang/trap-house networks, distribution networks for fentanyl and methamphetamine, and targeted interdiction of illegal firearms fueling

juvenile violence. The prior two years of subawards went to the Maine State Police (MSP) Crime Lab and the Maine Gun Coalition, with the MSP award funding forensic ballistics technology and the Coalition award funding the creation of the third edition of *Summary of Maine Gun Laws.*

100. Similarly, Rhode Island applied for the FY25 BJA Public Safety Mental Health Initiative, and the FY25 BJA Second Chance "Pay for Success" Initiative. These funds would be used to address critical gaps in structured and permanent supportive housing for individuals at elevated ricks of recidivism and homelessness.

101. The Notices of Funding Opportunity (NOFOs) for these FY 2025 and FY 2026 grants contain conditions that require recipients to cooperate with federal civil immigration enforcement efforts. *See, e.g.*, ECF 52-3 at 7-8 (FY 2025-2026 PSN NOFO). Plaintiff States do not agree to comply with these conditions.

## II. Congress Has Long Authorized Grants To States To Support State Juvenile Justice And Delinquency Prevention Programs.

102. Federal grants administered by USDOJ have long been instrumental in supporting state juvenile justice systems and efforts to prevent juvenile delinquency.

103. USDOJ's juvenile justice and delinquency grants are administered by OJJDP, which was established by Congress in 1973, pursuant to the Juvenile Justice and Delinquency Prevention (JJDP) Act of 1974, Public Law 93–415, sec. 201(a) (Sept. 7, 1974), to support local and state efforts to prevent delinquency and improve juvenile justice systems.

104. OJJDP sponsors research, program, and training initiatives; develops priorities and goals and sets policies to guide federal juvenile justice issues; disseminates information about juvenile justice issues; and awards funds to States to support local programs.

105. States and their local government subdivisions rely on the funding issued under the formula and competitive grant programs that OJJDP administers every year.

**A. OJJDP Title II Formula Grant**

106. First enacted in 1974, Title II authorized the OJJDP Administrator to "make grants to States and local governments to assist them in planning, establishing, operating, coordinating, and evaluating projects directly or through contracts with public and private agencies for the development of more effective education, training, research, prevention, diversion, treatment, and rehabilitation programs in the area of juvenile delinquency and programs to improve the juvenile justice system." Pub. L. No. 93–415, sec. 221. Congress intended that these "block grants" be distributed to the States by a formula for them to be spent "according to criteria and priorities determined by the States . . . themselves." S. Rep. No. 93-1101, at 5300 (1974).

107. Title II also specifies the requirements that a State must satisfy "[i]n order to receive formula grants," including submitting to USDOJ a three-year plan for carrying out the purposes of the grant funding program, the contents of which are enumerated in detail in the statute, and submitting annual performance reports. 34 U.S.C. § 11133(a).

108. The formula funds under Title II "shall be allocated annually among the States" based on "the relative population of people under the age of 18." *Id.* § 11132(a)(1). The Title II formula also guarantees each State a minimum amount of federal funding. *Id.* § 11132(a)(2).

109. The Title II statute requires Defendants to provide a federal grant to the State so long as it "has an approved comprehensive plan which conforms with the purposes and requirements of the Act and with rules, regulations, and procedures established by [the agency] consistent with the Act." S. Rep. No. 93-1101, at 5300 (1974). The authorizing statute, in 33 subsections, sets out the requirements for that state plan in extensive detail. 34 U.S.C. § 11133(a)(1)-(33). Among those requirements are four core mandates: (1) deinstitutionalization of status offenders; (2) separation of juveniles from adult inmates in secure facilities; (3) removal of juveniles from adult jails

and lockups; and (4) reduction of disproportionate minority contact with the juvenile justice system. S. Rep. No. 102-393, at 23 (1992); *see also* 34 U.S.C. §§ 11103(30), 11133(a)(11)-(13), (15).

110. The statute also enumerates the specific circumstances in which a State's formula allocation could be reduced. A State's share may be reduced by no less than twenty percent for each core requirement that has not been satisfied. *Id.* § 11133(c)(1)(A). Even then, a State may still receive its allocation if it agrees to spend half of the state's allocation toward compliance with the core requirement or if the OJJDP Administrator determines that the State has achieved substantial compliance or has committed to full compliance with the core requirement. *Id.* § 11133(c)(1)(B). The Administrator may also reallocate a state's allocation if the State does not submit a state plan, fails to submit a plan, or submits a plan that does not meet the requirements of the section. *Id.* § 11133(d).

111. If USDOJ determines that any allocated funds remain unobligated at the end of the fiscal year, they "shall be reallocated in a manner equitable and consistent with the purpose of" Title II. *Id.* § 11132(b).

112. The statutory formula makes no reference to state or local cooperation with federal immigration enforcement.

113. States have used Title II formula grant funds to support juvenile justice systems and delinquency prevention programs.

114. For example, from FY 2021 to 2023, New Jersey used over $3.2 million in Title II grant funds to fund transitional living expenses for young people released from parole or incarceration; initiatives that provide low-level offenders with alternatives to arrest; de-escalation training for law enforcement; summer expansion programs for justice-involved or at-risk youth; initiatives

focused on incarceration of girls and racial and ethnic disparities in incarceration; and salaries for program specialists and compliance monitors.

115. Similarly, from FY 2023 to 2026, California used about $4 million in Title II grant awards to fund case planning, reentry, and after care services for young people transitioning from parole or incarceration; youth mentorship, employment development, and trauma-informed counseling programs for youth at-risk or in contact with the criminal justice system; clinical counseling for mental health and substance abuse; community-based programs to prevent youth from dropping out of school; anti-recidivism programs; and comprehensive pre- and post-release reentry services for individuals exiting the juvenile justice system, including transitional housing and linkages to healthcare and other supportive services.

116. Rhode Island also relies on Title II funding to provide support to state and local delinquency prevention and intervention efforts and fund juvenile justice system improvements. Title II funds are distributed to community-based organizations, the Rhode Island Department of Children, Youth & Families, and Rhode Island Family Court. For example, Rhode Island received $599,479.00 in Title II funds for FY 2022. These funds were passed through to various community-based organizations, the tribal community, and Rhode Island Family Court for the purposes of efforts related to truancy, diversion, direct services for at-risk youth, racial and ethnic disparity research, and disproportionate minority contact.

117. Maine's Department of Corrections has used Title II funding to support delinquency prevention, intervention, and juvenile justice system improvements by focusing on community-based continuum of care, alternatives to incarceration, higher education and employment opportunities, mental health supports, and tribal engagement. In FY 2025, Maine received $622,975 in Title II monies to provide resources, strategic funding, and expert guidance to support

a rehabilitative environment for juveniles to build robust community-based organizations that promote diversion, intervention, and reentry programs for youth at-risk or in the juvenile justice system.

118. OJJDP allocated Title II formula funds to Plaintiff States from FY 2022 to FY 2025 in the following amounts as shown in Table 3 below:

| **Table 3 – Title II Allocations to Plaintiff States** | | | | |
|---|---|---|---|---|
| **Plaintiff** | **FY 2022** | **FY 2023** | **FY 2024** | **FY 2025** |
| California | $4,154,949.00 | $4,675,676.00 | $4,099,327.00 | $4,204,755.00 |
| Colorado | $765,549.00 | $814,180.00 | $7,509,000.00 | $657,314.00 |
| Connecticut | N/A | $600,554.00 | N/A | N/A |
| Delaware | $480,442.00 | $480,656.00 | $613,448.00 | $485,413.00 |
| D.C. | $600,280.00 | $600,407.00 | $480,478.00 | $611,677.00 |
| Hawaiʻi | $600,646.00 | $600,968.00 | $631,918.00 | $627,595.00 |
| Illinois | $1,155,896.00 | $1,275,478.00 | $939,148.00 | $1,299,251.00 |
| Maine | $600,539.00 | $600,805.00 | $626,520.00 | $622,975.00 |
| Maryland | $817,113.00 | $877,171.00 | $866,821.00 | $726,537.00 |
| Massachusetts | $646,754.00 | $527,716.00 | $434,881.00 | $450,522.00 |
| Michigan | $1,169,614.00 | $1,293,306.00 | $1,217,869.00 | $1,186,498.00 |
| Minnesota | $775,366.00 | $853,107.00 | $844,022.00 | $837,045.00 |
| Nevada | $590,500.00 | $590,509.00 | $672,542.00 | $653,877.00 |
| New Jersey | $914,816.00 | $1,244,486.00 | $1,093,781.00 | $1,156,410.00 |
| New Mexico | $590,500.00 | $614,595.00 | $650,069.00 | $643,204.00 |
| New York | $2,027,519.00 | $2,325,235.00 | $2,082,920.00 | $1,772,916.00 |
| Oregon | $590,500.00 | $665,657.00 | $681,658.00 | $667,119.00 |
| Rhode Island | $600,440.00 | $600,659.00 | $621,857.00 | $618,883.00 |
| Vermont | $480,246.00 | $600,370.00 | $488,372.00 | $488,929.00 |
| Washington | $938,430.00 | $1,020,199.00 | $989,598.00 | $998,528.00 |
| Wisconsin | $754,582.00 | $813,451.00 | $809,082.00 | $811,488.00 |

| | | | | |
|---|---|---|---|---|
| **Totals** | $19,254,681.00 | $21,675,185.00 | $26,353,311.00 | $19,520,936.00 |

119. Plaintiff States have applied for and been awarded Title II formula funds for decades, up to and including FY 2025.

120. OJP and OJJDP issued awards for FY 2025 Title II formula funds on or around July 13, 2026. The awards contain conditions that require recipients to cooperate with federal civil immigration enforcement efforts. *See, e.g.*, ECF 52-4 at 16-19 (award conditions 44-47 of the FY 2025 Title II pre-acceptance award package issued to Rhode Island). In addition, on August 19, 2026, OJP and OJJDP belatedly issued New Jersey's FY 2024 Title II award, which contains the same immigration-related conditions. *See* Exhibit 1 at 27-32. The NOFO announcing the FY 2025 Title II grant program contained these conditions, but the NOFO announcing the FY 2024 Title II grant program did not. Plaintiff States do not agree to comply with these conditions.

**B. OJJDP Competitive Grants**

121. OJJDP also administers competitive grant programs authorized by the JJDPA and other statutes, including but not limited to: Youth Gang Prevention and Intervention Program; Opioid Affected Youth Initiative; Second Chance Act Youth Reentry Program; Post-Secondary Education Opportunities for Child Protection Professionals; Enhancing Juvenile Indigent Defense; Byrne Discretionary Grant Program; and Reducing Recidivism for Female Juvenile Delinquents.

122. Awards under these programs support a range of initiatives designed to expand and strengthen services for youth, including establishing programs to address child abuse and neglect; expanding prosecutions related to technology-facilitated child sexual exploitation; implementing mentoring services to youth populations that are at risk or high risk for delinquency or victimization; supporting child advocacy training in undergraduate programming and continuing education; strengthening support services for children who have been exposed to violence in their homes,

schools, and communities; and improving juvenile indigent defense. Collectively, they enhance the quality and accessibility of services for vulnerable youth nationwide.

123. OJJDP competitive grants are governed by a variety of statutes, which specify the purpose of the grants and require OJJDP to make funds available for grants serving those purposes pursuant to a competitive process. *See, e.g.*, 34 U.S.C. § 20303 (Victims of Child Abuse Act authorizing competitive grants under the Regional Children's Advocacy Program, which focuses on enhancing communities agencies' ability to "respond to child abuse cases"); 34 U.S.C. §§ 11171-11172 (authorizing competitive grants under the Strategies to Support Children Exposed to Violence Program and requiring OJJDP to "ensure" that such grants "achieve an equitable geographical distribution of such projects throughout the [U.S.]"); Pub. L. No. 118-42, 138 Stat. 25, 150, para. 5 (appropriating moneys for the Internet Crimes Against Children Task Force National Training Program "as authorized by sections 404(b) and 405(a) of the [JJDPA]," which, in turn, enumerate purposes for which grant funds "shall be used" and are "authorized"). The statutory purposes of OJJDP competitive grant funds do not relate in any way to immigration enforcement.

124. Congress also specified certain criteria for creating and awarding these OJJDP competitive grant funds. The criteria do not relate in any way to immigration enforcement.

125. Several Plaintiff States and their political subdivisions and instrumentalities (including New Jersey, Hawai'i, Michigan, and Minnesota) have applied for and/or intend to apply for various OJJDP competitive grants in FY 2025 and FY 2026.

126. For example, New Jersey applied for the FY 2025 Youth Gang Prevention and Intervention Program and would use the funding to support efforts to help prevent youth from joining gangs, discontinue involvement in gangs, and prevent and reduce additional youth gang violence.

127. Plaintiffs are unaware of OJJDP ever having previously conditioned competitive grants on States assisting with federal immigration enforcement efforts.

128. The NOFOs for FY 2025 and FY 2026 OJJDP competitive grants contain conditions that require recipients to cooperate with federal civil immigration enforcement efforts. *See, e.g.*, ECF 52-5 at 9-10 (FY 2025 Youth Gang Prevention and Intervention Program NOFO). Plaintiff States do not agree to comply with these conditions.

## III. Congress Has Long Authorized Grants To States Under The Victims Of Crime Act To Support Crime Victims, Survivors, And Their Families.

129. Federal grants administered by USDOJ have long been instrumental in supporting state programs that provide compensation and assistance to victims of crime.

130. In December 1982, President Ronald Reagan's Task Force on Victims of Crime issued a report concluding that "[t]he neglect of crime victims is a national disgrace." Among the report's key recommendations was to "enact legislation to provide federal funding to assist state crime victim compensation programs" and "provide federal funding, reasonably matched by local revenues, to assist in the operation of federal, state, local, and private nonprofit victim/witness assistance agencies that make comprehensive assistance available to all victims of crime."

131. Congress answered the call two years later with VOCA, which created the Crime Victims Fund within the U.S. Treasury and established OVC as an office within USDOJ. Congress structured VOCA "with minimal bureaucratic 'strings attached,' for direct compensation and service programs to assist victims of crime" in order to support inadequately funded state and local victim assistance programs. S. Rep. No. 497, 98th Cong., 2d Sess. at 1, 3 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3607, 3607, 1984 WL 37447. "Unlike some past compensation bills," VOCA is "intended to keep conditions on Federal Aid to a bare minimum." *Id.* at 9. The U.S. Attorney General at the time emphasized that the new grants would not "creat[e] an unnecessary bureaucracy to

impose the Federal government's priorities on the States .... [T]he Federal government will provide money to the States to enable the States to effectively run their own programs." 130 Cong. Rec. S5252, 5352 (Mar. 13, 1984) (statement of Attorney General William French Smith).

132. Over the years, Congress amended VOCA to "allow a greater measure of flexibility to ... State and local victims' assistance programs" and provide "greater certainty" that funding "will not wax and wane with events .... [Grant recipients] need to be able to plan and hire and have a sense of stability if these measures are to achieve their fullest potential." S. Rep. No. 179, 104th Cong., 1st Sess. at 29 (1995), *reprinted in* 1996 U.S.C.C.A.N. 924, 941, 1995 WL 731704.

133. VOCA directs that the U.S. government shall deposit into the Crime Victims Fund various penalties and fees recovered from individuals convicted of federal offenses.

134. VOCA further directs that the Federal Government shall draw on the Crime Victims Fund to issue annual grants to States for victim compensation and assistance. 34 U.S.C. §§ 20101-20111.

135. Since VOCA's enactment, VOCA funds have been instrumental in providing critical support to millions of victims and survivors (and their families) of serious crime in all States and territories. *See, e.g.*, Office for Victims of Crime, *VOCA Victim Compensation Data Dashboard: Data Analyses for Fiscal Years 2021-2024*, https://tinyurl.com/3xt53tpd; Office for Victims of Crime, *VOCA Victim Assistance Data Dashboard: Data Analyses for Fiscal Years 2021-2024*, https://tinyurl.com/mr28xvfp. For example, in Federal Fiscal Year (FY) 2024 alone, VOCA grants enabled assistance to more than 2.8 million crime victims in Plaintiff States and payment for more than 88,000 claims for losses suffered by crime victims in Plaintiff States. *Id.*

136. As the available amounts in the Crime Victims Fund have fluctuated over the years, Congress has made additional funds available, including by amendments to VOCA via the 2001

USA PATRIOT ACT, Pub. L. 107-56, and the VOCA Fix to Sustain the Crime Victims Fund Act of 2021, Pub. L. 117-27. In January 2002, Congress also appropriated $68.1 million for the Crime Victims Fund to assist in providing relief to 9/11 victims. Emergency Supplemental Appropriations for Recovery from and Response to Terrorist Attacks on the United States Act, Pub. L. 107-117.

**A. VOCA Formula Grants**

137. Congress has directed OVC to administer two formula grant programs pursuant to VOCA that support crime victim compensation and assistance: Victim Compensation Formula Grants and Victim Assistance Formula Grants.

138. The Victim Compensation and Victim Assistance grants are formula grants, not competitive grants, which means each State is entitled to a specific amount of funding based on the applicable statutory formula. The relevant statutory formulas are detailed below.

139. For FY 2026, over $191 million from the Crime Victims Fund is to be awarded to States under the Victim Compensation Formula Grant, and over $1.2 billion is to be awarded to States under the Victim Assistance Formula Grant. Based on the applicable statutory formulas, OVC has calculated that Plaintiff States are collectively entitled to approximately $82 million of the Victim Compensation Formula Grant funds and approximately $562 million of the Victim Assistance Formula Grant funds.

140. Because each VOCA formula grant typically remains open for four years, and is subject to further extension, an award in one fiscal year can allow States to continue to support program activities in at least the three years thereafter.

**1. Victim Compensation Formula Grants**

141. Victim Compensation Formula Grants provide funding from the U.S. Treasury's Crime Victims Fund to all qualifying state-run crime victim compensation programs. 34 U.S.C. § 20102.

142. The purpose of these grants is to provide compensation to eligible crime victims for costs resulting from crime, including for medical care, lost wages, mental health counseling, funeral expenses, and crime scene clean-up. The grants are designed to supplement state and territory efforts to provide financial compensation to crime victims.

143. VOCA provides that the OVC Director "shall make an annual grant" to eligible victim compensation programs based on a fixed statutory formula. 34 U.S.C. § 20102(a).

144. VOCA delineates the precise set of requirements that a state victim compensation program must satisfy to be eligible for a grant, requiring, *e.g.*, that States pay for certain victim expenses, treat federal and state crimes and residents and non-residents the same, and not deny compensation based on a victim's familial relationship with an offender. *Id.* § 20102(b)(1)-(9). The recipient State must also certify that the grant funds will "not be used to supplant State funds otherwise available to provide crime victim compensation." *See id.* § 20102(b)(3). None of the statutory eligibility or certification requirements relates to immigration enforcement.

145. Victim Compensation Formula Grants are distributed among eligible state programs based on a statutory formula that accounts for the amount of money each state crime victim compensation program distributed to victims in the preceding fiscal year. Specifically, the OVC "Director shall make an annual grant from the Fund to an eligible crime victim compensation program of 75 percent of the amounts awarded" by the state compensation program "during the preceding fiscal year, other than amounts awarded for property damage." *Id.* § 20102(a)(1).

146. The statute recognizes only one exception to this statutory formula. If the Crime Victims Fund is “insufficient” to provide 75 percent of the amount distributed by each State in the preceding fiscal year, “the [OVC] Director shall make, from the sums available, a grant to each eligible crime victim compensation program so that all such programs receive the same percentage of the amounts awarded by such program during the preceding fiscal year, other than amounts awarded for property damage.” *Id.* § 20102(a)(2).

147. The statutory formula makes no reference to state or local cooperation with federal immigration enforcement.

148. States have used Victim Compensation Formula Grant funds to compensate victims and survivors of crime for various injuries and losses they suffered as a result of the crime.

149. For example, in FY 2024, New Jersey used Victim Compensation grant funds, along with associated state funds, to provide over $21.8 million in compensation to over 5,500 claimants, including victims and survivors of domestic violence, sexual assault, homicide, child abuse, and human trafficking. These payments covered funeral and burial costs, relocation expenses, crime scene cleanup, loss of support, attorney fees, and other necessary expenses.

150. In FY 2024, California’s Victim Compensation Board (CalVCB) received $23.2 million in VOCA Compensation Program awards, and CalVCB reimbursed 24,639 applications from victims and survivors of assault, homicide, child abuse, and other crimes for funeral, medical, mental health, relocation, and other costs incurred because of crime. The vast majority of CalVCB’s budget is spent providing direct compensation to victims whose financial losses are not covered by insurance or other sources. CalVCB plans to use VOCA Compensation Program funds in FY 2025 for these same purposes.

151. Rhode Island received a VOCA Compensation Program award of $290,000 in FY 2024, and the State has likewise used this funding to, for example, help victims and survivors pay for out-of-pocket medical expenses, funeral and burial costs, relocation expenses, mental health counseling fees, and crime scene clean-up costs.

152. Between FY 2022 and 2024, Delaware received a total of $2,050,000 in VOCA Victim Compensation funding. These funds supported state compensation programs that provided financial assistance to victims of crime for crime-related expenses such as medical care, lost wages, mental health counseling, and other costs.

153. Other Plaintiff States have likewise used Victim Compensation grants, along with associated state funds, to provide compensation to victims and their families for crime-related expenses. These federal funds have enabled Plaintiff States to pay for a wide range of victim and survivor services in the immediate aftermath of a crime (for example, the timely use of rape kits), and to help them heal from the lasting impacts of crime (for example, counseling for child witnesses to violent crime). These funds are also used to foster trust-based participation in the criminal justice system for victims, witnesses, and their families, by facilitating, for example, safe and secure transportation to and from court hearings.

154. OVC allocated Victim Compensation Formula Grant funds to Plaintiff States from FY 2023 to FY 2026 in the following amounts as shown in Table 4 below:

**Table 4 – VOCA Compensation Allocations to Plaintiff States**

| **Plaintiff** | **FY2023** | **FY2024** | **FY2025** | **FY2026** |
|---|---|---|---|---|
| California | $25,746,000.00 | $23,206,000.00 | $22,458,00.00 | $11,017,000.00 |
| Colorado | $5,841,000.00 | $7,510,000.00 | $7,509,000.00 | $7,250,000.00 |
| Connecticut | $844,000.00 | $1,076,000.00 | $750,000.00 | $863,000.00 |
| Delaware | $721,000.00 | $834,000.00 | $1,147,000.00 | $2,275,000.00 |

| | | | | |
|---|---|---|---|---|
| D.C. | $2,668,000.00 | $3,122,000.00 | $1,946,000.00 | $2,319,000.00 |
| Hawai'i | $262,000.00 | $318,000.00 | $379,000.00 | $433,000.00 |
| Illinois | $3,405,000.00 | $7,549,000.00 | $8,024,000.00 | $5,400,000.00 |
| Maine | $363,000.00 | $404,000.00 | $346,000.00 | $422,000.00 |
| Maryland | $1,081,000.00 | $1,369,000.00 | $296,000.00 | $1,670,000.00 |
| Massachusetts | $2,019,000.00 | $1,452,000.00 | $2,022,000.00 | $2,023,000.00 |
| Michigan | $1,316,000.00 | $2,680,000.00 | $2,462,000.00 | $5,286,000.00 |
| Minnesota | $2,545,000.00 | $2,106,000.00 | $1,080,000.00 | $1,322,000.00 |
| Nevada | $1,030,000.00 | $2,362,000.00 | $742,000.00 | $3,717,000.00 |
| New Jersey | $9,522,000.00 | $9,996,000.00 | $9,140,000.00 | $11,902,000.00 |
| New Mexico | $1,176,000.00 | $1,221,000.00 | $1,231,000.00 | $1,051,00.00 |
| New York | $10,880,000.00 | $6,789,000.00 | $6,498,000.00 | $8,590,000.00 |
| Oregon | $1,981,000.00 | $3,062,000.00 | $3,072,000.00 | $3,176,000.00 |
| Rhode Island | $642,000.00 | $290,000.00 | $294,000.00 | $265,000.00 |
| Vermont | $168,000.00 | $268,000.00 | $305,000.00 | $207,000.00 |
| Washington | $7,951,000.00 | $4,354,000.00 | $4,791,000.00 | $9,496,000.00 |
| Wisconsin | $2,524,000.00 | $3,008,000.00 | $2,189,000.00 | $3,351,000.00 |
| **Totals** | $82,685,000.00 | $82,976,000.00 | $76,681,000.00 | $80,984,000.00 |

155. Plaintiff States have applied for Victim Compensation Formula Grant funds for decades, including and up to FY 2026.

156. Plaintiff States are unaware of OVC ever having previously imposed conditions in Victim Compensation funding awards requiring States to assist with federal immigration enforcement efforts.

157. Final applications for Victim Compensation Formula Grants for FY 2026 were due on July 15, 2026. Plaintiff States have submitted applications for these grant funds. The NOFO for FY 2026 Victim Compensation Formula Grant contains conditions that require recipients to

cooperate with federal civil immigration enforcement efforts. *See* ECF 52-6 at 4-5 (FY 2026 VOCA Compensation NOFO). Plaintiff States do not agree to comply with these conditions.

### 2. Victim Assistance Formula Grants

158. Victim Assistance Formula Grants provide funding to each State to provide financial support for eligible crime victim assistance programs. 34 U.S.C. § 20103(a)(1).

159. The purpose of Victim Assistance Formula Grants is to improve the treatment of victims of crime by providing them with the assistance, support, and services necessary to aid their recovery after a criminal act. These grants are intended to enable States to provide subgrants to local community-based organizations and public agencies that provide services directly to crime victims, including but not limited to victim and witness advocacy services; crisis counseling; telephone and onsite information and referrals; criminal justice support and advocacy; emergency shelter; therapy; and consistent communication about significant events in their case. 34 U.S.C. § 20103(b)-(d). All services are to be administered without regard to a victim's immigration status. *See, e.g.*, 28 C.F.R. § 94.103(a).

160. VOCA provides that the OVC Director "shall make an annual grant" to the chief executive of each State to provide financial support to eligible victim assistance programs. 34 U.S.C. § 20103(a). Each State subgrants such funds out to community-based organizations and public agencies that provide services directly to crime victims. *Id.* § 20103(b)-(c).

161. Congress has specified the criteria for determining the eligibility of a victim assistance program to receive Victim Assistance grant funds. *Id.* § 20103(b). A program is eligible under these statutory criteria if, among other things, it is run by a public agency or nonprofit organization, has a demonstrated record of providing effective services to crime victims, assists victims in seeking compensation benefits, and does not discriminate against victims because they disagree with

how a case is prosecuted. *Id.* Congress has also specified which certifications are required of a State's chief executive, including that "funds awarded to eligible crime victim assistance programs will not be used to supplant State and local funds otherwise available for crime victim assistance." *Id.* § 20103(a)(2). None of the eligibility criteria or required certifications specified in the statute relate to immigration enforcement.

162. Victim Assistance Formula Grants are distributed among the States based on a fixed statutory formula. Under that formula, each State is entitled to a base amount of $500,000 and an additional share of the remaining available money in the Crime Victims Fund based on "each State's population in relation to the population of all States." *Id.* § 20103(a)(3).

163. The statutory formula makes no reference to state or local cooperation with federal immigration enforcement.

164. States use Victim Assistance Formula Grants to fund a wide range of activities that provide support to victims who are navigating the criminal justice system and addressing the trauma and disruption suffered as a result of their victimization.

165. For example, in FY 2024, New Jersey subgranted VOCA victim assistance funds and associated state funds to dozens of subrecipients that provide victim services across the State. Over $33 million in funds were subgranted to public agencies, including: county prosecutors' offices, to guide victims and witnesses through criminal and civil processes, and for Sexual Assault Response Teams and Forensic Nurse Examiner programs to assist victims of sexual assault; the Division of Criminal Justice, to support a statewide automatic notification service for victims when individuals convicted of sex crimes are released from custody; and the Department of Corrections, to support domestic violence survivors. Another $61 million in funds were subgranted to victim organizations to support services for victims and survivors, including trauma recovery centers,

clinical counseling, medical and behavioral health assessments, and legal representation. With those funds, over 34,000 calls were fielded by crisis hotlines, and over 9,400 individuals received assistance with shelter and supportive housing. Victim Assistance funds and associated state funds were used to support approximately 433,000 victims in New Jersey in FY 2024.

166. In Illinois, the Illinois Criminal Justice Information Authority (ICJIA) applied in FY 2025 for a VOCA Assistance Program award and received $46,400,453. ICJIA subgrants VOCA funds to over 60 subgrantees, three of which are lead entity programs that pass-through funds to 124 recipients. VOCA Assistance Program funds support a range of programming, including: services to domestic violence victims, including crisis response, legal advocacy, shelter, counseling, and case management through a statewide network of service providers; services to victims of sexual assault, including support for over 30 rape crisis centers in Illinois that provide 24/7 advocacy, medical accompaniment, counseling, support groups, and prevention education; and services to victims of child abuse, including forensic interviews, medical exams, counseling, and family advocacy to child victims of abuse, working closely with law enforcement and DCFS. These services include programs in schools and communities that work to prevent sexual violence before it happens; transitional housing services that provide safe, supportive housing for victims of domestic violence, trafficking, or other violent crimes; and trauma recovery centers that provide crime victims with mental health care, substance abuse support, and intensive case management, particularly for those who do not traditionally seek help.

167. Rhode Island received $4,516,901 in VOCA Assistance Program funds in FY 2025. These funds, which have been distributed to over two-dozen subgrantees throughout the State, support wrap-around services such as counseling, housing, job training, life skills training, financial education, advocacy, resource referrals, case management, language services, and other

support for victims of violent crimes and their families. Those services include support for human trafficking and domestic violence victims, advocacy and support for child sexual assault investigations, a domestic violence and sexual assault victim hotline, court advocates to accompany victims through the criminal justice process, clinics for uninsured victims as well as those seeking to preserve their anonymity, shelters for domestic violence victims and their families, advocacy services for the deaf and the elderly, and other support for community-based advocacy groups. The State also used VOCA Assistance Program funds to establish a multiagency platform to provide victims and their advocates information on offender compliance and release, as well as to allow victims to submit impact statements for parole hearings. In FY 2024 alone, over 40,000 individuals received services paid for by VOCA Assistance Program funds.

168. California uses VOCA Victim Assistance funds to support various victim assistance efforts through 35 programs, including subgrants to Victim Witness Assistance Centers at district attorney's offices in each of California's 58 counties, to provide comprehensive services to victims and witnesses of all types of violent crime; subgrants through the Domestic Violence Assistance Program to 98 non-government organizations throughout the state to provide comprehensive support, including emergency shelter, food, and clothing to victims of domestic violence and their children, a 24-hour crisis hotline, and local assistance to domestic violence service providers.

169. Other Plaintiff States have also used Victim Assistance funds for services such as information and referral, advocacy and accompaniment, support and safety, shelter and housing, and assistance with navigating the justice system. And they have used the funds for organizations that include child advocacy centers, rape crisis centers, sexual assault nurse examiner programs, domestic violence shelters and services providers, human trafficking service providers, legal services for victims, elder abuse resources, trauma recovery centers, and more.

170. OVC allocated Victim Assistance Formula Grant funds to Plaintiff States from FY 2021 to FY 2024 in the following amounts as shown in Table 5 below:

| Table 5 – VOCA Assistance Allocations to Plaintiff States | | | | |
|---|---|---|---|---|
| **Plaintiff** | **FY2023** | **FY2024** | **FY2025** | **FY2026** |
| California | $153,789,867.00 | $87,080,017.00 | $142,898,925.00 | $144,684,362.00 |
| Colorado | $23,436,628.00 | $13,559,953.00 | $22,014,416.00 | $22,527,963.00 |
| Connecticut | $14,742,118.00 | $8,537,306.00 | $13,771,852.00 | $14,013,385.00 |
| Delaware | $4,499,806.00 | $2,792,843.00 | $4,298,809.00 | $4,383,301.00 |
| D.C. | $3,138,542.00 | $2,008,665.00 | $3,036,050.00 | $3,041,278.00 |
| Hawaiʻi | $6,156,448.00 | $3,688,853.00 | $5,722,497.00 | $5,749,361.00 |
| Illinois | $49,916,616.00 | $28,385,202.00 | $46,400,453.00 | $47,098,573.00 |
| Maine | $5,940,998.00 | $3,601,271.00 | $5,573,949.00 | $5,683,613.00 |
| Maryland | $24,712,038.00 | $14,232,420.00 | $23,118,494.00 | $23,454,084.00 |
| Massachusetts | $27,992,083.00 | $16,056,993.00 | $26,271,000.00 | $26,710,112.00 |
| Michigan | $39,909,525.00 | $22,802,629.00 | $37,120,447.00 | $37,605,095.00 |
| Minnesota | $22,954,552.00 | $13,249,553.00 | $21,420,924.00 | $21,860,605.00 |
| Nevada | $12,980,873.00 | $7,597,406.00 | $12,299,970.00 | $12,524,812.00 |
| New Jersey | $36,875,827.00 | $21,144,096.00 | $34,810,617.00 | $35,481,387.00 |
| New Mexico | $8,800,274.00 | $5,198,098.00 | $8,193,037.00 | $8,287,096.00 |
| New York | $77,783,082.00 | $43,986,920.00 | $72,246,998.00 | $73,782,036.00 |
| Oregon | $17,153,369.00 | $9,906,452.00 | $15,928,901.00 | $16,156,954.00 |
| Rhode Island | $4,795,700.00 | $2,935,210.00 | $4,516,901.00 | $4,583,223.00 |
| Vermont | $3,041,379.00 | $1,938,654.00 | $2,841,916.00 | $2,861,824.00 |
| Washington | $31,079,099.00 | $17,860,091.00 | $29,239,538.00 | $29,812,995.00 |
| Wisconsin | $23,643,268.00 | $13,634,045.00 | $22,026,077.00 | $22,382,244.00 |
| **Totals** | $593,342,092.00 | $340,196,677.00 | $553,751,671.00 | $562,684,303.00 |

171. Plaintiff States have applied for and obtained Victim Assistance Formula Grant Funds for decades.

172. Plaintiff States are unaware of OVC ever having previously imposed conditions in Victim Assistance funding awards requiring States to assist with federal immigration enforcement efforts.

173. Final applications for Victim Assistance Formula Grants for FY 2026 were due on July 15, 2026. Plaintiff States have submitted applications for these grant funds. The NOFO for FY 2026 Victim Assistance Formula Grants contains conditions that require recipients to cooperate with federal civil immigration enforcement efforts. *See* ECF 52-7 at 5-6 (FY 2026 VOCA Assistance NOFO). Plaintiff States do not agree to comply with these conditions.

**B. VOCA Competitive Grants**

174. OVC also administers certain competitive grant programs authorized by VOCA, including but not limited to: Services for Victims of Crime; Emergency and Transitional Pet Shelter and Housing Assistance for Victims of Domestic Violence Program; Technology to Support Services for Victims of Crime; Services for Victims of Technology-Facilitated Abuse; Sexual Assault Nurse Examiner Program Development and Operation Guide; National Crime Victim Crisis Hotlines; Byrne Discretionary Grants; and Increasing Availability of Medical Forensic Examinations for Victims of Sexual Assault.

175. Awards under these programs support a range of initiatives designed to expand and strengthen services for crime victims, including funding specialized assistance for children, elders, and victims of technology-facilitated abuse; providing housing assistance for victims; expanding victims' access to specialized medical forensic professionals and examinations; and development of statewide technology programs to improve the quality and reach of victim services. Collectively, they enhance the quality and accessibility of services for victims of crime nationwide.

176. VOCA's competitive grants are generally governed by 34 U.S.C. § 20103(c), which specifies the purpose of competitive grants. VOCA provides that the OVC Director "shall make grants" for "victim services, demonstration projects, program evaluation, compliance efforts, and training and technical assistance services to eligible crime victim assistance programs" and "for the financial support of services to victims of Federal crime by eligible crime victim assistance programs." *Id.* § 20103(c)(1)(A)-(B). The OVC Director "shall … use funds made available" for these grants "pursuant to rules or guidelines that generally establish a publicly-announced, competitive process." *Id.* § 20103(c)(3)(E). The statutory purposes of VOCA competitive grant funds do not relate in any way to immigration enforcement.

177. Congress has also specified certain criteria for creating and awarding these funds. The only relevant restriction that Congress has placed on the use of these funds is that not more than 50 percent of available funds shall be used for support of victims of federal crime. *See id.* § 20103(c)(2)(A)-(B). The criteria make no reference to federal civil immigration policy.

178. Several Plaintiff States and their political subdivisions and instrumentalities (including Colorado, Michigan, New Jersey, Rhode Island, and Wisconsin) have applied or intend to apply for various VOCA competitive grants in FY 2025 and 2026.

179. For example, Rhode Island applied for a VOCA Technology Grant award for continued improvements to the state's VOICE (Victims Outreach Integrated Community Environment) System, a secure portal that provides real-time access to cases, offender status, and other information to crime victims, advocates, and state agencies.

180. Plaintiff States are unaware of OVC ever having previously imposed conditions in competitive grant funding awards requiring States to assist with federal immigration enforcement efforts.

181. The NOFOs for FY 2025 and 2026 OVC competitive grants contain conditions that require recipients to cooperate with federal civil immigration enforcement efforts. *See, e.g.*, ECF 52-8 at 5-6 (OVC FY 2026 Technology to Support Victims of Crime NOFO). Plaintiff States do not agree to comply with these conditions.

**IV. Plaintiffs' Law Enforcement Policies**

182. Plaintiff States are responsible for protecting public safety and the safety of their residents. Plaintiff States enact statutes and establish policies to effectively enforce state and local laws, prevent and investigate crimes, and provide public safety services. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) ("Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.").

183. Many Plaintiff States and their political subdivisions have long enacted laws or policies designed to ensure that state and local law enforcement can focus on fulfilling their core mission of public safety and criminal enforcement, including when working with witnesses and victims from local immigrant communities.

184. Evidence and experience teach that undocumented immigrants and their families are less willing to engage with law enforcement, even if they have been victims or witnesses to a crime, if their engagement with law enforcement could risk their deportation or the deportation of their friends or families. *See, e.g.*, S. 3672, 221st Leg., Reg. Sess. (N.J. 2024) (recognizing that the fear of engaging with state and local law enforcement "makes it more difficult for officers to solve crimes and bring suspects to justice"); Cal. Gov't Code § 7284.2 (finding that "immigrant community members fear approaching police" and "[e]ntangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of

accountability between local, state, and federal governments"); N.Y. Exec. Order No. 170, Sep. 15, 2017 (recognizing that "the reporting of unlawful activity by immigrant witnesses and victims is critical to strengthening ties between immigrants and law enforcement, reducing crime, and enhancing the State's ability to protect all residents."); Wash. Rev. Code § 43.10.315 (recognizing that restricting participation in federal immigration enforcement "ensure[s] state and law enforcement agencies are able to foster the community trust necessary to maintain public safety"); 2026 Haw. Sess. Laws Act 141 (Jun. 24, 2026) (recognizing that trust between the State's immigrant community and state and county agencies is threatened when state and county agencies are "entangled with federal immigration enforcement," which is "to the detriment of public safety and well-being of all residents").

185. Those concerns have been substantiated, time and again, by law enforcement agencies and independent studies. *See Cnty. of Ocean v. Grewal*, 475 F. Supp. 3d 355, 363 n.5 (D.N.J. 2020) (noting "a number of studies that confirm that immigration-related fears prevent individuals from reporting crimes"), *aff'd sub nom.*, *Ocean Cnty. Bd. of Commissioners v. Att'y Gen. of State of New Jersey*, 8 F.4th 176 (3d Cir. 2021); *e.g.*, Tom K. Wong and Karina Shklyan, *The Impact of Interior Immigration Enforcement on the Lives of Undocumented Immigrants* at 668-88, Journal of Race, Ethnicity, and Politics (vol. 9, issue 3, Nov. 2024), *available at* https://doi.org/10.1017/rep.2024.19; Rafaela Rodrigues et al., *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* at 72-73, National Immigrant Women's Advocacy Project (May 3, 2018), *available at* http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf; Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Great Cities Institute, University of

Illinois Chicago (May 2013), *available at* https://greatcities.uic.edu/wp-content/uploads/2014/05/Insecure_Communities_Report_FINAL.pdf.

186. The current Administration's policies and practices make these concerns even more acute, by making individuals in periods of authorized stay amenable to removal and criminalizing conduct related to immigration status, including ICE agents carrying out operations that resulted in U.S. citizens and others lawfully present detained for days and even physically assaulted. *See, e.g.*, *Noem v. Vasquez Perdomo,* 146 S. Ct. 1, at *7-9 (Sept. 8, 2025) (Sotomayor, J., dissenting) (detailing evidence of "21 declarations describing dozens of seizures" and "statements by federal officials" of ICE raids and tactics—"likened … to 'kidnapping[s]'"—that swept up U.S. citizens, causing widespread "panic and fear" across Los Angeles and its surrounding areas).

187. Several Plaintiff States and local governments have adopted policies to ensure that an immigrant can come forward to state and local law enforcement agencies when, *inter alia*, they have been victims or witnesses to a crime, without fear that this will lead to their detention or deportation. *See, e.g.*, N.J. Att'y Gen. Directive 2018-6 (N.J. Directive), *codified at* N.J. Pub. L. 2026 c. 5; 5 Ill. Comp. Stat. § 805/1 to /20; Cal. Gov. Code §§ 7282.5, 7284.6; Wash. Rev. Code Ann. § 10.93.160; Colo. Rev. Stat. § 24-76.6-102 to -103; Conn. Gen. Stat. Ann. § 54-192h; Or. Rev. Stat. § 181A.820; Vt. Stat. Ann. tit. 20, § 4651; N.Y. Exec. L. § 170-k; N.Y. Exec. Orders 170 and 170.1; 2026 Haw. Sess. Laws Act 141 (Jun. 24, 2026); Md. Code Ann., Crim. Proc. §§ 5-104, 5-201.1; Md. Code Ann., Corr. Servs. § 8-805. Although these policies are by no means identical, they promote effective state and local law enforcement by ensuring a clear distinction between the roles of state and local officers who enforce state criminal law and federal immigration officers who enforce federal civil immigration law.

188. As relevant, New Jersey's Immigrant Trust Act limits the voluntary assistance that state and local law enforcement officers provide in the civil enforcement of federal immigration law. For example, it restricts state and local law enforcement officers from participating in civil immigration raids, from providing federal civil immigration officials with access to state or local law enforcement facilities, and from giving notice to officials of certain low-level detainees' upcoming release dates from state custody. It is designed to help communities draw a clear distinction between state and local officers who enforce state criminal law, and federal immigration officers who enforce federal civil immigration law. *See* N.J. Pub. L. 2026 c. 5, § 1.

189. Similarly, Illinois has codified its commitment to building trust between immigrant communities and state and local law enforcement officers in the TRUST Act, which was enacted in 2017 by the Illinois General Assembly and signed into law by Bruce Rauner, then the Republican Governor of Illinois. The TRUST Act provides that law enforcement agencies and officers in Illinois may not detain a person solely on the basis of an "immigration detainer" or a civil immigration warrant, 5 Ill. Comp. Stat. § 805/15(a), and generally prohibits detaining people solely on the basis of citizenship or immigration status, *id.* § 805/15(b). The statute also prohibits state and local law enforcement officials from assisting federal immigration agents in any enforcement operations, *id.* § 805/15(h)(1); providing access to detained individuals to immigration agents, *id.* § 805/15(h)(2); and giving immigration agents non-public information about the release dates of detained individuals, *id.* § 805/15(h)(7).

190. Likewise, in 2017, California enacted Senate Bill 54, known as the California Values Act, Cal. Gov't Code §§ 7284-7284.12, to foster "trust between California's immigrant community and state and local agencies"; to "ensure effective policing, to protect the safety, well-being, and constitutional rights of the people of California"; and "to direct the state's limited

resources to matters of greatest concern to state and local governments." *Id.* § 7284.2. In furtherance of those objectives, the Values Act sets the parameters under which California law enforcement agencies may assist in immigration enforcement. For example, the Values Act: (a) prohibits compliance with detainer hold requests, *id.* § 7284.6(a)(1)(B); (b) defines when California law enforcement agencies may comply with requests by immigration authorities seeking the release date and time of a person in advance of the person's release, *i.e.*, notification requests, *id.* §§ 7282.5(a), 7284.6(a)(1)(C); (c) defines when California law enforcement agencies may transfer an individual to immigration authorities—including when authorized by a judicial warrant or judicial probable cause determination, *id.* §§ 7282.5(a), 7284.6(a)(4); and (d) restricts California law enforcement agencies from "[p]roviding personal information ... about an individual" for "immigration enforcement purposes," unless that information is publicly available, *id.* § 7284.6(a)(1)(D).

191. Additionally, in May 2026, the Maryland General Assembly enacted the Community Trust Act, which established statewide standards governing the circumstances under which Maryland's state and local law enforcement officials and correctional employees may participate—or must refrain from participating—in federal immigration enforcement. *See* 2026 Md. Laws, ch. 872, S.B. 791, 2026 Leg., Reg. Sess. (enrolled bill). As amended by the Community Trust Act, Maryland law prohibits law enforcement agents, during the performance of regular police functions, from inquiring about an individual's citizenship, immigration status, or place of birth during a stop, a search or an arrest; detaining, or prolonging the detention of an individual, for the purpose of investigating or based on suspicion that the individual has committed a civil immigration violation; transferring an individual to federal immigration authorities unless required by federal law; coercing, intimidating, or threatening any individual based on actual or perceived citizenship or immigration status; and providing immigration authorities with information about

an individual obtained in the court of the law enforcement agent's duties unless required by a valid court order. Md. Code Ann., Crim. Proc. § 5-104. Maryland law also sets out, among other things, the circumstances under which state and local correctional officials may hold an individual beyond the time the person would otherwise be released based solely on an immigration detainer. Md. Code Ann., Corr. Servs. § 8-805(c)(2).

192. Some States have likewise determined that diverting their resources to engage in inquiries into individuals' immigration status, fulfilling information requests by federal immigration officials not required by law, or facilitating civil immigration arrests in state buildings will interfere with important public functions and should be limited. *See, e.g.*, 11 Del. § 8402B; New Jersey Exec. Order 12 (Feb. 11, 2026); N.Y. Exec. L. Art. 15-AA; N.Y. Exec. Order 170 (Sept. 15, 2017); New York Exec. Order 170.1 (Apr. 25, 2018); 2026 Haw. Sess. Laws Act 141 (Jun. 24, 2026); Wash. Rev. Code § 10.93.160(2) ("The legislature finds that it is not the primary purpose of state and local law enforcement agencies or school resources officers to enforce civil federal immigration law."); 5 Me. Rev. Stat. § 4763(2) (eff. Jan. 11, 2026) (providing a range of permitted activities that a local law enforcement agency may take in connection with federal civil immigration enforcement).

193. Of course, there are important exceptions. Most obviously, although not every state statute or policy is the same, a range of Plaintiff States authorize state and local law enforcement to collaborate with federal civil immigration officials in order to facilitate the removal of violent criminals. *See, e.g.*, N.J. Pub. L. 2026 c. 5, § 3(c)(5)–(6) (authorizing law enforcement agencies to provide civil immigration authorities with notice of the release date, and to continue the detention of, any inmate or detainee convicted of any crime in the last five years or who is charged with or has ever been convicted of serious or violent offenses); Cal. Gov't Code §§ 7284.6(a)(1)(C),

7282.5(a)(1) (permitting law enforcement agencies to respond to requests from immigration authorities for notice of the release date of an individual who has been convicted of a serious or violent felony); 5 Ill. Comp. Stat. § 805/15(i) (allowing law enforcement officials to cooperate in criminal investigations conducted by federal immigration authorities).

194. Many of these state policies also include express exceptions confirming that state and local officials must comply with the law, including clarifications that, *inter alia*: (i) state and local law enforcement will support federal civil immigration authorities "when required to do so by law," including to comply with federal court orders (such as a removal order signed by a federal judge) and judicially issued arrest warrants, N.J. Pub. L. 2026 c. 5, §§ 3(c)(5)(c), (c)(6)(c), (d)(3); 5 Ill. Comp. Stat. § 805/15(h); Cal Gov't Code §§ 7282.5(a), 7284.6(a)(4); 11 Del. C. § 8402B(c); N.Y. Exec. L. Art. 15-AA § 319-a(9); N.Y. Exec. Order 170 (Sept. 15, 2017); Wash. Rev. Code § 10.93.160(16); and (ii) state and local law enforcement are in no way restricted from sharing with federal civil immigration authorities the citizenship or immigration status of any individual, N.J. Pub. L. 2026 c. 5, § 3(d)(10); 5 Ill. Comp. Stat. § 805/5; Cal Gov't Code § 7284.6(e); Wash. Rev. Code § 43.17.425; Wash. Sess. Laws of 2019, ch. 440, § 8; 5 Me. Rev. Stat. § 4762(1) (eff. Jan. 11, 2026).

195. Many of these measures have been in place for years. Illinois and California enacted their laws in 2017. New York's Executive Order 170 has been in place since 2017. New Jersey first adopted its policy in November 2018. *See* N.J. Directive at 1. Washington enacted its law in 2019, and Oregon enacted its law in 2021.

196. The Federal Government and other parties have at times challenged Plaintiffs' policies in court, and the courts have repeatedly and unanimously upheld them. *See, e.g.*, *Ocean Cnty.*, 8 F.4th at 182; *United States v. New Jersey*, Civ. No. 2013-64, 2021 WL 252270, at *1 (D.N.J. Jan.

26, 2021); *United States v. California*, 921 F.3d 865, 873 (9th Cir. 2019); *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022); *United States v. Illinois*, 796 F. Supp. 3d 494, 536 (N.D. Ill. 2025); *City of Philadelphia v. Sessions,* 309 F. Supp. 3d 289, 331–33 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds sub nom. City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 291 (3d Cir. 2019); *United States v. Colorado*, 831 F. Supp. 3d 1108 (D. Colo. 2026); *United States v. Minnesota*, No. 25-3798, 2026 WL 2085701, at *1 (D. Minn. July 20, 2026); *United States v. City of Los Angeles*, No. CV 25-5917, 2026 WL 1790971, at *1 (C.D. Cal. June 20, 2026).

197. Although other Plaintiff States do not have statewide directives regarding the use of law-enforcement resources to assist in federal immigration law (meaning that they do not have statewide limitations on the use of law-enforcement resources to assist in the enforcement of federal immigration law), they do not impose *requirements* that law-enforcement officers provide on-demand assistance to federal immigration authorities either. Many of these States have concluded that they can best protect their residents by maintaining control over state and local law-enforcement resources or by empowering law-enforcement officials to exercise discretion in determining when it would best promote public safety to assist federal immigration-enforcement efforts, rather than affirmatively requiring law enforcement officers to devote state and local resources to federal immigration enforcement on the federal government's command.

198. Other States are subject to different rules. For instance, some Plaintiff States must comply with state court rulings that restrict their cooperation with civil immigration detainer requests. *See, e.g.*, *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1146 (Mass. 2017). Still other Plaintiff States have concluded that participating in federal immigration-enforcement efforts imposes

substantial costs on local jurisdictions, not only in the form of personnel and resources but also in the form of potential civil liability.

199. While Plaintiff States' decisions have differed, all are consistent with the basic rule that States "remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521 U.S. 898, 928 (1997)—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

**V. The Challenged Grant Conditions**

200. On Inauguration Day, January 20, 2025, President Trump issued an executive order directing the Attorney General and Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions … do not receive access to Federal funds" and to take "any other lawful actions, criminal or civil, that they deem warranted." Exec. Order No. 14159, 90 C.F.R. 8443 (2025).

201. The following day, then-Acting Deputy Attorney General Emil Bove issued a memorandum asserting that "[f]ederal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests," and requiring all USDOJ employees to "work with the newly established Sanctuary Cities Enforcement Working Group … to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws." That directive required that U.S. Attorney's Offices and USDOJ litigating components "shall investigate … for potential prosecution" any and all "resistance, obstruction, or other non-compliance with lawful immigration-related commands."

202. On February 5, 2025, the day after her confirmation, then-Attorney General Pamela Bondi issued a document titled "Sanctuary Jurisdiction Directives" (the "Bondi Directive"), that directed USDOJ to undertake wide-ranging efforts to punish "so-called 'sanctuary jurisdictions'" for failing to assist in federal civil immigration enforcement. The Bondi Directive required USDOJ

attorneys to evaluate "all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens" for their potential termination. The Bondi Directive instructed USDOJ attorneys to investigate and prosecute "violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373," to promptly report declination decisions to USDOJ leadership, and to investigate and challenge state and local laws and policies "that facilitate violations of federal immigration laws or impede lawful federal immigration operations."

203. "In furtherance of that objective," the Bondi Directive declares: "[T]he Department of Justice will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department. Consistent with applicable statutes, regulations, court orders, and terms, the Department of Justice shall pause the distribution of all funds until a review has been completed, terminate any agreements that are in violation of law or are the source of waste, fraud, or abuse, and initiate clawback or recoupment procedures, where appropriate."

204. The Bondi Directive further reiterated that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice."

**A. OJP Initially Places Immigration Enforcement Conditions In All NOFOs.**

205. USDOJ's largest grant-funding office, OJP, proceeded to give effect to the directives requiring States to cooperate with federal civil immigration-enforcement efforts, irrespective of the particular statutory language governing those grants.

206. Beginning in July 2025, OJP implemented a practice across every one of the dozens of grant programs that it administers of warning applicants that such cooperation with federal civil immigration-enforcement efforts would be required as a condition of funding.

207. Specifically, each of the NOFOs issued by OJP's Program Offices—including BJA, OJJDP, OVC, BJS, and NIJ—for FY 2025 grants provided, in relevant part, that "[a]ny program

or activity" that "directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" is "out of the program scope and will not be funded."

208. Although styled as a restriction on the "unallowable use of funds," this language functioned as an eligibility requirement for applicants: the NOFOs indicated that OJP and its Program Offices "will not … fund" "[a]ny program or activity" unless it agrees to (1) provide notice to DHS agents on demand, (2) give unfettered access to DHS agents, (3) comply with 8 U.S.C. § 1373, and (4) honor any and all DHS requests. Further, the NOFOs stated that funds would not be provided to any program if DHS concludes that the program is directly or indirectly "imped[ing] or hinder[ing] enforcement of federal immigration law" in any other way. The NOFOs imposed all of these requirements on any and all applicants for FY 2025 grant awards administered by OJP.

209. The NOFOs did not explain what, if any, limits exist on the "notice" and "access" that must be provided and the "requests" that must be honored. The NOFOs did not define "program or activity" or "promoting or facilitating." And it is unclear what an "indirect" violation of the immigration laws (or "indirectly" promoting or facilitating a violation of the immigration laws) constitutes. On their face, however, the Immigration Enforcement Conditions would have required States to provide information about, and access to, victims with whom States interact in operating their victim services programs, for potential civil immigration enforcement.

210. On August 18, 2025, Plaintiff States commenced this action, challenging as unlawful the Immigration Enforcement Conditions set forth in certain NOFOs issued by OJP through OVC and seeking to enjoin USDOJ from implementing them.

211. Beginning on September 11, 2025, OJP's Program Offices began to issue NOFOs for various formula and competitive grant awards for FY 2025.

212. Every one of the OJP NOFOs contained substantially similar Immigration Enforcement Conditions as the OVC NOFOs.

213. In September 2025, OJP began issuing award notices for the formula and competitive grants administered through OVC. USDOJ omitted the Immigration Enforcement Conditions from these OVC award notices, and it subsequently confirmed that the Conditions do not apply to those OVC awards.

214. OJP also issued several other award notices issued for FY 2025 formula and competitive grants omitting the Immigration Enforcement Conditions, even though the corresponding NOFO had indicated that the Conditions would be applied.

215. However, OJP has since continued to issue NOFOs for FY 2025 grant programs and FY 2026 grant programs that contain the Immigration Enforcement Conditions.

**B. OJP Imposes Immigration Enforcement Conditions On Byrne JAG, Byrne SCIP, And Title II Awards.**

216. On or around July 13, 2026, OJP issued FY 2025 awards to Plaintiff States under three grant programs: Byrne JAG, Byrne SCIP, and Title II. And on August 19, 2026, OJP belatedly issued New Jersey's FY 2024 Title II award.

217. Each of the awards contained four Immigration Enforcement Conditions, which are substantively similar to the Conditions in the OJP NOFOs.

218. One condition (the Notice Condition) states that "no State or local government entity, agency, or official" receiving funding under the award "may interfere with the 'removal' process by failing to provide (as early as practicable …) advance notice to DHS of the scheduled release date and time for a particular alien, if a State or local government (or government-

contracted) correctional facility receives from DHS a formal written request pursuant to the [Immigration and Nationality Act (INA)] that seeks such advance notice."

219. Another condition (the Access Condition) states that "no State or local government entity, agency, or official" receiving funding under the award "may interfere with the exercise of [the federal] power to interrogate 'without warrant' (by agents of the United States acting under color of federal law) by impeding access to any State or local government (or government-contracted) correctional facility by such agents" for the purpose of interrogating any alien or person believed to be an alien as to their right to be or to remain in the United States.

220. Another condition (the Harboring Condition) states that "no State or local government entity, agency, or official" receiving funding under the award "may make any public disclosure of any federal law-enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice … or any alien who has come to, entered, or remains in the United States" in violation of the INA "without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. 1071 or 8 U.S.C. 1324(a)."

221. The final condition (the Communication Condition) states that "no State or local government entity, agency, or official" receiving funding under the award "may implement" an "information-communication restriction," which is defined as a restriction of "(1) any government entity or official from sending or receiving information regarding citizenship or immigration status to or from DHS; or (2) a government entity or agency from sending, requesting or receiving, or exchanging information regarding immigration status to, from, or with DHS, or from maintaining such information." The term "immigration status" is defined to have the meaning it does under 8 U.S.C. §§ 1373 and 1644.

222. With respect to all four Immigration Enforcement Conditions, the awards make clear that funding recipients are barred not only from any "use of funds" that would violate a Condition, but also more generally from operating directly or through a subrecipient any "program or activity" that would be "funded in whole or part under this award" that would violate a Condition. The term "program or activity" is defined to have the meaning it does under 42 U.S.C. 2000d-4a (defining "program or activity" to include, among other things, "all of the operations of … [any] instrumentality of a State or local government").

223. The deadline to accept the FY 2025 Byrne JAG, Byrne SCIP, and Title II awards is on or about August 27, 2026. The deadline to accept New Jersey's FY 2024 Title II award is on or about October 3, 2026.

224. As part of this litigation, Defendants have agreed to extend the deadline for Plaintiff States, including their political subdivisions, to accept these awards until November 15, 2026. *See* ECF No. 48.[1]

225. States or their subdivisions are responsible for operating the programs funded by OJP-administered grants. The Immigration Enforcement Conditions thus burden States directly,

[1] Each of the Immigration Enforcement Conditions in the FY 2025 Byrne JAG, Byrne SCIP, and Title II awards, by its own terms, only "shall be enforceable to the extent that it does not otherwise contravene any express requirement of any federal law, or of any judicial ruling, governing, or applicable to the award." In light of the permanent injunctions secured by certain Plaintiff States against USDOJ's prior attempt to impose substantively similar Immigration Enforcement Conditions, Defendants have agreed that USDOJ will not impose any of the Immigration Enforcement Conditions upon the FY 2025 Byrne JAG or Byrne SCIP awards for the States of California, Illinois, Oregon, and Colorado. *See California v. Sessions*, No. 17-4701 (ECF No. 154); *California v. Barr*, No. 18-5169 (ECF No. 51); *Illinois v. Barr,* No. 19-3461 (ECF No. 27); *Oregon v. Trump*, No. 18-1959; *Colorado v. USDOJ*, No. 19-736 (ECF No. 56); *see also* Dep't of Justice, Legal Notices, https://www.ojp.gov/funding/explore/legal-notices. These four States challenge the Immigration Enforcement Conditions solely with respect to grants and awards where USDOJ has imposed or will impose the Immigration Enforcement Conditions, which does not include the Byrne JAG or Byrne SCIP grants that are covered by those States' prior judgments.

denying them access to funding on which they have long relied, unless they either abandon policies that affirmatively limit their role in civil immigration enforcement or cease providing discretion to state officials on when and whether to participate in federal immigration enforcement.

226. The Immigration Enforcement Conditions burden and constrain Plaintiff States' ability to select the subgrantees of their choice, as States will be barred from choosing subgrantees that do not comply with the Conditions. In addition, States are required to monitor their subrecipients' compliance with subaward conditions. *See* 2 C.F.R. § 200.332(e). Each Plaintiff subawards OJP-administered funding to dozens of subrecipients—with some States issuing subawards to hundreds of different public agencies and organizations. Monitoring subgrantees' compliance with the Conditions would likewise impose a substantial new burden on States.

**VI. The Immigration Enforcement Conditions Are Unlawful.**

227. The Immigration Enforcement Conditions are unlawful for multiple, independent reasons: USDOJ lacks requisite statutory authority to impose them; their imposition was arbitrary and capricious; and even if authorized by statute, they violate the Spending Clause.

228. *First*, USDOJ has no statutory authority to impose the Immigration Enforcement Conditions. USDOJ's "power to act is 'authoritatively prescribed by Congress.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). USDOJ "literally has no power to act … unless and until Congress confers power upon it." *Id.* (quoting *La. Pub. Serv. Comm'n*, 476 U.S. at 374). Not only do Executive Branch agencies violate the law when they act without a congressional grant of authority, but that statutory authority must be clearly stated where the executive branch would upset any federal-state balance of power. *See Gregory v. Ashcroft*, 501 U.S. 452, 460-61 (1991). Here, these principles are fatal to

the Immigration Enforcement Conditions: no statutes, including the statutes that authorize the OJP grant programs, furnish USDOJ the authority to impose the Conditions.

229. The statutes defining the duties of the leader of USDOJ's Office of Justice Programs, its largest grantmaking entity, and of the heads of OJP's Program Offices do not grant these officials freestanding authority to impose the Immigration Enforcement Conditions.

230. The statutes directing OJP and its Program Offices to provide formula grants to the States likewise do not authorize the Immigration Enforcement Conditions. Rather, those laws expressly set forth the criteria for eligibility for the various formula grants and fixed a formula for determining the allocation of awards to the States. *See Providence*, 954 F.3d at 34-35. And those criteria do not include any demands relating to federal immigration enforcement. In addition, the federal statutes authorizing OJP competitive grants do not give USDOJ unfettered discretion to impose conditions that lack a sufficient nexus to the purpose and nature of the grant programs, as defined by statute. Here, nothing in the authorizing statute suggests that any of these grant funds are intended to support federal civil immigration enforcement.

231. 8 U.S.C. § 1373 also does not authorize OJP to impose the Immigration Enforcement Conditions on these grants. Section 1373(a) prohibits States and their local subdivisions from restricting the sharing of citizenship or immigration status information with federal immigration authorities, but it does not require States or their local subdivisions to provide the type of assistance mandated by the Conditions, nor does it in any way concern the receipt of federal funds. And the recent passage of an appropriation conditioning access to an entirely separate and discrete supplemental pool of USDOJ funds on compliance with Section 1373, *see* Pub. L. 119-21, sec. 100054, illustrates that when Congress wishes to condition funds on compliance with Section 1373, it does so expressly. No such express statutory conditions exist here.

232. Beyond violating the statutes authorizing the OJP grants, the Immigration Enforcement Conditions violate 34 U.S.C. § 10228(a), which says "[n]othing in this title or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a). The Conditions, as expounded in the awards, require that state recipients and their subdivisions give DHS agents access to detainees and provide DHS agents with notice of when such detainees are released from custody, while also barring disclosure of some immigration-related information, and barring restriction of disclosure of other immigration-related information. And they warn that to the extent any of the operations of any instrumentality of a State run afoul of the Conditions, they will not be "funded in whole or part under this award." But that is the type of federal "direction, supervision, or control" over state police and criminal justice agencies that section 10228(a) forbids.

233. The Immigration Enforcement Conditions violate Congress's carefully designed statutory schemes for these OJP grant programs. USDOJ cannot cite a clear statement of statutory authority to justify imposition of the Immigration Enforcement Conditions. Instead, this executive agency is arrogating for itself Congress's core power of the purse—to decide for itself who should obtain funds and on what substantive conditions, without support in any legal text.

234. *Second*, the imposition of the Immigration Enforcement Conditions represent arbitrary and capricious agency action in violation of the APA, which requires that agencies' decisions be supported by the relevant statutory factors and factual record, as well as a reasoned explanation or justification.

235. In imposing the Immigration Enforcement Conditions, USDOJ arbitrarily relied on immigration-related factors that Congress did not authorize it to rely on in allocating federal grant

monies to support state criminal law enforcement, juvenile justice, and crime victim support programs Indeed, by conscripting state criminal law enforcement, juvenile justice, and victim support agencies into federal immigration enforcement, the Conditions would undermine *federal* policies that require such agencies to provide service without regard to immigration status. *See, e.g.*, 28 C.F.R. 94.103(a) (stating that victim eligibility for VOCA assistance "is not dependent on the victim's immigration status"); 34 U.S.C. § 40502(c)(1)-(2) (stating that DNA samples obtained under the Missing Persons and Unidentified Remains Act can "be used only for identifying missing persons and unidentified remains" and "may not be disclosed to a Federal or State law enforcement agency for law enforcement purposes"); 34 U.S.C. § 11333(a)(11) (requiring that a Title II recipient's state plan must provide that a juvenile who is an alien not charged with any offense shall not be placed in a secure detention or correctional facility); 34 U.S.C. §§ 10152(a)(1), 10156 (providing that DOJ would make Byrne JAG and SCIP grants for specific programs, none of which include civil immigration enforcement, pursuant to formula not containing any immigration-related criteria). Such Conditions would likewise undermine rather than support state and local efforts to improve criminal law enforcement, juvenile justice, and victim support programs without regard to immigration status. Further, USDOJ failed to consider the States' reliance interests in their continued receipt of congressionally authorized funding on an annual basis to support ongoing state-run criminal law enforcement, juvenile justice, and victim services programs in maintaining policies that promote public safety by ensuring trust with immigrant communities.

236. *Third*, even if the Immigration Enforcement Conditions had been authorized by Congress, they would exceed Congress's authority under the Spending Clause. Where, as here, a new and coercive funding condition is unrelated to existing uses of federal funds, and is so

ambiguous as to prevent States from exercising their choice knowingly as to whether or how to comply, it doubly cannot be justified under the Spending Clause.

### VII. The Immigration Enforcement Conditions Harm The States.

237. USDOJ's imposition of the Immigration Enforcement Conditions causes significant harm to Plaintiff States by subjecting them to an impossible dilemma: either forego control over the use of their sovereign law enforcement resources and allow the Federal Government to invade their sovereign right to determine how best to exercise state police power, or forego hundreds of millions in critical federal funds Congress directed for them and that are necessary to sustain ongoing state law enforcement, juvenile justice, and victim-services programs.

238. Plaintiff States have long relied on federal USDOJ grant funding to support a wide range of initiatives that keep Plaintiff States' communities safer, including maintaining task forces that combat crime and dismantle drug trafficking organizations, supporting efforts to apprehend online child predators, and implementing state crisis intervention court proceedings to keep guns away from those who pose a specific safety risk. Plaintiff States have had access to this funding for decades and reasonably expected that they would be able to continue to do so, given that Congress has not seen fit to terminate these statutory funding programs.

239. With formula grant awards open for multiple years, Plaintiff States have sustained multi-year efforts to support criminal law enforcement efforts, improve juvenile justice, and provide victim services that would be interrupted by a disruption in funding. State compensation programs issue awards that crime victims can spend down over a multi-year period for a variety of expenses, and Plaintiff States have sustained multi-year law enforcement, juvenile justice, and public safety efforts that would be interrupted by any disruption in funding. States have maintained

programs for multiple years, based on the reasonable expectation that they can rely on consistent federal funding for these activities.

240. In short, lapses in grant funding, even if temporary, would result in the sudden and massive disruption of state criminal law enforcement efforts, juvenile justice, and victim services programs that have historically been supported by USDOJ grant funds.

241. The consequences of such a disruption would be disastrous for Plaintiff States. In FY 2024 alone, VOCA compensation supported Plaintiff States in making over $138 million in payments to over 88,000 victims of crime, and VOCA assistance funding supported Plaintiff States in subawarding over $1.2 billion in funding to public agencies and local community-based organizations, which, in turn, provided services to over 2.8 million individual victims of crime. Plaintiff States received over $138 million in funding to support criminal law enforcement from Byrne JAG and Byrne SCIP Formula Grants in FY 2024; and over $21 million in funding to support juvenile justice efforts from the Title II Formula Grant in FY 2024.

242. As an example, New Jersey has received between $3.4 million and $4.4 million in Byrne JAG funding for each of the past six years. Those funds have been dedicated to maintaining ongoing task forces that combat, among other things, organized crime, gang violence, and drug trafficking. For example, in a single year, two task forces operated through county prosecutors' offices made over 250 arrests, seized over 100 guns, and seized over 10,000 grams of fentanyl, 7,900 grams of heroin, 2,200 grams of crack cocaine, 110 kilograms of cocaine, 190 pounds of marijuana, and 2,000 grams of methamphetamine. Loss of grant funding, even for just one year, would require New Jersey to shut down these long-standing task forces, undermining active investigations into dangerous criminal activity and putting the State's residents at risk.

243. Rhode Island has invested nearly $2 million in Byrne SCIP funding over three years to set up its ERPO system to reduce suicide by gun and other gun violence. The program is now about to launch, and any disruption in funding would destabilize and potentially waste the years of time, money, and effort that have gone into setting up the ERPO system.

244. For the period covering FY 2022 to FY 2024, Massachusetts received over $10 million in Byrne SCIP funding, supporting the state's efforts to implement crisis intervention programs; mental health and domestic violence training; suicide prevention and de-escalation tools; gun violence prevention initiatives; school-based education, mentorship and outreach; and virtual reality training to enhance decision-making, situational awareness and preparedness. Absent this Byrne SCIP funding, Massachusetts would not be able to provide its law enforcement personnel with this essential training.

245. In the past three award periods alone, from 2021 through 2023, New Jersey received over $3 million in Title II funding. New Jersey's Title II funding has already been delayed significantly, and the loss of this funding would require New Jersey to significantly scale back its juvenile justice initiatives, undermining the State's ability to support at risk youth through initiatives like youth summer programs and transitional living expenses for youth coming from State oversight, such as parole or incarceration. For the same period, Illinois received over $4.5 million in Title II funds, which were used to fund programs and initiatives that support compliance with the four requirements of the Juvenile Justice and Delinquency Prevention Act, divert youth from the juvenile justice system and provide alternatives to detention, and improve data collection and analysis. Loss of Title II funding would require Illinois to significantly reduce the funding it provides to these existing juvenile justice programs.

246. Other Plaintiff States receive similarly substantial sums annually, and the loss of even one fiscal year of funding would have an immediate impact on their criminal law enforcement efforts and their juvenile justice work.

247. Absent these critical federal grant funds, Plaintiff States will be required to scale back juvenile justice programs, reduce or delay the availability of critical services to victims, and abandon certain criminal law enforcement initiatives.

248. Among other things, this could result in unsafe conditions for residents of Plaintiff States. Furthermore, this loss in federal funding and curtailment of services and programs would likely impact victims' willingness to cooperate with law enforcement and adversely impact law enforcement efforts throughout the State.

249. Curtailing OJP-funded programs would likely make States unable to support many critical and time-sensitive services. For example, curtailing victim assistance programs would likely make States unable to continue maintaining emergency hotlines, deploying sexual assault response teams, and providing notification to victims when perpetrators are released from incarceration. And it could interrupt the long-running efforts of victim and witness advocates to maintain relationships that ensure the continued engagement required for successful criminal prosecutions and civil restraining order proceedings. It would also result in harms to victims of crime and their families—the persons the state programs are meant to assist—especially because state victim compensation programs act as payors of last resort, paying for expenses only when crime victims have no other option. Interrupting such payments would likely result in the interruption of ongoing courses of medical treatment or mental-health counseling, and lead crime victims to be unable to afford time-sensitive services, such as funerals, burials, and crime-scene clean-up.

250. Similarly, curtailing OJP-funded criminal justice and public safety programs would likely make States unable to continue providing critical support to local law enforcement agencies (including task forces to combat drug-related crimes), programming at police training academies, mental health support and suicide prevention interventions for front-line personnel (including law enforcement officers, corrections, and child protective investigators), programming to reduce recidivism, initiatives to prevent violence in schools, and initiatives supporting juvenile justice.

251. Nor can Plaintiffs simply avoid these harms by acceding to the Immigration Enforcement Conditions, because doing so would subject the States to equally grave and irreparable harms.

252. If Plaintiff States were to accept the Conditions, they would lose their abilities as sovereigns to maintain what evidence and experience have taught them are optimal law enforcement policies—including the ability to determine on a case-by-case basis if an inquiry into whether a witness or victim lacks lawful immigration status will promote or harm public safety.

253. USDOJ's imposition of the Immigration Enforcement Conditions thus puts Plaintiff States in the untenable position of having to choose between refusing to comply with the unauthorized Conditions and facing substantial program disruption and loss of crucial federal funding, or forfeiting their sovereign law enforcement discretion and control of their law enforcement agencies by complying with the Conditions.

254. The harms that would flow from Plaintiff States' loss of OJP funding cannot be remedied by payment of damages at the conclusion of this litigation. Initially, sovereign immunity would prevent Plaintiffs from recovering damages against the Federal Government in this APA suit. And even if such damages were ultimately recoverable, even a short-term disruption to

Plaintiff States' access to federal funding would require Plaintiffs to cut back significantly their vital victim services, juvenile justice, and law enforcement programs and activities.

255. Expedited relief from this Court is therefore required to avert the immediate and irreparable harm that would result from States being forced to choose either of the two equally untenable options presented by USDOJ's imposition of the Conditions.

**FIRST CAUSE OF ACTION**
**Violation of Administrative Procedure Act**
**Agency Action In Excess of Statutory Authority and Contrary to Law**

256. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

257. The APA requires that a court "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or that is "not in accordance with law," *id.* § 706(2)(A).

258. Defendants have no statutory authority to impose the Immigration Enforcement Conditions. The statutes authorizing Defendants to administer the OJP grant programs lay out specific criteria for USDOJ to consider in awarding grants, none of which authorize the imposition of these conditions. *See, e.g.*, 34 U.S.C. § 10153(a) (Byrne grants); 34 U.S.C. § 11133(a) (Title II); 34 U.S.C. § 20102 (VOCA). Nor does any other statute authorize USDOJ to impose Immigration Enforcement Conditions on these OJP grants.

259. Further, Defendants' adoption of the Immigration Enforcement Conditions is contrary to specific statutory provisions. *See, e.g.*, 34 U.S.C. § 10156(a) (requiring that the Attorney General "shall … allocate" funds "to each State" in accordance with Byrne JAG statutory formula); 34 U.S.C. § 11133(a) (Title II) (requiring that "funds shall be allocated annually among the states" per the statutory formula); 34 U.S.C. § 20102(a) (requiring that the OVC Director "shall make an

annual grant from the Fund to an eligible crime victim compensation program"); *see also* 34 U.S.C. § 10228(a) ("Nothing in this title or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.").

260. Defendants have therefore exceeded their statutory authority and acted contrary to law in adopting the Immigration Enforcement Conditions.

261. The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

**SECOND CAUSE OF ACTION**
***Ultra Vires* Agency Action**

262. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

263. Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297-98 (2013). When an Executive agency acts in a manner that violates a specific statutory provision, such agency action is *ultra vires*. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025).

264. The Immigration Enforcement Conditions violate specific statutory provisions. *See, e.g.*, 34 U.S.C. § 10156(a) (requiring that the Attorney General "shall … allocate" funds "to each State" in accordance with Byrne JAG statutory formula); 34 U.S.C. § 11133(a) (Title II) (requiring that "funds shall be allocated annually among the states" per the statutory formula); 34 U.S.C. § 20102(a)( requiring that the OVC Director "shall make an annual grant from the Fund to an eligible crime victim compensation program"); *see also* 34 U.S.C. § 10228(a) ("Nothing in this title or any other Act shall be construed to authorize any department, agency, officer, or employee of the

United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof."). They are thus *ultra vires*.

265. The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

**THIRD CAUSE OF ACTION**
**Violation of U.S. Constitution**
**Separation of Powers**

266. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

267. The Constitution vests the spending power in Congress, not in the President or in any executive agency. U.S. Const. art. I, § 8, cl. 1. An executive agency therefore does not have unilateral authority to refuse to spend funds that Congress has directed it to disburse. And an executive agency likewise lacks authority to condition funds on satisfaction of eligibility criteria other than the ones that Congress authorized it to impose.

268. Defendants acted without authority to impose the Immigration Enforcement Conditions. Imposing these Conditions on the OJP grant programs thus amounts to refusing to spend money that Congress intends to be used for crime victims until the Conditions are satisfied. Defendants' imposition of the Immigration Enforcement Conditions thus amounts to improper usurpation of Congress's spending power by the Executive Branch.

269. The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

**FOURTH CAUSE OF ACTION**
**Violation of Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**

270. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

271. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made" (citation omitted)); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account").

272. In imposing the Immigration Enforcement Conditions, Defendants acted based on immigration policy concerns that Congress plainly did not intend the agency to consider in deciding how to administer the program.

273. In imposing the Immigration Enforcement Conditions, Defendants failed to account for the States' reliance on these congressionally approved grants and the harms the States and their residents will suffer if they are forced to scale back their law enforcement, juvenile justice, and victim services programs and activities on the one hand, or abandon their law enforcement policies on the other.

274. Defendants also failed to consider how the Conditions would undermine rather than support the statutory goals of the impacted grant programs. For example, Congress directed Byrne JAG grants to be allocated for a limited set of goals relating to criminal law enforcement—goals

that would be undermined by diverting state and local law enforcement resources to federal immigration enforcement and undermining trust between law enforcement and the communities they serve.

275. Individually and taken together, these errors all render the agency's imposition of the Conditions arbitrary and capricious.

276. The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

**FIFTH CAUSE OF ACTION**
**Violation of U.S. Constitution**
**Spending Clause**

277. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

278. The Constitution vests the spending power in Congress, not the President or any executive agency. U.S. Const. art. I, § 8, cl. 1.

279. Even if Congress had delegated USDOJ power to impose the Immigration Enforcement Conditions, the Constitution prohibits grant conditions that are not reasonably related to the purposes of the grants; that are so ambiguous as to prevent recipients from exercising their choice knowingly; or that are "so coercive as to pass the point at which pressure turns into compulsion." *S. Dakota v. Dole*, 483 U.S. 203, 211 (citation omitted) (1987).

280. The Immigration Enforcement Conditions are not related to the purposes of the OJP, BJA, or Title II, or VOCA grant programs, which include supporting law enforcement efforts by funding equipment purchases, task forces, and other law enforcement initiatives; supporting faster forensic testing and processing of rape kits; developing juvenile justice programs to reduce rates of crime among youth; and supporting victims through compensation and assistance.

281. The Immigration Enforcement Conditions are also improperly ambiguous in numerous respects, including as to what it means to "conceal, harbor, or shield from detection" an undocumented alien, what it means, for example: to make a disclosure in an "indirect attempt" to conceal, harbor, or shield from detection an unlawfully present non-citizen—and "without regard" to whether such disclosure is unlawful; what it means to "interfere" with the removal process; when is as "early as practicable" States must provide DHS information; what it means to "impede[]" immigration enforcement; what kind of "notice" DHS must give; what kind of "access" Plaintiff States must provide; and what sort of information about an individual's "immigration status" a State must not restrict from disclosure.

282. And the Immigration Enforcement Conditions impermissibly coerce Plaintiff States to abandon their own law enforcement policies and adopt federal civil immigration enforcement priorities by threatening to deprive Plaintiff States collectively of over a billion dollars in funding supporting crucial criminal justice and public safety programs.

283. The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

**SIXTH CAUSE OF ACTION**
**Violation of Administrative Procedure Act**
**Agency Action Contrary to Constitutional Right**

284. Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

285. For the reasons discussed above, the Immigration Enforcement Conditions violate the U.S. Constitution's separation of powers and Spending Clause. U.S. Const. art. I, § 8, cl. 1.

286. The Immigration Enforcement Conditions will cause significant, imminent, and irreparable harm to Plaintiff States.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court:

a. Declare that Defendants' adoption of the Immigration Enforcement Conditions and any actions Defendants, or any agencies or individuals working in concert with Defendants, take to implement or enforce the Conditions violate the Administrative Procedure Act, are *ultra vires*, and are unconstitutional;

b. Preliminarily and/or permanently enjoin Defendants from implementing or enforcing the Immigration Enforcement Conditions against Plaintiff States, including their sub-divisions and instrumentalities;

c. Vacate and set aside Defendants' adoption of the Immigration Enforcement Conditions and any actions taken by Defendants to implement or enforce them;

d. Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

e. Award Plaintiff States their reasonable fees, costs, and expenses, including attorney's fees; and

f. Award such additional relief as this Court may deem just and proper.

Respectfully submitted,

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By: */s/ Mayur P. Saxena*
Jeremy M. Feigenbaum
*Solicitor General*
Shankar Duraiswamy
*Deputy Solicitor General*
Mayur P. Saxena
*Assistant Attorney General*
Surinder K. Aggarwal
Bassam F. Gergi
Anaiis Gonzalez
Phoenix N. Meyers

Sarah Nealon
Nathaniel F. Rubin
*Deputy Attorneys General*

New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5365
Mayur.Saxena@law.njoag.gov
*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: */s/ Patrick J. Dolan*
Patrick J. Dolan (RI No. 10462)
*Senior Counsel to the Attorney General*
Leonard Giarrano IV (RI No. 10731)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
PDolan@riag.ri.gov
LGiarrano@riag.ri.gov
*Attorneys for the State of Rhode Island*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
*Senior Assistant Attorney General*
Lee I. Sherman
James E. Stanley
*Supervising Deputy Attorneys General*
Heidi Joya
Kelly Percival
Deylin Thrift-Viveros
*Deputy Attorneys General*

By: */s/ Delbert Tran*
Delbert Tran
*Deputy Attorney General*
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
(213) 269-6000
delbert.tran@doj.ca.gov
*Attorneys for the State of California*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: */s/ Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: */s/ Alex Hemmer*
Alex Hemmer
*Deputy Solicitor General*
Vikas Didwania
*Complex Litigation Counsel*
R. Henry Weaver
*Public Interest Counsel*
Michael M. Tresnowski
*Assistant Attorney General*

Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov
*Attorneys for the State of Illinois*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
*Attorneys for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Andrew M. Ammirati*
Andrew M. Ammirati
*Deputy Associate Attorney General*
Ashley Meskill
*Deputy Associate Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5090
andrew.ammirati@ct.gov
ashley.meskill@ct.gov
*Attorneys for the State of Connecticut*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL OF
THE DISTRICT OF COLUMBIA

By: */s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov
*Attorneys for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawaiʻi*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Katherine M. Hudson-MacRae*
Katherine M. Hudson-MacRae
*Assistant Attorney General*
Office of the Attorney General
6 State House Station

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Virginia A. Williamson*
Virginia A. Williamson
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor

Augusta, ME 04333
(207) 626-8800
katherine.m.hudson-macrae@maine.gov
*Attorneys for the State of Maine*

Baltimore, MD 21202
(410) 576-6584
VWilliamson@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Matthew M. Burke*
Matthew M. Burke
*Assistant Attorney General*
Michelle Pascucci
*State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2216
matthew.m.burke@mass.gov
michelle.pascucci@mass.gov
*Attorneys for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti
John Pallas
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PallasJ@michigan.gov
*Attorneys for the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Brian S. Carter*
Brian S. Carter*
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-7403
Brian.carter@ag.state.mn.us
*Attorneys for the State of Minnesota*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for the State of Nevada*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Mark Noferi*
Mark Noferi
*Senior Litigation Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
MNoferi@nmdoj.gov
*Attorneys for the State of New Mexico*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Natasha M. Korgaonkar*
Natasha M. Korgaonkar
*Special Counsel for Federal Initiatives*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Zoe Levine
*Special Counsel for Immigrant Justice*
Benjamin Liebowitz
*Assistant Attorney General*
28 Liberty Street
New York, NY 10005
(212) 416-6557
Natasha.Korgaonkar@ag.ny.gov

*Attorneys for the State of New York*

**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Thomas H. Castelli*
Thomas H. Castelli
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov
*Attorneys for the State of Oregon*

**JOSH SHAPIRO**
In his official capacity as Governor of the Commonwealth of Pennsylvania

By: */s/ Michael J. Fischer*
Michael J. Fischer
*Executive Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY T. CLARK**
Attorney General of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.Rose@vermont.gov
*Attorneys for the State of Vermont*

**JAY JONES**
Attorney General of Virginia

By: */s/ Megan C. Keenan*
Megan C. Keenan
*Deputy Solicitor General*
202 North Ninth Street
Richmond, VA 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Counsel for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Benjamin Seel*
Benjamin Seel
Cristina Sepe
*Deputy Solicitors General*
Washington State Office
of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov
*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Colin T. Roth*
Colin T. Roth
*Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us
*Attorneys for the State of Wisconsin*