**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF NEW JERSEY, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,

*Defendants.*

No. 1:25-cv-00404

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ....................1

BACKGROUND ....................4

I. Federal Formula Grants for Law Enforcement and Juvenile Justice Programs. ....................4

A. Byrne JAG Formula Grants. ....................4

B. Byrne SCIP Formula Grants. ....................7

C. Title II Formula Grants. ....................8

II. Plaintiff States' Immigrant Trust Policies. ....................10

III. The Challenged Immigration Enforcement Conditions. ....................15

ARGUMENT ....................21

I. The Immigration Enforcement Conditions are Unlawful. ....................22

A. USDOJ Lacks Statutory Authority To Impose The Conditions. ....................22

1. The Statutes Authorizing Byrne And Title II Grants Do Not Authorize Imposition Of The Immigrant Enforcement Conditions. ....................24

2. Congress Has Not Granted Freestanding Authority To Any Defendant To Impose Conditions On The Byrne Or Title II Grants. ....................30

3. Section 10228 Confirms That USDOJ Lacks Authority To Impose The Immigration Enforcement Conditions. ....................33

B. The Immigration Enforcement Conditions Are Arbitrary And Capricious. ....................35

1. USDOJ Relied On Immigration Considerations Congress Did Not Intend It To Consider When Administering These Grants. ....................36

2. USDOJ Failed To Consider The States' Reliance Interests. ....................37

3. USDOJ Failed To Consider The Impact Of The Conditions On The Effectiveness Of State And Local Law Enforcement. ....................40

C. The Immigration Enforcement Conditions Violate the Spending Clause. ....................41

1. The Conditions Are Not Reasonably Related to the Federal Interests In The Grant Programs At Issue. ....................42

2. The Conditions Are Impermissibly Ambiguous. ....................45

II. The Court Should Vacate, Enjoin, and Declare the Conditions Unlawful. ....................50

A. The Court Should Vacate The Imposition Of The Immigration Enforcement Conditions In The Grant Awards At Issue. ....................50

B. The Court Should Permanently Enjoin Defendants From Implementing Or Enforcing The Immigration Enforcement Conditions As To Plaintiff States. ....................51

C. The Court Should Declare Inclusion Of The Immigration Enforcement Conditions In The Grant Awards At Issue To Be Unlawful........................................54

CONCLUSION........................................................................................................................55

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Agency for Int'l Dev. v. All. for Open Soc'ys*,
570 U.S. 205 (2013) .......... 43

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*,
490 F.3d 1 (1st Cir. 2007) .......... 51

*Axis Ins. Co. v. Barracuda Networks, Inc.*,
160 F.4th 1 (1st Cir. 2025) .......... 21

*BlueRadios, Inc. v. Hamilton, Brook Smith & Reynolds, P.C.*,
166 F.4th 197 (1st Cir. 2026) .......... 21

*Brito v. Garland*,
22 F.4th 240 (1st Cir. 2021) .......... 55

*California v. U.S. Dep't of Transp.*,
808 F. Supp. 3d 291 (D.R.I. 2025) .......... *passim*

*California v. U.S. Dep't of Transp.*,
788 F. Supp. 3d 316 (D.R.I. 2025) .......... 54

*Chicago v. Sessions*,
321 F. Supp. 3d 855 (N.D. Ill. 2018) .......... 52

*Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) .......... 54

*City & County of San Francisco v. Barr*,
965 F.3d 753 (9th Cir. 2020) .......... 2, 25, 26, 42

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) .......... *passim*

*City of Philadelphia v. Att'y Gen.*,
916 F.3d 276 (3d Cir. 2019) .......... 2, 14, 22, 35

*City of Philadelphia v. Sessions*,
309 F. Supp. 3d 289–33 (E.D. Pa. 2018) .......... *passim*

*City of Providence v. Barr*,
385 F. Supp. 3d 160 (D.R.I. 2019) .......... *passim*

*City of Providence v. Barr*,
415 F. Supp. 3d 302 (D.R.I. 2019) .......................................................... 25, 50, 51, 54

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) .......................................................... *passim*

*Cnty. of Ocean v. Grewal*,
475 F. Supp. 3d 355 (D.N.J. 2020) .......................................................... 11, 41

*Cnty. of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) .......................................................... 4

*Colorado v. U.S. Dep't of Just.*,
455 F. Supp. 3d 1034 (D. Colo. 2020) .......................................................... 28, 52, 56

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......................................................... 55

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S. 212 (2022) .......................................................... 24

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......................................................... 38, 41

*Evanston v. Barr*,
412 F. Supp. 3d 873 (N.D. Ill. 2019) .......................................................... 57

*Garside v. Osco Drug, Inc.*,
895 F.2d 46 (1st Cir. 1990) .......................................................... 21

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......................................................... 2, 24

*Hardt v. Reliance Std. Life Ins. Co.*,
560 U.S. 242 (2010) .......................................................... 29

*Healey v. Spencer*,
765 F.3d 65 (1st Cir. 2014) .......................................................... 56

*Illinois v. FEMA*,
801 F. Supp. 3d 75 (D.R.I. 2025) .......................................................... *passim*

*Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) .......................................................... 56

*Kansas v. United States*,
249 F.3d 1213 (10th Cir. 2001) .......................................................... 53

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) .......................................................... *passim*

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) .......... 2, 24

*Los Angeles v. Sessions*,
No. 18-7347, 2019 WL 1957966 (C.D. Cal. Feb. 15, 2019) .......... 28

*Mass. Delivery Ass'n v. Coakley*,
769 F.3d 11 (1st Cir. 2014) .......... 59

*Massachusetts v. United States*,
435 U.S. 444 (1978) .......... 43

*McHenry Cnty. v. Raoul*,
44 F.4th 581 (7th Cir. 2022) .......... 15

*MedImmune, Inc. v. Genetech, Inc.*,
549 U.S. 118 (2007) .......... 56

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) .......... 57

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 39, 44

*National Min. Ass'n v. US Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) .......... 56

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519, 577 (2012) .......... 49

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 54

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of New Jersey*,
8 F.4th 176 (3d Cir. 2021) .......... 15

*Off. of Pers. Mgmt. v. Richmond*,
496 U.S. 414 (1990) .......... 23

*Ohio v. EPA*,
603 U.S. 279 (2024) .......... 53, 54

*Or. Nat. Res. Council v. Thomas*,
92 F.3d 792 (9th Cir. 1996) .......... 42

*Oregon v. Trump*,
406 F. Supp. 3d 940 (D. Or. 2019) .......... 26

*Owens v. City of Malden*,
85 F.4th 625 (1st Cir. 2023) .......... 27

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 38, 47

*Quintana-Dieppa v. Dep't of the Army*,
130 F.4th 1 (1st Cir. 2025) .......... 21

*Rhode Island v. Trump*,
810 F. Supp. 3d 283 (D.R.I. 2025) .......... 51

*Rosario-Urdaz v. Rivera-Hernandez*,
350 F.3d 219 (1st Cir. 2003) .......... 54

*San Francisco v. Sessions*,
349 F. Supp. 3d 924 (N.D. Cal. 2018) .......... 46, 53, 57

*San Francisco v. Sessions*,
372 F. Supp. 3d 928 (N.D. Cal. 2019) .......... 52, 28, 52, 53

*SEC v. Locke Cap. Mgmt., Inc.*,
794 F. Supp. 2d 355 (D.R.I. 2011) .......... 54

*South Dakota v. Dole*,
483 U.S. 203 (1987) .......... 46, 49, 53

*State ex rel. Becerra v. Sessions*,
284 F. Supp. 3d 1015 (N.D. Cal. 2018) .......... 58

*Steffel v. Thompson*,
415 U.S. 452 (1974) .......... 60

*Tennessee v. Dep't of Educ.*,
104 F.4th 577 (6th Cir. 2024) .......... 54

*Texas v. Yellen*,
105 F.4th 755 (5th Cir. 2024) .......... 47

*Trump v. CASA, Inc.*,
145 S. Ct. 2540 (2025) .......... 55

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
481 U.S. 1301 (1987) .......... 59

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 15, 53

*United States v. City of Los Angeles*,
No. CV 25-5917, 2026 WL 1790971 (C.D. Cal. June 20, 2026) .......... 15

*United States v. Cnty. of Washtenaw*,
--- F. Supp. 3d ---, 2026 WL 2453724 (E.D. Mich. Aug. 21, 2026) .......... 15, 53

*United States v. Colorado*,
831 F. Supp. 3d 1108 (D. Colo. 2026) ........................................ 14

*United States v. Evans*,
333 U.S. 483 (1948) ........................................ 50

*United States v. Hernandez-Ferrer*,
599 F.3d 63 (1st Cir. 2010) ........................................ 28

*United States v. Illinois*,
796 F. Supp. 3d 494 (N.D. Ill. 2025) ........................................ 15

*United States v. Minnesota*,
No. 25-3798, 2026 WL 2085701 (D. Minn. July 20, 2026) ........................................ 15

*United States v. New Jersey*,
No. 2013-cv-64, 2021 WL 252270 (D.N.J. Jan. 26, 2021) ........................................ 15

*United States v. Philadelphia*,
644 F.2d 187 (3d Cir. 1980) ........................................ 36

*Vazquez-Velazquez v. P.R. Highways & Transp. Auth.*,
73 F.4th 44 (1st Cir. 2023) ........................................ 23

*Viscito v. Nat'l Planning Corp.*,
34 F.4th 78 (1st Cir. 2022) ........................................ 23

*Washington v. Adams Cnty. Sheriff's Off.*,
No. 2:25-CV-99-RLP, 2025 WL 1762373 (E.D. Wash. June 25, 2025)........................................ 54

*West Virginia v. U.S. Dep't of the Treasury*,
59 F.4th 1124 (11th Cir. 2023) ........................................ 47, 48

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........................................ 34

*Winter v. NRDC*,
555 U.S. 7 (2008) ........................................ 58

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........................................ 24

**Federal Statutes**

5 U.S.C. § 703 ........................................ 56

5 U.S.C. § 706 ........................................ 39, 55

8 U.S.C. § 1324 ........................................ *passim*

8 U.S.C. § 1644 ........................................ 27, 53

8 U.S.C. § 1373 ........................................ *passim*

18 U.S.C. § 371 ........ 17
18 U.S.C. § 1071 ........ 52, 20
20 U.S.C. § 1232g ........ 52
20 U.S.C. § 1681 ........ 29
23 U.S.C. § 324 ........ 29
28 U.S.C. § 2201 ........ 59
29 U.S.C. § 794 ........ 29
34 U.S.C. § 10102 ........ 32
34 U.S.C. § 10142 ........ 34
34 U.S.C. § 10152 ........ *passim*
34 U.S.C. § 10153 ........ 5, 6
34 U.S.C. § 10156 ........ 6, 8
34 U.S.C. § 10171 ........ 34
34 U.S.C. § 10228 ........ *passim*
34 U.S.C. § 11111 ........ 35
34 U.S.C. § 11131 ........ 9, 46
34 U.S.C. § 11132 ........ 9, 30, 31
34 U.S.C. § 11133 ........ *passim*
34 U.S.C. § 11182 ........ 35
42 U.S.C. 2000d-4a ........ 21
42 U.S.C. §200d ........ 29
42 U.S.C. § 6101 ........ 29

**State Statutes**

5 Ill. Comp. Stat. § 805/1 ........ 13, 14, 15
5 Me. Rev. Stat. § 4762 ........ 15
11 Del. C. § 8402B ........ 15
2026 Md. Laws, ch. 872 ........ 14
Cal Gov't Code § 7284.6 ........ 15
Cal. Educ. Code § 234.7 ........ 52
Cal. Gov't Code § 7283.1 ........ 51, 52
Cal. Gov't Code § 7284.2 ........ 11
Cal. Gov't Code §§ 7284.5 to 7284.6 ........ 13-15
Cal. Labor Code § 90.2 ........ 52
Colo. Rev. Stat. § 24-76.6-102 to -103 ........ 13

Conn. Gen. Stat. Ann. § 54-192h ........ 13
Md. Code Ann., Corr. Servs. § 8-805 ........ 13
Md. Code Ann., Crim. Proc. §§ 5-104, 5-201.1 ........ 13
Or. Rev. Stat. § 181A.820 ........ 13
Vt. Stat. Ann. tit. 20, § 4651 ........ 13
Wash. Rev. Code § 10.93.160 ........ 13, 15, 51
Wash. Rev. Code § 43.10.315 ........ 11
Wash. Rev. Code § 43.17.425 ........ 15

**<u>Other</u>**

2 C.F.R. § 200.1 ........ 41
90 C.F.R. § 8443 ........ 48
S. Rep. No. 90-1097, 90th Cong., 2nd Sess. 1968, 1968 U.S.C.C.A.N. 2112, 1968 WL 4856 ........ 37

## INTRODUCTION

For decades, state and local law enforcement agencies have relied on a wide range of federal grants to sustain critical law enforcement operations. These grant programs, created by Congress and administered by the U.S. Department of Justice (USDOJ), provide hundreds of millions of dollars to States annually to address some of the most serious threats to the safety of their residents: from gang violence to drug trafficking to sexual assault to all kinds of violent crimes. In enacting these grant programs, Congress's focus was clear: the funds must be used to support criminal law enforcement and juvenile justice programs. Indeed, Congress mandated the distribution of the vast majority of these funds to States based on fixed statutory formulas.

Yet the Office of Justice Programs (OJP), an agency within USDOJ charged with administering these federal grants, has now declared that States will be unable to access funds for three major formula grants providing States with critical support for law enforcement and juvenile justice programs—the Byrne JAG, Byrne SCIP, and Title II formula grants—unless they accede to the Executive Branch's immigration enforcement priorities. OJP seeks to condition the use of funds on States' assistance to the U.S. Department of Homeland Security (DHS) with unrelated civil immigration enforcement efforts. Specifically, OJP has required that grant recipients provide access to individuals in state custody who are believed to be aliens; required that recipients notify DHS of the release of such individuals from custody; imposed restrictions relating to the disclosure of immigration-related information by recipients; and barred public disclosure of federal law enforcement information to conceal, harbor, or shield individuals unlawfully present (collectively, the "Immigration Enforcement Conditions" or "Conditions").

Defendants' manipulation of critical law enforcement funding to strong-arm States into supporting the Administration's civil immigration policies runs headlong into two basic principles

of American governance: separation of powers and federalism. A federal agency has "no power to act ... unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). That is particularly so when it comes to federal funding, where Congress retains the power of the purse, and thus establishes the criteria that executive branch agencies like USDOJ must use when awarding grants. And because the imposition of the Conditions would dramatically upset the federal-state balance—forcing the States to change their policies to gain access to vast sums of federal dollars—there must be a "clear statement" in the statute showing that Congress intended to impose them. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). But no federal statute authorizes USDOJ to impose immigration-related funding conditions on these grant programs.

Indeed, that is precisely what this Court, the First Circuit, and multiple federal courts of appeal concluded when they rejected USDOJ's last attempt nearly a decade ago to impose substantively identical immigration-related conditions on some of the exact same grant programs. *See City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020); *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020); *City & County of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020); *City of Philadelphia v. Att'y Gen.*, 916 F.3d 276 (3d Cir. 2019). The conclusion of these courts—that the conditions are unlawful because USDOJ lacks the statutory authority to impose them—remains true today and is fatal to all of the Immigration Enforcement Conditions.

Nor is the lack of statutory authority the sole legal defect. Imposition of the Conditions is also arbitrary and capricious under the APA in multiple respects. USDOJ imposed the Conditions based on immigration policy concerns that Congress plainly did not intend the agency to consider in deciding how to administer the programs. USDOJ failed to grapple with the States' reliance on the grants and the harms they will suffer if forced to scale back grant-funded criminal law enforcement and juvenile justice programs. And USDOJ failed to consider how the Conditions would

undermine rather than support Congress's goal of assisting state and local criminal law enforcement and juvenile justice programs. Further, the conditions violate the Spending Clause—because they are improperly ambiguous and unrelated to the underlying grant programs at issue. Indeed, this Court's recent precedents confirm that federal agencies run afoul of the APA and the Spending Clause when they seek to impose immigration-related conditions on unrelated funding streams. *See California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291 (D.R.I. 2025); *Illinois v. FEMA*, 801 F. Supp. 3d 75 (D.R.I. 2025).

Action by this Court is needed to prevent the substantial harms the Immigration Enforcement Conditions will otherwise inflict on Plaintiff States. The Conditions force Plaintiff States either to abandon critical funds to support public safety or relinquish their sovereign right to decide how to use their own law enforcement resources. Many Plaintiff States have long concluded as a matter of state policy that public safety is improved by focusing their limited law enforcement resources on core public safety missions and ensuring that victims and witnesses to a crime will not hesitate to come forward due to their immigration status. Other Plaintiff States have chosen to permit their political subdivisions or law enforcement agencies to exercise their own discretion in determining whether law enforcement resources are best spent assisting the Federal Government in immigration matters. Either way, USDOJ's imposition of the Immigration Enforcement Conditions forces Plaintiff States into an untenable position: either forfeit access to critical resources or accept unlawful conditions that conscript state and local officials into immigration enforcement and undermine the trust between law enforcement and immigrant communities that is critical to addressing crime.

The Court should declare unlawful and vacate the Immigration Enforcement Conditions, and it should permanently enjoin their implementation or enforcement against Plaintiff States, including their subdivisions and instrumentalities.

## BACKGROUND[1]

### I. Federal Formula Grants for Law Enforcement and Juvenile Justice Programs.

Congress has created multiple federal formula grant programs that are administered for USDOJ by the OJP and two of its program offices, the Bureau of Justice Assistance (BJA) and the Office of Juvenile Justice and Delinquency Prevention (OJJDP). These grants have long been instrumental in funding programs to support state criminal justice and law enforcement efforts as well as juvenile justice and delinquency prevention.

#### A. Byrne JAG Formula Grants.

Named after an officer in the New York City Police Department who was murdered while protecting a witness in a drug case, the Edward Byrne Memorial State and Local Law Enforcement Programs have for decades been the leading federal source of criminal justice funding to state and local jurisdictions. President Reagan created the original Byrne grant programs by signing into law the Anti-Drug Abuse Act of 1988, with the purpose "to assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system," while emphasizing the prevention of drug crime and violent crime. Pub. L. No. 100-690, §§ 500-501, 102 Stat. 4181, 4329 (1988). In 2006, Congress merged the

[1] The parties have agreed that Statements of Undisputed Facts and responses thereto are not necessary in this case and have previously requested in a Joint Status Report that the requirement to submit them under Local Civil Rule 56(a) be waived. *See* ECF 62, ¶ 9. Consistent with that agreement, Plaintiffs have not submitted a Statement of Undisputed Facts with this motion. Of course, in the event the Court denies the parties' joint request, Plaintiffs are prepared to submit a Statement of Undisputed Facts should the Court so desire.

Byrne Programs with another formula grant program, the Local Law Enforcement Block Grant Program, creating the Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) Program.

The Byrne JAG program authorizes formula grants to States and units of local government "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice." Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3095 (2006). Byrne JAG is designed to give state and local governments "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" to State and local criminal justice problems. H.R. Rep. No. 109-233, at 89 (2005). Consistent with this approach, Congress enumerated several types of programs for which this funding can be used, including: law enforcement; prosecution and court programs; prevention and education; corrections and community corrections; drug treatment and enforcement; planning, evaluation, and technology improvement; and crime victim and witness programs, other than compensation. Pub. L. No. 109-162, § 1111 (codified at 34 U.S.C. § 10152(a)(1)(A)-(G)). Every State is eligible to receive Byrne JAG formula funds, so long as the State complies with the express statutory application requirements. These requirements include providing certain certifications and assurances, 34 U.S.C. § 10153(A)(1)-(5), and providing a comprehensive plan detailing how grants received will be used to improve administration of the criminal justice system, including "a description of how the State will allocate funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title." § 10153(A)(6)(B).

Congress was explicit that all Byrne JAG "grants to States and units of local government" must be made "in accordance with the formula established under" the statute. § 10152(a)(1). The grant formula mandates that USDOJ "shall … allocate … to each State" funding based on just two factors: (1) the ratio of the State's population to the total U.S. population, and (2) the ratio of the

three-year average of violent crimes reported by the State to the three-year average for all States. § 10156(a)(1). There is only one exception to this express statutory formula: if any State receives less than 0.25% of the total amount of funding, then all allocations must be adjusted so that "each State" receives no less than 0.25% of the total amount.[2] § 10156(a)(2). Ultimately, if USDOJ determines that any State will not qualify to receive Byrne JAG funds, will be unable to use any portion of its allocation, or if a State chooses not to participate in the Byrne JAG Program, then USDOJ "shall" award that State's allocation "to units of local government, or combinations thereof, within such State," prioritizing the States with the highest number of violent crimes reported in the past three years. § 10156(f). The statutory formula makes no reference to immigration enforcement.

States have used statutorily assigned Byrne JAG formula funds for decades to support a wide variety of state and local criminal justice and law enforcement programs, including crime prevention, education, corrections, drug treatment, drug crime enforcement, technology improvement, victim and witness services, mental and behavioral health programs, and crisis intervention. *See, e.g.*, Ex. 17 (Ottobre Decl.), ¶ 17; Ex. 20 (Lostritto Decl.), ¶¶ 16-17; Ex. 31 (Ebato Decl.), ¶ 16; Ex. 27 (Daniell Decl.), ¶ 14; Ex. 30 (McDonald Decl.), ¶ 15; Ex. 19 (Lennig Decl.), ¶ 15; Ex. 24 (Kervick Decl.), ¶ 15; Ex. 41 (Ireland Decl.), ¶ 3; Ex. 33 (Sauschuck Decl.), ¶ 15; Ex. 29 (Grady Decl.), ¶ 15; Ex. 21 (Kenyon Decl.), ¶ 15; Ex. 25 (McNeil Decl.), ¶ 18; Ex. 26(Porter Decl.), ¶ 14; Ex. 28(Karpowitz Decl.), ¶ 13; Ex. 23X (Kenny Decl.), ¶ 15; Ex. 22 (Stanton Decl.), ¶ 16; Ex. 32 (Guertin-Anderson Decl.), ¶¶ 17-20; Ex. 16 (Hogan Decl.), ¶ 16; Ex. 43 (Babine Decl.), ¶ 20. In FY 2025, Plaintiff States were collectively allocated over $80,000,000 in Byrne JAG awards. *See*

[2] States must allocate a portion of their Byrne JAG funding to local governments. 34 U.S.C. § 10156(d). Local governments' allocations are determined based on their relative rates of violent crime compared to the State as a whole. § 10156(b)(2), (d).

BJA, *FY 2025 Byrne JAG State Allocations*, https://bja.ojp.gov/funding/fy25-jag-state-allocations.pdf.

**B. Byrne SCIP Formula Grants.**

Congress established the Byrne State Crisis Intervention Program (SCIP) in 2022 as part of the Bipartisan Safer Communities Act (BSCA). Through BSCA, Congress amended the Byrne JAG statute to authorize use of Byrne funds "to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice or civil proceedings," and expanded the permissible uses of such funding. Pub. L. No. 117-159, § 12003, 136 Stat. 1313, 1325 (2022) (amending 34 U.S.C. § 10152(a)(1)). Specifically, Congress now permitted Byrne funds to be used for (1) "[m]ental health programs and related law enforcement corrections programs, including behavioral programs and crisis intervention teams"; and (2) "[i]mplementation of State crisis intervention court proceedings and related programs or initiatives." 34 U.S.C. § 10152(a)(1)(H)-(I). Because Byrne SCIP remains part of the overall Byrne statutory framework, USDOJ is charged with administering the Byrne SCIP grants, which it does through OJP and BJA. As with Byrne JAG, any grants made pursuant to Byrne SCIP must be made "in accordance with the formula established under" the Byrne JAG statute. § 10152(a)(1); *see also* § 10156 (setting forth formula). The statutory formula makes no reference to federal immigration policy.

States have used Byrne SCIP funding to fund state crisis intervention courts and related programs, including extreme risk protection order (ERPO) programs to keep guns out of the hands of those who pose a threat to themselves or others, suicide reduction initiatives, firearm safety trainings and other efforts to reduce gun violence, mental health initiatives, drug courts, and veterans' treatment courts. *See, e.g.*, Ex. 17 (Ottobre Decl.), ¶ 29; Ex. 20 (Lostritto Decl.), ¶ 28; Ex.

31 (Ebato Decl.), ¶ 26; Ex. 30 (McDonald Decl.), ¶ 25; Ex. 19 (Lennig Decl.), ¶ 25; Ex. 24 (Kervick Decl.), ¶ 25; Ex. 41 (Ireland Decl.), ¶ 4; Ex. 33 (Sauschuck Decl.), ¶ 25; Ex. 29 (Grady Decl.), ¶ 25; Ex. 21 (Kenyon Decl.), ¶ 26; Ex. 25 (McNeil Decl.), ¶ 28; Ex. 26 (Porter Decl.), ¶ 22; Ex. 28 (Karpowitz Decl.), ¶ 24; Ex. 23 (Kenny Decl.), ¶ 26; Ex. 22 (Stanton Decl.), ¶ 29; Ex. 16 (Hogan Decl.), ¶ 23; Ex. 43 (Babine Decl.), ¶ 31. In FY 2025, Plaintiff States were collectively allocated over $56,000,000 in Byrne SCIP awards. *See* BJA, *FY 2025 Byrne SCIP Formula Allocations*, https://bja.ojp.gov/funding/fy-2025-byrne-scip-allocations.pdf.

**C. Title II Formula Grants.**

Congress established a series of juvenile justice and delinquency prevention grants pursuant to the Juvenile Justice and Delinquency Prevention Act (JJDPA) of 1974, Pub. L. No. 93-415, § 204, 88 Stat. 1109, 1112 (1974), *codified at* 34 U.S.C. § 11114, to support local and state efforts to prevent youth delinquency and improve juvenile justice systems. USDOJ is charged with administering these grants, via OJJDP. OJJDP sponsors research, program, and training initiatives; develops priorities and goals and sets policies to guide federal juvenile justice issues; disseminates information about juvenile justice issues; and awards funds to states to support local programming.

Title II of the JJDPA instructs OJJDP to "make grants to States and units of local government … to assist them in planning, establishing, operating, coordinating, and evaluating projects directly or through contracts with public and private agencies for the development of more effective education, training, research, prevention, diversion, treatment, and rehabilitation programs in the area of juvenile delinquency and programs to improve the juvenile justice system." 34 U.S.C. § 11131(a). Title II is a formula grant program. The statute specifies that funds "shall be allocated annually among the States" based on the "relative population of people under 18 years of age." 34 U.S.C. § 11132(a)(1). The statute also enumerates the specific circumstances in which a State's

formula allocation could be reduced. A State's share may be reduced by no less than twenty percent for each core requirement that has not been satisfied. § 11133(c)(1)(A). Even then, a State may still receive its allocation if it agrees to spend half of its allocation toward compliance with the core requirements or if OJJDP determines that the State has achieved substantial compliance or has committed to full compliance with the core requirement. § 11133(c)(1)(B). The Administrator may reallocate a State's allocation if the State does not submit a state plan or submits a plan that does not meet the express requirements of the section. § 11133(d). If USDOJ determines that any allocated funds remain unobligated at the end of the fiscal year, they "shall be reallocated in a manner equitable and consistent with the purpose of" Title II. § 11132(b). The formula makes no reference to immigration enforcement.

Title II specifies the requirements that a State must satisfy "[i]n order to receive formula grants," including submitting to USDOJ a three-year plan for carrying out the purposes of the grant funding program, the requirements of which are enumerated in detail in the statute, and submitting annual performance reports. § 11133(a). The Title II statute requires USDOJ to provide a grant to the State so long as it "has an approved comprehensive plan which conforms with the purposes and requirements of the Act and with rules, regulations, and procedures established by [the agency] consistent with the Act." S. Rep. No. 93-1101, at 5300 (1974). The authorizing statute, in 33 sub-sections, expressly sets out the requirements for that state plan in extensive detail. 34 U.S.C. § 11133(a)(1)-(33). None of these requirements relate to immigration enforcement.

States have used Title II formula grant funds to support juvenile justice systems and juvenile delinquency prevention programs. *See, e.g.*, Ex. 17 (Ottobre Decl.), ¶ 40; Ex. 20 (Lostritto Decl.), ¶ 35; Ex. 36 (Gillespie Decl.), ¶ 14; Ex. 24 (Kervick Decl.), ¶ 35; Ex. 37 (Marshall Decl.), ¶¶ 15-16; Ex. 35 (Detman Decl.), ¶ 14; Ex. 34 (House Decl.), ¶ 15; Ex. 39 (Young), ¶¶ 15-16; Ex.

21 (Kenyon Decl.), ¶ 37; Ex. 25 (McNeil Decl.), ¶ 36; Ex. 26 (Porter Decl.), ¶ 30; Ex. 23 (Kenny Decl.), ¶ 37; Ex. 22 (Stanton Decl.), ¶ 38-39; Ex. 40 (Thibeault Decl.), ¶ 15; Ex. 42 (Lunn Decl.), ¶ 15; Ex. 32X (Guertin-Anderson Decl.), ¶¶ 31-33; Ex. 16 (Hogan Decl.), ¶ 33; Ex. 43 (Babine Decl.), ¶ 42; Ex. 38 (Jackson Decl.), ¶¶ 14-17. In FY 2025, Plaintiff States were collectively allocated over $19,000,000 in Title II awards. *See* OJP, *Distribution of Juvenile Justice Formula Grants by State - FY 2025*, https://ojjdp.ojp.gov/funding/fy2025/titleII/fy25-award-amounts.pdf.

## II. Plaintiff States' Immigrant Trust Policies.

Many Plaintiff States, and many of their municipalities, have enacted laws or policies designed to ensure that state and local law enforcement can focus on fulfilling their core mission of public safety and criminal enforcement, including when working with local immigrant communities. These policies reflect well-established concerns that undocumented immigrants and their families are less willing to engage with law enforcement, even if they have been victims or witnesses to a crime, if their engagement with law enforcement could risk their deportation or the deportation of their families. *See, e.g.*, N.J. Pub. L. 2026 c. 5, § 1(g) (recognizing fear of engaging with state and local law enforcement "can impede the ability of law enforcement to solve crimes and apprehend suspects, posing a public safety risk to every resident of the State"); Cal. Gov't Code § 7284.2(c), (d) (finding "immigrant community members fear approaching police" and "[e]ntangling state and local agencies with federal immigration enforcement programs diverts already limited resources and blurs the lines of accountability between local, state, and federal governments"); N.Y. Exec. Order No. 170 (Sep. 15, 2017) (recognizing "the reporting of unlawful activity by immigrant witnesses and victims is critical to strengthening ties between immigrants and law enforcement, reducing crime, and enhancing the State's ability to protect the safety of all of its residents."); Wash. Rev. Code § 43.10.315 (recognizing that restricting participation in federal immigration enforcement "ensure[s] state and law enforcement agencies are able to foster the

community trust necessary to maintain public safety"); 2026 Haw. Sess. Laws Act 141 (June 24, 2026) (recognizing that trust between State's immigrant community and state and county agencies is threatened when those agencies are "entangled with federal immigration enforcement," which is "to the detriment of public safety and the well-being of all residents").

Those concerns have been substantiated, time and again, by law enforcement agencies and independent studies. *See* Ex. 14 (Declaration of Providence, Rhode Island Chief of Police Oscar L. Perez), ¶¶ 10, 12, 14, 19; Ex. 15 (Declaration of Rhode Island State Police Administrative Bureau Commander, Major Peter J. Cambio), ¶¶ 8-13; Ex. 18 (Declaration of Bridgeton, New Jersey Chief of Police James Battavio), ¶¶ 8-9, 11, 16, 21; *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 363 n.5 (D.N.J. 2020) (noting "a number of studies that confirm that immigration-related fears prevent individuals from reporting crimes"), *aff'd sub nom.*, *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of State of New Jersey*, 8 F.4th 176 (3d Cir. 2021); *e.g.*, Tom K. Wong and Karina Shklyan, *The Impact of Interior Immigration Enforcement on the Lives of Undocumented Immigrants* at 668-88, J. of Race, Ethnicity, & Politics (vol. 9, issue 3, Nov. 2024), https://doi.org/10.1017/rep.2024.19; Rafaela Rodrigues et al., *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* at 72-73, Nat'l Immigrant Women's Advocacy Project (May 3, 2018), http://library.niwap.org/wp-content/uploads/Immigrant-Access-to-Justice-National-Report.pdf; Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Great Cities Inst., Univ. of Illinois Chicago (May 2013), https://immigrantjustice.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF. Indeed, USDOJ has long been aware of this broad consensus among local law enforcement authorities. *See* Ex. 13 (USDOJ Office of Inspector General 2007 Audit Report), at

OJP_AR_775 (citing the observation by Major Cities Chiefs of Police that "[i]mmigration enforcement by local police likely negatively effect (*sic*) and undermine the level of trust and cooperation between local police and immigrant communities").

Given the importance of ensuring a relationship of trust between law enforcement and immigrant communities, a number of States and local governments have adopted policies to ensure that immigrants can come forward to state and local law enforcement agencies when, *inter alia*, they have been victims or witnesses to a crime, without fear that this will lead to their detention or deportation. *See, e.g.*, N.J. Att'y Gen. Directive 2018-6 (N.J. Directive), *codified at* 2026 N.J. Sess. Law. Serv. ch. 5; 5 Ill. Comp. Stat. 805/1 to /20; Cal. Gov't. Code §§ 7282.5, 7284.6; Wash. Rev. Code Ann. § 10.93.160; Colo. Rev. Stat. § 24-76.6-102 to -103; Conn. Gen. Stat. Ann. § 54-192h; Or. Rev. Stat. § 181A.820; Vt. Stat. Ann. tit. 20, § 4651; N.Y. Exec. Law § 170-k; N.Y. Exec. Orders 170 and 170.1; 2026 Haw. Sess. Laws Act 141 (June 24, 2026); Md. Code Ann., Crim. Proc. §§ 5-104, 5-201.1; Md. Code Ann., Corr. Servs. § 8-805; R.I. State Police General Order 56A10(IV)(G).

Although the States' policies are by no means identical, they share important common features. Principally, these policies promote law enforcement cooperation by ensuring a clear distinction between the roles of state and local officers who enforce state criminal law and the federal immigration officers who enforce federal civil immigration law. For example, New Jersey's Immigrant Trust Act restricts state and local law enforcement officers from participating in civil immigration raids, from providing federal civil immigration officials with access to state or local law enforcement facilities, and from giving notice to officials of certain low-level detainees' upcoming release dates from state custody. These policies are designed to help communities draw a clear distinction between state and local officers who enforce state criminal law, and federal

immigration officers who enforce federal civil immigration law. *See* 2026 N.J. Sess. Law. Serv. Ch. 5, § 1; *see also, e.g.*, R.I. State Police General Order 56A10(IV)(A), (D) (establishing that "[i]nvestigating and enforcing violations of federal civil immigration law is not the responsibility of the Rhode Island State Police" and refusing ICE access to individuals in custody and the use of ICE facilities to question individuals if "ICE's sole purpose is enforcement of Federal Civil Immigration Law"); 5 Ill. Comp. Stat. 805/15 (Illinois TRUST Act providing for similar restrictions on cooperation with federal immigration enforcement); Cal. Gov't Code §§ 7284-7284.12 (same as to California Values Act); 2026 Md. Laws Ch. 872(enrolled bill) (same as to Maryland Community Trust Act).

Of course, there are important exceptions. Most obviously, although not every state policy is the same, a range of Plaintiff States allow state and local law enforcement to collaborate with federal civil immigration officials to facilitate the removal of violent criminals. *See, e.g.*, 2026 N.J. Sess. Law. Serv. Ch. 5, § 3(c)(5)–(6) (authorizing law enforcement to provide civil immigration authorities with notice of the release date, and to continue the detention of, any detainee who is charged with or has ever been convicted of serious or violent offenses); Cal. Gov't Code §§ 7284.6(a)(1)(C), 7282.5(a)(1) (permitting law enforcement to respond to requests from immigration authorities for notice of the release date of an individual who has been convicted of a serious or violent felony); 5 Ill. Comp. Stat. 805/15(i) (allowing law enforcement to cooperate in criminal investigations conducted by federal immigration authorities). Many of these policies include express exceptions confirming that state and local officials must comply with federal law, including clarifications that, *inter alia*: (i) state and local law enforcement will cooperate with federal civil immigration authorities "when required to do so by law," including to comply with federal court orders (such as a removal order signed by a federal judge) and with judicially issued arrest

warrants, 2026 N.J. Sess. Law. Serv. Ch. 5, § 3(c)(5)(c), (c)(6)(c), (d)(3); 5 Ill. Comp. Stat. 805/15(h); Cal. Gov't Code §§ 7282.5(a), 7284.6(a)(4); Del. Code Ann. tit. 11, § 8402B(c); N.Y. Exec. Law§ 319-a(9); N.Y. Exec. Order 170 (Sep. 15, 2017); Wash. Rev. Code Ann. § 10.93.160(3)-(6), (14), (16); R.I. State Police General Order 56A10(IV)(D)-(E); and (ii) state and local law enforcement are in no way restricted from sharing with federal civil immigration authorities the citizenship or immigration status of any individual, 2026 N.J. Sess. Law. Serv. Ch. 5, § 3(d)(10); 5 Ill. Comp. Stat. 805/5; Cal. Gov't Code § 7284.6(e); Wash. Rev. Code Ann. § 43.17.425; 2019 Wash. Sess. Laws, ch. 440, § 8; Me. Rev. Stat. Ann. tit. 5, § 4762(1).

The Federal Government and other parties have at times challenged Plaintiff States' policies in court, and the courts have repeatedly and unanimously upheld them. *See, e.g.*, *McHenry Cnty. v. Raoul*, 44 F.4th 581, 594 (7th Cir. 2022); *Ocean Cnty.*, 8 F.4th at 182; *United States v. California*, 921 F.3d 865, 873 (9th Cir. 2019); *United States v. County of Washtenaw*, No. 26-11166, 2026 WL 2453724, at *1 (E.D. Mich. Aug. 21, 2026); *United States v. Minnesota*, No. 25-cv-3798, 2026 WL 2085701, at *1 (D. Minn. July 20, 2026); *United States v. City of Los Angeles*, No. CV 25-5917, 2026 WL 1790971, at *1 (C.D. Cal. June 20, 2026); *United States v. Colorado*, 831 F. Supp. 3d 1108 (D. Colo. 2026); *United States v. Illinois*, 796 F. Supp. 3d 494, 536 (N.D. Ill. 2025); *United States v. New Jersey*, Civ. No. 20-1364, 2021 WL 252270, at *1 (D.N.J. Jan. 26, 2021); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 331–33 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds sub nom.*, *City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 291 (3d Cir. 2019).

Although other Plaintiff States do not have statewide limitations on the use of law-enforcement resources to assist in federal immigration enforcement, they do not *require* that their law-enforcement officers provide on-demand assistance to federal immigration authorities either.

Many of these States have concluded that they can best protect their residents by maintaining local control over state and local law-enforcement resources or by empowering law-enforcement officials to exercise discretion in determining when it would best promote public safety to assist federal immigration-enforcement efforts, rather than affirmatively requiring officers to devote state and local resources to federal immigration enforcement merely on that federal agency's command. *See, e.g.*, Ex. 20 (Lostritto Decl.), ¶ 43; Ex. 15 (Cambio Decl.), ¶¶ 8-13; Ex 27 (Daniell Decl.) ¶ 19-20; Ex. 22 (Stanton Decl.), ¶ 49. Still other Plaintiff States have concluded that participating in federal immigration-enforcement efforts imposes substantial costs on local jurisdictions, including in the form of personnel and resources. *See, e.g.*, Ex. 17 (Ottobre Decl.), ¶ 45; Ex. 16 (Hogan Decl.), ¶ 37; Ex. 19 (Lennig Decl.) ¶ 39; Ex. 43 (Babine Decl.), ¶ 42; Ex. 38 (Jackson Decl.), ¶ 29.

## III. The Challenged Immigration Enforcement Conditions.

On Inauguration Day, January 20, 2025, President Trump issued an executive order directing the Attorney General and Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions … do not receive access to Federal funds" and to take "any other lawful actions, criminal or civil, that they deem warranted." Ex. 1 (Executive Order No. 14,159), § 17. The following day, a memorandum from then-Acting Deputy Attorney General Emil Bove asserted that "[f]ederal law prohibits state and local actors from resisting, obstructing, and otherwise failing to comply with lawful immigration-related commands and requests," and required all USDOJ employees to "work with the newly established Sanctuary Cities Enforcement Working Group … to identify state and local laws, policies, and activities that are inconsistent with Executive Branch immigration initiatives and, where appropriate, to take legal action to challenge such laws." Ex. 2 (Bove Memorandum), at 3. That directive required that U.S. Attorney's Offices and USDOJ

litigating components "shall investigate … for potential prosecution" any and all "resistance, obstruction, or other non-compliance with lawful immigration-related commands." *Id.*

On February 5, 2025, the day after her confirmation, then-Attorney General Pamela Bondi issued a document titled "Sanctuary Jurisdiction Directives" (the "Bondi Directive"), that directed USDOJ to undertake wide-ranging efforts to punish "so-called 'sanctuary jurisdictions'" for failing to assist in federal civil immigration enforcement. Ex. 3 (Bondi Directive), at 2. The Bondi Directive required USDOJ attorneys to evaluate "all contracts, grants, or other agreements with organizations that support or provide services to removable or illegal aliens" for their potential termination. *Id.* The Bondi Directive further instructed USDOJ attorneys to investigate and prosecute "violations of federal laws such as 18 U.S.C. § 371 and 8 U.S.C. §§ 1324 and 1373," to promptly report declination decisions to USDOJ leadership, and to investigate and challenge state and local laws and policies "that facilitate violations of federal immigration laws or impede lawful federal immigration operations." *Id.* at 3. "In furtherance of that objective," the Bondi Directive declares that USDOJ "will ensure that, consistent with law, 'sanctuary jurisdictions' do not receive access to Federal funds from the Department," and that USDOJ will "pause the distribution of … funds" and "terminate any agreements" that are inconsistent with this new policy. *Id.* at 1. The Bondi Directive makes clear the Administration's view that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." *Id.*

On March 31, 2025, USDOJ's Office of the Associate Attorney General submitted a report to the Attorney General in response to the Bondi Directive "[t]o help enable [USDOJ] to end funding to sanctuary jurisdictions." Ex. 3 (Bondi Directive), at 1. The report identified grants totaling "approximately $2.75 billion per year" to which USDOJ might apply immigration-related conditions—including the Byrne and Title II grants—although it anticipated "obstacles (including

litigation)" if USDOJ in fact imposed the conditions. *Id.* at 1-2. The report added that imposition of such immigration-related conditions would be "far from the only effort that [USDOJ] is currently taking to crack down on sanctuary jurisdictions and to ensure that [its] grant-related activities are aligned with the priorities of this administration." *Id.* at 1.

USDOJ's largest grant-funding office, OJP, then proceeded to implement these directives. Beginning in July 2025, OJP adopted a practice across every OJP-administered grant program (dozens in total) of warning applicants that it would condition access to funding streams on cooperation with federal civil immigration-enforcement efforts. Specifically, all Notices of Funding Opportunity (NOFOs) issued by OJP's program offices for FY 2025 grants—including the Byrne JAG, Byrne SCIP, and Title II grants—provided that "[a]ny program or activity" that "directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" is "out of the program scope and will not be funded." Ex. 5 (FY25 Byrne JAG), at 9; Ex. 7 (FY25 Byrne SCIP), at 10; Ex. 6 (FY25 Title II), at 8.

In August 2025, Plaintiffs filed this suit, challenging OJP's imposition of immigration enforcement conditions on FY25 Victims of Crime Act ("VOCA") grants. ECF No. 1. After this action was filed, however, OJP temporarily backed down: although it continued its practice of including immigration enforcement conditions in its NOFOs for OJP-administered grant programs, OJP did not include those conditions in the FY 2025 VOCA awards.

But on July 13, 2026, Defendants issued final awards to Plaintiff States—for the FY 2025 Byrne JAG, Byrne SCIP, and Title II grant programs—that included immigration enforcement conditions. Final awards for all three programs include four conditions (described below and

collectively referred to as the "Immigration Enforcement Conditions") that are substantively similar to the conditions in the OJP NOFOs.

One condition (the "Notice Condition") states that "no State or local government entity, agency, or official" receiving funding under the award "may interfere with the 'removal' process by failing to provide (as early as practicable …) advance notice to DHS of the scheduled release date and time for a particular alien, if a State or local government (or government-contracted) correctional facility receives from DHS a formal written request pursuant to the [Immigration and Nationality Act] (INA) that seeks such advance notice." Ex. 9 (FY25 Byrne JAG award), at 22; Ex. 10 (FY25 Byrne SCIP award), at 20; Ex. 11 (FY25 Title II award), at 17.

Another condition (the "Access Condition") states that "no State or local government entity, agency, or official" receiving funding under the award "may interfere with the exercise of [the federal] power to interrogate 'without warrant' (by agents of the United States acting under color of federal law) by impeding access to any State or local government (or government-contracted) correctional facility by such agents for the purpose of interrogating any alien or person believed to be an alien as to his [or her] right to be or to remain in the United States." Ex. 9 (FY25 Byrne JAG award), at 23; Ex. 10 (FY25 Byrne SCIP award), at 21; Ex. 11 (FY25 Title II award), at 18.

Another (the "Harboring Condition") states "no State or local government entity, agency, or official" receiving funding under the award "may make any public disclosure of any federal law-enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice … or any alien who has come to, entered, or remains in the United States" in violation of the INA "without regard to whether such disclosure would constitute (or could form a predicate for) a violation of 18 U.S.C. 1071 or 8 U.S.C. 1324(a)." Ex. 9 (FY25 Byrne JAG award), at 21; Ex. 10 (Byrne SCIP award), at 18-19; Ex. 11 (Title II award) at 16.

The final condition (the "Communication Condition") states that "no State or local government entity, agency, or official" receiving funding under the award "may implement" an "information-communication restriction," which, tracking the language of 8 U.S.C. § 1373, is defined as a restriction of "(1) any government entity or official from sending or receiving information regarding citizenship or immigration status to or from DHS; or (2) a government entity or agency from sending, requesting or receiving, or exchanging information regarding immigration status to, from, or with DHS, or from maintaining such information." Ex. 9 (FY25 Byrne JAG award), at 21-22; Ex. 10 (FY25 Byrne SCIP award), at 19-20; Ex. 11 (FY25 Title II award), at 19. The term "immigration status" is defined to have its meaning under 8 U.S.C. §§ 1373 and 1644. *Id.*

Grant recipients must comply with the Conditions with respect to all of their operations—whether or not those operations are funded by the grants in question. That is because the awards not only bar funding recipients from any "use of funds" that would violate a Condition, but also from operating directly or through any subrecipient any "program or activity" "funded in whole or part" by the grant that would violate any of the Conditions. *Id.* And the term "program or activity" is defined to have the meaning it does under 42 U.S.C. § 2000d-4a, which encompasses "all of the operations of … [any] instrumentality of a State or local government." *Id.*

Defendants applied the Immigration Enforcement Conditions to the FY 2025 Byrne JAG, Byrne SCIP, and Title II grant awards for each Plaintiff State. Ex. 17 (Ottobre Decl.), ¶ 43; Ex. 20 (Lostritto Decl.), ¶ 42; Ex. 31 (Ebato Decl.), ¶ 29; Ex. 27 (Daniell Decl.), ¶ 18; Ex. 30 (McDonald Decl.), ¶ 28; Ex. 19 (Lennig Decl.), ¶ 37; Ex. 36 (Gillespie Decl.), ¶ 16; Ex. 24 (Kervick Decl.), ¶ 37; Ex. 37 (Marshall Decl.), ¶ 19; Ex. 33 (Sauschuck Decl.), ¶ 28; Ex. 35 (Detman Decl.), ¶ 16; Ex. 29 (Grady Decl.), ¶ 28; Ex. 34 (House Decl.), ¶ 17; Ex. 39 (Young Decl.), ¶ 20; Ex. 21 (Kenyon Decl.), ¶ 41; Ex. 25 (McNeil Decl.), ¶ 38; Ex. 26 (Porter Decl.), ¶ 32; Ex. 28 (Karpowitz Decl.), ¶

27; Ex. 23 (Kenny Decl.), ¶ 39; Ex. 22 (Stanton Decl.), ¶ 41-46; Ex. 40 (Thibeault Decl.), ¶ 17; Ex. 42 (Lunn Decl.), ¶ 17; Ex. 32 (Guertin-Anderson Decl.), ¶ 37; Ex. 16 (Hogan Decl.), ¶ 35; Ex. 43 (Babine Decl.), ¶ 45 . In addition, on or about, August 19, 2026 (after having previously issued the FY 2025 Title II award), Defendants belatedly issued the FY 2024 Title II award to New Jersey, on which OJP imposed the same four Immigration Enforcement Conditions. Ex. 12 (FY24 Title II award), at 27-32.. The original deadline to accept the FY 2025 Byrne JAG, Byrne SCIP, and Title II awards was on or about August 27, 2026, and the original deadline to accept New Jersey's FY 2024 Title II award is on or about October 3, 2026. As part of this litigation, Defendants agreed to extend the deadline for Plaintiff States, including their political subdivisions, to accept all these awards until November 15, 2026, *see* ECF 48; ECF 62, and Plaintiffs amended and supplemented the Complaint to include claims challenging the Immigration Enforcement Conditions in these awards. *See* ECF 54; ECF 65. [3]

Plaintiffs now move for partial summary judgment to vacate, enjoin, and declare unlawful the Immigration Enforcement Conditions included in the FY 2025 Byrne JAG, FY 2025 Byrne SCIP, and FY 2024 and FY 2025 Title II grant awards.

---

[3] Each of the Immigration Enforcement Conditions in the FY 2025 Byrne JAG, Byrne SCIP, and Title II awards, by its own terms, only "shall be enforceable to the extent that it does not otherwise contravene any express requirement of any federal law, or of any judicial ruling, governing, or applicable to the award." Ex. 9 (FY25 Byrne JAG award), at 21-24; Ex. 10 (FY25 Byrne SCIP award), at 19-22; Ex. 11 (FY25 Title II award), at 16-19. In light of the permanent injunctions secured by certain Plaintiff States against USDOJ's prior attempt to impose substantively similar immigration enforcement conditions, Defendants have agreed that USDOJ will not impose any of the Immigration Enforcement Conditions upon the FY 2025 Byrne JAG or Byrne SCIP awards for the States of California, Illinois, Oregon, and Colorado, as well as certain municipalities. *See California v. Sessions*, No. 17-4701 (ECF No. 154); *California v. Barr*, No. 18-5169 (ECF No. 51); *Illinois v. Barr,* No. 19-3461 (ECF No. 27); *Oregon v. Trump*, No. 18-1959; *Colorado v. USDOJ*, No. 19-736 (ECF No. 56); *see also* USDOJ, Legal Notices, OJP_AR_1079-83. These four States challenge the Immigration Enforcement Conditions solely with respect to their grants and awards for which USDOJ has imposed or will impose the Immigration Enforcement Conditions, which do not include the Byrne JAG or Byrne SCIP grants that are covered by those States' prior judgments.

## ARGUMENT

Plaintiffs are entitled to partial summary judgment because "the record, construed in the light most amiable to the nonmovant, presents no genuine issue as to any material fact and reflects [Plaintiffs'] entitlement to judgment as a matter of law." *BlueRadios, Inc. v. Hamilton, Brook, Smith & Reynolds, P.C.*, 166 F.4th 197, 212 (1st Cir. 2026). "A 'genuine' issue exists only if there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial.'" *Axis Ins. Co. v. Barracuda Networks, Inc.*, 160 F.4th 1, 8 (1st Cir. 2025) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)). The court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor, but paying no heed to conclusory allegations, improbable inferences, or unsupported speculation." *Quintana-Dieppa v. Dep't of the Army*, 130 F.4th 1, 7 (1st Cir. 2025) (cleaned up). Where, as here, "the parties cross-move for summary judgment, 'the court must examine each motion separately, drawing inferences against each movant in turn.'" *Vazquez-Velazquez v. P.R. Highways & Transp. Auth.*, 73 F.4th 44, 51 (1st Cir. 2023) (quoting *Viscito v. Nat'l Plan. Corp.*, 34 F.4th 78, 83 (1st Cir. 2022)).

The Court should enter summary judgment for Plaintiffs as to the imposition of the Immigration Enforcement Conditions on the FY 2025 Byrne JAG, FY 2025 Byrne SCIP, and FY 2024 and FY 2025 Title II awards for three independent reasons: (1) Defendants lack statutory authority to impose the Immigration Enforcement Conditions; (2) their policy to impose the Conditions on the grants is arbitrary and capricious; and (3) even if Defendants had statutory authority to impose the Conditions, doing so would run afoul of the Spending Clause. This is a straightforward case: the four Conditions are substantively identical to the immigration enforcement conditions that the First Circuit and multiple other circuits held unlawful when USDOJ tried to impose them on FY

2017 and FY 2018 Byrne JAG grants. *See Providence*, 954 F.3d at 29-30 (rejecting *New York v. U.S. Dep't of Just.*, 951 F.3d 84 (2d Cir. 2020)); *Chicago*, 961 F.3d at 888-89; *San Francisco*, 965 F.3d at 758-59; *Philadelphia*, 916 F.3d at 280-81. Plaintiffs are therefore entitled to vacatur of the Immigration Enforcement Conditions, a permanent injunction barring Defendants from enforcing or implementing the Conditions against Plaintiff States (including their subdivisions and instrumentalities), and declaratory relief.

## I. THE IMMIGRATION ENFORCEMENT CONDITIONS ARE UNLAWFUL.

### A. USDOJ Lacks Statutory Authority To Impose The Conditions.

As the First Circuit has already made clear, USDOJ lacks authority to restrict federal grants that *Congress* established based on noncompliance with the *Executive's* federal civil immigration priorities. An agency "has no power to act …. unless and until Congress confers power upon it." *LPSC*, 476 U.S. at 374. This is especially true in the area of federal funding, where Congress "has broad power" to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 643 (1952) (Jackson, J., concurring) ("Congress alone controls the raising of revenues and their appropriation and may determine in what manner and by what means they shall be spent …."). Absent a statutory delegation of that congressional spending power, "the Attorney General cannot pursue the policy objectives of the executive branch through the power of the purse." *Chicago*, 961 F.3d at 887. After all, as courts have found repeatedly, "public funds [must] be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). And that clear statutory authorization is especially important where the Executive is trying to upset the federal-state balance of power—such as when the Executive requires States to change their policies to access funds that Congress has made available to them. *See, e.g.*,

*Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (law must have a "clear statement" that it "in fact faced, and intended to" upset the federal-state balance of power); *Kentucky v. Yellen*, 54 F.4th 325, 347-48 (6th Cir. 2022) (collecting cases). USDOJ must thus show through the statute itself "that Congress intended to permit the DOJ to create qualification requirements unrelated to the grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39.

USDOJ comes nowhere near identifying any statutory text—let alone the clear statement—necessary to justify the Immigration Enforcement Conditions. Indeed, the First Circuit already held that the statute establishing the Byrne grant programs does not afford USDOJ any right to impose the Conditions, *Providence*, 954 F.3d at 32-39, and its reasoning applies with equal force to the Title II program. Congress required distribution of Byrne and Title II funds based on express, precise allocation formulas and eligibility criteria that have nothing to do with immigration enforcement. So USDOJ's "use of extra-statutory conditions on federal grant awards as a tool to obtain compliance with [its] policy objectives strikes at the heart of … the separation of powers among the branches of the federal government." *Chicago*, 961 F.3d at 892. Further, as the First Circuit has also held, USDOJ and OJP have no freestanding power to impose extra-statutory conditions on the grants they administer. *See Providence*, 954 F.3d at 45. Nor do the relevant OJP program offices—BJA and OJJDP—have generalized authority to apply any conditions they want on any grant they administer. Finally, Congress has made clear that the relevant statutes cannot be construed as permitting the Conditions by barring USDOJ from using grant funding to direct the activities of state and local law enforcement. For any or all of these reasons, consistent with First Circuit precedent, Plaintiffs are entitled to summary judgment.

### 1. The Statutes Authorizing Byrne And Title II Grants Do Not Authorize Imposition Of The Immigrant Enforcement Conditions.

For the same reasons articulated by the First Circuit in *Providence*, the statutes authorizing the Byrne JAG, Byrne SCIP, and Title II grants do not confer any authority on OJP or its program offices to impose the Immigration Enforcement Conditions.

*Byrne JAG*. Start with the Byrne JAG statute, which authorizes criminal justice grants to States and localities "in accordance with the formula established under section 10156 of [Title 34]." 34 U.S.C. § 10152(a)(1). The First Circuit held in *Providence* that this law has "not vested [USDOJ] with authority to impose" immigration-related conditions on Byrne JAG funds. *Providence*, 954 F.3d at 45; *see also id.* at 32-39. That reasoning is just as binding as it was in 2020. Now, as then, USDOJ's claimed authority to impose immigration-related conditions is at odds with the very "nature of the [Byrne JAG] program." *Id.*at 38. Byrne JAG grants are distributed based on a fixed formula that considers two factors—population and violent crime statistics—and is subject only to specific and limited deviations that Congress prescribed by statute. *See* 34 U.S.C. §§ 10156, 10157(b), 20927, 60105(c)(2). In other words, Congress already chose the exclusive criteria for these formula grants and the sole bases for deviating from the formula. This "statutory formula is not so elastic" as to allow USDOJ to "impose by brute force conditions on Byrne JAG Grants to further its own unrelated law enforcement priorities." *Providence*, 954 F.3d at 35-36. Because nothing in Byrne JAG's criteria or exclusions involve civil immigration enforcement, that is the end of the inquiry.[4]

[4] The First Circuit also considered and rejected the suggestion that any specific provision of the Byrne JAG statute authorized any of the challenged conditions. *Providence*, 954 F.3d at 35-37.

The holding and reasoning of *Providence* applies with full force to the Immigration Enforcement Conditions at issue here. Three of the conditions considered then are substantively identical to the Notice Condition, the Access Condition, and the Communication Condition that USDOJ seeks to impose now.[5] And in a subsequent opinion, this Court extended the First Circuit's logic to a condition that is substantively identical to the Harboring Condition. *See City of Providence v. Barr*, 415 F. Supp. 3d 302, 305 (D.R.I. 2019) ("Because the FY 2018 … Harboring … Condition[] [is a] substantive immigration policy condition[] unmoored in the text, structure, or purpose of the Byrne JAG statute, DOJ acted outside its statutory authority in imposing [it]."). And for good reason: the Harboring Condition, like the others, appears nowhere in the Byrne JAG statute and is not authorized by any other language therein. *See* 34 U.S.C. §§ 10153, 10156, 10157. Other appellate and district courts reached the same conclusion, holding that the FY 2018 Harboring Condition was not authorized by statute. *See, e.g.*, *Chicago*, 961 F.3d at 894-96 (rejecting argument that FY 2018 Harboring Condition is authorized by federal law); *accord City & County*

[5] For the Notice Condition, *compare Providence*, 954 F.3d at 29 (FY 2017 condition requiring recipient to "honor" any "formal written request authorized by the Immigration and Nationality Act [INA] that seeks advance notice of the scheduled release date and time for a particular alien"), *with* Ex. 9 (Byrne JAG award), at 22 (FY 2025 condition prohibiting recipient from "failing to provide … advance notice to DHS of the scheduled release date and time for a particular alien" after "receiv[ing] a formal written request pursuant to the INA that seeks such advance notice"). For the Access Condition, *compare Providence*, 954 F.3d at 29-30 (FY 2017 condition requiring recipient to give federal immigration agents access to "correctional facilit[ies] for the purpose of permitting [federal] agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States"), *with* Ex. 9 (Byrne JAG award), at 23 (FY 2025 condition prohibiting recipient from "impeding access to any … correctional facility by [federal] agents for the purpose of interrogating any alien or person believed to be an alien as to his or her right to be or remain in the United States"). For the Communication Condition, *compare Providence*, 954 F.3d at 30 (FY 2017 condition requiring "ongoing compliance with 8 U.S.C. § 1373" by recipient), *with* Ex. 9 (Byrne JAG award), at 21-22 (FY 2025 condition prohibiting recipient from adopting an information-communication restriction on providing "citizenship or immigration status to or from DHS" with "immigration status" defined to mean "what it means under 8 U.S.C. 1373 and 8 U.S.C. 1644").

*of San Francisco v. Sessions*, 372 F. Supp. 3d 928, 949 (N.D. Cal. 2019), *aff'd in part and vacated in part on other grounds sub nom.*, *City & County of San Francisco v. Garland*, 42 F.4th 1078, 1082 (9th Cir. 2022); *Oregon v. Trump*, 406 F. Supp. 3d 940, 967-70 (D. Or. 2019), *aff'd in part and vacated in part on other grounds sub nom.*, *San Francisco*, 42 F.4th 1078; *City of Los Angeles v. Sessions*, No. CV 18-7347, 2019 WL 1957966, at *5 (C.D. Cal. Feb. 15, 2019); *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1057 (D. Colo. 2020).

Recent legislative developments have confirmed that the Byrne JAG statute cannot be read to authorize immigration-related conditions on formula grants. Last year, as part of the One Big Beautiful Bill Act ("OBBBA"), Pub. L. No. 119-21, 139 Stat. 72 (2025), Congress appropriated funding to the Byrne JAG grant program and the Office of Community Policing "for initiatives associated with," among other things, "immigration enforcement and removal efforts." OBBBA § 100054, 139 Stat. at 389-91. OBBBA conditioned the disbursement of such immigration-related discretionary grants to States and localities on their compliance with 8 U.S.C. § 1373, *id.* § 100054—one of the very Conditions USDOJ seeks to impose by executive fiat on FY25 Byrne JAG formula grants. Said another way, where Congress adopted a discretionary grant program—distinct from the Byrne JAG formula grant program—to support immigration enforcement and removal specifically, Congress saw Section 1373 compliance as a relevant condition. But that directly undercuts USDOJ's efforts to impose immigration-related conditions here. Under the canon of *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of other things," *United States v. Hernandez-Ferrer*, 599 F.3d 63, 67 (1st Cir. 2010)), Congress's choice to apply an immigration-related restriction for the first time to these OBBBA funds suggests that the omission of such restrictions as to any other pot of Byrne JAG funds—including the formula grants here—is presumed to be "by deliberate choice, not inadvertence." *Owens v. City of Malden*,

85 F.4th 625, 632 (1st Cir. 2023). That is, OBBBA confirms the First Circuit's holding in *Providence* that the Byrne JAG statute does not authorize such immigration-related conditions, and USDOJ may not impose them merely because it is unsatisfied with the exclusive criteria and exclusions that Congress actually chose.[6]

*Byrne SCIP*. The First Circuit's holding in *Providence* also confirms that USDOJ lacks authority to impose the Conditions on Byrne SCIP formula grants. Although USDOJ administers these grants separately from Byrne JAG grants, they are authorized and governed by the exact same statute. Indeed, Congress created the Byrne SCIP grant program simply by amending the Byrne JAG statute to include "State crisis intervention court proceedings and related programs or initiatives" as one permissible use of Byrne JAG funds. *See* Bipartisan Safer Communities Supplemental Appropriations Act, 2022 (Pub. L. No. 117-159, 136 Stat. 1313, 1325-26, 1339); 34 U.S.C. § 10152(a)(1)(I). As a result, these grants must be issued "in accordance with the formula"

[6] To the extent USDOJ responds that it can at least impose the Communication Condition on these grants because that Condition merely compels compliance with another federal statute (Section 1373), that response fails for three independent reasons. First, compliance with Section 1373 is not an element of the grant-authorizing statutes here and thus cannot a condition of those grants under the First Circuit's reasoning in *Providence*. Second, the OBBBA reveals that Congress is explicit and intentional when it conditions funding on compliance with Section 1373, and it did not do so for the grants at issue here—a dispositive choice bolstered by the *expressio unius* canon. And third, beyond OBBBA, Congress has consistently shown that when it wants to condition federal funding on compliance with any distinct federal statute or body of federal law, it does so explicitly—for example, in the anti-discrimination context. *See, e.g.*, 42 U.S.C. § 2000d (prohibiting discrimination on the basis of race, color, or national origin for "any program or activity receiving Federal financial assistance"); 23 U.S.C. § 324 (prohibiting sex discrimination for "any program or activity receiving Federal assistance under this title"); 20 U.S.C. § 1681(a) (prohibiting sex discrimination for any "education program or activity" receiving federal funding); 42 U.S.C. § 6101 (prohibiting age discrimination for "programs or activities receiving Federal financial assistance"); 29 U.S.C. § 794(a) (prohibiting discrimination on the basis of one's disability "under any program or activity receiving Federal financial assistance"). That "Congress knows how to" tie federal funding to compliance with other extant federal statutes, but "failed to include" such provisions in any grant-making or other statute here, underscores that it did not intend to impose a Section 1373-related condition on these formula grants. *Hardt v. Reliance Std. Life Ins. Co.*, 560 U.S. 242, 252 (2010).

that already governs Byrne JAG. 34 U.S.C. § 10152(a)(1). And because Byrne SCIP formula grants are governed by the Byrne JAG statute, *Providence*'s statutory analysis and holding apply to them with equal force.

*Title II*. OJJDP likewise lacks authority to impose the Immigration Enforcement Conditions on Title II formula grants. No provision of the JJDPA, which authorizes these grants, permits USDOJ to promulgate eligibility conditions, much less any civil immigration related conditions. To the contrary, like the Byrne JAG statute, the JJDPA directs issuance of Title II grants based on a fixed formula and tightly circumscribes the conditions under which such grants can be withheld. As in *Providence*, these features of the statute confirm that USDOJ lacks the discretion to block the distribution of Title II funds based on the Immigration Enforcement Conditions.

Begin with the fact that "Congress structured [Title II] as a formula grant program." *Providence*, 954 F.3d at 27. Congress specified explicitly that appropriated Title II funds, "shall be allocated annually among the States" based on a single criterion: "the relative population of people under 18 years of age." 34 U.S.C. § 11132(a)(1). Indeed, the authorizing statute requires USDOJ to provide each State with a grant award so long as the State has approved a plan that addresses the mandates set forth in that statute—none of which relate to cooperation with immigration enforcement. *See* 34 U.S.C. §§ 11103(30), 11133(a)(11)-(13), (15). Moreover, the JJDPA expressly enumerates the circumstances under which the State's share of formula funding may be reduced (none of which relate to immigration enforcement), § 11133(c)-(d), and requires any reallocation to be done "in a manner equitable and consistent with the purpose of" Title II, *id.* § 11132(b). As the First Circuit reasoned in *Providence*, USDOJ's claimed authority to impose immigration-related conditions is inconsistent with the "formulaic nature" of the program—where Congress has already chosen both the exclusive criteria and the exclusions that govern. 954 F.3d at 34.

Moreover, USDOJ's imposition of the Conditions cannot be squared with JJDPA's specification of the precise criteria States must meet to be eligible "to receive formula grants" under Title II in the first place. Congress required only that States submit a state plan that complies with specific statutory requirements and submit performance reports. 34 U.S.C. § 11133(a) (describing 33 state plan requirements). All of the state plan requirements concern matters intertwined with the juvenile justice grants, such as program organization, government and educational agency coordination, distribution of funds, research and evaluation, juvenile justice and detention policies, and financial controls. *Id.* And when they require States to consider particular policy goals, these goals all relate again to the very juvenile justice programs being funded—from a State's consideration of "a plan to use community-based services to respond to the needs of at-risk youth or youth who have come into contact with the juvenile justice system" to "coordination and maximum utilization of evidence-based and promising juvenile delinquency programs." § 11133(a)(7)(B)(vii), (a)(8) None relate to civil immigration enforcement. *See id.*[7]

The reasoning of *Providence* is again dispositive. In invalidating imposition of immigration conditions on Byrne JAG grants, the First Circuit emphasized that because Congress itself chose the statutory formula for grant allocations and delineated precise preconditions for accessing the funds, USDOJ officials could not "impose by brute force conditions … to further its own unrelated law enforcement priorities." *Providence*, 954 F.3d at 34-35. The same is true here. Congress has established a statutory formula for Title II grant allocations and delineated precise conditions for States to access the funds—conditions Congress has limited to a specific range of juvenile-justice-

[7] Congress most recently amended the Title II authorizing statute in 2018. *See* Pub. L. No. 115-385, 132 Stat. 5123. The 2018 amendments expanded the "core" protections for juveniles and required state juvenile justice plans to consider the latest scientific research on adolescent development and behavior, including trauma-informed care, among other things. *Id.* at 5126, 5133. None of the 2018 amendments relate to immigration enforcement.

related topics. Congress's choice to say nothing of immigration conditions is conspicuous, and the Executive cannot impose those demands by fiat merely because it wishes Congress had done so.

### 2. Congress Has Not Granted Freestanding Authority To Any Defendant To Impose Conditions On The Byrne Or Title II Grants.

Not only do the relevant grant-authorizing statutes and their detailed formulas and specified exclusions foreclose USDOJ from imposing the Conditions, but USDOJ also lacks any authority to impose these kinds of funding conditions under OJP's organic statute.

The First Circuit has conclusively held that the Assistant Attorney General for OJP ("OJP AAG"), the largest grantmaking component of USDOJ—which oversees BJA's administration of the Byrne grants, *see* 34 U.S.C. §§ 10151-10203—lacks freestanding authority to impose whatever conditions she wants on USDOJ-administered grant programs. In *Providence*, USDOJ argued that 34 U.S.C. § 10102(a)(6)—which provides that one of the duties of the OJP AAG is to "exercise such other powers and functions as may be vested in" her "pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants"—authorized OJP to impose any grant-wide condition they "deem[] warranted." 954 F.3d at 39-40. The First Circuit rejected that reading as contrary to the provision's "plain meaning." *Id.* at 44. It instead held that this section "authorizes the imposition of special conditions on Byrne JAG grants only to the extent that such power is 'vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General.' The provision does not constitute an independent grant of authority to the Assistant AG to impose whatever conditions he may deem advisable." *Id.* at 45. In other words, the OJP AAG could "plac[e] special conditions" on a grant only if such power is separately statutorily vested in her or in the Attorney General (and then delegated to her). *Id.* at 40.

Congress likewise did not give the BJA Director any generalized authority to impose whatever conditions on Byrne JAG grants she deems advisable. To the contrary, Congress confined the

BJA Director's authority and duties to carrying out statutory mandates and engaging in consultative and cooperative activities, such as "[p]roviding funds to eligible States"; "[c]ooperating with and providing technical assistance to States"; "[p]roviding for the development of technical assistance and training programs"; "[e]ncouraging the targeting of State and local resources on" drug abuse and crime efforts; operating a "continuing program of cooperation with the States" to "encourage and promote consultation and coordination concerning decisions made by [BJA] affecting [ ] drug control and criminal justice priorities"; and "[p]reparing recommendations on . . . the National Drug Control Strategy." 34 U.S.C. § 10142. One statutory provision authorizes the Director to "[e]stablish[] programs in accordance with part B of subchapter V … on terms and conditions determined by the Director *to be consistent with part B of subchapter V*." § 10142(2) (emphasis added). But part B of subchapter V governs discretionary grants—not the formula grants at issue here. And in any event, these Conditions are not "consistent with" the provisions governing Byrne JAG discretionary grants, which all support "alternatives to traditional modes of incarceration and offender release programs." § 10171(a)(1). None of the BJA Director's prescribed duties empower her to impose extra-statutory eligibility conditions on the formula grants at issue here.

Nor does the BJA statute's catch-all provision conferring on the Director "such other powers and functions as may be vested … by delegation of the Attorney General or Assistant Attorney General," § 10142, authorize the Director to impose eligibility conditions on Byrne JAG grants. Like the catch-all provision at issue in *Providence*, this provision only confers authority that is already statutorily vested in the Attorney General or the OJP AAG (to the extent such authority is then delegated); it does not create any *independent* authority to impose grant conditions that they all otherwise lack. Further, because this phrase follows a series of enumerated ministerial responsibilities—such as administering and providing funds in accordance with the terms of the statutes

and other "technical assistance"—*noscitur a sociis* weighs against treating it as "grant[ing] wide-ranging substantive authority … to impose special conditions." *Providence*, 954 F.3d at 41; *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."). *Providence* is dispositive again.

Similarly, under the Juvenile Justice and Delinquency Prevention Act (JJDPA), the OJJDP Administrator's limited duties do not empower her to create new eligibility conditions for Title II grants. She is "authorized to prescribe regulations *consistent with this chapter* to award, administer, modify, extend, terminate, monitor, evaluate, reject or deny all grants and contracts from, and applications for, funds made available." 34 U.S.C. § 11111(b) (emphasis added). Rather than conferring any freestanding authority over the terms of a grant, this provision limits grant-related actions by the Administrator to those that are "consistent with" the statute—which makes no mention of immigration enforcement. For the same reasons, the Administrator's authority to "establish such rules, regulations, guidelines, and procedures as are necessary for the exercise of the functions of the Office and only to the extent necessary to ensure that there is *compliance with the specific requirements of this subchapter*," 34 U.S.C. § 11182 (emphasis added), and to make annual determinations "regarding whether each State receiving Title II funds is in compliance or out of compliance *with respect to each of the core requirements,*" 34 U.S.C. § 11133(g)(1) (emphasis added), does not empower her to conjure novel funding restrictions that appear nowhere in the statute—let alone entirely unrelated to the statute.

Moreover, as with the grant-authorizing statutes, reading these general statutory provisions as conferring on USDOJ officials an open-ended authority to impose any funding condition at all would be inconsistent with the formula grant programs that they are tasked with administering.

Allowing such discretion would mean that USDOJ could, in any cycle, alter conditions so that the grants are no longer issued on the basis of a statutory formula but on a boundless set of discretionary conditions that serve unrelated executive policy priorities. Had Congress contemplated such an outcome, it would have made "a more direct statement to that effect" and presumably would have been more candid that a formula grant it designed to guarantee specific monies to States was not in fact a guarantee at all. *Providence*, 954 F.3d at 42.

Congress never passed any statutes that confer any freestanding grants of authority to either the BJA Director or the OJJDP Administrator to impose whatever conditions they later prefer on their grant programs. The logic of *Providence* makes quick work of this issue.

**3. Section 10228 Confirms That USDOJ Lacks Authority To Impose The Immigration Enforcement Conditions.**

The holding and reasoning of *Providence* make this an easy case: the Byrne and Title II formula grants are governed by exclusive formulas and exclusions that leave no room for Executive-imposed immigration conditions, and none of USDOJ's grant-administering offices have such authority regardless. But as other courts have held, there is yet another reason to conclude that USDOJ lacks authority to impose the challenged conditions: 34 U.S.C. § 10228(a) provides that no statute "shall be construed to authorize *any* department, agency, officer, or employee of the United States to exercise *any* direction, supervision, or control over *any* police force or *any* other criminal justice agency of *any* State or *any* political subdivision thereof." *Id*. (emphases added). That explicit prohibition applies, at a minimum, to the Access, Notice, and Harboring conditions.

Other decisions, including by this Court, have recognized the force of Section 10228. Congress's "'dominant concern' in enacting this language … 'was to guard against any tendency towards federalization of local police and law enforcement agencies.'" *Philadelphia*, 309 F. Supp. 3d at 287 (citation omitted); *see also, e.g.*, *United States v. Philadelphia*, 644 F.2d 187, 206 (3d

Cir. 1980) ("Congress has explicitly stated its determination to place strict limits on federal executive interference with local police departments."). Indeed, as this Court has recognized, Section 10228(a) (and its predecessor) is purposefully broad, to shield any state and local police forces and law-enforcement officers from federal conditions that could conceivably morph into a form of control. *See, e.g.*, *City of Providence v. Barr*, 385 F. Supp. 3d 160, 164 (D.R.I. 2019).

That was by design. During the 1968 hearings on the block-grant legislation that gave rise to section 10228, U.S. Senators expressed concern regarding the potential for federal overreach and a desire to make certain that the disbursement of federal grant funding "would place control at the State level rather than at the Federal level of government." S. Rep. No. 90-1097, 90th Cong., 2nd Sess. 1968, 1968 U.S.C.C.A.N. 2112, 2273, 1968 WL 4856 (Sen. Eastland); *id.* at 2280 ("[W]e don't want the Attorney General … to become the director of state and local law enforcement as well…. [H]e is not chief law enforcement officer of states or cities.") (Sens. Dirksen, Hruska, Scott, and Thurmond). Section 10228(a) was a critical safeguard to address such concerns, with Attorney General Ramsey Clark testifying that it would be a "violation of the mandate and spirit" of the statute and grant funding scheme to withhold federal funding because state and local authorities were not operating "the way the Attorney General says they must." *Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th Cong. 100, 384, 497 (1967); *see also* 113 Cong. Rec. H21078, 21083 (Aug. 2, 1967) (remarks of Congressman Emmanuel Cellar, chairman of the judiciary committee that introduced the House bill) (observing that the language now in Section 10228(a) was included to "dispel" any "qualms about th[e] bill having any tendency to set up a Federal police force," and underscoring that it would "further improvement in local community relations, better rapport between local officials and local police and minority groups").

Courts—including this Court—have heeded Congress's concerns and hewed closely to Section 10228(a)'s aim and proscription by refusing to allow federal agencies to attach conditions on grant funding that would compel state and local authorities to abide by federal immigration dictates and priorities. *See, e.g.*, *Providence*, 385 F. Supp. 3d at 164 (holding that Section 10228 "undercut" the argument that USDOJ was authorized to impose conditions requiring recipients to cooperate with federal immigration enforcement agents regarding access to correctional facilities, schedule of release for suspected aliens in custody, and information sharing); *Philadelphia*, 916 F.3d at 291 (noting Section 10228 barred Attorney General from imposing conditions on "Philadelphia Police communications with ICE"). For good reason: the Immigration Enforcement Conditions exercise control over state and local law enforcement, precisely what the language and context of Section 10228(a) abhor. The Conditions require state officials to, among other things, devote their staff and resources to DHS requests, provide notices to DHS agents, and grant access to DHS agents. These obligations effectively turn States and localities into enforcement arms of federal immigration authorities, in direct contravention of Section 10228(a). Accordingly, the Conditions are contrary to statute and would upset the carefully crafted protections for States and localities against federal intrusion into their policing and law enforcement functions.

**B. The Immigration Enforcement Conditions Are Arbitrary And Capricious.**

Even if USDOJ had authority to impose the Immigration Enforcement Conditions—which, *Providence* makes clear, it did not—the agency's exercise of that authority in connection with the Byrne and Title II grants did not comply with the APA's bedrock requirement of "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (cleaned up). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle*

*Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also* 5 U.S.C. § 706(2)(A). The Conditions contravene these constraints on agency action in three ways: USDOJ explicitly relied on considerations outside the permissible factors Congress laid out; failed to consider reliance interests; and ignored other critical aspects of the problem.

**1. USDOJ Relied On Immigration Considerations Congress Did Not Intend It To Consider When Administering These Grants.**

Begin with the first defect in agency decisionmaking: USDOJ "relied on factors"—immigration policy concerns—"which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. By structuring the Byrne and Title II programs as formula grants, Congress determined the funds must be disbursed according to a "structured, precise calculation," *Chicago*, 961 F.3d 882 at 921, and thus cannot simply be reallocated based on unrelated Executive policies. *See supra* at 8-9. But that is what USDOJ has done here: it insists that any "program or activity"—defined broadly as "all of the operations of … [any] instrumentality of a State or local government"—may not be "funded in whole or in part by this award" if it fails to comply with the Immigration Enforcement Conditions. Ex. 9 (FY25 Byrne JAG award), at 21-24; Ex. 10 (FY25 Byrne SCIP award), at 18-22; Ex. 11 (FY25 Title II award), at 16-19; Ex. 12 (FY24 Title II award), at 27-32. In other words, Defendants base the *entire* funding decision under the grants on States' federal civil immigration enforcement work, even though Congress chose not to make this one of the relevant factors for funding.[8]

[8] To the extent that Defendants provide any explanation at all for this decision, they point not to any congressional directive, but rather to an *executive* directive to "end funding to sanctuary jurisdictions" as part of an effort "to crack down on sanctuary jurisdictions and ensure that [USDOJ's] grant-related activities are aligned with the priorities of this administration." Ex. 4 (OAAG Report), at 1; *see also supra* at 15-17 (discussing Executive Order 14,159, Bove Memorandum, and Bondi Directive).

Indeed, this is precisely the problem that this Court already identified when the U.S. Department of Transportation made a similar decision to impose immigration-enforcement conditions on transportation funding. The Court explained that this was "patently arbitrary and capricious" because Congress did not intend the agency to "consider factors related to State cooperation with federal civil immigration enforcement in determining conditions for federal transportation funding." *California*, 808 F. Supp. 3d at 309. These principles are especially clear in a formula grant context such as this one. "*Congress* may fix the terms on which it shall disburse federal money to the States," meaning that "federally imposed conditions" on States must square with the relevant "legislation enacted pursuant to the spending power." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added). The statutory authorization for a formula grant program, by definition, sets forth all the factors that Congress requires—and permits—an agency to consider in issuing funds. And here, the relevant formulas say nothing about immigration enforcement, making Defendants' decision arbitrary and capricious.

#### 2. USDOJ Failed To Consider The States' Reliance Interests.

USDOJ's imposition of the Conditions also contravenes another core principle of administrative law: "When an agency changes course, as [USDOJ] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents*, 591 U.S. at 30. In particular, the agency must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *Id.* at 33. But here, USDOJ failed to consider the States' longstanding reliance on Byrne and Title II formula grants to support critical state programs.

For years, the States and their political subdivisions have received from USDOJ hundreds of millions of dollars in formula grants annually to support criminal justice and law enforcement efforts as well as juvenile justice and delinquency prevention. *See* ECF 65, ¶¶ 68, 84, 118 (charts

summarizing Byrne and Title II grant allocations to Plaintiff States in recent years); *see also* Exs. 16-17, 19-43. (state declarations discussing grant funding). Because this funding has consistently been distributed pursuant to statutory formulas that prescribe an annual allocation to each State, Plaintiffs have relied on these steady funding streams to plan and support ongoing law enforcement operations, and those operations have not historically been confined to a single fiscal year. Rather, as the Federal Government is well-aware, the period of performance—*i.e.*, "the time interval between the start and end date of a [USDOJ] award," 2 C.F.R. § 200.1—is three years for Byrne SCIP awards and four years for Byrne JAG and Title II awards. Accordingly, States have structured their operational planning based on the reasonable expectation of continued funding. *See* Ex. 17 (Ottobre Decl.), ¶¶ 48-49; Ex. 20 (Lostritto Decl.), ¶¶ 48, 50; Ex. 31 (Ebato Decl.), ¶¶ 33-34; Ex. 27 (Daniell Decl.), ¶ 22; Ex. 30 (McDonald Decl.), ¶¶ 33-34; Ex. 19 (Lennig Decl.), ¶ 42; Ex. 36 (Gillespie Decl.), ¶ 19; Ex. 24 (Kervick Decl.) ¶¶ 41-42; Ex. 41 (Ireland Decl.), ¶ 5; Ex. 37 (Marshall Decl.), ¶¶ 27-28; Ex. 33 (Sauschuck Decl.), ¶¶ 33-34; Ex. 35 (Detman Decl.), ¶¶ 20-21; Ex. 29 (Grady Decl.), ¶¶ 32-33; Ex. 34 (House Decl.), ¶¶ 21-22; Ex. 39 (Young Decl.), ¶¶ 24-26, 30; Ex. 21 (Kenyon Decl.), ¶ 44; Ex. 25 (McNeil Decl.), ¶ 41; Ex. 28 (Karpowitz Decl.), ¶¶ 30-31; Ex. 23 (Kenny Decl.), ¶¶ 44-45; Ex. 22 (Stanton Decl.), ¶¶ 55-56; Ex. 40 (Thibeault Decl.), ¶ 23; Ex. 42 (Lunn Decl.), ¶¶ 22-23; Ex. 32 (Guertin-Anderson Decl.), ¶¶ 43-44; Ex. 16 (Hogan Decl.), ¶¶ 41-41; Ex. 43 (Babine Decl.), ¶¶ 51-52; Ex. 38 (Jackson Decl.), ¶ 43. And Title II even *requires* that States adopt multiyear strategic plans, which USDOJ has been an active participant in developing. *See* 34 U.S.C. § 11133(a). A loss of future funding would prevent States from fulfilling these plans, and it would disrupt the continuity of several ongoing programs, compromising public safety and welfare. But USDOJ did not weigh, or even acknowledge, any of this.

A number of examples underscore what a meaningful failure this is. Rhode Island has spent the past two years and over $1.2 million developing its ERPO implementation plan to keep guns out of the hands of those who pose a threat to themselves or others, by providing mental health resources, trainings to public servants, and disseminating information throughout the communities they serve. Those efforts will be wasted if Rhode Island is suddenly cut off from the Byrne SCIP funds that Congress committed to the implementation of that plan. Ex. 16 (Hogan Decl.), ¶¶ 23-25. Similarly, Title II funds in Illinois support local Juvenile Justice Councils which craft local solutions to juvenile justice issues. Multiple local councils in Illinois would stop operating entirely if Title II funds were cut. Ex. 37 (Marshall Decl.), ¶ 23.

USDOJ's failure to account for these substantial reliance interests renders the Immigration Enforcement Conditions arbitrary and capricious. Indeed, in two other recent cases, this Court has held that similar immigration-related conditions on federal funding were arbitrary and capricious for the same reason—a failure to consider the impact on state programs and budgets. *See California*, 808 F. Supp. 3d at 309 (agency's imposition of similar immigration enforcement conditions was arbitrary and capricious "particularly" due to agency's failure to consider "reliance interests, both with respect to States' reliance on federal funding for transportation programs themselves and the impact that cessation of such funds may have on state budgets"); *Illinois*, 801 F. Supp. 3d at 94 (agency's imposition of similar immigration enforcement conditions was arbitrary and capricious because agency "did not meaningfully evaluate the states' reliance interests, even though the record shows that states have structured their budgets and emergency preparedness planning for decades around consistent federal support"). So too here. The States have long relied on steady streams of law enforcement funding, based on fixed statutory formulas, for vital law enforcement operations. Yet USDOJ ignored these interests entirely.

#### 3. USDOJ Failed To Consider The Impact Of The Conditions On the Effectiveness Of State And Local Law Enforcement.

USDOJ also failed to consider a critically "important aspect of the problem": the effect that compliance with the Immigration Enforcement Conditions would have on the effectiveness of state and local law enforcement. As USDOJ is aware, many States and localities limit their participation in immigration enforcement to enhance public safety by "build[ing] trust between their law enforcement agencies and immigrant communities and ensur[ing] that noncitizens feel comfortable reporting crimes, cooperating with investigators, and serving as witnesses." *Providence*, 954 F.3d at 30. That approach is well supported by the evidence. *See County. of Ocean*, 475 F. Supp. 3d at 363 n.5 (canvassing studies "confirm[ing] that immigration-related fears prevent individuals from reporting crimes")—including evidence that was before USDOJ when it was determining whether to impose the Conditions. *See* Ex. 13, USDOJ Office of Inspector General 2007 Audit Report), at OJP_AR_00775-76 (USDOJ Office of the Inspector General audit summarizing 2006 statement by Major Cities Chiefs of Police that concluded: "Immigration enforcement by local police would likely negatively effect (*sic*) and undermine the level of trust and cooperation between local police and immigrant communities…. Distrust and fear of contacting or assisting the police would develop among legal immigrants as well.").[9] And declarations submitted in this case by senior law enforcement officials within Plaintiff States' jurisdictions further confirm the value of their immigrant trust policies in promoting public safety. *See* Ex. 14 (Perez Decl.) ¶¶ 14-16, 19; Ex. 15 (Cambio Decl.), ¶¶ 8-13; Ex. 18 (Battavio Decl.), ¶¶ 13-16, 19-21.

Defendants were required to consider this impact on public safety efforts before deciding to impose the Immigration Enforcement Conditions. After all, the factors that an agency must

[9] *See also, e.g.*, Dale T. Manning & Jesse Burkhardt, *The Local Effects of Federal Law Enforcement Policies: Evidence from Sanctuary Jurisdictions and Crime*, 40 Contemp. Econ. Pol'y 423, 435-36 (2022) (finding reduction in crimes in sanctuary jurisdictions).

consider "turns on what the relevant substantive statute makes 'important.'" *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 799 (9th Cir. 1996) (quoting *State Farm*, 463 U.S. at 43). And here, the statutory purpose of USDOJ's grant programs is to support law enforcement and promote public safety. Yet nothing in the record suggests that USDOJ acknowledged, much less weighed, the public safety concerns animating state and local policies regarding involvement in immigration enforcement. That failure renders Defendants' action arbitrary and capricious.

**C. The Immigration Enforcement Conditions Violate the Spending Clause.**

Even assuming (contrary to *Providence* and the statutes' text) that USDOJ had statutory authority to impose the Conditions, and even assuming (contrary to the USDOJ's plainly inadequate reasoning) that the Conditions withstand arbitrary and capricious review, they suffer from a third flaw: they violate the Spending Clause. The Conditions violate the Spending Clause in two respects: (1) they impose requirements that are not reasonably related to the purposes of the grants themselves, and (2) they are unlawfully ambiguous. Notably, this Court has twice found that similar immigration enforcement conditions imposed by other federal agencies violate the Spending Clause in both respects. *See California*, 808 F. Supp. at 311 (agency "blatantly violate[d] the Spending Clause" because conditions "b[ore] no reasonable relationship to the transportation infrastructure programs to which it has been attached," and were "likely so ambiguous as to undermine the ability of the States" to make an informed choice); *Illinois*, 801 F. Supp. At 96 (immigration enforcement conditions violated Spending Clause because they were "overbroad and unrelated to the underlying programs," and used "vague terms" whose "ambiguity deprives the states of the ability to make informed decisions"). Both defects apply here, and each is dispositive.

### 1. The Conditions Are Not Reasonably Related to the Federal Interests In The Grant Programs At Issue.

The Immigration Enforcement Conditions are unconstitutional because they are unrelated to the purposes of the Byrne and Title II formula grants. To fall within the Federal Government's authority under the Spending Clause, conditions on federal grants must be "reasonably related to the federal interest in particular national projects or programs." *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord South Dakota v. Dole*, 483 U.S. 203, 207 (1987). As several district courts concluded with respect to the first Trump Administration's effort to impose similar civil-immigration-related conditions on Byrne JAG funding, the Immigration Enforcement Conditions bear no such relationship to the subject grants. *See, e.g.*, *Philadelphia*, 280 F. Supp. 3d at 639-44; *City & County San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958-61 (N.D. Cal. 2018), *aff'd in part and rev'd in part on other grounds sub nom.*, *City & County of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020). Congress has appropriated Byrne grant and Title II funds for specifically enumerated purposes, none of which is advanced by forcing States to participate in federal immigration enforcement. *See, e.g.*, 34 U.S.C. § 11131(a) (appropriating Title II funds "for the development of more effective education, training, research, prevention, diversion, treatment, and rehabilitation programs in the area of juvenile delinquency and programs to improve the juvenile justice system."). USDOJ seeks to foreclose grant funding *regardless* of these grant-specific purposes, so long as the recipient fails to comply with the Immigration Enforcement Conditions. By imposing the Conditions without regard to their lack of connection to the grants at issue, USDOJ impermissibly "seek[s] to leverage funding to regulate [States'] activities outside the contours of the [grant] program[s]," *Agency for Int'l Dev. v. All. for Open Soc'ys*, 570 U.S. 205, 214-15 (2013) (*AOSI*) (applying similar principle in First Amendment context), contrary to hornbook federalism.

This attempt to circumvent Congress's legislative intent is exactly the type of executive overreach that this Court has already rejected as violating the Spending Clause. Just last year, the Court held that a similar condition imposed on state transportation and highway safety grants administered by USDOT requiring cooperation with federal immigration enforcement violated the Spending Clause on this basis. *See California*, 808 F. Supp. 3d at 310–11 (holding the condition "bears no reasonable relationship to the transportation infrastructure programs to which it has been attached," because the funded state programs "have no plausible connection to a condition mandating cooperation with federal civil immigration enforcement"). Also last year, this Court held that similar immigration enforcement conditions imposed by DHS on emergency preparedness, fire safety, dam safety, and disaster relief grants—requiring state recipients to comply with federal requests for cooperation in immigration enforcement operations, provide access to immigrant detainees, refrain from disclosing information about federal immigration operations, and comply with federal harboring laws and 8 U.S.C. § 1373—were "not reasonably related to the purposes of the grants to which they attach." *See Illinois*, 801 F. Supp. 3d at 95-96 (observing even if a few DHS programs bear some relationship to immigration enforcement, imposing the conditions across multiple DHS grants "regardless of statutory purpose" is "overbroad" and "lack[s] the necessary tailoring," and therefore also violates the Spending Clause).

The same is true here. Title II funds a wide variety of state programs designed to improve juvenile justice and prevent juvenile delinquency—including reentry programs for formerly incarcerated individuals, transitional housing, diversion programs for low-level offenders, summer programs for at-risk youth, and school programs to foster positive relationships between youth and police. Pub. L. No. 93–415, § 221; Ex. 6 (FY25 Title II), at 9. Byrne funding likewise supports a diverse array of state and local law enforcement programs—including ballistics technology,

purchases of body armor and other equipment, improvements to data infrastructure, training for prosecutors and police, anti-drug and anti-gang task forces, ERPO and other gun-violence reduction programs, and diversion programs. Pub. L. No. 109-162, § 1111, codified at 34 U.S.C. § 10152(a)(1)(A)-(G); Pub L. No. 117-159, § 12003 (2022); Exs. 5, 7. None of these programs relate to federal civil immigration enforcement, and Defendants have not even attempted to explain any such relationship in the Byrne and Title II awards.

The relatedness violations are especially egregious in the USDOJ context. As laid out above, Defendants' public statements reveal that they view the Immigration Enforcement Conditions not as a lawful exercise of authority granted them by Congress, but as a way of pressuring the States into exercising their police power "outside the contours" of the grant programs at issue. *AOSI*, 570 U.S. at 214. President Trump, for instance, issued an executive order directing former Attorney General Bondi to "ensure that so-called 'sanctuary' jurisdictions … do not receive access to Federal funds" and to take "any other lawful actions, criminal or civil" to deter these jurisdictions' immigrant trust policies. Ex. 1 (Executive Order 14,159), § 17. Former Attorney General Bondi, in turn, directed USDOJ to consider how to leverage "grants to … reduce efforts by state or local jurisdictions to undermine a lawful system of immigration." Ex. 3 (Bondi Directive), at 2. And then-Acting Deputy Attorney General Bove singled out officials in such jurisdictions for "potential prosecution." Ex. 2 (Bove Memorandum) at 3. Both the Bondi and Bove directives, as well as USDOJ's March 31, 2025 report prepared in response to those directives, demand a whole-of-USDOJ approach to targeting States and cities with such policies. Ex. 4 (OAAG Report), at OJP_AR_733-735 (stating that the imposition of immigration-related conditions on grant funding "is far from the only effort that [USDOJ] is currently taking both to crack down on sanctuary jurisdictions and to ensure that the Department's grant-related activities are aligned with the

priorities of this administration"). These are not actions designed to impose reasonable conditions on the use of public funds to advance the programmatic goals animating those appropriations; they instead explicitly and impermissibly leverage preexisting funds to obtain policy outcomes that cannot otherwise be achieved, regardless of the statutory objects and uses of those funds. As such, the Conditions contravene the Spending Clause because they are not reasonably related to the purposes of the Byrne and Title II grants—supporting state and local law enforcement and juvenile justice programs.

**2. The Conditions Are Impermissibly Ambiguous.**

The Immigration Enforcement Conditions violate the Spending Clause for the separate reason that they are exceptionally unclear and leave Plaintiff States and their agencies guessing at what they must do to comply. Indeed, the declarations submitted in this case by state officials confirm that this confusion not merely academic; it is quite real. *See* Ex. 17 (Ottobre Decl.), ¶ 44; Ex. 38 (Jackson Decl.), ¶¶ 24-26; Ex. 20 (Lostritto Decl.), ¶ 44; Ex. 31 (Ebato Decl.), ¶ 30; Ex. 30 (McDonald Decl.), ¶ 29; Ex. 19 (Lennig Decl.), ¶ 38; Ex. 33 (Sauschuck Decl.), ¶ 29; Ex. 39 (Young Decl.), ¶ 21; Ex. 21 (Kenyon Decl.), ¶ 42; Ex. 26 (Porter Decl.), ¶ 33; Ex. 22 (Stanton Decl.), ¶ 47; Ex. 23 (Kenny Decl.), ¶ 40; Ex. 32 (Guertin-Anderson Decl.), ¶ 38; Ex. 16 (Hogan Decl.), ¶ 36; Ex. 43 (Babine Decl.), ¶ 46.

The Spending Clause requires that, any time the Federal Government imposes conditions on federal funds, those conditions must be unambiguous, such that States can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207; *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J.); *Pennhurst*, 451 U.S. at 17, 24–25. This Court has recently held similar immigration enforcement conditions to be so ambiguous as to violate the Spending Clause. *See Illinois*, 801 F. Supp. 3d at 96 (conditions that required States to provide "cooperation" with federal immigration enforcement

and to participate in "information sharing" but "without defining what compliance entails" were unlawfully ambiguous); *California*, 808 F. Supp. 3d at 310–11 (immigration enforcement condition that used "vague language," combined with the agency's "insistence that, despite the plain text of the condition itself, the [condition] mandates only compliance with federal law," was unlawfully ambiguous).

Here too, the Conditions do not pass muster. Begin with the Harboring Condition. Rather than just prohibiting the conduct that would constitute the existing federal criminal offense of harboring—*i.e.*, acting while "knowing or with reckless disregard" to "conceal, harbor, or shield from detection" an alien unlawfully in the United States, 8 U.S.C. § 1324(a)—the Condition prohibits a broad and vaguely defined swath of lawful conduct, specifically "*without regard* to whether such disclosure would constitute (or could form a predicate for) a violation of … 8 U.S.C. 1324(a)." *See, e.g.*, Ex. 9 (FY25 Byrne JAG award), at 21 (emphases added).

Moreover, the terms "conceal" and "harbor" themselves have broad meaning, leaving "very real doubt and ambiguity concerning the scope of the acts forbidden." *United States v. Evans*, 333 U.S. 483, 489 (1948). Such ambiguity becomes especially pronounced due to the Harboring Condition's use of the word "indirect." In recent years, three appellate courts determined a provision in the America Rescue Plan Act that prohibited a state from "indirectly offset[ting]" tax cuts was unconstitutionally ambiguous "primarily [because of] the capacious meaning of the term 'indirectly.'" *Texas v. Yellen*, 105 F.4th 755, 771–72 (5th Cir. 2024); *Kentucky*, 54 F.4th at 348 (same); *West Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1144–45 (11th Cir. 2023). As they explained, the word "indirect" means "obliquely" or in a "roundabout" manner, such as "through some intervening" connection. *Kentucky*, 54 F.4th at 348. Because the word "indirect" vaguely extends the range of prohibited conduct, a recipient "simply cannot pin down when [the

conduct] becomes attenuated enough to no longer be 'indirect,'" *West Virginia*, 59 F.4th at 1145, particularly where the range of prohibited conduct is itself vaguely defined. So too here, where the Harboring Condition prohibits actions that "indirect[ly]" "conceal, harbor, or shield [aliens] from detection," such that what the condition "actually obliges the States to do is difficult to say." *Kentucky*, 54 F.4th at 348. And the Harboring Condition only aggravates the inherent ambiguity of the "indirect" language by adding that the covered public disclosures violate the condition "without regard" to whether the disclosure is unlawful.

In addition, the terms "public disclosure" and "federal law-enforcement information" are defined broadly to mean, respectively, "any communication" outside of the recipient and any government subrecipient, and any "information compiled for any law-enforcement purpose." Ex. 9 (FY25 Byrne JAG award), at 21. Exacerbating the vagueness is that the Condition may be violated by disclosure of any federal "information compiled for any law-enforcement purpose" to any person other than the state recipient and subrecipient. *Id.*. Such a broad and ill-defined set of conduct, particularly unmoored from any *mens rea* requirement, could encompass any number of legitimate disclosures by state law enforcement authorities, depending on how the Harboring Condition's ambiguous language is interpreted. For instance, it is unclear whether the Harboring Condition prohibits States from engaging in legitimate government functions such as providing notice to a detained person, or their counsel, when ICE seeks access to interrogate that individual, *see, e.g.*, Cal. Gov't Code § 7283.1(b); N.J. Pub. L. 2026 c. 5, § 6(a); Wash. Rev. Code Ann. § 10.93.160(14); notifying consulates when foreign nationals are detained, *see, e.g.*, R.I. State Police General Order 56A10(IV)(H); advising criminal defendants at public court appearances that potential charges and convictions may carry immigration consequences, *see, e.g.*, N.J Pub. L. 2026 c. 5, § 5(a); publishing reports detailing instances of assistance provided to federal civil

immigration authorities by any law enforcement agency, *see, e.g.*, 2026 N.J. Sess. Law. Serv. Ch. 5, § 6(c); holding public forums to discuss ICE's access to individuals in state or local custody and any state or local cooperation with immigration enforcement, *see, e.g.*, Cal. Gov't Code § 7283.1(d); requiring employers to provide notice to employees of an I-9 inspection to allow employees the opportunity to correct any deficiencies, *see, e.g.*, Cal. Labor Code § 90.2; or notifying parents or guardians about requests by immigration authorities, including notifications necessary to obtain parental consent before making a disclosure consistent with the Family Education Rights and Privacy Act, 20 U.S.C. § 1232g(b); Cal. Educ. Code § 234.7(b); R.I. Gen. Laws 16-71-3(a)(7).

Indeed, two district courts that considered a nearly identical condition imposed on FY 2018 JAG funding recognized that the language of the Harboring Condition provides the agency with "unexplained and unbounded discretion" for determining what constitutes a violation, which fails to provide the grant recipient with the requisite notice of what the condition requires.[10] *San Francisco*, 372 F. Supp. 3d at 949; *see also Colorado*, 455 F. Supp. 3d at 1057; *cf. also Kentucky*, 54 F.4th at 350 (holding language unconstitutionally ambiguous because the federal government "was necessarily left with a huge range of discretion about which state behavior it would deem permissible versus impermissible"). For these reasons, "the breadth of the condition's scope renders it [unconstitutionally] ambiguous." *San Francisco*, 372 F. Supp. 3d at 950-51.

Similarly, the Communication Condition prohibits States from adopting an "information-communication restriction" that restricts "sending or receiving information regarding citizenship

---

[10] *Compare San Francisco*, 372 F. Supp. 3d at 937-38 (FY 2018 condition prohibiting "public disclosure …. of any federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive …. or any alien …. in the United States in violation of 8 U.S.C. ch. 12 – without regard to whether such disclosure would constitute …. a violation of 18 U.S.C. 1071 or 1072 or 8 U.S.C. 1324(a)"), *with* Ex. 9 (FY25 Byrne JAG award), at 21 (FY 2025 condition prohibiting the same).

or immigration status to or from DHS," with the term "immigration status" defined only to mean "what it means under 8 U.S.C. 1373 and 8 U.S.C. 1644." *See, e.g.*, Ex. 9 (FY25 Byrne JAG award), at 21-22. Defendants' failure to give the term "immigration status" a more definite meaning is particularly troubling given that the Federal Government has taken a wide variety of positions over the years on the meaning of Section 1373. *See San Francisco*, 349 F. Supp. 3d at 958 (finding Section 1373 compliance condition violated the Spending Clause where "DOJ's evolving interpretations of the [§ 1373] certification condition further demonstrate ambiguities that prevent applicants from deciding whether to accept the funds 'cognizant of the consequences of their participation'" (quoting *Dole*, 483 U.S. at 207)); *e.g.*, Plf.'s Mem. Opp. To Defs.' Mot. to Dismiss, *United States v. Illinois*, No. 1:25-cv-1285, ECF 50 at 35 (N.D. Ill. Apr. 1, 2025) (arguing that "'information regarding citizenship or immigration status' also covers aliens' contact information and release dates"). Such a broad interpretation has been repeatedly rejected by courts as unsupported by the statutory text—*see, e.g.*, *California*, 921 F.3d at 891-93 (reasoning that the term "immigration status" "is naturally understood as a reference to person's legal classification under federal law" and "does not include information like release dates and addresses"); *Washtenaw*, 2026 WL 2453724, at *10 ("The Government has tried this argument before many courts, and '[w]ithout exception, each has rejected the United States's capacious reading of § 1373.'"); *Washington v. Adams Cnty. Sheriff's Off.*, No. 2:25-CV-99-RLP, 2025 WL 1762373, at *3 (E.D. Wash. June 25, 2025) ("[T]he reference to information regarding 'immigration status' in §§ 1373 and 1644 is narrow and extends only to information strictly pertaining to immigration status—i.e. what that immigration status is.") (cleaned up). Yet Defendants have refused to adopt a more concrete definition of "immigration status" that would eliminate continued doubt as to its meaning. This refusal renders the Communication Condition ambiguous too.

The Immigration Enforcement Conditions would subject the States' control over their own public safety operations to unbounded intrusions by the Federal Government. They thus run afoul of the constraints imposed by the Spending Clause and should be enjoined on that basis as well.

## II. THE COURT SHOULD VACATE, ENJOIN, AND DECLARE THE CONDITIONS UNLAWFUL.

Plaintiff States are entitled to vacatur of the promulgation of Immigration Enforcement Conditions as to the Byrne JAG, Byrne SCIP, and Title II formula grants, as well as declaratory and permanent injunctive relief. The Court may decide the appropriate relief based on undisputed facts without a separate hearing. *See SEC v. Locke Cap. Mgmt., Inc.*, 794 F. Supp. 2d 355, 368–71 (D.R.I. 2011) (determining appropriate remedies based on undisputed facts at summary judgment). Indeed, this Court has taken this approach in prior cases challenging similarly unlawful immigration enforcement conditions. *See, e.g.*, *California*, 808 F. Supp. 3d at 314 (vacating conditions and granting declaratory and permanent injunctive relief); *Illinois*, 801 F. Supp. 3d at 96-98 (same); *Providence*, 385 F. Supp. 3d at 164-65 (granting permanent injunction); *Providence*, 415 F. Supp. 3d at 306 (granting permanent injunction and declaratory relief).

### A. The Court Should Vacate The Imposition Of The Immigration Enforcement Conditions In The Grant Awards At Issue.

The APA directs that a "reviewing court shall ... hold unlawful and set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of the challenged agency action. *Rhode Island v. Trump*, 810 F. Supp. 3d 283, 311 (D.R.I. 2025) (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring)). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Id.* "This vacation applies to the unlawful action itself, rather than merely to its application to the individual challengers." *California*, 808 F. Supp.

3d at 312; *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 n.10 (2025) (declining to upset caselaw on APA vacatur). Because the inclusion of the Immigration Enforcement Conditions in the FY 2025 Byrne JAG, Byrne SCIP, and Title II awards was contrary to multiple statutes, was arbitrary and capricious, and was unconstitutional, this Court should vacate the agency action.

### B. The Court Should Permanently Enjoin Defendants From Implementing Or Enforcing The Immigration Enforcement Conditions As To Plaintiff States.

Plaintiffs are also entitled to a permanent injunction against future implementation or enforcement of the Immigration Enforcement Conditions in Plaintiff States, including their political subdivisions and instrumentalities. *See, e.g.*, *Providence*, 385 F. Supp. 3d at 165 (permanently enjoining FY 2017 immigration conditions); *Providence*, 415 F. Supp. 3d at 306 (same as to FY 2018 conditions). Courts issue such relief where "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014) (quoting *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). However, under this Court's precedent, "once the court reache[s] the conclusion that the rule was indeed illegal … there [is] no separate need to show irreparable injury." *Illinois*, 801 F. Supp. 3d at 97 (quoting *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)). That holding accords with the APA, which permits "actions for … prohibitory or mandatory injunction[s]." 5 U.S.C. § 703.

But even if this Court needed to assess the factual record to evaluate irreparable harm, Plaintiff States have readily made such a showing. They face a choice between two stark alternatives: forgoing hundreds of millions in federal funding to support and sustain critical law

enforcement operations and juvenile justice programs or relinquishing their sovereign right to decide how to use their law enforcement officers. *See, e.g.*, Ex. 17 (Ottobre Decl.), ¶ 46; Ex. 29 (Grady Decl.), ¶ 29; Ex. 32 (Guertin-Anderson Decl.), ¶ 40; Ex. 16 (Hogan Decl.), ¶ 38; Ex. 43 (Babine Decl.), ¶ 48; Ex. 38 (Jackson Decl.), ¶ 28. This impossible choice inflicts irreparable harm. *See, e.g.*, *Colorado*, 455 F. Supp. 3d at 1061 (finding "irreparable harm" to support permanent injunction where "Colorado must either suffer constitutional injury or forgo Byrne JAG funds entirely"); *Chicago v. Sessions*, 321 F. Supp. 3d 855, 878 (N.D. Ill. 2018) ("[T]he Hobson's choice that now confronts the City—whether to suffer this injury or else decline much-needed grant funds—is not a choice at all and is itself sufficient to establish irreparable harm.") (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)); *Philadelphia*, 280 F. Supp. 3d at 657 (a choice "between, on the one hand, complying with a law [one] credibly believes is unconstitutional, and on the other hand, foregoing funds [one] plans to use for life-saving projects" establishes irreparable harm).

Acceding to the Immigration Enforcement Conditions to preserve access to critical grant funds would intrude on Plaintiff States' sovereignty. Such an impairment of the States' "sovereign interests in regulating their own industries and citizens" constitutes irreparable harm. *Ohio v. EPA*, 603 U.S. 279, 291 (2024); *see also Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (States suffer "irreparable" injury when forced to abandon their "sovereign interests and public policies"); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (impact of an invasion of state sovereignty "cannot be economically quantified" and is irreparable). Forcing Plaintiff States to abandon specific policies governing their limited law-enforcement resources is exactly what the Immigration Enforcement Conditions require. It is therefore unsurprising that courts repeatedly found that USDOJ's previous attempt to impose similar immigration-related conditions

on grant funding caused irreparable harm. *See, e.g.*, *Evanston v. Barr*, 412 F. Supp. 3d 873, 888 (N.D. Ill. 2019); *Philadelphia*, 309 F. Supp. 3d at 340; *San Francisco*, 349 F. Supp. 3d at 970; *County. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537–38 (N.D. Cal. 2017).

The other path left open by the Immigration Enforcement Conditions—forgoing billions in funds—also leads to irreparable harm. As an initial matter, the States could not later have claims for damages because the Federal Government would have sovereign immunity—meaning any lost sums absent an injunction cannot be recouped later. *See Ohio v. EPA*, 603 U.S. 279, 292 (2024) (observing that such costs are "nonrecoverable"); *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) (unavailability of damages remedy due to immunity makes monetary harm irreparable). But beyond challenges with recoupment, even a temporary loss of funding would upend the programs and activities that these formula grants support. If deprived of funds under programs administered by USDOJ, Plaintiff States would have to scale back or shut down efforts to protect the public, including drug treatment, mental and behavioral health services, readiness training for active shooter situations, and gun violence reduction measures. *See supra* 38-40 (summary of declarations discussing harm caused by disruption to ongoing programs and initiatives). The harms that come from those shutdowns justify an injunction.

That leaves the final two factors, which "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And here, "the balance of equities tips in [Plaintiff States'] favor" and "an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The public is served if Plaintiff States do "not have to choose between the Byrne JAG Program grant funds to assist [their] criminal law enforcement efforts and the health of [their] relationship with the immigrant community." *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1037 (N.D. Cal. 2018). Otherwise "the States and its citizens will face a significant

disruption" in law enforcement operations, "jeopardizing ongoing projects, ones in development for which resources have been expended, and the health and safety of ... services that are integral to daily life." *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 324 (D.R.I. 2025). And on the other side of the ledger, Defendants would suffer no harm by simply returning to the status quo, in which they allocate these congressionally mandated funds without the Conditions attached. *See Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) (no harm where agency can "distribute the funds without mandating the conditions—as has been done for over a decade"). "Continuation of [that] status quo will not work an irreparable harm." *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers). Defendants cannot complain of an injunction that merely obliges them to administer funding in the very ways they have for decades—under the very same Congressional enactments.

This Court previously enjoined USDOJ from conditioning receipt of Byrne JAG program funding on compliance with immigration-related requirements. *Providence*, 385 F. Supp. 3d at 165; *Providence*, 415 F. Supp. 3d at 306. It should do so again here for all the grants at issue.

### C. The Court Should Declare Inclusion Of The Immigration Enforcement Conditions In The Grant Awards At Issue To Be Unlawful.

Finally, the Court should declare that promulgation of the Immigration Enforcement Conditions was without statutory authority, arbitrary and capricious, and in violation of the Constitution. Courts routinely issue declaratory relief where "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Mass. Delivery Ass'n v. Coakley*, 769 F.3d 11, 16 (1st Cir. 2014) (quoting *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 127 (2007)); *see also* 28 U.S.C. § 2201(a) (authorizing court to "declare the rights and other legal relations" if there is a "controversy within its jurisdiction of any interested party seeking

such declaration, whether or not further relief is or could be sought"). "[T]he propriety of granting federal declaratory relief may properly be considered independently of a request for injunctive relief." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974). That is because the two "differ[] legally and materially." *Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021). Declaratory relief is appropriate because this case presents a substantial controversy of sufficient immediacy. Plaintiffs States have been awarded over $156 million in FY 2025 Byrne and Title II grants, with political subdivisions within Plaintiff States having been awarded over $43 million in FY 2025 Byrne JAG grants, and the Immigration Enforcement Conditions appear in each award. *See* BJA, *FY 2025 Byrne JAG State and Local Allocations by State*, https://bja.ojp.gov/funding/fy25-jag-state-local-allocations.pdf. Far from an abstract debate, this is a dispute over the legality of concrete agency actions, involving discrete legal issues, with immediate real-world consequences. Declaratory relief is warranted.

## CONCLUSION

This Court should grant the Plaintiff States' motion for summary judgment.

Dated: September 4, 2026

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By: /s/ *Mayur P. Saxena*
Mayur P. Saxena
*Assistant Attorney General*

Jeremy M. Feigenbaum
*Solicitor General*
Shankar Duraiswamy
*Deputy Solicitor General*
Surinder K. Aggarwal
Bassam F. Gergi
Anaiis Gonzalez

Phoenix N. Meyers
Sarah Nealon
Nathaniel F. Rubin
*Deputy Attorneys General*

New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5365
Mayur.Saxena@law.njoag.gov
*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: /s/ Kathryn M. Sabatini
Kathryn M. Sabatini (RI No. 8486)
*Chief, Civil Division*
*Special Assistant Attorney General*
Paul T.J. Meosky (RI No. 10742)
*Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400
ksabatini@riag.ri.gov
pmeosky@riag.ri.gov
*Attorneys for the State of Rhode Island*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
*Senior Assistant Attorney General*
Lee I. Sherman
James E. Stanley
*Supervising Deputy Attorneys General*
Heidi Joya
Kelly Percival
Deylin Thrift-Viveros
*Deputy Attorneys General*

By: /s/ Delbert Tran
Delbert Tran
*Deputy Attorney General*
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
(415) 229-0110
delbert.tran@doj.ca.gov
*Attorneys for the State of California*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: /s/ Vanessa L. Kassab
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: /s/ Alex Hemmer
Alex Hemmer
*Deputy Solicitor General*
Christopher G. Wells
*Chief of the Public Interest Division*
Michael M. Tresnowski
R. Henry Weaver
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov
*Attorneys for the State of Illinois*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
*Attorneys for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Andrew M. Ammirati*
Andrew M. Ammirati
*Deputy Associate Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5090
andrew.ammirati@ct.gov
*Attorneys for the State of Connecticut*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL OF
THE DISTRICT OF COLUMBIA

By: */s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov
*Attorneys for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawaiʻi*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Katherine M. Hudson-MacRae*
Katherine M. Hudson-MacRae
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
katherine.m.hudson-macrae@maine.gov
*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Virginia A. Williamson*
Virginia A. Williamson
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6584
VWilliamson@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Matthew M. Burke*
Matthew M. Burke
*Assistant Attorney General*
Michelle Pascucci
*State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2216
matthew.m.burke@mass.gov
michelle.pascucci@mass.gov
*Attorneys for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti
John Pallas
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PallasJ@michigan.gov
*Attorneys for the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Brian S. Carter*
Brian S. Carter
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-7403
Brian.carter@ag.state.mn.us
*Attorneys for the State of Minnesota*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for the State of Nevada*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Mark Noferi*
Mark Noferi
*Senior Litigation Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
MNoferi@nmdoj.gov
*Attorneys for the State of New Mexico*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Natasha M. Korgaonkar*
Natasha M. Korgaonkar
*Special Counsel for Federal Initiatives*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Zoe Levine
*Special Counsel for Immigrant Justice*
Benjamin Liebowitz
*Assistant Attorney General*
28 Liberty Street
New York, NY 10005
(212) 416-6557
Natasha.Korgaonkar@ag.ny.gov
*Attorneys for the State of New York*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: /s/ Thomas H. Castelli
Thomas H. Castelli
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov
*Attorneys for the State of Oregon*

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

By: /s/ Michael J. Fischer
Michael J. Fischer
*Executive Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY T. CLARK**
ATTORNEY GENERAL OF VERMONT

By: /s/ Jonathan T. Rose
Jonathan T. Rose
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.Rose@vermont.gov
*Attorneys for the State of Vermont*

**JAY JONES**
ATTORNEY GENERAL OF VIRGINIA

By: /s/ Megan C. Keenan
Megan C. Keenan
*Deputy Solicitor General*
202 North Ninth Street
Richmond, VA 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Counsel for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: /s/ Benjamin Seel
Benjamin Seel
Cristina Sepe
*Deputy Solicitors General*
Washington State Office
of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov
*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: /s/ Colin T. Roth
Colin T. Roth
*Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us
*Attorneys for the State of Wisconsin*