**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*,<br><br>Plaintiffs,<br>*v.*<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>Defendants. | Civil Action No.<br>25-cv-404-JJM-AEM |

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 4

I. OJP and the Relevant Formula Grant Programs ..... 4

A. Byrne JAG ..... 4

B. Byrne SCIP ..... 5

C. Title II ..... 6

II. The FY 2025 Funding Process and the Challenged Conditions ..... 7

A. The Four Challenged Conditions ..... 9

LEGAL STANDARDS ..... 10

ARGUMENT ..... 11

I. The FY25 Byrne JAG Claims Are Moot ..... 11

II. The Challenged Conditions Are Lawful as Applied to Byrne JAG, Byrne SCIP, and Title II ..... 11

A. Congress Authorized OJP to Impose the Challenged Conditions ..... 11

B. The Challenged Conditions Fall Within OJP's Authority ..... 15

C. The Challenged Conditions Do Not Violate Any Statute ..... 20

1. Section 10228 Does Not Prohibit the Challenged Conditions ..... 20

2. The Statutory Formulas Do Not Prohibit the Challenged Conditions ..... 22

D. The Decision to Impose the Challenged Conditions Was Not Arbitrary and Capricious ..... 23

E. The Challenged Conditions Do Not Violate the Spending Clause ..... 28

1. The Challenged Conditions Are Related to the Purposes of the Grant Programs ..... 29

2. The Challenged Conditions Are Unambiguous ..... 30

3. The Challenged Conditions Are Not Coercive ..... 31

F. The Challenged Conditions Do Not Violate the Separation of Powers ..... 32

III. Plaintiffs' Requested Relief Is Overbroad and Would Violate Article III ..... 33

A. A Permanent Injunction is Improper ..... 33

B. Any Relief Should Be Limited to the State Plaintiffs ..... 34

C. Plaintiffs' Request for Forward-Looking Relief is Unripe and Exceeds the APA 36

IV. Plaintiffs' Remaining Claims Should Be Dismissed ..... 38

CONCLUSION ..... 41

## INTRODUCTION

Law enforcement in this country is a cooperative endeavor. Unlawful acts often implicate the jurisdiction of more than one agency, and thus local, state, tribal, and federal officials work together in a variety of ways to fight crime and ensure public safety. Unfortunately, some states and local governments reject this proposition when it comes to the enforcement of federal immigration laws. That the Department of Justice ("DOJ" or "Department") would expect basic cooperation when it gives out federal funds should be unsurprising. When Congress created the Department's primary grant-making component, the Office of Justice Programs ("OJP"), it made a specific finding that "law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government." Pub. L. No. 90-351, 82 Stat. 197 (1968). The grant requirements challenged in this case all reflect a very basic application of this important principle—the ability of one law enforcement agency to obtain relevant information from and take custody of those held by another law enforcement agency, to be granted entry for lawful questioning, and to trust that sensitive information shared with other agencies will not be disclosed to actors seeking to thwart its operations. This basic type of cooperation is specifically contemplated by the Immigration and National Act ("INA") and fully consistent with the grant programs at issue here.

Plaintiffs challenge four conditions that the Department included in Fiscal Year ("FY") 2025 awards under three formula grant programs administered by OJP: the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG"), the Byrne State Crisis Intervention Formula Program ("Byrne SCIP"), and the Title II Formula Grants Program under the Juvenile Justice and Delinquency Prevention Act. DOJ placed four conditions concerning criminal alien law enforcement on each of these programs, which fund State

and local law enforcement operational activities, including arrests and detentions. The conditions concern safeguarding federal law-enforcement information, communicating immigration-status information, allowing federal officers to access correctional facilities, and providing notice of an alien's release from custody. Plaintiffs contend that DOJ lacked statutory authority to impose those conditions, that the conditions are unrelated to the purposes of the underlying grant programs, and that their imposition violated the Spending Clause and the Administrative Procedure Act ("APA").

In a recent Legal Notice posted to OJP's public webpage, OJP informed all FY 2025 Byrne JAG recipients that the four challenged conditions will not be enforced on their Byrne JAG awards pursuant to a permanent injunction issued in *City of Chicago v. Garland,* 1:17-cv-05720 (N.D. Ill. 2022) (ECF No. 258). Accordingly, Plaintiff States request to enjoin or set aside the conditions as applied to the 2025 Byrne JAG awards is moot. If the Court nevertheless reaches the merits of Plaintiffs' Byrne JAG challenge, the conditions fall within DOJ's statutory authority and satisfy the APA and Spending Clause for the reasons explained below.

Congress placed the Byrne JAG, Byrne SCIP, and Title II programs within OJP's grantmaking structure and authorized OJP to administer federal financial assistance and impose special conditions on its grants. The challenged conditions do not conscript Byrne JAG, Byrne SCIP, or Title II recipients into enforcing immigration violations; Plaintiffs' suggestion to the contrary is hyperbole. The challenged conditions simply regulate how recipients of federal funds interact with federal law enforcement in circumstances that arise within the very criminal-justice and juvenile-justice institutions and activities those grants support. Byrne JAG broadly funds state and local criminal-justice activities. Byrne SCIP

funds crisis-intervention activities carried out through courts, law-enforcement agencies, corrections systems, and crisis-response programs. And Title II funds and regulates juvenile justice systems that include law enforcement, probation, detention, correctional facilities, and reentry. Conditions addressing release from custody, access to correctional facilities, governmental information-sharing, and protection of law-enforcement-sensitive information therefore bear a reasonable relationship to the federally funded programs.

The course of OJP's FY 2025 grantmaking confirms that the challenged conditions were not imposed pursuant to an indiscriminate policy. Although FY 2025 Notices of Funding Opportunity ("NOFOs") for all OJP grant programs advised applicants that grant funds could not be used in ways that violated federal immigration law or impeded federal immigration enforcement, those NOFOs did not dictate the final terms of awards, and indeed, OJP has now issued numerous FY 2025 awards without the challenged conditions. But here, OJP decided to place these conditions in particular programs whose funded activities involve criminal justice, custodial, correctional, or law-enforcement functions. That history underscores the program-specific relationship between the challenged conditions and the grants on which OJP ultimately imposed them.

Although a substantial number of FY 2025 awards have been issued, OJP's FY 2025 award process remains ongoing for other grant programs, and DOJ has not determined whether any of the challenged conditions will appear in any future award packages. Plaintiffs therefore moved only for partial summary judgment, effectively inviting the Court to retain jurisdiction indefinitely, including through at least the next fiscal year, in case OJP later imposes similar conditions elsewhere. Article III does not permit that kind of holding pattern or anticipatory review. The possibility of future

conditions does not create a present controversy. Following the Court's resolution of the present dispute on the merits, Article III requires dismissal of Plaintiffs' Second Amended Complaint.

## BACKGROUND

### I. OJP and the Relevant Formula Grant Programs

Congress created OJP in 1968 to promote "the effectiveness . . . and coordination of law enforcement and criminal justice systems at all levels of government." Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 197 (codified as amended at 34 U.S.C. § 10101 et seq.). OJP's primary functions are issuing grants and providing technical assistance to state and local law enforcement agencies and community-based organizations to enhance criminal justice. *See, e.g.*, 34 U.S.C. § 10152(a)(1). OJP includes, among other components, the Bureau of Justice Assistance ("BJA"), the Office of Juvenile Justice and Delinquency Prevention ("OJJDP"), and the Office for Victims of Crime ("OVC"). The Assistant Attorney General for OJP oversees those components and administers OJP's grantmaking functions. *See* 34 U.S.C. §§ 10101-10102.

This case concerns FY 2025 awards under three formula-grant programs administered by OJP: Byrne JAG, Byrne SCIP, and Title II.

#### A. Byrne JAG

Byrne JAG, administered by BJA, is a federal formula grant that supports state and local criminal justice activities. Congress authorizes Byrne JAG funds for a broad range of criminal-justice purposes. 34 U.S.C. § 10152(a)(1). Examples of permissible purposes include "law enforcement programs," "prosecution and court programs," and "corrections and community corrections programs." *Id.* The grant funds are divided among grantees

based on a statutory formula, largely premised on population and crime statistics. *Id.* § 10156.

In the same statute that created the Byrne JAG program, Congress amended the statutory provision defining the powers granted to the Assistant Attorney General for OJP. *See* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006). The statute had previously authorized the Assistant Attorney General, among other things, to exercise "powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General." *See* 42 U.S.C. § 3712(a)(6) (2000) (later recodified at 34 U.S.C. § 10102(a)(6)). The amendments added the phrase "including placing special conditions on all grants, and determining priority purposes for formula grants" at the end of that provision. Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113; *codified at* 34 U.S.C. § 10102(a)(6).

The Attorney General may "finally disapprove any application" that does not comply with requirements set by the Attorney General or his delegates. 34 U.S.C. § 10154. If funds are withheld from a State, the Byrne JAG statute provides direction for reallocating those appropriations. *See id.* § 10156(f) ("If the Attorney General determines . . . that a State will be unable to qualify or receive funds . . . then such State's allocation (or portion thereof) shall be awarded by the Attorney General to units of local government, or combinations thereof, within such State.").

**B. Byrne SCIP**

Congress established Byrne SCIP through the Bipartisan Safer Communities Act of 2022 ("BSCA"), which amended the Byrne JAG statute to authorize use of Byrne JAG funds to provide support "for criminal justice or civil proceedings," and expanded the permissible uses of those grant funds. Pub. L. No. 117-159, § 12003, 136 Stat. 1313, 1325

(2022) (amending 34 U.S.C. § 10152(a)(1)). BSCA also specifically authorized the separate Byrne SCIP program, which is administered by BJA and provides formula funding to states for "[m]ental health programs and related law enforcement corrections programs," and "[i]mplementation of State crisis intervention court proceedings and related programs or initiatives." 34 U.S.C. § 10152(a)(1)(H)-(I). BJA identifies extreme risk protection order programs, mental health courts, drug courts, and veterans treatment courts among the programs that may receive Byrne SCIP funding. AR_00055.

**C. Title II**

Title II grants are administered by OJJDP under the Juvenile Justice and Delinquency Prevention Act ("JJDPA") of 1974, which contains various other grant making authorizations that support local and state efforts to improve juvenile justice. *See* Pub. L. No. 93-415, § 204, 88 Stat. 1109, 1112 (1974), *codified at* 34 U.S.C. § 11114. OJJDP makes grants to states and local governments pursuant to Title II of the JJDPA to assist them in developing "more effective education, training, research, prevention, diversion, treatment, and rehabilitation programs in the area of juvenile delinquency and programs to improve the juvenile justice system." 34 U.S.C. § 11131(a). Title II is a formula grant program. To be eligible, participating states must submit comprehensive juvenile justice plans and satisfy the statutory requirements set out in 34 U.S.C. § 11133. Among other things, states must address the treatment of juveniles in secure detention and correctional facilities, separation of juveniles from adult inmates, removal of juveniles from adult jails and lockups, and demonstrate an effective system for monitoring jails, lock-ups, detention facilities, and correctional facilities to ensure that the core requirements are met. 34 U.S.C. § 11133(a).

## II. The FY 2025 Funding Process and the Challenged Conditions

For FY 2025, OJP issued NOFOs for over thirty grant programs administered by its component offices. The NOFOs provide prospective applicants with information concerning available funding, eligibility and application requirements, permissible uses of funds, and matters that may bear on an eventual award. *See generally*, AR_00018-80. But the terms governing a particular recipient are determined later in the award process, after OJP conducts programmatic, legal, and financial review, and are reflected in the recipient's final award package. *See* AR_00863 (advising recipients to "refer to their award terms and conditions to determine the specific requirements that apply to their award"); ECF No. 45, Joint Stipulation and Motion to Hold Case in Abeyance ¶ 5 (confirming that NOFO language may not be included in final awards and that OJP's determinations about final award conditions "will be made at the time the award is issued").

The FY 2025 NOFOs contained language stating that "[a]ny program or activity that, directly or indirectly, violates (or promotes or facilitates the violation of) federal immigration law (including 8 U.S.C. § 1373) or impedes or hinders the enforcement of federal immigration law—including by failing to comply with 8 U.S.C. § 1373, give access to DHS agents, or honor DHS requests and provide requested notice to DHS agents" is "out of the program scope and will not be funded." *Id.* ¶ 3. Following OJP's publication of an initial set of FY 2025 NOFOs with this language, Plaintiffs filed this lawsuit seeking to enjoin the "implementation and enforcement" of the NOFO language. *See* ECF No. 1, Compl pp. 40-45. But that language did not establish final conditions that would cover every FY 2025 OJP award. The course of FY 2025 grantmaking bears that out. OJP has now issued FY 2025 awards across numerous programs that do not contain immigration-related terms or conditions. *See id.* ¶¶ 4-5.

Rather than applying a set of immigration-related conditions uniformly across OJP grant programs, OJP has continued to determine the terms of awards through its program-specific review process. After approving a grant application, DOJ issues a grant award letter that the designated government entity must sign to receive its grant. This letter contains the special conditions with which the designated grant recipient must comply. E.g., AR_000138-151. Some conditions relate to the recipient's administration of the grant (such as collecting and maintaining data on the funded programs and cooperating with DOJ's monitoring of the grant). *See id.* Others require that recipients use their funding for certain purposes (including purchasing police equipment and developing training materials) that adhere to federal guidelines. *See id.* Recipients likewise must obey federal information technology, training, and nondiscrimination regulations and policies. *See id.* Every grant award letter states that DOJ may either withhold or terminate funding if the recipient does not comply with these conditions. E.g., AR_000174-75.

To date, the four challenged conditions have been included in final FY 2025 awards under the three formula grant programs referenced above: Byrne JAG, Byrne SCIP, and Title II. AR_00132-139 (Byrne JAG Award Conditions 63-66); AR_00151 (Byrne SCIP Award Conditions 55-58); AR_00171-174 (Title II Award Conditions 44-47). OJP recently announced that the conditions on Byrne JAG awards are not being enforced.[1]

OJP's FY 2025 grantmaking process remains ongoing for other programs, and the final terms of those awards have not yet been determined.

[1] Legal Notices, U.S. Department of Justice, Office of Justice Programs (updated September 4, 2026), accessible at: https://www.ojp.gov/funding/explore/legal-notices.

**A. The Four Challenged Conditions**

In relevant part, the FY 2025 Byrne JAG, Byrne SCIP, and Title II awards were issued with the following four conditions:

***Notice Condition.*** The Notice Condition addresses advance notice of a scheduled release from custody. When a State or local correctional facility receives a formal written request from the Department of Homeland Security ("DHS") concerning a particular alien pursuant to the Immigration and Nationality Act, the condition requires the recipient to provide advance notice of the person's scheduled release date and time as early as practicable. AR_00130-31 (Byrne JAG, Condition 65), AR_00153-54 (Byrne SCIP, Condition 57), AR_00173 (Title II, Condition 46). The condition does not require a recipient to hold any person beyond the time at which the person would otherwise be released, and it expressly does not encompass requests to continue detention following a scheduled release. *See id.*

***Access Condition.*** The Access Condition addresses access by authorized federal officers to state and local correctional facilities. It provides that a recipient may not impede a federal officer acting under color of federal law from accessing a correctional facility to question an alien, or a person believed to be an alien, concerning that person's right to be or remain in the United States. AR_00131-32 (Byrne JAG, Condition 66); AR_00154-55 (Byrne SCIP, Condition 57); AR_00174 (Title II, Condition 47). The condition identifies the federal statutory authority governing such questioning and contains additional rules governing its application. *See id.*

***Communication Condition.*** The Communication Condition concerns the exchange of immigration-status information with DHS. It prohibits recipients from imposing or implementing restrictions that prevent governmental entities, agencies, officials, or

employees from sending, receiving, maintaining, requesting, or exchanging information regarding citizenship or immigration status with DHS. AR_00129-30 (Byrne JAG, Condition 64); AR_00152-53 (Byrne SCIP, Condition 56); AR_00172-73 (Title II, Condition 45). The award documents define the relevant terms and specify the scope of that requirement. *See id.*

***Harboring Condition.*** The Harboring Condition addresses disclosure of federal law-enforcement sensitive information. It prohibits the use of award funds, or the operation of a funded program or activity, to make a public disclosure of specified federal law-enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection a fugitive from justice or an alien unlawfully present in the United States. AR_00129 (Byrne JAG, Condition 63); AR_00151-52 (Byrne SCIP, Condition 55); AR_00171 (Title II, Condition 44). The condition includes definitions and rules of construction identifying the information and disclosures to which it applies. *See id.*

## LEGAL STANDARDS

Under Rule 56 summary judgment is warranted when, viewing the evidence in the light most favorable to the non-movant, the Court determines there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 457 (1992); *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (quoting Fed. R. Civ. P. 56).

"[T]he summary judgment rubric has a special twist in the administrative law context." *Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (citation omitted). Where, as here, claims are asserted under the Administrative Procedure Act and the case is proceeding on the basis of an administrative record, "summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must

review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Id*.

## ARGUMENT

### I. The FY25 Byrne JAG Claims Are Moot

OJP posted a Legal Notice on September 11, 2026, stating that the challenged conditions in the FY25 Byrne JAG awards would not be enforced upon any recipient. *Supra* n.1. Plaintiffs' grant agreements contain a provision that OJP may issue a "legal notice" stating that "it will not enforce . . .one or more requirements otherwise applicable to the award." AR_00115. Such legal notices are "incorporated by reference into the award." Therefore, under the terms of Plaintiffs' award agreements, the four challenge conditions will not be enforced. There is no longer a live controversy over Plaintiffs' claims for relief from the conditions on these awards. As we have already acknowledged, there is an injunction that presently prohibits enforcement of the challenged Byrne JAG conditions, and the Department agrees that those conditions cannot be enforced while that injunction remains in place. *See City of Chicago v. Garland*, No. 1:17-cv-05720 (N.D. Ill. 2022) (ECF No. 258). Because non-enforcement is compelled by that injunction, absent further court action to lift the injunction, there is no reasonable expectation that the challenged conditions will recur. The Court should therefore dismiss these claims on mootness grounds. *See Gulf of Me. Fishermen's All. v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002).

### II. The Challenged Conditions Are Lawful as Applied to Byrne JAG, Byrne SCIP, and Title II.

#### A. Congress Authorized OJP to Impose the Challenged Conditions

Counts One, Two, and Three of Plaintiffs' SAC allege, respectively, that the four challenged conditions exceed DOJ's statutory authority in violation of the APA, are ultra

vires, and violate the Constitution's separation of powers. SAC ¶¶ 256-269. Plaintiffs' claims lack merit. As set forth below, Congress granted OJP express statutory authority to "place special conditions on all grants, 34 U.S.C. § 10102(a)(6), and the four conditions at issue in this case are valid both (1) as exercises of OJP's general authority to adopt special conditions and (2) as implementations of grant programs' specific statutory requirements.

Congress may properly delegate to the Executive Branch the authority to attach conditions to federal grants. *See*, *e.g.*, *Clinton v. City of N.Y.*, 524 U.S. 417, 488 (1998). This was done here: Congress vested the Attorney General with "final authority over all functions, including any grants" performed by OJP. *Id.* § 10110. Statutorily, OJP is headed by an Assistant Attorney General, *see id.* § 10101; 28 U.S.C. § 530C(a)(4). And the Assistant Attorney General of OJP is expressly charged with "placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102(a)(6). Confirming the statute's plain text, a House of Representatives report accompanying the enactment of this language stated that the provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Statutory history confirms that this delegation of authority was intended. The authority for "placing special conditions on all grants, and determining priority purposes for formula grants" was added as part of the same legislation that created the Byrne JAG Program. *See* DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006), § 1152(b) (adding language to subsection (a)(6)); *id.* § 1111 (creating Byrne JAG Program). Before that amendment, § 10102 contained only the most general authority to exercise powers otherwise vested in the Assistant Attorney General. *See* Joint Resolution

Making Continuing Appropriations for FY 1985, Pub. L. No. 98-473, § 603, 98 Stat. 1837 (1984) (stating only that the Assistant Attorney General "exercise[s] such other powers and functions as may be vested in the Assistant Attorney General pursuant to this title or by delegation of the Attorney General."). The organic statute enacted in 2002 for the head of a separate Department grantmaking component, by comparison, continues to contain substantially the same, more limited language as Section 10102 earlier used to contain, without the additional "special conditions" and "priority purposes" powers that Congress elected to bestow with respect to OJP. *See* 34 U.S.C. § 10444(7) (providing only that Director of Violence Against Women Office "[e]xercis[es] such other powers and functions as may be vested in the Director pursuant to this subchapter or by delegation of the Attorney General"). This context confirms that Congress did intend the "special conditions" and "priority purposes" language to confer distinctive and meaningful power.

Congress's decision to add express authority to place special conditions on all grants and determine priority purposes for formula grants must be given effect. *See Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect.").[2]

Independent of the authority conferred in Section 10102(a)(6), the Byrne JAG program statute provides a separate source of authority, specifying that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes. 34 U.S.C. § 10152(a)(1). Among other requirements set out

---

[2] Defendants recognize that *City of Providence v. Barr*, 954 F.3d 23, 32 (1st Cir. 2020), rejected the Government's reliance on § 10102(a)(6) to support materially similar Byrne JAG conditions. Defendants respectfully preserve their position that the provision's text confers broader authority than *Providence* recognized.

specifically in the statute, applicants must certify that they "will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(A)(5)(D), and agree to undertake various activities to advance law-enforcement goals. For example, applicants must provide an assurance that they will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require," and that "there has been appropriate coordination with affected agencies." *Id.* § 10153(A)(4), (5)(C). Further, the Attorney General is authorized to "reasonably require" "programmatic" information about the funded program, 34 U.S.C. § 10153(A)(4), and to demand "appropriate coordination" with affected agencies, *id.* § 10153(A)(5)(C). Notice concerning a scheduled release from custody is information directly connected to the operation of law-enforcement and correctional programs, while access by federal officers to persons in custody implicates coordination between recipient agencies and federal law enforcement authorities. The Communication and Harboring Conditions likewise reinforce compliance with applicable federal law requirements governing information-sharing and interference with federal enforcement.

Section 10153 provides additional statutory authority. Underscoring the Byrne JAG program's emphasis on intergovernmental cooperation, the Department has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). Each condition likewise tracks or implements an existing and applicable federal law. The Harboring Condition references federal statutes prohibiting concealment and harboring, 18 U.S.C. § 1071-72, 8 U.S.C. § 1324(a), and is "[c]onsistent with the purposes and objective of federal law enforcement statutes and federal criminal law (including 8 U.S.C. 1324 and 18 U.S.C. chs. 1, 49, 227)." The Notice

Condition concerns the release of certain individuals from state custody, a circumstance addressed throughout the INA. *See* 8 U.S.C. §§ 1231, 1226, and 1366. The Access Condition corresponds to federal officers' statutory authority to question aliens concerning their right to remain in the United States, ensuring there is no obstruction of that authority by grant recipients. *See* 8 U.S.C. § 1357(a); 8 C.F.R. § 287.5(a). And the Communication Condition tracks the language and existing obligations established by 8 U.S.C. § 1373.

**B. The Challenged Conditions Fall Within OJP's Authority**

The four conditions regulate interactions between recipients of federal justice-system funds and federal law-enforcement authorities. Those subjects fit comfortably within OJP's statutory responsibilities and purpose. When Congress created OJP, it made a specific finding that "law enforcement efforts must be better coordinated, intensified, and made more effective *at all levels* of government." Pub. L. No. 90-351, 82 Stat. 197 (1968) (emphasis added). Congress thus charged OJP with maintaining relationships among federal, state, and local governments "in matters relating to criminal justice" and with administering federal criminal- and juvenile- justice assistance. 34 U.S.C. § 10102(a); *see Id.* § 10251(a)(1) (broadly defining "criminal justice").

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function, and requires frequent interaction with criminal justice systems at all levels of government. Through the INA, 8 U.S.C. §§ 1101 *et seq*., Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States. These responsibilities are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland Security ("DHS"), the Department of Justice, and other Executive agencies to administer and enforce the immigration laws. The

INA gives the Executive Branch considerable authority and discretion to conduct and direct immigration enforcement. *See Arizona v. United States*, 567 U.S. 387, 396-97 (2012).

Several outcomes and federal agency responsibilities under the INA turn on the existence and timing of local or state criminal proceedings against aliens. For example, the INA provides that aliens who have committed certain classes of crimes—whether federal, state, or local—shall be removed from the United States upon order of the Attorney General or the Secretary of Homeland Security. *See*, *e.g.*, 8 U.S.C. § 1227(a)(2). A specific statute provides that every twelve months, the Attorney General must report to the House and Senate judiciary committees on "the number of illegal aliens convicted of felonies in any Federal or State court [during the preceding year]" and "the number of illegal aliens incarcerated in Federal and State prisons for having committed felonies"—"stating the number incarcerated for each type of offense." *Id*. § 1366(1), (2).

The connection between immigration law and criminal law is also reflected in the fact that the INA contains a number of criminal provisions related to immigration. For example, the statute imposes criminal penalties on an alien for failing to register with federal authorities and for failing to notify federal authorities of a change of address. *Id*. §§ 1306(a), (b). More seriously, the INA imposes criminal penalties on any person[3] who conceals, harbors, or shields an alien from detention "in any place, including any building or any means of transportation," "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law." *Id*. § 1324(a)(1)(A)(iii). It also imposes penalties for "engag[ing] in any conspiracy to commit

---

[3] "Person" for purposes of that crime means "an individual or an organization." 8 U.S.C. § 1101(b)(3).

any of the preceding acts" and for "aid[ing] or abet[ting] the commission of any of [those] acts." *Id*. § 1324(a)(1)(A)(v).

The INA repeatedly contemplates coordination between federal officials and state and local officials on immigration enforcement. For example, state and local officers are authorized to make arrests for violation of the INA's prohibitions against smuggling, transporting, or harboring aliens, *id*. § 1324(c), and to arrest certain felons who have unlawfully returned to the United States, *id*. § 1252c; *see id*. § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens). Consistent with this coordination and with the importance of state and local criminal proceedings under the INA, certain provisions of federal immigration law protect the transfer of information regarding aliens between and among federal officials and state and local government entities.

Section 1373 of Title 8 provides that "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." Congress enacted 8 U.S.C. § 1373 in 1996 to facilitate communication between federal immigration officials and state and local authorities, as well as to prevent state and local governments from frustrating or impeding federal officials' efforts to enforce the immigration laws. Section 1373 thus seeks to ensure that no obstacles will prevent federal, state, and local governments from sharing information that is crucial to enforcement of the immigration laws.

Section 1644 of Title 8 contains substantially the same proscription. Section 1373 also states that no person or agency may prohibit or restrict a federal, state, or local government entity from "[m]aintaining such information" or from "[e]xchanging such information with any other Federal, State, or local government entity." By the same token, the INA requires federal immigration authorities to "cooperate with the States" to ensure that state and local officials have information to assist them in making arrests under the INA. *Id*. § 1252c(b).

The four challenged conditions in the Byrne JAG, Byrne SCIP, and Title II awards are designed to promote cooperation and information-sharing between federal law enforcement and state and local grant recipients. While the federal government has "broad, undoubted power over the subject of immigration and the status of aliens," *Arizona*, 567 U.S. at 394, states have a strong interest in enforcing their criminal laws. Congress designed a system that permits states to first enforce their criminal laws on the understanding that states will not interfere with the federal government's detention and removal of aliens after state custody has ended. It is because of this setup that federal immigration enforcement *must* intersect with state and local law enforcement, making coordination and cooperation vital for an efficient system.

In general, if the Secretary of Homeland Security issues a warrant for an alien's arrest, DHS may arrest and detain the alien "pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a).[4] Once an alien is subject to a final removal order, DHS "shall" remove the alien within 90 days and "shall" detain the alien

[4] Section 1226(a) refers to the Attorney General, but functions performed under the detention and removal program have been transferred to the Secretary of Homeland Security. *See* 6 U.S.C. § 251(2).

during that removal period. *Id.* § 1231(a)(1), (2). But when an alien is already in state or local criminal custody, the federal government generally cannot take custody of and remove the alien until he or she is released. *Id.* § 1231(a)(4)(A). However, in the case of an alien with certain criminal history or who has engaged in certain terrorist activities, DHS "shall" take the alien into custody "when the alien is released" from local criminal custody and may not (except in narrow circumstances) release the alien during the duration of the removal proceedings. 8 U.S.C. § 1226(c)(1), (2); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 846-47 (2018). The federal government strongly prefers to encounter and take custody of criminal aliens in the controlled environment of a state or local detention facility, rather than apprehending them in the broader community, so the general public and federal immigration officers are not endangered.

The four challenged conditions therefore ensure a minimal level of coordination between federal, State, and local officers in federally funded programs or activities when the circumstances identified in the conditions arise, particularly when removable aliens arrested for criminal violations are in State or local custody. The fact that the relevant federal officers are enforcing immigration law, or that immigration enforcement is often civil in nature, does not place the conditions outside OJP's authority or outside the purview of these grants, which directly fund police and correctional programs and facilities. Federal immigration law expressly contemplates interaction with state and local criminal-justice institutions, including where individuals are in state custody, where federal officers seek access to detainees, and where governmental entities possess immigration-status information. *See, e.g.*, 8 U.S.C. §§ 1226, 1231, 1357, 1373. The challenged conditions thus

concern the operation of federally funded State and local justice systems at points when those systems intersect with federal law enforcement.

### C. The Challenged Conditions Do Not Violate Any Statute

Plaintiffs have alternatively argued that the challenged conditions violate 34 U.S.C. § 10228 through the improper commandeering of state or local police forces. FAC ¶ 232. They also claim that the conditions violate statutory provisions establishing the formulas allocating the amounts that eligible states can receive under the programs at issue. SAC ¶ 264. Both claims fail as a matter of law.

#### 1. Section 10228 Does Not Prohibit the Challenged Conditions

Byrne JAG, Byrne SCIP, and Title II grantees voluntarily consent to conditions in return for receiving federal dollars. These are *voluntary* programs. If grantees are unhappy with the conditions, they are free to decline the award and thus never have any obligation to comply with its conditions. Apart from this, requiring modest cooperation with federal law enforcement in exchange for federal law enforcement funds does not exercise "direction, supervision, or control." Indeed, an earlier version of 34 U.S.C. § 10228 (which similarly prohibited the United States "to exercise any direction, supervision, or control over any police force or any other law enforcement agency of any State or any political subdivision thereof") was enacted in the same 1968 Omnibus Crime Control Act whose express statutory object was to promote "the effectiveness . . . and *coordination of law enforcement and criminal justice systems at all levels of government*." Pub. L. No. 90-351, 82 Stat. at 197, 249 (emphasis added). Moreover, concurrent with the enactment of 34 U.S.C. § 10228, Congress created the National Institute of Justice (a component of OJP), *see* An Act to Restructure the Federal Law Enforcement Assistance Administration, Pub. L. No. 96-157, §§ 202, 815, 93 Stat. 1167, 1172, 1206 (1979), which has as one of its

express statutory purposes "to develop programs and projects . . . to improve and expand cooperation among the Federal Government, States, and units of local government . . . ." 34 U.S.C. § 10122(c)(2)(F).

Furthermore, the four conditions at issue do not impose unfunded mandates on grant recipients. Two of the conditions (the Communication and Harboring Conditions) impose prohibitions rather than affirmative obligations, and Plaintiffs have offered no explanation as to how those conditions would commandeer their resources or authority over their own day-to-day practices. *Cf. Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (construing statute to prohibit federal authorities from "[prescribing] the type of shoes and uniforms to be worn by local law enforcement officers, the type or brand of ammunition to be purchased and used by police departments and many other vital matters pertaining to the day-to-day operations of local law enforcement" (citation omitted)).

Plaintiffs likewise overstate the effect of the four conditions when they claim that the conditions "affirmatively requir[e] law enforcement officers to devote state and local resources to federal immigration enforcement on the federal government's command." FAC ¶ 197. None of the conditions deputize state officers, requires them to make immigration arrests, obligates them to investigate immigration violations, or transfers operational command to federal officials. The Access Condition prevents recipients from obstructing federal officers exercising federal authority; the Notice Condition requires provision of specified release information in response to a formal request. The time and resources it may take to provide basic release information plainly does not rise to the level of commandeering. *Compare Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFID")*, 567 U.S. 519, 581 (2012) (holding that Medicaid funding condition was the equivalent to a "gun to

the head" of the States because of potential loss of all federal Medicaid funds). Even if there were new costs associated with this obligation, the Byrne JAG, Byrne SCIP, and Title II award packages state that recipients may obligate award funds toward reasonable and allocable costs of any actions taken to ensure compliance. E.g., AR_00129-131. The notion that awardees are saddled with significant, unreimbursed costs to comply with these conditions is simply wrong.

**2. The Statutory Formulas Do Not Prohibit the Challenged Conditions**

Plaintiffs argue that the challenged conditions violate statutory provisions establishing the formulas that allocate the amounts that eligible states can receive under the Byrne JAG, Byrne SCIP, and Title II grants. SAC ¶ 264. *See, e.g.*, 34 U.S.C. § 10156(a) (requiring that the Attorney General "shall … allocate" funds "to each State" in accordance with Byrne JAG statutory formula); 34 U.S.C. § 11133(a) (Title II) (requiring that "funds shall be allocated annually among the states" per the statutory formula). However, the formula nature of these programs "does not dictate that such an applicant must be given federal money even as it continues to flout federal law." *State v. Dep't of Just.*, 951 F.3d 84, 107 (2d Cir. 2020). "While Congress's intent in appropriating funds for formula (as distinct from discretionary) grants is to have all the money distributed, even a formula grant applicant must satisfy the program's requirements before being entitled to receive funding." *Id.* Moreover, "whether a grant is awarded by formula or by discretion, there is something disquieting in the idea of States and localities seeking federal funds to enforce their own laws while themselves hampering the enforcement of federal laws, or worse, violating those laws." *State v. Dep't of Just.*, 951 F.3d 84, 107 (2d Cir. 2020)

### D. The Decision to Impose the Challenged Conditions Was Not Arbitrary and Capricious

Count Four of Plaintiffs' SAC raises an APA claim contending that Defendants acted arbitrarily and capriciously by imposing the challenged conditions. SAC ¶¶ 270-76. Counts One and Six are also stated as APA claims. *See id.* ¶¶ 256-261, 284-286. These claims fail as a matter of law.

Plaintiffs' arbitrary-and-capricious claim largely repackages their disagreement with the legality and wisdom of DOJ's policy choice. But if the conditions are statutorily authorized and comport with the Spending Clause, "arbitrary or capricious" scrutiny should not otherwise limit DOJ's broad discretion.

In any event, judicial review of an agency's action under the "arbitrary or capricious" standard is "deferential," and a court "may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Under this standard, a court "simply ensures that the agency has acted within a zone of reasonableness," and "may not substitute its own policy judgment for that of the agency." *Id.* An agency is not required to provide a perfect explanation. Rather, a court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations*, Inc., 556 U.S. 502, 513–14 (2009) (citation omitted).

That standard was met here. Plaintiffs' disagreement with DOJ's policy rationale does not make the decision arbitrary and capricious. Federal officers are charged with the duty to enforce the nation's immigration laws, and DOJ has long been aware of jurisdictions with policies that cause local officials to believe they are prohibited or restricted from cooperating with ICE in all respects. *See* AR_00849, Office of Inspector

General Memorandum re Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C § 1373 by Grant Recipients (May 31, 2016) (finding that some jurisdictions will honor a civil immigration detainer request when the subject meets certain conditions, such as prior felony convictions, gang membership, or presence on a terrorist watch list," while other jurisdictions "will not honor a civil immigration detainer request, standing alone, under any circumstances"). Those policies interfere with the efficient and orderly enforcement of federal laws in the very programs and facilities funded by DOJ's law-enforcement and justice program grants. *See* AR_00852 (explaining that ICE had to close its office on Riker's Island and cease operations on any New York City Department of Corrections property because of a policy restricting corrections personnel from communicating with ICE regarding an inmate's release date without a judicial warrant supporting a detainer request).

Consistent with a February 5, 2025 memorandum by the Attorney General, OJP reviewed its grants to determine whether immigration-related conditions would be appropriate to apply to any of its existing programs. AR_00176-77, AR_00186-196, AR_00733. OJP tailored the final four conditions to the specific context of criminal alien law enforcement and applied those conditions only to grant programs funding state and local justice systems that intersect with federal agents. AR_00176-77, AR_00186-196, AR_00733. The challenged conditions help to prevent the counterproductive use of federal funds for policies that intentionally frustrate the enforcement of federal laws and undermine the cooperative functions that OJP is charged to oversee.

Immigration enforcement undoubtedly relates to criminal justice. As discussed above, *see supra* at pp. 15-19, numerous federal statutes expressly tie these two subjects

together—most centrally inasmuch as a conviction for any of a wide array of criminal offenses renders an alien removable from this country, *see* 8 U.S.C. § 1227(a)(2), and thus no longer present here with the potential to re-offend. Accordingly, a January 20, 2025 executive order stated that it is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, *particularly* those aliens who threaten the safety or security of the American people." Executive Order 14159 (Jan. 20, 2025) (emphasis added). AR_00007.

The conditions thus rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress contemplates in immigration enforcement. *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12 ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations.").

For aliens who commit crimes and end up in state or local criminal custody, the expectation of cooperation is particularly evident. In deference to a state or local jurisdiction's significant interest in punishing its criminals, the INA usually permits these aliens to serve their entire sentence before being subject to federal detention for possible removal from the country. Except in limited circumstances, the Department of Homeland Security "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," and the alien's removal period "begins on . . . the date the alien is released from [state or local criminal] detention." 8 U.S.C. § 1231(a)(1)(B)(iii), (a)(4)(A); *see id.* § 1226(c)(1) (requiring that federal immigration authorities take custody

of a criminal alien "when the alien is released" from criminal custody); § 1231(a)(1)(A) (for an alien incarcerated by a State or local government, a 90-day "removal period" during which the federal government "shall" detain and then "shall" remove an alien from the U.S. "begins" no later than "the date the alien is released from . . . confinement"); § 1231(i) (expressly authorizing the federal government to make payments to a "State or a political subdivision of the State . . . with respect to the incarceration of [an] undocumented criminal alien").

In delaying removal of these individuals until state and local jurisdictions' criminal justice interests are served, it was certainly not Congress's intent that these criminal aliens would evade federal immigration authorities. *See id.* § 1226(c)(1) (the federal government "shall take into custody" certain "criminal aliens" "when the alien is released"); § 1231(a)(2) (mandating detention during 90-day removal period for all aliens against whom a final order of removal has been entered); § 1231(a)(1)(B)(iii) (providing that "[i]f the alien is detained or confined (except under an immigration process)," the 90-day period presumptively runs from the date on which "the alien is released from detention or confinement"); *see also id.* § 1366 (requiring an annual DOJ report to Congress on "the number of illegal alien [felons] in Federal and State prisons" and programs underway "to ensure the prompt removal" from the U.S. of removable "criminal aliens"). Thus, these provisions and others contemplate that federal immigration officials will have access to information regarding the whereabouts, custody, and release status of aliens in state and criminal custody.

The criminal alien law enforcement conditions were crafted to address these concerns. Consistent with OJP's purpose of enhancing cooperation across all levels of law

enforcement, the conditions have been implemented to promote such cooperation, improve efficiency and public safety, and reduce efforts by state or local jurisdictions to use federal funds in ways that actively undermine the enforcement of federal laws.

Plaintiffs contend that Defendants did not consider the States' reliance interests on local law enforcement, but an agency need only consider and weigh a party's valid, reasonable reliance interests—not "unreasonable" ones. *See Libby Welding Co. v. United States,* 444 F. Supp. 987, 992 (D.D.C. 1977), *aff'd,* 595 F.2d 887 (D.C. Cir. 1979). Given OJP's discretion to amend award terms consistent with the relevant statutes and the fact that new award decisions are made on an annual basis, any reliance by Plaintiffs on award terms identical to those of past awards was not reasonable. *Smilry v. Citibank,* 517 U.S. 735, 742 (1996) (requiring agencies to consider "legitimate reliance").

Accordingly, this case bears no resemblance to the reliance interests at issue in *Dep't of Homeland Security v. Regents of the Univ. of Cal.,* 591 U.S. 1, 30-31 (2020). That case challenged the termination of a program that provided immigration benefits to a specific group of individuals brought to the United States as children, and the Court recognized the reliance interests of those beneficiaries. *See id.* at 31 (stating that recipients had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on DACA). Here, Plaintiff States do not have any comparable cognizable reliance interests in the way OJP chooses to allocate its annual grant funding from one year to the next.

Similarly, Plaintiffs miss the mark in contending that Defendants should have considered the impacts of the conditions on their state and local law enforcement agencies. The conditions relate to how grantees exercise an integral aspect of the grant programs—

*i.e.*, their policies concerning access to and release of prisoners in criminal custody. Indeed, the conditions ensure that any "program or activity" funded by the federal law enforcement grants does not thwart the federal government's ability to remove aliens whom the grantee itself *arrested* for criminal conduct. It is unrelated to the grantees' treatment of witnesses. It is therefore reasonable for Defendants to condition law enforcement grants on state and local agencies not undertaking a deliberate policy of refusing to provide basic information necessary to enforcement of the immigration laws.

### E. The Challenged Conditions Do Not Violate the Spending Clause

In Count Five of the SAC, Plaintiffs contend that the challenged conditions violate the Spending Clause because they are unrelated to the purposes of the underlying grants, insufficiently clear, and coercive. SAC ¶¶ 277-283. Those arguments fail.

As an initial matter, the Spending Clause does not apply here at all. That Clause is a limitation on Congress' power to legislate; it has no application to Executive Branch decisions about how to expend funds Congress has appropriated. *See Bd. of Educ. for Silver Consol. Sch. v. McMahon*, 2025 WL 2017177, at *10 (D.N.M. July 18, 2025) ("[T]he Spending Clause is only implicated 'when Congress imposes a spending or funding condition.' And without alleging congressional action, Plaintiff 'cannot state a claim under the Spending Clause.'" (quoting *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 2025 WL 1502329, at *24, (D.D.C. May 27, 2025)).

Even if the Spending Clause did apply to Executive Branch spending decisions, Congress may attach conditions to federal funds so long as the conditions are unambiguous, sufficiently related to the federal interest in the funded program, and not so coercive that financial pressure becomes compulsion. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). The challenged conditions satisfy each requirement.

### 1. The Challenged Conditions Are Related to the Purposes of the Grant Programs

First, Plaintiffs frame relatedness at the wrong level of abstraction. They compare "immigration enforcement" on one side with criminal justice, crisis intervention, or juvenile delinquency prevention on the other, and conclude that the subjects are categorically unrelated. *See* SAC ¶ 280. But *Dole* does not require that a funding condition duplicate the same programmatic objective of the federal grant. Indeed, it is well-established that the "relatedness" aspect of *Dole* does not pose a difficult hurdle; to the contrary, the Supreme Court has held that only "some relationship" is needed between spending conditions and "the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992); *see Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (stating that this "low-threshold" inquiry "is a far cry from . . . an exacting standard for relatedness"). As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The grant conditions at issue here easily satisfy this "low-threshold" relatedness inquiry. *Mayweathers*, 314 F.3d at 1067. The challenged conditions meet that standard because they regulate interactions that can arise within the very justice system institutions that the Byrne JAG, Byrne SCIP, and Title II programs fund. These conditions specifically concern the release of persons from state or local custody, federal officers' access to correctional facilities, governmental exchange of immigration-status information, the disclosure of federal law enforcement sensitive information in circumstances designed to frustrate federal enforcement. Defendants are not simply applying abstract immigration policy requirements on programs with no connection to law enforcement. These conditions

regulate custody, correctional facilities, and information-sharing—all subjects that arise in the operation of activities funded under Byrne JAG, Byrne SCIP, and Title II.

### 2. The Challenged Conditions Are Unambiguous

Plaintiffs' challenge under the Spending Clause based on ambiguity must fail. The Spending Clause requires conditions on federal funds to be applied "unambiguously" to enable a State to accept federal funds "knowingly, cognizant of the consequences of its participation." *Dole*, 483 U.S. at 207 (citation omitted). The challenged conditions satisfy this requirement.

Here, each condition states what triggers the obligation and what the recipient must—or must not—do. The Notice Condition applies when a correctional facility receives a formal written DHS request concerning a particular person and requires advance notice of the scheduled release as early as practicable. AR_00130-31, 153-54, 172-73. It expressly provides that recipients need not detain anyone beyond the otherwise scheduled release. *Id.* The Access Condition prohibits recipients from impeding specified federal officers' access to correctional facilities for the purpose identified in the condition. AR_00131-32, 154, 173. The Communication Condition identifies the particular restrictions on immigration-status information that recipients may not impose. AR_129-30, 152-53, 174. And the Harboring Condition specifies the category of federal law enforcement information, the prohibited public disclosure, and the concealment or shielding purpose that triggers the restriction. AR_00129, 151-52, 171-72.

Plaintiffs identify marginal questions about how phrases such as "as early as practicable," "impede," or "indirect attempt" might apply in particular circumstances. But the Spending Clause does not require federal grant conditions to anticipate every factual permutation before a State can knowingly accept them. *See Biden v. Missouri*, 595 U.S.

87, 90, 94 (2022) (per curiam) (holding that a funding condition requiring staff to be vaccinated against COVID-19 was lawful and the HHS secretary's "authority extends beyond imposing a list of bureaucratic rules regarding technical administration"). The Supreme Court has recognized that when "the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). *Finley* rejected a vagueness challenge to grant criteria requiring consideration of "general standards of decency and respect for the diverse beliefs and values of the American public[,]" although those standards were "undeniably opaque" and might raise vagueness concerns in a criminal or regulatory scheme. *Id.* at 588–90 (Scalia, J., concurring) (citation omitted); *see Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 167 F.4th 86, 102 (4th Cir. 2026). Indeed, "the exact nature of [grant] conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see*, *e.g.*, *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper.") (citation omitted).

### 3. The Challenged Conditions Are Not Coercive

Plaintiffs' coercion theory is weaker still. Spending becomes constitutionally coercive only when financial pressure crosses the line into compulsion. *Dole*, 483 U.S. at 211. The Supreme Court found such compulsion in *National Federation of Independent Businesses v. Sebelius ("NFIB")*, 567 U.S. 519 (2012), where states faced the threatened loss of their existing Medicaid funding—a massive portion of state budgets—if they

declined a fundamentally transformed program. That circumstance was exceptional. The Supreme Court instructed that "courts should not conclude that [an enactment] is unconstitutional on this ground unless the coercive nature of an offer is unmistakably clear," *id.* at 681, such as where a state risks losing "over *10 percent* of a State's overall budget" if it declines to adopt certain conditions. *Id.* at 582 (emphasis added). Nothing comparable is present here.

**F. The Challenged Conditions Do Not Violate the Separation of Powers**

Count Six of the SAC contends that the challenged conditions violate the separation of powers. *See* SAC ¶ 285. This claim is nothing more than a repackaged version of Plaintiffs' statutory claim that the conditions are not authorized by an Act of Congress. As explained above, that claim fails on the merits.

In any event, the Supreme Court has made clear that there is no support for the "proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Rather, the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is . . . well established." *Id.* at 474. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5. Because Plaintiffs' separation-of-powers claim focus entirely on their contention that OJP has not acted consistent with its statutory obligations, such claims are untenable under *Dalton*. *See Glob. Health Council v. Trump*, 153 F.4th 1, 7 (D.C. Cir. 2025).

## III. Plaintiffs' Requested Relief Is Overbroad and Would Violate Article III

If the Court grants any relief to Plaintiffs, it should be limited to vacating the specific conditions in the FY25 grant awards that the Court finds unlawful under 5 U.S.C. § 706, only as to the State Plaintiffs before the Court. It should not enter the sweeping permanent injunction Plaintiffs request, which would cover nonparties and broadly apply to unspecified future actions not before the Court.

### A. A Permanent Injunction is Improper

An injunction is "a drastic and extraordinary remedy," not a remedy to be granted as a matter of course. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). *Monsanto* itself rejected a forward-looking injunction because vacatur was a "less drastic remedy" sufficient to address the agency error. *Id.* at 165; *see Rhode Island Coal. Against Domestic Violence v. Kennedy*, No. 25-CV-342-MRD-PAS, 2026 WL 2364298, at *5 (D.R.I. Aug. 14, 2026) (vacating grant conditions and denying request for permanent injunction); *See O.A. v. Trump*, 404 F. Supp. 3d 109, 153-54 (D.D.C. 2019) ("The Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would 'have [a] meaningful practical effect independent of its vacatur.'" (quoting *Monsanto Co.*, 561 U.S. at 165)). The same is true here. If the Court concludes that a particular condition is unlawful, vacatur would address Plaintiffs' asserted injury without barring Defendants from exercising lawful grantmaking authority in the future.

Plaintiffs' request for permanent forward-looking injunctive relief would prevent Defendants from curing any defects through additional explanation, additional process, or revised terms. That is not permissible. When a court identifies legal error in agency action, the ordinary remedy is to remand to the agency for further proceedings consistent with the

corrected legal standard. *See SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943); *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999). Further, courts routinely recognize that an injunction should not prevent agencies from making funding decisions within their lawful authority. *See New York v. Trump*, 133 F.4th 51, 70 n.16 (1st Cir. 2025). Any relief should preserve Defendants' ability to administer OJP programs and adopt lawful conditions in future awards.

Nor have Plaintiffs satisfied the equitable requirements for permanent injunctive relief. Plaintiffs cannot show that the equities favor an injunction that would significantly interfere with the Executive Branch's administration of federal grant programs. *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026) (finding that the federal government "is likely to suffer irreparable harm" because the "District Court's breach of Article III interferes with the internal operations of the Executive Branch."); *Nat'l Park Serv. v. Nat'l Tr. for Historic Pres. in the United States*, No. 26A203, 2026 WL 2564318, at *3 (U.S. Aug. 31, 2026) ("The district court likely exceeded its Article III authority to enjoin the activities of a coordinate branch of government."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time the Government is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury.").

**B. Any Relief Should Be Limited to the State Plaintiffs**

The Court also should reject Plaintiffs' request for relief extending to their political subdivisions and instrumentalities. Pls.' Mot. at 51. The thousands of cities and towns located within the Plaintiff States are separate legal entities and not parties to this action. Plaintiffs do not explain how such overbroad relief is necessary to redress their own alleged injuries. *See Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025). At most, a court "may

administer complete relief between the parties" and should not go beyond that to enjoin action or implementation more broadly. *Id.* at 851 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928) (emphasis omitted)). As the Supreme Court recently reiterated, "[c]omplete relief is not a guarantee—it is the maximum a court can provide" and can be curtailed by considerations of "equity." *Id.* at 854; *accord Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. . . . [A] federal judge . . . is not mechanically obligated to grant an injunction for every violation of law." (citations omitted)).

These principles apply with special force in the grant context. "In the context of new and existing contracts, extending the injunction to nonparties is unnecessary to provide complete relief to the plaintiffs; a contract term may be enforceable in one agreement but dormant in another." *Georgia v. President of the United States*, 46 F.4th 1283, 1307 (11th Cir. 2022). Plaintiffs therefore cannot obtain broader relief merely by asserting that other grantees may be subject to the same or similar terms.

The political subdivisions and instrumentalities of the Plaintiff States are perfectly capable of bringing their own lawsuits to vindicate their own interests should they decide to do so. *See, e.g.*, NJ Rev. Stat. § 40:43-1 (stating that every New Jersey municipality may "sue and be sued"). Just as the States lack standing as *parens patriae* to bring an action against the federal government, *see Haaland v. Brackeen*, 599 U.S. 255, 294–95(2023), they similarly cannot sue the federal government on behalf of their political subdivisions.

Moreover, the APA does not permit universal vacatur of agency action that would extend relief to non-parties. *See United States v. Texas*, 599 U.S 670, 695 (2023) (Gorsuch,

J., concurring) (The APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise)."). The history and structure of the APA do not support that the "set aside" language in § 706(2) is synonymous to "vacate," but rather that "set aside" should be understood to mean that a court should "disregard" the action taken by the agency in determining the outcome of a case. *See id.* As the Supreme Court recently explained in *CASA*, there is no basis in equity for a universal injunction that goes beyond remedying the harms incurred by the plaintiffs who have brought the lawsuit. 606 U.S. at 843;[5] *see California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (remedies "ordinarily operate with respect to specific parties" rather than "on legal rules in the abstract") (citations and internal quotation marks omitted); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (observing that the "general rule" is that equitable relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.") (citations omitted). Accordingly, any relief in this case should be limited solely to the Plaintiff States.

### C. Plaintiffs' Request for Forward-Looking Relief is Unripe and Exceeds the APA

In addition, the Court should reject Plaintiffs' request for forward looking relief that would prohibit "future implementation or enforcement" of the challenged conditions beyond the FY25 grant awards. Pls.' Mot. at 51.

Article III limits federal courts to live cases and controversies and prevents courts from issuing advisory opinions. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024). Plaintiffs' request for relief against hypothetical grant terms potentially years into the future rests on several contingent future events: whether

[5] In a footnote in *CASA*, the Supreme Court reserved the question about the meaning of the "set aside" language in the APA. 606 U.S. at 847 n.10 (quoting 5 U.S.C. § 706(2)).

Defendants will adopt future terms, how they will adopt those terms, what those terms will say, what statutory authority will govern them, and how they will apply. There is no live dispute with respect to hypothetical terms for future grant awards, and such relief would exceed Article III's limits.

Future hypothetical terms are not just unripe—they are not yet even a planted seed. Ripeness prevents courts from "entangling themselves in abstract disagreements over administrative policies" and improperly interfering in agency decisionmaking. *City of Fall River v. Fed. Energy Regulatory Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007). A claim is not ripe if it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). Plaintiffs bear the burden to prove ripeness, *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016), and they have not done so for future grant terms not yet adopted.

Nor have Plaintiffs identified any final agency action for future grant terms. Final agency action requires both the "consummation of the agency's decisionmaking process" and a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). Future NOFOs and future award conditions have not yet been adopted, much less finally applied to Plaintiffs. The APA does not permit Plaintiffs to seek "wholesale improvement" of agency management "by court decree." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Nor may courts review generalized complaints about ongoing agency behavior, because such a programmatic attack is not "in itself, a 'final agency action' under the APA." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006).

For these reasons, if the Court grants any relief, it should be limited to the specific challenged conditions in the FY25 grant awards as applied solely to the Plaintiffs States.

## IV. Plaintiffs' Remaining Claims Should Be Dismissed

Following resolution of the merits discussed above, this Court should dismiss the remainder of Plaintiffs' SAC for lack of subject matter jurisdiction. Under Article III of the Constitution, the jurisdiction of the federal courts extends only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. Matters outside this are nonjusticiable. Two principles of justiciability are involved here: standing and ripeness. "While standing is concerned with *who* is a proper party to litigate a particular matter, the doctrines of mootness and ripeness determine *when* that litigation may occur." *Haw. Cty. Green Party v. Clinton*, 14 F. Supp. 2d 1198, 1201 (D. Haw. 1998).

To satisfy the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate an "injury in fact," a "fairly traceable" causal connection between the injury and defendant's conduct, and redressability. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-03 (1998). The injury needed for constitutional standing must be "concrete," "objective," and "palpable," not merely "abstract" or "subjective." *See Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *Bigelow v. Virginia*, 421 U.S. 809, 816-17 (1975). Additionally, the injury must be "certainly impending" rather than "speculative." *Whitmore*, 495 U.S. at 157, 158. "[S]tanding is perhaps the most important of [the jurisdictional] doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation marks omitted).

A claim is constitutionally unripe and thus non-justiciable if the challenged action has not been "formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). In other words, "[a] claim is not

ripe for adjudication [under the Constitution] if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted); *see Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain Cty., Ind.*, 977 F.2d 287, 288-89 (7th Cir. 1992) (noting that ripeness doctrine "seeks to avoid the premature adjudication of cases when the issues posed are not fully formed, or when the nature and extent of the statute's application are not certain").

In assessing constitutional ripeness in the context of a "pre-enforcement challenge" to an administrative action, the courts consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Standard Alaska Prod. Co. v. Schaible*, 874 F.2d 624, 627 (9th Cir. 1989). In other words, a court considers whether the court and the parties would "benefit from deferring review until the agency's policies have crystallized and the question arises in some more concrete and final form." *Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985) (internal quotation marks omitted); *see Humana Hosp. Corp. v. Blankenbaker*, 734 F.2d 328, 332 (7th Cir. 1984) (finding that claim was not fit for decision where administrative proceedings had not concluded and such proceedings may "crystaliz[e] the issues for judicial review"). Finally, to meet the hardship requirement, plaintiff must show that withholding review would result in "substantial immediate impact." *See Hinrichs v. Whitburn*, 975 F.2d 1329, 1336 (7th Cir. 1992).

Plaintiffs filed this suit over a year ago to challenge language that OJP placed in NOFOs for formula and competitive grants administered under the Victims of Crime Act of 1984 (VOCA). *See* Compl., ECF No. 1. Plaintiffs incorrectly characterized the NOFO language, which referred to immigration, as "conditions" on the respective grants and as a reflection of a new "policy" to require all recipients of these grants to comply with the federal government's immigration priorities. *Id.* ¶ 2. Plaintiffs' challenge was unripe when filed, and their assumptions about a purported policy to apply immigration-related conditions to all OJP grants have been proven incorrect.

Applying Article III standards here, DOJ's NOFO language itself does not present a ripe controversy or inflict an injury-in-fact. Any alleged future injury that Plaintiff States might claim is not justiciable, as it depends on multiple contingencies—eligibility for an award, selection for an award (for competitive programs), and inclusion of the challenged language—that may never occur. Indeed, injury never occurred and a dispute never ripened for the many FY 2025 awards that Plaintiffs received without the challenged conditions. Until DOJ decided to apply the Challenged Conditions to final award packages for the Byrne JAG, Byrne SCIP, and Title II programs, this case remained in abeyance for nearly a year, as there was simply no controversy for this Court to resolve. Plaintiffs have not established an Article III case or controversy as to any issue except for those presented in their motion for partial summary judgment. Therefore, following the Court's resolution of the instant motions, this case should be dismissed.

Any alleged future injury that Plaintiff States might claim with respect to the remaining FY 2025 and FY 2026 awards that have yet to issue depends on multiple contingencies—eligibility for an award, selection for an award (for competitive programs),

and inclusion of the challenged language—that may never occur. Moreover, because standing is not dispensed in gross, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), Plaintiff States' cursory references in the SAC to other grant programs does not sufficiently establish each Plaintiff State's standing to seek relief with respect to each still-pending FY 2025 or FY 2026 award. *See* SAC ¶¶ 90-100. There is no "certainly impending" or "substantial risk" of injury, *TransUnion*, 594 U.S. at 435, where the SAC fails to specify which Plaintiff applied to which grants, let alone explain how NOFO language alone, which is not guaranteed to appear in a final award, would injure their ability to implement a specific project funded by a specific formula or competitive grant program. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (Plaintiffs bear the burden of establishing standing, and therefore "must clearly . . . allege facts demonstrating each element.").

The Court should not allow this case to serve as an endless vehicle for serial amendments each time DOJ issues new grant award that the States find objectionable. The Could should resolve the pending cross-motions for summary judgment, enter final judgment, and close this case. Any future grant award dispute can be addressed in a separate lawsuit when a ripe claim arises.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment for Defendants and dismiss any remaining claims.

Dated: September 18, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW WARDEN
Assistant Branch Director

*/s/ Natalie M. Villalon*
NATALIE M. VILLALON
D.C. Bar No. 90015127
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(202) 860-9963
Natalie.M.Villalon@usdoj.gov

*Counsel for Defendants*