**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF NEW JERSEY, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>*Defendants.* | No. 1:25-cv-00404 |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**PAGE**


INTRODUCTION ....................................................................................................1

ARGUMENT ..........................................................................................................2

I. THE PARTIES AGREE THAT DEFENDANTS ARE BARRED FROM ENFORCING THE CONDITIONS ON THE FY 2025 BYRNE JAG AWARDS. .............2

II. THE IMMIGRATION ENFORCEMENT CONDITIONS ARE UNLAWFUL. ................5

A. USDOJ Lacks Statutory Authority To Impose The Conditions. ..................................5

1. The Byrne And Title II Statutes Do Not Authorize Defendants' Imposition Of The Immigrant Enforcement Conditions. .........................................6

2. No Statute Gives Defendants Freestanding Authority To Impose Any Conditions On Byrne And Title II Grants. .............................................................8

3. Section 10228 Underscores That USDOJ Lacks Authority To Impose The Conditions. ..........................................................................................13

B. The Immigration Enforcement Conditions Are Arbitrary And Capricious. ................15

1. USDOJ Relied On Immigration Considerations Congress Did Not Intend It To Consider When Administering These Grants. ..................................................15

2. USDOJ Failed To Consider The States' Reasonable Reliance Interests................17

3. USDOJ Failed To Consider The Impact Of The Conditions On The Effectiveness Of State And Local Law Enforcement.............................................20

C. The Immigration Enforcement Conditions Violate The Spending Clause. .................23

III. THE COURT SHOULD VACATE, ENJOIN, AND DECLARE THE CONDITIONS UNLAWFUL...........................................................................................28

A. The Court Should Enter A Permanent Injunction.......................................................28

B. Relief Must Extend To Plaintiff States' Subdivisions And Instrumentalities. ............32

1. A Permanent Injunction Should Extend To Plaintiffs' Subdivisions And Instrumentalities. ..............................................................................32

2. Vacatur Extends To Plaintiffs' Subdivisions And Instrumentalities.......................35

IV. PLAINTIFF STATES' CHALLENGE TO THE INCLUSION OF IMMIGRATION ENFORCEMENT CONDITIONS IN THE NOFOS IS RIPE. ............37

CONCLUSION .......................................................................................................41

# TABLE OF AUTHORITIES

**PAGE (S)**

**Cases**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967)........................................................................................ 37

*Am. Ass'n of Univs. v. Dep't of Defense*,
806 F. Supp. 3d 79 (D. Mass. 2025)................................................................. 36

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
145 F.4th 39 (1st Cir. 2025)............................................................................. 32

*Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*,
490 F.3d 1 (1st Cir. 2007)................................................................................ 28

*Bd. of Educ. for the Silver Consolidated Schs. v. McMahon*,
791 F. Supp. 3d 1272 (D.N.M. 2025)................................................................ 24

*Benning v. Georgia*,
391 F.3d 1299 (11th Cir. 2004)........................................................................ 27

*Biden v. Nebraska*,
600 U.S. 477 (2023)........................................................................................ 33

*Calcutt v. FDIC*,
598 U.S. 623 (2023)........................................................................................ 29

*California ex rel. Becerra v. Sessions*,
No. 3:17-CV-04701-WHO, 2018 WL 6069940 (N.D. Cal. Nov. 20, 2018)........................ 35

*California v. Dep't of Educ.*,
No. 25-cv-10548, 2026 WL 2754968 (D. Mass. Sept. 17, 2026)................................... 35

*California v. Texas*,
593 U.S. 659 (2021)........................................................................................ 36

*California v. U.S. Dep't of Transp.*,
788 F. Supp. 3d 316 (D.R.I. 2025)................................................................... 35

*California v. U.S. Dep't of Transp.*,
808 F. Supp. 3d 291 (D.R.I. 2025)................................................................... *passim*

*Charles v. Verhagen*,
348 F.3d 601 (7th Cir. 2003) ..................... 27

*City & Cty. of San Francisco v. Barr*,
965 F.3d 753 (9th Cir. 2020) ..................... 35, 38

*City & Cty. of San Francisco v. Garland*,
42 F.4th 1078 (9th Cir. 2022) ..................... 35

*City & Cty. of San Francisco v. Sessions*,
349 F. Supp. 3d 924 (N.D. Cal. 2018) ..................... 26, 38

*City of Chicago v. Barr*,
513 F. Supp. 3d 828 (N.D. Ill. 2021) ..................... 30

*City of Chicago v. Barr,*
961 F.3d 882 (7th Cir. 2020) ..................... 11, 12, 13, 29

*City of Chicago v. Garland*,
No. 17-cv-05720, ECF 258 (N.D. Il.. Mar. 8, 2022) ..................... 3, 4, 5

*City of Chicago v. Sessions*,
264 F. Supp. 3d 933 (N.D. Ill. 2017) ..................... 6

*City of Chicago v. Sessions*,
321 F. Supp. 3d 855 (N.D. Ill. 2018) ..................... 38

*City of Fall River v. FERC*,
507 F.3d 1 (1st Cir. 2007) ..................... 31

*City of Fresno v. Turne*r,
No. 25-cv-07070-RS, 2025 WL 2721390 (N.D. Cal. Sep. 23, 2025) ..................... 27

*City of Philadelphia v. Session*s,
280 F. Supp. 3d 579 (E.D. Pa. 2017) ..................... 26

*City of Philadelphia v. Att'y Gen.*,
916 F.3d 276 (3d Cir. 2019) ..................... 11, 13, 30

*City of Philadelphia v. Sessions*,
309 F. Supp. 3d 289 (E.D. Pa. 2018) ..................... 6

*City of Providence v. Barr*,
385 F. Supp. 3d 160 (D.R.I. 2019) .......... 30

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) .......... *passim*

*City of Trenton v. New Jersey*,
262 U.S. 182 (1923) .......... 33

*Cty. of Santa Clara v. Noem*,
815 F. Supp. 3d 979 (N.D. Cal. 2025) .......... 24

*Corner Post, Inc. v. Bd. of Govs.*,
603 U.S. 799 (2024) .......... 36

*Dalton v. Specter*,
511 U.S. 462, 472 (1994) .......... 6

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) .......... 17, 22

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) .......... 39

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025) .......... 29

*Freedom Network v. Trump*,
830 F. Supp. 3d 681 (N.D. Ill. 2026) .......... 39

*FTC v. Standard Oil Co.*,
449 U.S. 232 (1980) .......... 38

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 10

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) .......... 33

*Hennepin Cty. v. HHS*,
No. 26-cv-2460, 2026 WL 2426300 (D.D.C. Aug. 19, 2026) .......... 40

*Housatonic River Initiative v. EPA*,
75 F.4th 248 (1st Cir. 2023) .......... 21

*llinois v. FEMA*
No. 25-cv-206, 2025 WL 2908807 (D.R.I. Oct. 14, 2025) .......... 35

*Illinois v. FEMA*,
801 F. Supp. 3d 75 (D.R.I. 2025) .......... *passim*

*In re Fin. & Oversight Mgmt. Bd. for Puerto Rico*,
37 F.4th 746 (1st Cir. 2025) .......... 20

*Jensen v. R.I. Cannabis Control Comm'n*,
160 F.4th 18 (1st Cir. 2025) .......... 37, 40

*Kansas v. United States*,
249 F.3d 1213 (10th Cir. 2001) .......... 34

*Kearns v. Cuomo*,
981 F.3d 200 (2d Cir. 2020) .......... 7

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) .......... 33

*Kinney-Coastal Oil Co. v. Kieffer*,
277 U.S. 488 (1928) .......... 33

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*,
844 F.3d 318 (1st Cir. 2016) .......... 31

*Lawson v. FMR LLC*,
571 U.S. 429 (2014) .......... 14

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) .......... 36

*Maine v. Taylor*,
477 U.S. 131 (1986) .......... 34

*Massachusetts v. Nat'l Insts. of Health*,
770 F. Supp. 3d 277 (D. Mass. 2025) .......... 36

*Massachusetts v. USDA*,
No. 26-cv-11396, 2026 WL 1815807 (D. Mass. June 24, 2026) .......... 38

*Mayweathers v. Newland*,
314 F.3d 1062 (9th Cir. 2002) .......... 25, 27

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 15, 20, 21

*Multnomah Cty. v. Azar*,
340 F. Supp. 3d 1046 (D. Or. 2018) ........ 39

*Murphy v. Nat'l Coll. Athletic Ass'n*,
584 U.S. 453 (2018) ........ 12, 14

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ........ 27

*New York v. Dep't of Justice*,
951 F.3d 84 (2d Cir. 2020) ........ 8

*New York v. United States*,
505 U.S. 144 (1992) ........ 24, 25, 38

*Oregon v. Trump*,
406 F. Supp. 3d 940 (D. Or. 2019) ........ 35

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ........ 26

*President & Fellows of Harvard Coll. v. HHS*,
798 F. Supp. 3d 77 (D. Mass. 2025) ........ 5

*Printz v. United States*,
521 U.S. 898 (1997) ........ 12

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........ 11

*Reynolds v. Sims,*
377 U.S. 533 (1964) ........ 34

*Rhode Island v. Trump*,
810 F. Supp. 3d 283 (D.R.I. 2025) ........ 5

*Riva v. Massachusetts*,
61 F.3d 1003 (1st Cir. 1995) ........ 31

*Roman Cath. Bishop of Springfield v. City of Springfield*,
724 F.3d 78 (1st Cir. 2013) ........ 37

*Sig Sauer, Inc. v. Brandon*,
826 F.3d 598 (1st Cir. 2016) .......... 38

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
699 F.3d 1 (1st Cir. 2012) .......... 37

*South Dakota v. Dole*,
483 U.S 203 (1987) .......... 14

*Starbucks Corp. v. McKinney*,
602 U.S. 339 (2024) .......... 33

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) .......... 31, 40

*Tennessee v. Cardona*,
762 F. Supp. 3d 615 (E.D. Ky. 2025) .......... 35

*Texas v. United States*,
523 U.S. 296 (1998) .......... 31

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 37

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) .......... 32

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 29, 33, 36

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 38

*United States v. Baass*,
No. 25-mc-00083, 2026 WL 898670 (C.D. Cal. Mar. 4, 2026) .......... 7

*United States v. Gonzales*,
520 U.S. 1 (1997) .......... 13

*United States v. Texas*,
599 U.S. 670 (2023) .......... 37

*United States v. Wheeler*,
435 U.S. 313 (1978) .......... 33

*Williams v. Eggleston*,
170 U.S. 304 (1898) ... 33

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*,
784 F. Supp. 3d 127 (D.D.C. 2025) ... 23

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
186 F.4th 25, (1st Cir. 2026) ... 35

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) ... 33

**Statutes**

5 U.S.C. § 703 ... 31

5 U.S.C. § 706 ... 28, 35, 36

8 U.S.C. § 1101 ... 7

8 U.S.C. § 1226 ... 7, 11, 17

8 U.S.C. § 1231 ... 7, 11

8 U.S.C. § 1252c ... 11

8 U.S.C. § 1324 ... 7, 11

8 U.S.C. § 1357 ... 7, 11, 17

8 U.S.C. § 1366 ... 7

8 U.S.C. § 1373 ... 7, 11, 27

8 U.S.C. § 1644 ... 11

18 U.S.C. § 1071 ... 7

18 U.S.C. § 1072 ... 7

18 U.S.C. § 249 ... 12

18 U.S.C. § 923 ... 12

34 U.S.C. § 10102 ... 9, 10, 16

34 U.S.C. § 10152 .......... 5, 25

34 U.S.C. § 10153 .......... 6, 7, 11

34 U.S.C. § 10228 .......... 5, 13, 14

34 U.S.C. § 11131 .......... 25

34 U.S.C. § 11132 .......... 34

34 U.S.C. § 11133 .......... 18

34 U.S.C. § 20102 .......... 39

34 U.S.C. § 20297 .......... 12

34 U.S.C. § 20912 .......... 11

34 U.S.C. § 40901 .......... 11

34 U.S.C. § 40914 .......... 12

34 U.S.C. § 60105 .......... 12

Pub. L. No. 90-351, 82 Stat. 197 (1968) .......... 10

Pub. L. No. 98-473, 98 Stat. 1837 (1984) .......... 10

Cal. Gov't Code § 7284.2 .......... 20

Cal. Gov't Code § 7284.4 .......... 34

11 Del. C. § 8401B .......... 34

5 Ill. Comp. Stat. § 805/10 .......... 34

2026 N.J. Laws ch. 5 .......... 20, 34

**Regulations**

2 C.F.R. § 200.332 .......... 34

8 C.F.R. § 287.5 .......... 7

28 C.F.R. § 66.12 .......... 9

**Other Authorities**

*Any*, Webster's New Int'l Dictionary (3d ed. 1976) .................................................................. 13

Bureau of Justice Assistance, *Byrne SCIP Program Frequently Asked Questions*, https://bja.ojp.gov/doc/byrne-scip-faq.pdf.. ............................................................................ 19

Bureau of Justice Assistance, *FY 2025 Byrne SCIP Formula Allocations*, https://bja.ojp.gov/funding/fy-2025-byrne-scip-allocations.pdf. ............................................ 34

Bureau of Justice Assistance, *NOFO, Byrne JAG Program—State Formula*, https://www.ojp.gov/funding/docs/bja-2026-172704.pdf....................................................... 30

H.R. Rep. No. 109-233 (2005)........................................................................................................ 9

Felipe M. Gonçalves et al., *Immigration Enforcement and Public Safety*, Nat'l Bureau of Econ. Research (February 2024), .................................................................. 20

*Liaison*, Am. Heritage Dictionary (2d College ed. 1982)........................................................... 10

Tom K. Wong, *The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants*, U.S. Immigr. Pol'y Ctr. (April 3, 2019)................ 21

# INTRODUCTION

Binding precedent resolves this case and forecloses Defendants' arguments. In *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020), the First Circuit rejected the same arguments Defendants now make about their statutory authority to impose their Immigration Enforcement Conditions. The court held that neither the provisions of the Byrne statute nor OJP's general authority to impose "special conditions" on some grants authorized immigration-related conditions identical to those at issue here. The court also underscored that agencies do not have discretion to alter fixed formula grant programs by conjuring eligibility conditions that are not found in the statute. And while Defendants now float novel theories based on unrelated provisions of federal statutes like the Immigration and Nationality Act, those arguments fail for even more obvious reasons: the cited statutes do not govern the grant programs at issue here and do not say anything about immigration-related federal funding conditions. In short, because no statute authorizes the Conditions, the Conditions are unlawful under the Administrative Procedure Act. That alone is sufficient reason to grant summary judgment to the Plaintiffs.

But that is not all. The Conditions are also unlawful because they are arbitrary and capricious and violate the Spending Clause. Defendants considered factors Congress did not intend them to consider in allocating formula grants, ignored Plaintiffs' legitimate reliance interests on multi-year formula funding, and disregarded the impact of the Conditions on state policies that promote criminal justice enforcement—all hallmarks of unreasoned agency decisionmaking. And even if Congress had authorized the Conditions, they would still fail to meet the Spending Clause's requirements that funding conditions be related to the purposes of a spending program and provide unambiguous and clear notice to recipients of the terms of such conditions.

Plaintiffs are therefore entitled to summary judgment. And while Defendants have now agreed not to enforce the Conditions on FY 2025 Byrne JAG formula grants, the Court should enter an order blocking enforcement of the Conditions on FY 2025 Byrne SCIP and Title II formula grants. That order should direct that the Conditions be vacated and include a permanent injunction that blocks Defendants from imposing these unlawful Conditions again—as they have many times before, despite multiple courts rejecting them. Moreover, that relief should run to Plaintiff States' political subdivisions and municipalities: they are parts of the States, receive these grants as a pass-through from the States, and in any event are covered by vacatur under the APA.

Finally, the Court should reject Defendants' attempt to foreclose further litigation regarding their efforts to impose the Conditions on other grant programs. Though Plaintiffs have not yet moved for summary judgment as to the other grant programs, the claims in their complaint certainly clear the bar for ripeness. Defendants have developed a policy of imposing the Conditions across federal grants administered by USDOJ's Office of Justice Programs, as reflected by the many FY 2025 and FY 2026 Notices of Funding Opportunity that contain these Conditions. The fact that Defendants may decide to shift course and remove these Conditions from final awards may be relevant to how expeditiously these claims must be litigated, but as multiple other courts have held, it does not support outright dismissal of the claims.

## ARGUMENT

### I. THE PARTIES AGREE THAT DEFENDANTS ARE BARRED FROM ENFORCING THE CONDITIONS ON THE FY 2025 BYRNE JAG AWARDS.

As Defendants now concede, the Immigration Enforcement Conditions in the FY 2025 Byrne JAG awards do not apply to, and cannot be enforced against, any of the Plaintiff States or their localities. ECF 69 (Defs.' Cross Mot. Summ. J.), at 11. In light of that concession, Plaintiffs

agree not to pursue their claims as to FY 2025 Byrne JAG grants. The Court therefore need not adjudicate the parties' respective motions for summary judgment as to those grants.

Defendants' brief acknowledges that they are foreclosed by a previously issued permanent injunction in *City of Chicago v. Garland*, No. 1:17-cv-05720, ECF 258 (N.D. Ill. Mar. 8, 2022), from enforcing the Conditions in the FY 2025 Byrne JAG awards. ECF 69 at 11. This follows a Legal Notice posted by OJP on September 11, 2026—after Plaintiffs filed their Motion for Summary Judgment in this case—stating that USDOJ "will not implement or enforce" the Immigration Enforcement Conditions as to the FY 2025 Byrne JAG awards for "[a]ll recipients" in light of the *Chicago* injunction. *See id.*; Ex. 44 (OJP, *Legal Notices* - FY25 Byrne JAG Award), at 2-3, https://www.ojp.gov/funding/explore/legal-notices#notice-1.[1] Under the terms of the grant awards themselves, Defendants' recent representations conclusively establish that the Conditions are inapplicable to Plaintiff States' FY 2025 Byrne JAG awards. First, each Condition, by its own terms, is enforceable only "to the extent that it does not otherwise contravene any express requirement … of any judicial ruling, governing or applicable to the award," Ex. 10 (FY25 Byrne JAG Award Conditions 63-66), at 18-22, which Defendants now concede includes the *Chicago* injunction. And second, USDOJ's statement in the OJP Legal Notice that it "will not implement or enforce" the Conditions is, by operation of a separate award condition, itself "incorporated by reference into the award." *Id.* at 6-7 (Condition 7). There is thus no dispute that the Conditions do not apply to, and cannot be enforced against, any of the Plaintiff States or their localities.

In reliance on Defendants' representations that they will not impose the Conditions on FY 2025 Byrne JAG awards and view themselves as barred from doing so by the *Chicago* injunction,

[1] "Ex." refers to exhibits filed in support of Plaintiffs' Motion for Partial Summary Judgment. Exhibits 1-43 are filed as exhibits to ECF 67 and Exhibit 44 is filed as an exhibit to this brief.

Plaintiffs agree not to pursue their claims as to the FY 2025 Byrne JAG grants. Thus, the Court need not adjudicate the parties' respective motions for summary judgment as to those grants.[2]

To be sure, OJP's Legal Notice states that "[i]f future litigation causes the [*Chicago* injunction] order to cease to be in effect, such that USDOJ determines that it may and will implement or enforce one or more of the requirements, USDOJ will provide advance written notice of each such determination to affected recipients, including an indication of the effective date(s) for implementation thereof." Ex. 44 at 3. In those circumstances, or if Defendants otherwise change their position on the enforceability of the Conditions in the FY 2025 Byrne JAG awards or attempt to seek relief from the *Chicago* injunction, Plaintiffs reserve the right to again seek summary judgment on their claims as to the FY 2025 Byrne JAG awards.

That said, Defendants have not taken the position in any litigation filing or Legal Notice that the *Chicago* injunction forecloses them from enforcing the Conditions as to any other grant—including the grants announced by the FY 2026 Byrne JAG and Byrne SCIP NOFOs and the awards issued for the FY 2025 Byrne SCIP grants. So Plaintiffs' claims challenging Defendants' imposition of the Conditions as to those grants are unaffected by these recent developments.[3]

---

[2] Because Plaintiffs are no longer seeking summary judgment on their claims with respect to the FY 2025 Byrne JAG grants based on Defendants' concessions in their briefing, this Court need not address whether those aspects of their claims are moot. Nor do these recent developments regarding the FY 2025 Byrne JAG grant support the dismissal of any particular count in the complaint, because each count applies to the full range of OJP grant programs—much broader than just the FY 2025 Byrne JAG grant—that are subject to OJP's policy of imposing Immigration Enforcement Conditions. But to the extent the Court partially dismisses any count, it should do so without prejudice so that Plaintiffs can pursue claims as to the FY 2025 Byrne JAG grants if Defendants change their mind and seek to re-impose the Conditions on those grants.

[3] Should Defendants amend OJP's Legal Notice to state that the Conditions will not be enforced as to the FY 2026 Byrne JAG and Byrne SCIP NOFOs and the FY 2025 Byrne SCIP awards based on the *Chicago* injunction, Plaintiffs would also consider agreeing to no longer press their claims as to those grants. Indeed, given Defendants' concession that the *Chicago* injunction extends to

## II. THE IMMIGRATION ENFORCEMENT CONDITIONS ARE UNLAWFUL.

### A. USDOJ Lacks Statutory Authority To Impose The Conditions.

Defendants fail to identify any source of statutory authority that supports their imposition of the Conditions on Plaintiffs' Byrne and Title II grants. Their arguments grounded in the Byrne statute's text were all considered and rejected by the First Circuit in *Providence*, and Defendants do not even attempt to point to separate statutory authority in the language authorizing SCIP or Title II grants. Nor do Defendants persuasively point to any other source of statutory authority. As *Providence* held, OJP's authority to add "special conditions" does not extend to immigration enforcement conditions. And OJP's general statutory responsibilities fail to provide any support for Defendants' argument, much less the necessary "clear statement" of statutory authority. Defendants also fare no better in relying on the Immigration and Nationality Act (INA)'s general intergovernmental coordination goals, when that statute does not govern the Byrne or Title II grant programs. Finally, Defendants do not refute the fundamental problem that section 10228 poses for their theory of the case: that section's text, structure, and history all show that it forbids grant conditions that would direct, supervise, or control state and local law enforcement.[4]

---

the FY 2025 Byrne JAG award, it should likewise foreclose Defendants from imposing the Conditions on the FY 2026 Byrne JAG award. And OJP has elsewhere acknowledged that prior permanent injunctions in cases involving Byrne JAG grants issued to the Plaintiff States of California, Colorado, Illinois, and Oregon preclude OJP from imposing the Conditions on Byrne SCIP awards. OJP_AR_1079-83 (Legal Notices). Defendants rightly interpreted those injunctions to extend to the Byrne SCIP program because it is authorized by the exact same statute as Byrne JAG, 34 U.S.C. § 10152, and the injunctions—like the *Chicago* injunction—were premised on rulings finding that the Conditions were not authorized by that statute. See ECF 66 (Plfs.' Mot. Summ. J.), at 20 n.3 (discussing rulings).

[4] Defendants incorrectly argue that Plaintiffs' assertion of an APA statutory claim forecloses the related but distinct constitutional claim that the Conditions violate the Separation of Powers. *See* ECF 69 at 32. There are many examples of such claims being brought concurrently. *See, e.g.*, *Rhode Island v. Trump*, 810 F. Supp. 3d 283 (D.R.I. 2025); *President & Fellows of Harvard Coll. v. HHS*, 798 F. Supp. 3d 77 (D. Mass. 2025). Of course, if the Court finds that the Conditions are

#### 1. The Byrne And Title II Statutes Do Not Authorize Defendants' Imposition Of The Immigrant Enforcement Conditions.

As Defendants concede, ECF 69 at 13 n.2, their attempt to find authority for the Conditions in the Byrne grant-authorizing statute is foreclosed by the First Circuit's ruling in *Providence*. *See* 954 F.3d at 32-45. There, the court considered and rejected as a source of statutory authority each of the provisions Defendants point to now. And Defendants do not even attempt to argue that any of Title II's specific grant-authorizing provisions supports imposing the Conditions.

Start with 34 U.S.C. § 10153, which Defendants incorrectly claim authorizes the Notice and Access Conditions. *See* ECF 69 at 13-14. That section's information-reporting provision, *id.* § 10153(A)(4), "authorizes the DOJ to require a Byrne JAG applicant only to assure that it will maintain and report information about its grant and the programs that the grant funds," 954 F.3d at 35—not about unrelated issues related to immigration enforcement. The coordination provision in section 10153(A)(5)(C) likewise allows the Federal Government only "to require a certification that the applicant has coordinated in the preparation of its application with agencies affected by the programs for which the applicant seeks funding," 954 F.3d at 35. It does not contemplate any broader coordination, much less as to immigration enforcement. Neither provision leaves "DOJ free rein to insist that Byrne JAG applicants furnish information and engage in coordination with

---

unauthorized by statute, it need not reach the constitutional question of whether they also invade the Separation of Powers. *Providence*, 954 F.3d at 45 n.9. *Dalton v. Specter* is not to the contrary, as that decision merely held that a purely statutory claim of unauthorized executive action cannot automatically be recast, without more, as a constitutional claim. 511 U.S. 462, 472 (1994). But where unauthorized action invades the constitutional authority of another coordinate branch—as here, where, among other things, the Conditions trench on Congress's exercise of its spending power to specify eligibility criteria for the grants at issue—a constitutional separation-of-powers claim is proper and stands independent of any statutory cause of action. *See, e.g.*, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933 (N.D. Ill. 2017) (holding that similar immigration enforcement conditions were both unauthorized by statute and in violation of the separation of powers); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) (same).

respect to all of their law enforcement operations." *Id.* The First Circuit has already disposed of Defendants' arguments based on these provisions of the Byrne statute.

Defendants also cannot rely on section 10153(a)(5)(D)'s condition requiring Byrne applicants to certify that they will comply with the Byrne statute and "all other applicable federal laws." As the First Circuit explained in *Providence*, both the *noscitur a sociis* canon and the Byrne statutory scheme indicate that Congress did not intend to authorize "DOJ to condition grants on certification of compliance with federal laws that require some law-enforcement-related cooperation but lack any nexus to the Byrne" program. 954 F.3d at 37-38. Instead, "'applicable Federal laws' under section 10153(a)(5)(D) are federal laws that apply to state and local governments in their capacities as Byrne … grant recipients." *Id.* at 39. Defendants therefore cannot rely on this provision to justify conditions that purport to "track or implement an existing" federal law of only general applicability. ECF 69 at 14. For that reason, 8 U.S.C. § 1373 is not an "applicable law" that could justify the Communication Condition. *See Providence*, 954 F.3d at 39. The other Conditions are even less supported by the "applicable Federal laws" provision. As the Federal Government acknowledges, the Harboring Condition, *see* ECF 69 at 14 (citing 18 U.S.C. §§ 1071-72 and 8 U.S.C. § 1324), Notice Condition, *see* ECF 69 at 15 (citing 8 U.S.C. §§ 1231, 1226, 1366), and Access Condition, *see* ECF 69 at 15 (citing 8 U.S.C. § 1357(a) and 8 C.F.R. § 287.5(a)) each purport to rely on statutes and regulations of general applicability—which lack even the language of § 1373 purporting to regulate state and local government entities.[5] Even under a broad definition

[5] As Defendants acknowledge, for example, 8 U.S.C. § 1324 applies to "person[s]," which are "individuals or organizations," ECF 69 at 16 n.3, but that definition does not encompass States. Rather, the INA defines "States" separately in 8 U.S.C. § 1101(a)(36), reinforcing that it is not encompassed within the definition of "person." Other courts have reached this same conclusion. *See Kearns v. Cuomo*, 981 F.3d 200, 2012 (2d Cir. 2020); *United States v. Baass*, No. 25-mc-00083, 2026 WL 898670, at *4 (C.D. Cal. Mar. 4, 2026), *report and recommendation adopted*, 2026 WL 897012 at *1 (Mar. 31, 2026), *appeal filed* (9th Cir. June 2, 2026, No. 26-3537).

of "applicable," these laws do not fit. And under *Providence*, they simply do not apply to States or localities "in their capacities" as grant recipients. 954 F.3d at 39.

Ultimately, as the First Circuit concluded in *Providence*, the Byrne and Title II statutes cannot support Defendants' statutory authority arguments. *Providence* made clear that Congress's decision to impose a formula structure on a grant program constrains USDOJ's authority to add conditions that advance the Executive's policy priorities. *See* 954 F.3d at 34. Defendants' only response is to quote reasoning from the Second Circuit's opinion in *New York v. Dep't of Justice*, 951 F.3d 84 (2d Cir. 2020), ECF 69 at 22, but they ignore that the First Circuit explicitly rejected the portion of the Second Circuit opinion containing that reasoning, *see* 954 F.3d at 36-38, and instead adopted a different view of formula funding. *Providence*, 954 F.3d at 35 ("[T]he express authorization for specific deviations from the formula strongly implies that Congress did not intend to give DOJ the power to advance its own priorities by means of grant conditions.").

Defendants' reliance on specific provisions of the Byrne statute (which applies to both the Byrne JAG and SCIP grant programs) is foreclosed by *Providence*. And Defendants offer no argument at all that any provision of the Title II statute authorizes the Conditions. The Byrne and Title II grantmaking statutes thus provide no support for Defendants' statutory authority argument.

**2. No Statute Gives Defendants Freestanding Authority To Impose Any Conditions On Byrne And Title II Grants.**

With no foothold in the Byrne and Title II grant-authorizing statutes, Defendants fall back on OJP's general authority over USDOJ programs, its statutory purpose, and generalized statements in the INA—an entirely different federal law that does not govern the relevant grant programs. None of these arguments has any merit.

Defendants do not so much as acknowledge that the First Circuit squarely rejected Defendants' argument based on the OJP Assistant Attorney General's authority to "plac[e] special

conditions on all grants, and determin[e] priority purposes for formula grants." ECF 69 at 12 (citing 34 U.S.C. §10102(a)(6)); *see Providence*, 954 F.3d at 39-45. And Defendants do not contest the central reasons why: that the text of section 10102(a)(6) does not give the AAG of OJP additional powers over those already provided by statute, *see* 954 F.3d at 41; that if Congress had intended to grant OJP such expansive authority, it would have done so by clear statement, *see id.* at 41-42; or that Defendants' reading of the statute would turn many of the other statutory provisions that allow USDOJ to withhold portions of formula grant programs into mere surplusage, *see id.* at 43.

Defendants offer no reason this Court should stray from the First Circuit's holding on this score. For one, the First Circuit already rejected Defendants' argument based on legislative history. House of Representatives Report No. 109-233 "does not provide an unmistakable indication of congressional intent," and so gives "no reason to believe that Congress meant to give the DOJ virtually unfettered authority to impose whatever grant conditions it deems warranted." *Id.* at 44. The First Circuit also rejected Defendants' reliance on the USDOJ Reauthorization Act of 2005 and its amendment to § 10102. *See* ECF 69 at 12-13. In the context of USDOJ's regulations at the time, authority to impose "special conditions" referred to "the type of individualized grant conditions for high-risk grantees authorized by [then-]28 C.F.R. § 66.12 and its sister regulations." *Providence*, 954 F.3d at 43. And Defendants' comparison of the "special conditions" provision to different language that Congress used to establish OVW in 2002 is similarly unpersuasive. *See* ECF 69 at 13. At most, it shows that Congress vested the directors of each office with different authorities. But none of that changes the fact that Congress gave OJP limited authority to impose conditions on high-risk grantees, not the broad-based authority Defendants assert now.

Defendants' alternative attempt to ground the Conditions within OJP's general "responsibilities and purpose" also falls short. ECF 69 at 15-20. Defendants do not point to any "clear

statement" in the statute showing that Congress intended to grant OJP free-ranging authority to impose whatever grant conditions it desires. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). Instead, they rely on a 1968 congressional finding favoring law enforcement coordination and the OJP AAG's authority to "maintain liaison with" State and local governments, 34 U.S.C. § 10102(a)(2), (a)(4). *See* ECF 69 at 15 (citing Pub. L. No. 90-351, 82 Stat. 197 (1968)). Neither suffices. First, even if general legislative findings could be enough in some circumstances to supply a "clear statement" of statutory authority, the 1968 finding would not: it was part of legislation that did not even create OJP, but instead its predecessor agency the Law Enforcement Assistance Administration, directed by an Administrator of Law Enforcement Assistance. *See* 82 Stat. at 198. That legislation created none of the specific duties and functions of the OJP AAG, an office that was not established until 1984. *See* Pub. L. No. 98-473, Title II, § 603(a), 98 Stat. 1837, 2077-78 (1984). Second, Defendants characterize the "maintain liaison" language as authorizing OJP to "maintain[] relationships" by imposing the challenged conditions. ECF 69 at 15. But that is not what Congress actually prescribed. *See Gregory*, 501 U.S. at 461. "Liaison" was, in ordinary usage at the time the OJP AAG was created, "[a] channel or means of *communication*." *Liaison*, Am. Heritage Dictionary 727 (2d College ed. 1982). A mere power to communicate does not grant OJP a free-ranging commission to govern all "coordination" between state and federal law enforcement, even where federal statutes contemplate that such coordination may exist. And the statute certainly does not do so where, as here, the First Circuit has explained that the duties contained in § 10102(a)(1)-(5) are "purely ministerial responsibilities." *Providence*, 954 F.3d at 41. Defendants accordingly cannot rest on § 10102(a) as a basis to enforce any and every form of state-federal cooperation it desires.

Defendants fare no better in asserting that miscellaneous provisions of the INA authorize grant conditions simply because the INA, in Defendants' view, contemplates state-federal interaction in the area of immigration enforcement.[6] The grant programs at issue here are governed by specific authorizing statutes, not by the INA. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general."). And nothing in those statutes suggests that USDOJ has freestanding authority to add grant conditions simply because other statutes might generally contemplate interaction between state and federal law enforcement. Indeed, as to formula programs, where Congress includes "express authorization for specific deviations from the formula," that "strongly implies that Congress did not intend to give the DOJ the power to advance its own priorities by means of grant conditions." *Providence*, 954 F.3d at 35; *see also City of Chicago v. Barr*, 961 F.3d 882, 908 (7th Cir. 2020); *City of Philadelphia v. Att'y Gen.*, 916 F.3d 276, 285-86, 290 (3d Cir. 2019). That is true regardless of whether those priorities are derived from USDOJ's desire to promote the coordination purposes of other, unrelated statutes.

Moreover, the Byrne statute expressly identifies what forms of intergovernmental cooperation may be relevant to the allocation of Byrne grant funds, and none of those relate to immigration enforcement. Federal law expressly contemplates state-federal cooperation with respect to a national sex offender registration system, *see* 34 U.S.C. § 20912(a), a national criminal background check system, *see* 34 U.S.C. § 40901, and reporting of individuals' deaths in state custody,

---

[6] To the extent that Defendants mean to argue (ECF 69 at 16-20) that 8 U.S.C. §§ 1231(a),1226, 1231, 1252c, 1324(c), 1357(g), 1373, and 1644 are "applicable laws" within the meaning of 34 U.S.C. § 10153(a)(5)(D), that argument is foreclosed by circuit precedent because none of these statutes apply to States or localities in their capacity as grant recipients—rather than as statutes either of general applicability to States or persons, or statutes that instead bind the federal government. *See supra* pp. 7-8.

*see* 34 U.S.C. § 60105(a). Congress then carved out specific exceptions to the Byrne funding formula (which applies both to the JAG and SCIP grant programs) for these forms of cooperation in particular, providing for specific reductions in funding if a State did not comply with them. *See* 34 U.S.C. §§ 20297(a), 40914(b)(2), 60105(c)(2). That Congress provided express exceptions to the funding formula—and did so specifically for these forms of cooperation alone, while excluding others—underscores that Congress did not authorize USDOJ to impose far harsher funding eligibility conditions tied to other areas of state-federal cooperation. *See Providence*, 954 F.3d at 34; *Chicago*, 961 F.3d at 907. As a result, whether the Conditions ensure some "minimal level of coordination between federal, State, and local officers" is beside the point. ECF 69 at 19. What matters is whether the funding conditions are ones that Congress specifically intended to authorize. And because Congress did not, USDOJ now lacks statutory authority to impose them.

If credited, Defendants' theory of statutory authorization based on non-grant-specific statutory provisions that promote intergovernmental cooperation would confer sweeping powers on the Federal Government to impose coercive conditions on federal funding. For example, other federal laws contemplate federal-state coordination regarding sharing federal firearms information and prosecuting hate crimes. *See* 18 U.S.C. § 923(g)(1)(D); 18 U.S.C. § 249(b)(1)(A)-(C). On Defendants' theory, these, too, could become bases for USDOJ to impose grant conditions unrelated to the Byrne JAG program itself—such as requiring states to share information about all firearm purchasers or mandating that states assist all federal hate crime prosecutions. Indeed, Defendants' expansive theory raises significant constitutional concerns, based on the anti-commandeering doctrine, that this Court can avoid by rejecting Defendants' theory. *See Printz v. United States*, 521 U.S. 898, 935 (1997) (Congress can neither "compel the States to enact or enforce a federal regulatory program" nor "conscript[] the State's officers" to do so directly); *Murphy v.*

*Nat'l Coll. Athletic Ass'n*, 584 U.S. 453, 477 (2018) (rejecting constitutionality of laws that direct States "either to enact or refrain from enacting a regulation of the conduct of activities occurring within their borders").

**3. Section 10228 Underscores That USDOJ Lacks Authority To Impose The Conditions.**

Just as in *City of Providence*, Defendants cannot identify any statutory authority for the Conditions in the Byrne or Title II grantmaking statutes or elsewhere. That resolves this case. And 34 U.S.C. § 10228 only provides further confirmation of Defendants' lack of authority to impose the challenged conditions. *See* ECF 66 (Plfs.' Mot. Summ. J.), at 33-35.

For one, Defendants' argument that section 10228 does not apply to grants is belied by the text and structure of the statute. The plain language of the statute provides that no law should be construed as authorizing the Federal Government to exercise "*any* direction, supervision, or control over any police force or any other criminal justice agency of any State" (emphasis added). The word "any" encompasses multiple ways in which the Federal Government could seek to direct the actions of local law enforcement. *See United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting *Any*, Webster's New Int'l Dictionary (3d ed. 1976)) ("[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"). And the structure of the statute leaves no doubt that section 10228(a) extends to grant conditions. It provides that "[n]othing in this chapter" can authorize federal control over state law enforcement, and appears in Chapter 101 of Title 34, which also governs grant programs like Byrne JAG. It would make little sense for Congress to explicitly apply section 10228(a) to all of Chapter 101 if it did not intend to encompass Chapter 101's grant programs. That is why both the Third and Seventh Circuits understood that section 10228 could apply to grants as well as restrictions. *See Philadelphia*, 916 F.3d at 291; *Chicago*, 961 F.3d at 908-09. Regardless of whether the Federal Government acts

through direct regulation or encouragement, *see South Dakota v. Dole*, 483 U.S 203, 212 (1987), under the ordinary meaning of section 10228(a), either type of control is forbidden.

Section 10228's history confirms the same. Although Defendants reference legislative findings that laud the goal of coordination efforts, *see* ECF 69 at 21-22, they nowhere contest the limiting principles that Congress in fact considered when it enacted section 10228. *See* ECF 66 at 34-35. A statute's meaning should be informed by "the mischief to which Congress was responding." *Lawson v. FMR LLC*, 571 U.S. 429, 433, 447-48 (2014). Here, section 10228 meant to avoid situations precisely like this one: where USDOJ seeks to withhold grant funding because local law enforcement does not operate the way the Attorney General says they must.

Defendants' other attempts to recharacterize the Conditions as falling outside of section 10228's scope fall short. But even if the Communication and Harboring Conditions were only prohibitions, as Defendants assert, ECF 69 at 21, that would not change the fact that they impose a form of "direction, supervision, or control" over state and local law enforcement's routine interactions with suspects, defendants, witnesses, and community members, and therefore violate section 10228(a). *Cf. Murphy*, 584 U.S. at 474 (observing that "dictat[ing] what a state legislature . . . may not do" still results in "state legislatures [being] put under the direct control of Congress"). So, too, for the Access and Notice Conditions. Defendants admit that the Notice Condition affirmatively requires the release of information, ECF 69 at 21, and do not dispute that the Access Condition requires state governments to affirmatively permit federal agents to access secure State facilities, *see* ECF 66 at 18. Whether those conditions require a financial outlay is beside the point to whether they direct the conduct of local law enforcement.

In short, section 10228 provides an independent bar to the Conditions here.

### B. The Immigration Enforcement Conditions Are Arbitrary And Capricious.

Defendants do not dispute any of the material facts underlying Plaintiffs' arbitrary-and-capricious claims. Indeed, Defendants concede that USDOJ imposed the Immigration Enforcement Conditions to effectuate the Executive's policy preferences as embodied in the Bondi Directive—not to effectuate any factors Congress intended it to consider. *See* ECF 69 at 24-25. Nor do Defendants dispute, that in imposing the Conditions, they failed to consider the reliance interests of Plaintiff States in receiving continuing formula funding to support ongoing law enforcement activity or the adverse impact on criminal justice and public safety caused by degrading trust between state law enforcement and immigrant communities. Instead, Defendants attempt to brush these facts aside—pointing to policy concerns that Congress did *not* intend them to consider, disregarding Plaintiffs' reliance on long-term funding even though the relevant statutes and grant terms recognize the need for multi-year planning, and dismissing the Conditions' disruption of immigrant trust policies that support criminal law enforcement. These arguments all fall flat.

#### 1. USDOJ Relied On Immigration Considerations Congress Did Not Intend It To Consider When Administering These Grants.

Ignoring Congress's expressly stated eligibility criteria and allocation formulas, Defendants conditioned the entirety of the Byrne SCIP and Title II grants on a factor that "Congress has not intended [USDOJ] to consider," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), in administering these grants: the nature and extent of States' cooperation with federal civil immigration enforcement. The Byrne statute and JJDPA identify the exact criteria that Congress wanted USDOJ to consider in in distributing Byrne SCIP and Title II formula funds—and none relates to immigration enforcement. *See* ECF 66 at 27-29 (discussing statutory eligibility and formula provisions). Defendants do not dispute this. Indeed, they do not point to *any* provision of either the Byrne statute or the JJDPA identifying immigration

enforcement as a relevant consideration or priority in deciding whether to disburse funds to States or their localities. *See* ECF 69 at 23-25.

Instead, Defendants invoke policy concerns and unrelated laws that Congress did not mention in the Byrne statute or JJDPA. Defendants emphasize that the Conditions advance their policy goals of disrupting States' immigrant trust policies. ECF 69 at 23-24. But Plaintiffs do not dispute that such considerations motivated the Conditions; the problem is that those are not the factors that Congress intended Defendants to consider in distributing the relevant grants. Defendants also point to language in the OJP authorizing statute that charges the agency with "maintain[ing] liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice." 34 U.S.C. § 10102(a)(2); *see* ECF 69 at 25. But that statute simply defines OJP's general duties; it does not directly govern the SCIP and Title II grants, much less identify relevant criteria for deciding whether to disburse those grants to eligible entities. Indeed, as the First Circuit explained in *Providence*, this subsection and its surrounding provisions "encompass purely ministerial responsibilities" and do not dictate eligibility conditions for formula grants. 954 F.3d at 41. Defendants' reading "stretch[es] the statutory language beyond hope of recognition." *Id.* at 32.

Defendants also incorrectly invoke several provisions of the INA to suggest that Congress contemplated that USDOJ could consider cooperation with immigration enforcement in administering the Byrne SCIP and Title II grants. *See* ECF 69 at 24-26. But none of those provisions bears directly on the question here: whether Congress contemplated that USDOJ could impose immigration-related conditions on *grant funding* that is authorized by the Byrne statute and the JJDPA and administered pursuant to the OJP AAG's authority. The provisions of the INA cited by Defendants reflect the Federal Government's authority to remove criminal aliens once released from state custody; but they do not govern these USDOJ grant programs, and none of them authorizes

USDOJ to impose the Conditions. To the extent the INA provisions cited by Defendants bear on state cooperation with federal immigration enforcers at all, they undercut Defendants' argument: they illustrate that Congress did not impose cooperation mandates on States, but instead left them considerable discretion, including the discretion not to cooperate at all. *See, e.g.*, 8 U.S.C. § 1226(d)(3) (providing for federal assistance in identifying unlawfully present aliens "[u]pon the request of the governor or chief executive officer of any State"); 8 U.S.C. § 1357(g) (providing for voluntary participation in federal-state cooperative immigration enforcement agreements at the election of a State).

Thus, Defendants' reliance on the nature and extent of recipients' cooperation with federal civil immigration enforcement, a factor that Congress did not intend it to consider when administering the Byrne SCIP and Title II grants, was arbitrary and capricious.

**2. USDOJ Failed To Consider The States' Reasonable Reliance Interests.**

The Supreme Court's decision in *Regents* forecloses Defendants' contention that they were not required even to consider Plaintiff States' long-term reliance interests because the relevant grants are re-issued annually at USDOJ's discretion. *See* ECF 69 at 27. In *Regents*, "the Government [did] not contend that [the agency] considered potential reliance interests; it counter[ed] that [it] did not need to" because the deferred action policy at issue "provided benefits only in two-year increments" and conferred no substantive right to renewal, and thus any asserted reliance interests were not "legally cognizable." *DHS v. Regents of the University of Cal.*, 591 U.S. 1, 31 (2020). The Court rejected that argument. It explained that the Federal Government, having made a significant reversal in policy, "*was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 33. There is no evidence that Defendants did any of this. Nor do Defendants get any further with their cursory assertion—rejected by this Court in other cases—that Plaintiffs' reliance on

continued funding across multiple formula grant years was "unreasonable," merely because formula awards are issued annually and conditions can be changed annually, ECF 69 at 27. *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 309 (D.R.I. 2025) (holding that agency's failure to consider States' reliance on continued federal funding for transportation and effect of disruptions on state budgets was "particularly" indicative of arbitrary and capricious decisionmaking), and *Illinois v. FEMA*, 801 F. Supp. 3d 75, 94 (D.R.I. 2025) (finding arbitrary and capricious agency's failure to "meaningfully evaluate the states' reliance interests, even though the record shows that states have structured budgets and emergency preparedness planning for decades around consistent federal support").

Had Defendants evaluated Plaintiff States' reliance interests, they too would have found ample evidence—including in the grant-authorizing statutes and Defendants' own grant terms—of substantial and reasonable reliance on continued, multi-year federal funding. For example, Title II requires States to submit strategic plans that span multiple years as a condition of receiving awards. *See* 34 U.S.C. § 11133(a) (requiring states to submit a three-year plan to receive formula grants). Consequently, Title II awards typically remain open for multiple years. *See, e.g.*, ECF 58-3 at OJP_AR_156 (FY 2025 Title II award is open from 2026 to 2030). And consistent with the timeframes contemplated by the authorizing statute, Title II grants are used to fund projects that necessarily require multiple years to develop and effectuate. *See, e.g.*, Ex. 26 (Porter Decl.) ¶ 30 (describing grants as typically supporting "multi-year, data-driven plans that focus on both compliance with core juvenile justice requirements and strengthening local capacity to deliver effective prevention and intervention strategies"); Ex. 23 (Kenny Decl.) ¶ 37(b) (noting that awards were used to complete a 3-year plan that sets funding priorities and identifies priority initiatives); Ex. 24 (Kervick Decl.) ¶ 36 (noting that Title II awards would be used for "a new 3-year plan for the

Office of Juvenile Justice and Delinquency Prevention"). Similarly, Byrne SCIP awards—by their terms—also typically remain open for multiple years. *See, e.g.*, ECF 58-3 at OJP_AR_134 (FY 2025 Byrne SCIP award is open from 2025 to 2028). Recipients must submit a State Crisis Intervention Plan describing implementation throughout the entire award period, and BJA's guidance even permits a plan "that is designed to cover multiple award years (e.g., a plan that covers both the FY22-23 and FY24 funding)." BJA, *Byrne SCIP Frequently Asked Questions* (Aug. 2026), at 2, https://bja.ojp.gov/doc/byrne-scip-faq.pdf. Accordingly, many states have reasonably implemented projects that have taken multiple years to execute under their Byrne SCIP grants. For example, Rhode Island had used FY 2022-2023 Byrne SCIP funding to develop a plan to standardize policy and provide training on Extreme Risk Protection Orders (ERPOs), and it "intends to use its FY 2025 Byrne SCIP award to implement [that] ERPO plan," so if Rhode Island "is unable to access FY 2025 Byrne SCIP funds, two years of planning and investment in the ERPO system will be wasted." Ex. 16 (Hogan Decl.) ¶¶ 21-25; *see also, e.g.*, Ex. 25 (McNeil Decl.) ¶¶ 21-28 (stating "Virginia has relied on Byrne SCIP funding to support crisis intervention courts and other behavioral health initiatives since 2023," including through planned use of FY 2025 Byrne SCIP funds). Ex. 19 (Lennig Decl.) ¶¶ 23-27 (describing implementation of Maryland's multi-year ERPO, firearm safe storage, and veterans treatment court programs).

Far from "unreasonable," Plaintiffs' reliance on continued, multi-year funding is contemplated by the statutes and grant terms that govern Byrne SCIP and Title II grants. Defendants ignored these interests entirely. That was arbitrary and capricious.

**3. USDOJ Failed To Consider The Impact Of The Conditions On The Effectiveness Of State And Local Law Enforcement.**

Defendants do not dispute that they failed to consider or address the impact that undermining immigrant trust policies would have on public safety and effective criminal law enforcement—

undoubtedly "an important aspect of the problem" when considering whether to disburse law enforcement funds. *State Farm*, 463 U.S. at 43. Instead, Defendants brush these concerns aside, suggesting that the Conditions are consistent with effective state law enforcement because they are focused on "aliens whom the grantee itself *arrested* for criminal conduct" and are "unrelated to the grantees' treatment of witnesses." ECF 69 at 28. As a threshold matter, such *post hoc* rationalizations in litigation filings cannot cure an agency's contemporaneous failure to engage in reasoned decisionmaking. *In re Fin. & Oversight Mgmt. Bd. for Puerto Rico*, 37 F.4th 746, 761 (1st Cir. 2025). In any event, Defendants' belated explanation still fails to grapple with the actual concerns underlying Plaintiffs' immigrant trust policies.

Informed by evidence and decades of experience, Plaintiff States have determined that entangling state and local law enforcement agencies with federal immigration enforcement improperly blurs the distinction between state criminal law enforcement and federal immigration enforcement. *See, e.g.*, 2026 N.J. Laws ch. 5 § 1(f)-(g) ; Cal. Gov't Code 7284.2(c)-(d); *see also* ECF 66 at 10-11 (collecting legislative policy statements). This undermines the trust of immigrant community members in law enforcement generally and makes it more likely that immigrant community members will refrain from approaching law enforcement as victims or witnesses—and that, in turn, emboldens criminals and hinders effective investigation or prosecution of crimes. *See id.* at 11-12 (collecting declarations from law enforcement officials and studies). *See generally* Felipe M. Gonçalves et al., Nat'l Bureau of Econ. Research, *Immigration Enforcement and Public Safety* 3 (February 2024) (study finding that coordination between local police and federal immigration authorities under the Secure Communities Program caused both a decline in reporting of crimes by and an increase in victimization of Hispanic people), https://www.nber.org/system/files/working_papers/w32109/w32109.pdf; Tom K. Wong, U.S. Immigr. Pol'y Ctr. *The Impact of Interior*

*Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants* 17 (April 3, 2019) (study finding that when undocumented immigrants are told local law enforcement is working together with ICE they are significantly less likely to interact with police and report crimes, including when they are victims), https://usipc.ucsd.edu/publications/usipc-working-paper-1.pdf.[7]

USDOJ has long been aware of these important considerations. A January 2007 report by USDOJ's Office of Inspector General incorporated a statement from the Major Cities Chiefs of Police Organization (MCC), representing 57 chiefs of major metropolitan police departments employing over 1,000 law enforcement officers, that "[i]mmigration enforcement by local police" would likely "undermine the level of trust and cooperation between local police and immigrant communities." Ex. 13 at OJP_AR_775. Indeed, it acknowledged that "[d]istrust and fear of contacting or assisting the police would develop among legal immigrants as well." *Id.*; *see also* OJP_AR_819 to 821 (MCC position statement stating that "[t]he decision to enter into [federal immigration] enforcement should be left to local government and not mandated or forced upon them by the federal government through the ... withholding of existing police assistance funding"). It is arbitrary and capricious to offer an explanation for agency decisionmaking that "runs counter to the evidence before the agency"—and that is what happened here. *State Farm*, 463 U.S. at 29.

Nothing in the MCC statement or anywhere else in the record before USDOJ suggests that the Conditions would avoid this adverse impact. To the contrary, the Conditions broadly require cooperation as to all kinds of arrestees, regardless of the severity of the alleged crime. For example, the Access Condition requires state law enforcement to provide immigration agents access to

---

[7] Extra-record evidence is permitted precisely where, as here, it is relevant to "determin[ing] whether the agency considered all relevant factors in making its decision." *Housatonic River Initiative v. EPA*, 75 F.4th 248, 278-79 (1st Cir. 2023).

interrogate "any alien or person believed to be an alien," and the Notice Condition requires state law enforcement to provide advance notice of release date for any "alien" who may be subject to removal. Ex. 10 (Byrne SCIP award), at 20, 21; Ex. 11 (Title II award) at 20, 21. Such pervasive cooperation, even if limited to arrestees, would cause immigrant communities to view local law enforcement and immigration enforcement as related entities. That is why many States have struck a careful balance by permitting cooperation with federal immigration enforcement only in certain instances (e.g., removal of individuals charged with or convicted of violent felonies) but not others. *See* ECF 66 at 13-14 (describing state policies). Defendants' failure to consider the important law enforcement interests underlying these policies renders their action arbitrary and capricious.

In any event, even if Defendants' characterization of the intent and effect of the Conditions were correct, the textual overbreadth of the Conditions underscores Defendants' failure to consider reasonable "alternatives that are within the ambit of the existing policy," *Regents*, 591 U.S. at 30 (cleaned up). As noted, the Access and Notice Conditions are not limited to those arrestees who present a greater risk to public safety and as to whom States have indicated a greater willingness to cooperate with federal immigration enforcers. Instead, they extend broadly to all aliens regardless of the severity of the offense charged. The Harboring Condition goes even further: it is not limited to arrestees at all and instead proscribes disclosure of certain federal information without limitation if USDOJ deems it to be an "indirect attempt to conceal … any alien who has come to, entered, or remains in the United States" in violation of the INA, "without regard to whether such disclosure" would constitute criminal harboring. Ex. 10 (Byrne SCIP award), at 18-19; Ex. 11 (Title II award) at 16. And the Communication Condition similarly extends to prohibit information-communication restrictions "regarding citizenship or immigration status" of any person, and is by no means limited to arrestees. Ex. 10 at 19-20; Ex. 11 at 19.

Accordingly, the Conditions are arbitrary and capricious.

### C. The Immigration Enforcement Conditions Violate The Spending Clause.

Even if the Conditions were statutorily authorized, they would violate the Spending Clause on relatedness and ambiguity grounds. Defendants offer three main defenses, and each fails.

*First*, Defendants' contention that the Spending Clause does not apply to funding conditions imposed by federal agencies, ECF 69 at 28, misunderstands how the Spending Clause operates. This Court and many others have invalidated unconstitutional conditions imposed by executive agencies under the Spending Clause. *See, e.g.*, *California*, 808 F. Supp. at 311 (holding that immigration enforcement conditions imposed by agency "blatantly violate[d] the Spending Clause"); *Illinois*, 801 F. Supp. at 96 (holding immigration enforcement conditions "constitutionally invalid" under Spending Clause); *see also* ECF 66 at 42 (collecting additional cases).

Of course, it is true that where an executive agency imposes funding conditions that are *not* authorized by Congress, as here, such conditions are invalid for lack of statutory authority, *see supra* pp. 5-14, and the Court need not reach the application of the Spending Clause. That is how the First Circuit ruled in *Providence*. *See* 954 F.3d at 45 n.9. However, Defendants here contend that the Conditions *are* authorized by Congress, ECF 69 at 11-22, and should that contention prevail, the court must then consider the Spending Clause as a limit on congressional authorization of those conditions. The two out-of-circuit district court cases on which Defendants rely—*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127, 162 (D.D.C. 2025), and *Bd. of Educ. for the Silver Consolidated Schs. v. McMahon*, 791 F. Supp. 3d 1272, 1288 (D.N.M. 2025)—are at odds with this Court's own precedents and have been rejected by other courts for ignoring this distinction. *See Cty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1030 (N.D. Cal. 2025) (disagreeing with *Wilmer* and *Silver* and noting authority to the contrary).

*Second*, Defendants do not meaningfully dispute that the Byrne SCIP and Title II grant programs are unrelated to immigration enforcement. They instead argue that relatedness must be analyzed at a higher "level of abstraction," contending that the standard is satisfied merely because the Byrne SCIP and Title II grant programs are generally related to "custody, correctional facilities, and information-sharing." ECF 69 at 29-30. But this argument fails several times over. Initially, when analyzing funding conditions substantively similar to the ones at issue here, this Court and others have rightly viewed them as *immigration enforcement* conditions, rejecting attempts to re-frame them and minimize their core purpose. *See, e.g., Illinois*, 801 F. Supp. 3d at 96 (finding that "[s]weeping immigration-related conditions" are not related to DHS disaster relief and emergency preparedness grant programs and concluding that they could not be justified by mere reference to DHS's "broad homeland security mission"); *see also* ECF 66 at 42 (collecting additional cases).

Moreover, the constitutional bar for relatedness under the Spending Clause is not as low as Defendants wish to set it. The standard is not satisfied if a funding condition merely has an incidental factual connection to certain grant-funded operations. Instead, the "conditions must ... bear some relationship to *the purpose of the federal spending*; otherwise, of course, the spending power could render academic the Constitution's other grants and limits on federal authority." *New York v. United States*, 505 U.S. 144, 167 (1992) (emphasis added) (citation omitted) (holding that funding conditions requiring States to develop waste disposal sites were reasonably related to the purposes of the Low-Level Radioactive Waste Policy Act as they "embody Congress' efforts to address the pressing problem of radioactive waste disposal"). The authority cited by Defendants is not to the contrary. *See Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (concluding that funding condition has "'relationship to the purpose of the federal spending'" (quoting *New York*, 505 U.S. at 167)).

Defendants do not even attempt to argue that the Immigration Enforcement Conditions bear any reasonable relationship to the *purposes* of the Byrne SCIP and Title II programs. With good reason. The Conditions are far afield from the purposes Congress identified in the text of those statutes: "[m]ental health programs and related law enforcement corrections programs, including behavioral programs and crisis intervention teams" and "[i]mplementation of State crisis intervention court proceedings and related programs or initiatives," 34 U.S.C. § 10152(a)(1)(H)-(I) (Byrne SCIP), and assisting States "in planning, establishing, operating, coordinating, and evaluating projects directly or through contracts with public and private agencies for the development of more effective education, training, research, prevention, diversion, treatment, and rehabilitation programs in the area of juvenile delinquency and programs to improve the juvenile justice system," 34 U.S.C. § 11131(a) (Title II).[8] So, the Conditions are insufficiently related to the purposes of the Byrne SCIP and Title II programs.

*Third*, Defendants do not dispute that the specific terms in the Harboring and Communication Conditions referenced by Plaintiffs are ambiguous. They do not attempt to clarify under what

[8] Even if Defendants' standard were the correct one, the Conditions would be impermissibly overbroad because many aspects of the Byrne SCIP and Title II programs bear no relationship to custodial or correctional facilities—the supposed factual nexus to the Conditions on which Defendants rely. *See Illinois*, 801 F. Supp. 3d at 96 (finding immigration enforcement conditions "overbroad and unrelated to the underlying programs" even where a relationship between the conditions and a "few programs" was established); *see, e.g.*, Ex. 16 ¶¶ 23-25; Ex. 22 ¶¶ 26-30; Ex. 25 ¶¶ 21-28; Ex. 28 ¶¶ 23-26 (summarizing Plaintiff States' diverse uses of Byrne SCIP funds, including to support the creation and implementation of state crisis intervention court proceedings, such as extreme risk protection order programs, the creation and continuation of mental health and veterans' treatment courts and other state specialty courts, and behavioral health responses to individuals in crisis like civil commitment treatment orders and establishment of guardianship programs); *see also, e.g.*, Ex. 37 ¶¶ 14-18; Ex. 38 ¶¶ 12-22; Ex. 39 ¶¶ 14-19; Ex. 42 ¶¶ 14-16 (describing Plaintiff States' use of Title II funds for de-escalation training for law enforcement, youth mentorship, employment development, trauma-informed counseling, community-based programs to prevent youth from dropping out of school, and securing higher education and employment opportunities).

circumstances the Harboring Condition might penalize States for engaging in a broad swath of lawful conduct, some of which is currently required by state laws. *See* ECF 66 at 46-48. And they do not attempt to clarify which of their many definitions of "immigration status" applies under the Communication Condition. *Id.* at 48-49. Instead, they dismiss these issues as "marginal questions" about how this language in the Conditions "might apply in particular circumstances." ECF 69 at 30. But these questions are not minutiae; they prevent the States from exercising "their choice knowingly, cognizant of the consequences of their participation." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). As this Court and other courts have previously found when invalidating similar conditions as impermissibly ambiguous, Defendants have threatened to deprive States of millions of dollars in federal funding if they do not comply with immigration enforcement efforts "without defining what such compliance entails." *Illinois*, 801 F. Supp. at 96 (conditions used "vague terms" whose "ambiguity deprives the states of the ability to make informed decisions"); *accord California*, 808 F. Supp. 3d at 311; *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018), *aff'd in party and vacated in part on other grounds by City & Cty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020); *City of Philadelphia v. Session*s, 280 F. Supp. 3d 579, 651 (E.D. Pa. 2017).

Defendants instead attempt to lower the bar for how much ambiguity is constitutionally permissible, primarily relying on cases interpreting funding conditions imposed by Congress in RLUIPA. *See Benning v. Georgia*, 391 F.3d 1299 (11th Cir. 2004), *Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003); *Mayweathers*, 314 F.3d 1062. These cases are inapposite because they all concern ambiguity challenges to RLUIPA's "least restrictive means" standard; courts have found this condition to be unambiguous, despite its open-ended nature, precisely because it "is not new" but rather "reanimates the strict scrutiny long applied to the states in disputes regarding the free

exercise of religion" under well-established standards of constitutional law. *Benning*, 391 F.3d at 1306 ("RLUIPA gives states wide latitude in applying its provisions, but this flexibility does not make the conditions of RLUIPA opaque."). Defendants can take no such comfort here. The Immigration Enforcement Conditions are not grounded in well-recognized legal standards, and are impermissibly ambiguous *because* they fail to hew to any such standards. The Harboring Condition applies "without regard" to whether the prohibited conduct "would constitute (or form a predicate for) a violation" of existing criminal laws and includes "indirect" violations, ECF 66 at 46-48, and the Communication Condition fails to clarify USDOJ's "evolving interpretations" of 8 U.S.C. § 1373, ECF 66 at 48-49. As such, these Conditions are impermissibly ambiguous and violate the Spending Clause.[9]

## III. THE COURT SHOULD VACATE, ENJOIN, AND DECLARE THE CONDITIONS UNLAWFUL.

Defendants do not dispute that if the Court rules for Plaintiffs on the merits, it should declare the Immigration Enforcement Conditions unlawful and vacate them as unlawful agency actions under the APA. *See* 5 U.S.C. § 706. Defendants argue only that the Court should refrain from entering a permanent injunction that provides forward-looking relief and should deny any relief to Plaintiff States' political subdivisions and instrumentalities. *See* ECF 69 at 33-38. Neither argument has merit. First, as other courts rejecting nearly identical conditions have concluded,

---

[9] Defendants' reliance on *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), is similarly misplaced. *Finley* does not concern ambiguity under the Spending Clause at all. Instead, it rejected a facial challenge to a statute setting forth the criteria for certain federal arts grants including consideration of "decency and respect" for diverse values under the First Amendment and constitutional vagueness doctrines. *Id.* at 579-80. The Court expressly cabined the scope of its holding to that particular context, noting that the same "undeniably opaque" terms "could raise substantial vagueness concerns" "if they appeared in a criminal statute or regulatory scheme." *Id.* at 588; *see also City of Fresno v. Turne*r, No. 25-cv-07070-RS, 2025 WL 2721390, at *14 (N.D. Cal. Sep. 23, 2025) (finding "the tolerance for vagueness in *Finley*" unwarranted when there was a "potential loss of all federal grants administered by the Defendant agency" and "Congress has laid out specific aims for the grant programs as well as specific criteria").

Plaintiffs are entitled to a permanent injunction based on traditional equitable factors. Indeed, they need one to prevent Defendants from continuing attempting to impose Conditions on the Byrne SCIP and Title II grant programs again—as they have done with Byrne JAG grants, despite countless court rulings finding the Conditions unlawful. *See* ECF 66 at 2, 22, 25, 42, 53 (collecting cases). Second, relief should also plainly extend to Plaintiffs' subdivisions and instrumentalities: not only are they components of the Plaintiff States, but they receive their Byrne SCIP and Title II funds through the Plaintiff States. And in any event, vacatur of Conditions is a remedy that necessarily extends to any grant applicants.

**A. The Court Should Enter A Permanent Injunction.**

Defendants' brief further underscores that Plaintiffs meet the criteria for a permanent injunction here. Defendants contest neither the governing framework for a permanent injunction—requiring success on the merits, irreparable injury, a balancing of the equities, and protection of the public interest, *see Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)—nor that imposition of the Conditions would impose irreparable harm upon Plaintiffs, *see* ECF 66 at 51-54. Instead, Defendants offer three arguments against permanent injunctive relief, but none of them is persuasive.

*First*, Defendants claim that a permanent injunction would deprive USDOJ of the opportunity to conduct further proceedings consistent with the law. ECF 69 at 33-34. But Defendants have no need to "cur[e] any defects" with the Conditions "through additional explanation, additional process, or revised terms." ECF 69 at 33. That is because the Conditions are illegal: USDOJ lacks the authority to impose them, *see supra* pp. 5-14, necessarily acts arbitrarily and capriciously in doing so by considering factors Congress did not intend it to consider, *see supra* pp. 15-17, and in so doing imposes conditions unrelated to Congress's purposes in violation of the Spending Clause, *see supra* pp. 24-25. Whether Plaintiffs prevail on some or all of these theories, remand is

unwarranted. The law is clear, so "[t]here is not the slightest uncertainty" as to the proper outcome of future proceedings. *Calcutt v. FDIC*, 598 U.S. 623, 630 (2023) (quotation omitted).

Indeed, given the undisputed harms stemming from USDOJ's repeated attempts to reimpose the Conditions and demonstrated indifference to other court rulings invalidating identical conditions as unlawful, a permanent injunction is necessary to provide the Plaintiffs with "'complete relief.'" *Doe v. Trump*, 157 F.4th 36, 45 (1st Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025)). Absent an ongoing injunction, the prospect of further Conditions, leading to another potential loss of funding that "would upend the programs and activities that these formula grants support," will leave Plaintiffs uncertain as to whether they can continue the critical programs—involving drug treatment, mental health and behavioral services, active shooter readiness, gun violence reduction, and more—they plan to undertake to protect the public. ECF 66 at 53. These kinds of disruptive consequences have led courts facing similar arbitrary and unlawful federal Executive Branch conditions on formula grants to order precisely the sort of permanent injunctive relief that Plaintiffs seek here. *See, e.g.*, *California*, 808 F. Supp. 3d at 312-13; *Illinois*, 801 F. Supp. 3d at 98-99.

It is therefore no surprise that courts have granted injunctive relief, and not just a remand, in response to the Federal Government's previous attempts to impose unlawful conditions on USDOJ formula grants. In *Providence, Chicago*, and *Philadelphia*, courts consistently recognized that where the Federal Government lacked authority to impose the conditions—whatever the precise way in which the conditions were improper—an injunction rather than remand was necessary to provide complete relief. *See City of Providence v. Barr*, 385 F. Supp. 3d 160, 165 (D.R.I. 2019); *Philadelphia*, 916 F.3d at 292 (complete relief was provided by injunctive relief confirming that conditions could not be enforced going forward, so that injunction could otherwise be more

narrowly tailored); *City of Chicago v. Barr*, 513 F. Supp. 3d 828, 836-37 (N.D. Ill. 2021) (requiring nationally fair distribution of funds). This case is no different.

In fact, the need for a permanent injunction is especially acute here, given Defendants' repeated efforts to impose unlawful immigration enforcement conditions despite prior court rulings. Even in the face of countless rulings rejecting its imposition of the Conditions on Byrne JAG grants, USDOJ included these conditions again in its FY 2025 Byrne JAG awards, ultimately relenting only because earlier courts had entered permanent injunctions. *See supra* pp. 3-4; ECF 66 at 20 n.3. And Defendants then included the Conditions in the FY 2026 Byrne JAG NOFO. *See* BJA, *NOFO, Byrne JAG Program—State Formula*, https://www.ojp.gov/funding/docs/bja-2026-172704.pdf. Absent a permanent injunction as to Byrne SCIP and Title II, Defendants are exceedingly likely to pursue these conditions again. Indeed, the January 20 Executive Order and the Bondi Directive make clear the administration's goal that "[s]anctuary jurisdictions should not receive access to federal grants administered by the Department of Justice." Ex. 3 at 1. Given Defendants' repeated and ongoing pattern of conduct disregarding adverse court rulings rejecting the Condition, it is difficult to imagine a more appropriate case for permanent injunctive relief.

*Second*, and for the same reasons, the Court should reject Defendants' separate contention that Plaintiffs' request for prospective relief is premature. ECF 69 at 36-38. The mere fact that Plaintiffs seek to enjoin conduct that USDOJ may undertake in the future does not render such relief unripe. Indeed, federal courts routinely consider agency action ripe and otherwise reviewable when "a history of past enforcement" makes "substantial" "the threat of future enforcement." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014). And a litigant can seek relief that is "primarily prospective in character" when the issue is fit "for immediate review and" there is "hardship to the litigant should review be postponed." *Riva v. Massachusetts*, 61 F.3d 1003, 1009

(1st Cir. 1995). The APA itself recognizes as much, expressly authorizing courts to award injunctive relief, *see* 5 U.S.C. § 703, that necessarily is prospective in form.

Here, Plaintiffs' request for injunctive relief is plainly ripe. USDOJ's past and present imposition of the Conditions constitutes a "history of past enforcement" that renders the threat of future enforcement "substantial," 573 U.S. at 164, rather than "uncertain and contingent," 61 F.3d at 1009. The issue is also fit for review because the questions for this Court are "of an intrinsically legal nature," the adverse parties are before the Court, and the controversy has a concrete factual basis. *Id.* at 1010. Likewise, the concrete harms that Plaintiffs will suffer in the absence of the complete relief an injunction provides, *see* ECF 66 at 51-54, underscore that the harm Plaintiffs face is neither "remote [n]or contingent." 61 F.3d at 1010. That makes prospective injunctive relief appropriate here. And it distinguishes this case from those on which Defendants rely, where no underlying act was ripe for challenge. *See Texas v. United States*, 523 U.S. 296, 300-02 (1998); *Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326-27 (1st Cir. 2016); *City of Fall River v. FERC*, 507 F.3d 1, 7-8 (1st Cir. 2007).

*Third*, Defendants mistakenly argue that the Court should decline to enter a permanent injunction because it would "interfere with the Executive Branch's administration of federal grant programs." ECF 69 at 34. But none of the cases Defendants cite suggest the balance of equities requires denying an injunction simply because it will run against the federal Executive Branch. To be sure, a federal court should not "*improperly* intrude[] on a coordinate branch," *Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026) (emphasis added), but where the Federal Government imposes illegal conditions, it is entirely appropriate to "require[e] a party to comply with existing federal law." *California*, 808 F. Supp. 3d at 313. So as long as Plaintiffs prevail on the merits, the equities do not favor Defendants.

Moreover, any equitable concerns about barring the Executive Branch from imposing immigration enforcement conditions on unrelated funding streams are plainly outweighed by the harms Plaintiff face. Defendants point to, at most, abstract "interfer[ence] with the Executive Branch's administration of federal grant programs." ECF 69 at 34. Plaintiffs, by contrast, point to specific non-monetary harms in addition to the loss of grant funds themselves, including that "even a temporary loss of funding" would "upend the programs and activities" that the formula grants at issue in this case support. ECF 66 at 53. Those are precisely the sort of time-sensitive, unrecoverable injuries that dominate balancing-of-harms analysis. *See Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 55 (1st Cir. 2025) (non-monetary, time-sensitive harms to medical research predominated balancing analysis). And they foreclose the Federal Government from prevailing on a balance-of-harms analysis here.

### B. Relief Must Extend To Plaintiff States' Subdivisions And Instrumentalities.

The Court should order relief that bars Defendants from imposing the unlawful Conditions on all Plaintiff States and their political subdivisions and municipalities. Such relief is authorized and appropriate under both the Court's equitable authority to enter a permanent injunction and the APA's vacatur provisions.

#### 1. A Permanent Injunction Should Extend To Plaintiffs' Subdivisions And Instrumentalities.

The Court can and should enter a permanent injunction that provides relief to Plaintiff States' subdivisions and instrumentalities. Contrary to Defendants' contention that subdivisions and instrumentalities are "separate legal entities," ECF 69 at 34-35, courts have long recognized that "State political subdivisions are 'merely . . . department[s] of the State.'" *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009) (quoting *City of Trenton v. New Jersey*, 262 U.S. 182, 187 (1923)); *see also United States v. Wheeler*, 435 U.S. 313, 320-21 (1978) ("A city is nothing more

than 'an agency of the State'" (quoting *Williams v. Eggleston*, 170 U.S. 304, 310 (1898)). Thus, "[a]n injunction barring the federal government from enforcing [a] mandate against the States would also run to the States' subdivisions." *Kentucky v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023). And while Defendants suggest that cities and counties can sue independently, ECF 69 at 35, the Supreme Court has rejected the argument that because a State's instrumentality "can sue on its own behalf, it—not [the State]—must be the one to sue." *Biden v. Nebraska*, 600 U.S. 477, 493 (2023).

In any event, an order that extends injunctive relief to the Plaintiff States' local subdivisions is necessary to provide complete relief to the Plaintiffs here. *See CASA*, 606 U.S. at 851 ("[T]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief between the parties'" (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)); *Starbucks Corp. v. McKinney*, 602 U.S. 339, 347 (2024) (courts must "mould each decree to the necessities of the particular case" (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). For one thing, local jurisdictions receive JAG SCIP and Title II grant funds solely as subrecipients from the Plaintiff States. *See* 34 U.S.C. § 11132(a)(1); BJA, *FY 2025 Byrne SCIP Formula Allocations*, https://bja.ojp.gov/funding/fy-2025-byrne-scip-allocations.pdf. And federal regulations require Plaintiff States to monitor their subrecipients' compliance with the grants' conditions. *See* 2 C.F.R. § 200.332(e). If Plaintiff States' local subdivisions remain bound by the Immigration Enforcement Conditions, federal regulations would effectively require Plaintiff States to police their local subrecipients' compliance with the Conditions, inflicting the very harm from which Plaintiff States seek relief. *See* ECF 66 at 51-53; ECF 65, ¶ 226.

For another thing, Defendants' unlawful conditions threaten to infringe the Plaintiff States' sovereign authority to allocate their limited state and local law enforcement resources, including

through laws and policies limiting state and local cooperation with federal civil immigration enforcement. *See* ECF 66 at 10-14. Many of the immigrant trust policies adopted by the Plaintiff States expressly extend to local law enforcement. *See, e.g.*, 2026 N.J. Laws ch. 5; Cal. Gov't Code § 7284.4(a); 5 Ill. Comp. Stat. § 805/10; 11 Del. C. § 8401B. Extending this Court's final judgment to the States' local subdivisions is therefore necessary to protect States' ability to exercise their sovereign authority over local law enforcement resources. ECF 66 at 51-53; *Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."); *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (states suffer "irreparable" injury when forced to abandon their "sovereign interests and public policies"); *cf. Reynolds v. Sims,* 377 U.S. 533, 575 (1964) ("Political subdivisions of States . . . have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions.").

Courts have consistently held in similar federal funding litigation that relief awarded to a State must also flow to the State's local subdivisions.[10] And in other federal funding cases,

[10] *See, e.g.*, Text Order, *California v. U.S. Dep't of Transp.*, No. 25-cv-208 (D.R.I. Nov. 18, 2025) (clarifying that final judgment to Plaintiff States extends to their "instrumentalities and local subdivisions"); *Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2908807, at *1 (D.R.I. Oct. 14, 2025) (ordering Defendants to "amend all award documents that they have issued to Plaintiff States and their instrumentalities and subdivisions"); *California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 324 (D.R.I. 2025) (issuing preliminary injunction to protect "the [Plaintiff] States and their governmental subdivisions," including any "local jurisdiction" within Plaintiff States); *Tennessee v. Cardona*, 762 F. Supp. 3d 615, 628 (E.D. Ky. 2025) ("Plaintiff States, their political subdivisions, and their recipient schools need not comply with the Rule to receive federal funding."); *Oregon v. Trump*, 406 F. Supp. 3d 940, 975 (D. Or. 2019) ("Plaintiffs and their political subdivisions are therefore entitled to a permanent injunction against the challenged . . . funding conditions."), *vacated in part on other grounds and remanded sub nom. City & Cty. of San Francisco v. Garland*, 42 F.4th 1078 (9th Cir. 2022); *California ex rel. Becerra v. Sessions*, No. 17-cv-4701, 2018 WL 6069940, at *1 (N.D. Cal. Nov. 20, 2018) (permanently enjoining immigration conditions on JAG funding for "any California state entity" and "any California political subdivision"), *vacated in part on other grounds sub nom. City & Cty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020).

Defendants have conceded that relief to the States should flow to their instrumentalities. *See California v. Dep't of Educ.*, No. 25-cv-10548, 2026 WL 2754968, at *31 n.10 (D. Mass. Sept. 17, 2026) ("Defendants suggest limiting the scope of relief to apply only to Plaintiff States and their instrumentalities . . . ."). There is no reason for a different result here.

**2. Vacatur Extends To Plaintiffs' Subdivisions And Instrumentalities.**

The relief ordered in this case must extend to Plaintiff States' subdivisions and instrumentalities for a second independent reason: the APA remedy of vacatur—which Defendants concede is appropriate here, ECF 69 at 33—would necessarily extend to them.

The APA's remedial provision, 5 U.S.C. § 706, "has long been understood to authorize vacatur" of "unlawful agency actions." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 56 (1st Cir. 2026); *see* 5 U.S.C. § 706 (directing courts to "hold unlawful and set aside agency action" found unlawful). And because vacatur "acts directly on the 'agency action,'" *Am. Ass'n of Univs. v. Dep't of Defense*, 806 F. Supp. 3d 79, 121 (D. Mass. 2025), it is not a plaintiff-specific remedy. *See Corner Post, Inc. v. Bd. of Govs.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring) (distinguishing section 706(2) of the APA, which "directs federal courts to vacate agency actions in the same way that appellate courts vacate the judgments of trial courts," from nationwide injunctions entered pursuant to a court's equitable powers). Rather, the typical remedy for a successful APA challenge is "vacatur" of the agency action "and its applicability to all who would have been subject to it." *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 329 (D. Mass. 2025).

Here, vacatur should extend to all recipients of Byrne SCIP and Title II funds. Plaintiffs have identified the Defendants' decision and policy to impose the Conditions as the agency action in question. *See* ECF 66 at 17-20. And Defendants made no suggestion that the scope of agency action here cuts more narrowly. *See* ECF 69 at 33; *see also Illinois*, 801 F. Supp. 3d at 90

(confirming that promulgated conditions can constitute agency action). In those circumstances, vacatur of the Conditions extends to all recipients of Byrne SCIP and Title II funds, including Plaintiffs' subdivisions and instrumentalities.

Defendants' authorities are not to the contrary. They point to no binding authority limiting APA vacatur only to the named parties to an action. *See* ECF 69 at 35-36. And the Supreme Court has instead made clear that "whether the [APA] authorizes federal courts to vacate federal agency action" is a "distinct question" from the permissibility of universal injunctive relief pursuant to a court's general equitable authority. *CASA, Inc.*, 606 U.S. at 847 n.10.. That means cases like *CASA*, *California v. Texas*, 593 U.S. 659 (2021), and *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994)—all of which dealt with equitable injunctions—do not squarely answer the scope of APA vacatur here.

## IV. PLAINTIFF STATES' CHALLENGE TO THE INCLUSION OF IMMIGRATION ENFORCEMENT CONDITIONS IN THE NOFOS IS RIPE.

Finally, because Plaintiff States' remaining claims—challenging the inclusion of Immigration Enforcement Conditions in NOFOs related to other OJP grant programs—are ripe, this Court should deny Defendants' motion for summary judgment as to those claims. The "jurisdictional" component of ripeness "concerns whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." *Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013). Where the plaintiff asserts a harm that "has matured sufficiently to warrant judicial intervention," the dispute is ripe. *Jensen v. R.I. Cannabis Control Comm'n*, 160 F.4th 18, 24 (1st Cir. 2025). Ripeness thus shares a constitutional core with Article III's injury-in-fact requirement, preventing courts "from entangling themselves in abstract disagreements." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 8 (1st Cir. 2012) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967)).

Defendants do not suggest that Plaintiff States' challenge to the imposition of the Immigration Enforcement Conditions in the Byrne JAG, Byrne SCIP, or Title II award letters is unripe. Nor could they. The conditions threaten to imminently deprive Plaintiff States of millions of dollars of funding, a monetary harm that "readily qualif[ies]" as a concrete, justiciable injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021); *see also United States v. Texas*, 599 U.S. 670, 676 (2023) ("Monetary costs are of course an injury.").

Defendants instead argue that Plaintiff States' challenges to the imposition of the Conditions on *other* OJP grant programs are not ripe because Defendants have imposed those conditions only through NOFOs associated with those programs, rather than in award letters (which they have not yet issued). Defendants are wrong. As the complaint explains, ECF 65 (SAC) ¶ 2, Defendants have adopted an across-the-board policy of imposing Immigrant Enforcement Conditions on *every* new OJP NOFO. And the Conditions are unequivocal: any program that refuses to "give access to DHS agents, or honor DHS requests" "*will not be funded*." *See, e.g.*, ECF 58-3 (AR) 26, 62, 88 (emphasis added). These Conditions are a "definitive statement of the agency's position." *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 241 (1980)). Defendants believe that they may use the federal funds they control to coerce "the States to . . . administer a federal regulatory program," *New York*, 505 U.S. at 188—the civil immigration enforcement system. Defendants' argument is simply that they might later change their mind and decide not to include the conditions in the award letters, but the mere "possibility" that defendants could take further action to revise the across-the-board policy adopted in the NOFOs "does not make [their] otherwise definitive decision nonfinal." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).

It is thus unsurprising that countless courts have rejected the argument Defendants make here. As one judge of this Court held last year, defendants' policy of "conditioning FY 2025 funding on immigration enforcement compliance" inflicts a concrete, justiciable injury "even if the final decision to award the funds . . . is still pending." *Illinois*, 801 F. Supp. 3d at 89; *see also Massachusetts v. USDA*, No. 26-cv-11396, 2026 WL 1815807, at *13 (D. Mass. June 24, 2026); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 865-66 (N.D. Ill. 2018); *San Francisco*, 349 F. Supp. 3d at 961-62, *aff'd in part and vacated in part on other grounds sub nom. City & Cty. of San Francisco v. Barr*, 965 F.3d 753 (9th Cir. 2020).

Moreover, the injury inflicted by defendants' adoption of this final policy is not abstract. Many of the grant programs to which USDOJ has attached the Conditions are—like the Byrne and Title II programs—"formula" programs, in which States are entitled to funds based on a formula that turns on objective factors. *See, e.g.*, 34 U.S.C. § 20102 (Victims of Crime Act Formula Grant). With respect to these programs, only the Immigration Enforcement Conditions stand between the Plaintiff States and congressionally committed funds. Defendants insist, especially as to "competitive" grant programs, that Plaintiff States' injuries "depend[] on multiple contingencies," by which they appear to mean that Plaintiff States may not win awards, or that Defendants might ultimately revise their policy and elect not to impose the Conditions. ECF 69 at 40. But the harm caused by the inclusion of the Immigration Enforcement Conditions in all OJP NOFOs is already complete. Defendants' definitive statement that they may consider an applicant-State's willingness to accede to the Executive Branch's immigration enforcement priorities when *awarding* grants has already placed Plaintiff States at a competitive disadvantage. *See, e.g.*, ECF 52-5 at 8-9, 16, 22 (evaluating applicants for OJJDP's Youth Gang Prevention and Intervention Grant on their capacity to comply with the Immigration Enforcement Conditions). Loss of competitive standing is a

justiciable harm. *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 116-17 (2025). And the fact that defendants may ultimately choose not to impose the challenged conditions does not make a dispute over that condition any less fit for review from a constitutional perspective; again, Defendants do not seriously contend otherwise.

Indeed, district courts throughout the country have found in cases just like this one that competitive grant applicants need not wait for the government to include a facially unconstitutional condition in their award letters before they may sue. The inclusion of unlawful conditions in the NOFO itself creates a justiciable controversy when it unlawfully disadvantages an applicant-plaintiff. *See, e.g.*, *Freedom Network v. Trump*, 830 F. Supp. 3d 681, 699 (N.D. Ill. 2026) (rejecting the government's contention that the dispute was unripe where the plaintiff already suffered a "key harm": loss of a chance to compete for grants); *Multnomah Cty. v. Azar*, 340 F. Supp. 3d 1046, 1055 (D. Or. 2018) (explaining that an applicant need not show that but for an unlawful condition it would have been awarded a grant; an applicant's allegation that the condition precluded it from competing on "equal footing" is justiciable); *Hennepin Cty. v. HHS*, No. 26-cv-2460, 2026 WL 2426300, at *10 (D.D.C. Aug. 19, 2026) ("Fundamental programmatic changes that favor certain groups of grant applicants over others create the kind of competition-related injury that is cognizable under Article III's case or controversy requirement.").

Defendants also cite a handful of cases applying *prudential* ripeness standards, ECF 69 at 39, but they advance no serious argument that Plaintiffs' remaining claims are prudentially unripe. Initially, the Supreme Court has questioned whether the doctrine of prudential ripeness has any "continuing vitality" at all. *Susan B. Anthony List*, 573 U.S. at 167. To the extent that it does, it has no application here: Plaintiffs' challenge to the inclusion of the Conditions in the NOFOs is fit for judicial resolution because it presents pure questions of law "not likely to be significantly

affected by further factual development." *Jensen*, 160 F.4th at 25. Again, Defendants do not seriously contend otherwise, identifying no issue of fact (material or otherwise) that could actually impact the resolution of Plaintiffs' APA claims. And although Defendants invoke the rule that courts sometimes decline review where withholding review would result in no "hardship," ECF 69 at 39, they (again) advance no serious argument that Plaintiffs' claims are unripe in this way. Nor could they, given the impact of the Conditions on Plaintiff States' budgets and decisionmaking on public-safety issues—an undoubted hardship. *See Illinois*, 801 F. Supp. 3d at 89 (explaining that "withholding review would cause serious and immediate injury" given breadth of challenged conditions and budgetary impact).

Plaintiff States' remaining claims are ripe, and the Court should deny Defendants' motion for summary judgment as to these claims and allow litigation to proceed.

## CONCLUSION

This Court should grant the Plaintiff States' motion for summary judgment and deny Defendants' cross-motion for summary judgment.

Dated: September 28, 2026

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

By: /s/ *Mayur P. Saxena*
Mayur P. Saxena
*Assistant Attorney General*

Sundeep Iyer
*Solicitor General*
Shankar Duraiswamy
*Deputy Solicitor General*
Surinder K. Aggarwal
Bassam F. Gergi
Anaiis Gonzalez

Phoenix N. Meyers
Sarah Nealon
Nathaniel F. Rubin
*Deputy Attorneys General*

New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5365
Mayur.Saxena@law.njoag.gov
*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

By: /s/ *Kathryn M. Sabatini*
Kathryn M. Sabatini (RI No. 8486)
*Chief, Civil Division*
*Special Assistant Attorney General*
Paul T.J. Meosky (RI No. 10742)
*Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400
ksabatini@riag.ri.gov
pmeosky@riag.ri.gov
*Attorneys for the State of Rhode Island*

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
*Senior Assistant Attorney General*
Lee I. Sherman
James E. Stanley
*Supervising Deputy Attorneys General*
Heidi Joya
Kelly Percival
Deylin Thrift-Viveros
*Deputy Attorneys General*

By: /s/ *Delbert Tran*
Delbert Tran
*Deputy Attorney General*
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
(415) 229-0110
delbert.tran@doj.ca.gov
*Attorneys for the State of California*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

By: /s/ *Vanessa L. Kassab*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

By: /s/ *Alex Hemmer*
Alex Hemmer
*Deputy Solicitor General*
Christopher G. Wells
*Chief of the Public Interest Division*
Michael M. Tresnowski
R. Henry Weaver
*Assistant Attorneys General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov
*Attorneys for the State of Illinois*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

By: */s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
*Attorneys for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

By: */s/ Andrew M. Ammirati*
Andrew M. Ammirati
*Deputy Associate Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5090
andrew.ammirati@ct.gov
*Attorneys for the State of Connecticut*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL OF
THE DISTRICT OF COLUMBIA

By: */s/ Mitchell P. Reich*
Mitchell P. Reich
*Senior Counsel to the Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov
*Attorneys for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for the State of Hawaiʻi*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

By: */s/ Katherine M. Hudson-MacRae*
Katherine M. Hudson-MacRae
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
katherine.m.hudson-macrae@maine.gov
*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

By: */s/ Virginia A. Williamson*
Virginia A. Williamson
*Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6584
VWilliamson@oag.state.md.us
*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

By: */s/ Matthew M. Burke*
Matthew M. Burke
*Assistant Attorney General*
Michelle Pascucci
*State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2216
matthew.m.burke@mass.gov
michelle.pascucci@mass.gov
*Attorneys for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

By: */s/ Neil Giovanatti*
Neil Giovanatti
John Pallas
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
PallasJ@michigan.gov
*Attorneys for the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

By: */s/ Brian S. Carter*
Brian S. Carter
*Special Counsel*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 300-7403
Brian.carter@ag.state.mn.us
*Attorneys for the State of Minnesota*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

By: */s/ Heidi Parry Stern*
Heidi Parry Stern
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for the State of Nevada*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

By: */s/ Mark Noferi*
Mark Noferi
*Senior Litigation Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 490-4060
MNoferi@nmdoj.gov
*Attorneys for the State of New Mexico*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

By: */s/ Natasha M. Korgaonkar*
Natasha M. Korgaonkar
*Special Counsel for Federal Initiatives*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Zoe Levine
*Special Counsel for Immigrant Justice*
Benjamin Liebowitz
*Assistant Attorney General*
28 Liberty Street
New York, NY 10005
(212) 416-6557
Natasha.Korgaonkar@ag.ny.gov
*Attorneys for the State of New York*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

By: */s/ Thomas H. Castelli*
Thomas H. Castelli
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov
*Attorneys for the State of Oregon*

**JOSH SHAPIRO**
IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

By: */s/ Michael J. Fischer*
Michael J. Fischer
*Executive Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov
*Counsel for Governor Josh Shapiro*

**CHARITY T. CLARK**
ATTORNEY GENERAL OF VERMONT

By: */s/ Jonathan T. Rose*
Jonathan T. Rose
*Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Jonathan.Rose@vermont.gov
*Attorneys for the State of Vermont*

**JAY JONES**
ATTORNEY GENERAL OF VIRGINIA

By: */s/ Megan C. Keenan*
Megan C. Keenan
*Deputy Solicitor General*
202 North Ninth Street
Richmond, VA 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Counsel for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

By: */s/ Benjamin Seel*
Benjamin Seel
Cristina Sepe
*Deputy Solicitors General*
Washington State Office
of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Benjamin.Seel@atg.wa.gov
*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

By: */s/ Colin T. Roth*
Colin T. Roth
*Assistant Attorney General*
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us
*Attorneys for the State of Wisconsin*